# 20-2184/3410

---

## UNITED STATES COURT OF APPEALS

## FOR THE SECOND CIRCUIT

———— ••❂•• ————

UNITED STATES OF AMERICA,

*Appellee,*

-against-

PAUL CALDER LEROUX, AKA JOHAN SMIT,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

## APPENDIX TO THE OPENING BRIEF

### VOLUME I OF II
### A. 1 TO A. 299

---

**JEFF CHABROWE, Esq.**
261 Madison Ave., 12th Fl.
New York, New York 10016
(917) 529-3921
*Attorney for Defendant-Appellant*
PAUL CALDER LEROUX

**Table of Contents – Appendix** *Page*

### Case #:1:12-cr-00489-RA-1

S.D.N.Y. Criminal Docket, Case #:1:12-cr-00489-RA-1.................................... A.1

Sealed Indictment, Southern District of New York (Sep. 26, 2012).................... A.23

S.D.N.Y. Cooperation Agreement (Oct. 18, 2013)............................................... A.29

Sealed Information, District of Minnesota (Jan. 13, 2014)................................. A.37

Transcript of Proceedings, Plea (both dockets; Feb. 19, 2014)............................. A.48

Order, Case Reassignment & Sentence Date (both dockets; May 30, 2019)........ A.116

Standing Order, Cares Act Teleconferencing (both dockets; Mar. 30, 2020)...... A.117

Sentencing Submission, by Counsel (both dockets; June 5, 2020)...................... A.120

Sentencing Submission, by the Government (both dockets; June 11, 2020)....... A.145

Transcript of Proceedings, Sentencing (both dockets; June 12, 2020)................ A.209

Notice of Appeal (June 30, 2020)........................................................................ A.255

Judgment (July 8, 2020)....................................................................................... A.257

Transcript of Proceedings, Sentencing Cont'd (both dockets; Sep. 10, 2020).... A.265

Amended Judgment (Sep. 10, 2020).................................................................... A.271

Consolidation of Appeals, Info Sheet (both dockets; Dec. 22, 2020)................ A.279

Order to Consolidate Cases (both dockets; Dec. 29, 2020)................................. A.284

### Case #:1:14-cr-00075-RA-1

S.D.N.Y. Criminal Docket, Case #:1:14-cr-00075-RA-1................................. A.286

Notice of Appeal (June 30, 2020)........................................................................ A.296

Judgment (Sep. 9, 2020)...................................................................................... A.297

**U.S. District Court**
**Southern District of New York (Foley Square)**
**CRIMINAL DOCKET FOR CASE #: 1:12-cr-00489-RA-1**

Case title: USA v. Leroux

Date Filed: 06/21/2012
Date Terminated: 07/08/2020

Assigned to: Judge Ronnie
Abrams

**Defendant (1)**

**Paul Calder Leroux**
*TERMINATED: 07/08/2020*

represented by **James Matthew Branden**
Law Office of James M. Branden
551 Fifth Avenue
Suite 422
New York, NY 10176
212-286-0173
Fax: 212-286-0495
Email: jamesmbranden@aol.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Jessica Ortiz**
MoloLamken LLP (NYC)
430 Park Avenue
New York, NY 10022
212-607-8160
Fax: 212-607-8161
Email: jortiz@mololamken.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: CJA Appointment*

**Jonathan Andrew Marvinny**
Federal Defenders of New York Inc.
(NYC)
52 Duane Street
10th Floor
New York, NY 10007
(212)-417-8792
Fax: (212)-571-0392

A

Email: jonathan_marvinny@fd.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Public Defender or*
*Community Defender Appointment*

**Bernard Alan Seidler**
B. Alan Seidler
580 Broadway
Room 402
New York, NY 10012
212-334-3131
Fax: 212-334-2211
Email: snedens66@aol.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Jeffrey Chabrowe**
Law Offices of Jeffrey Chabrowe
261 Madison Avenue
12th, Floor
New York, NY 10016
(917)-529-3921
Email: jchabrowe@gmail.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Joseph DiBenedetto**
The Law Office of Joseph
DiBenedetto, PC
1565 Franklin Avenue, Suite 301
Mineola, NY 11501
212-608-5858
Email:
jdibenedetto@dibenedettolaw.com
*ATTORNEY TO BE NOTICED*
*Designation: Retained*

**Pending Counts**

21:963=CI.F
ATTEMPT/CONSPIRACY -
CONTROLLED SUBSTANCE -
IMPORT/EXPORT
(1s)

**Disposition**

IMPRISONMENT: 300 months.
SUPERVISED RELEASE: Life.

A                    2

| | |
|---|---|
| 50:1701 to 1707.F PENALTIES, VIOLATES ANY LICENSE OR ORDER (EXPORTATION OF GOODS AND TECHNOLOGY TO BE SUPPLIED TO A FOREIGN GOVERNMENT WITHOUT THE REQUIRED APPROVAL OF THE TREASURY DEPARTMENT) (2s) | IMPRISONMENT: 300 months. SUPERVISED RELEASE: Life. |
| 18:1030B.F COMPUTER FRAUD (3s) | IMPRISONMENT: 300 months. SUPERVISED RELEASE: Life. |
| 18:3.F ACCESSORY AFTER THE FACT (IMPEDING AN OFFENDERS EXTRADITION) (4s) | IMPRISONMENT: 300 months. SUPERVISED RELEASE: Life. |

**Highest Offense Level**
**(Opening)**

Felony

| **Terminated Counts** | **Disposition** |
|---|---|
| 21:963=NI.F ATTEMPT/CONSPIRACY - NARCOTICS - IMPORTATION/EXPORTATION (1) | Any Open Counts are dismissed on the motion of the US |
| 21:963=NI.F ATTEMPT/CONSPIRACY - NARCOTICS - IMPORTATION/EXPORTATION (1ss) | Any Open Counts are dismissed on the motion of the US |

**Highest Offense Level**
**(Terminated)**

Felony

| **Complaints** | **Disposition** |
|---|---|
| None | |

<u>A</u>                                3

**Plaintiff**

**USA**                                    represented by   **Emil Joseph Bove , III**
US Attorneys Office, SDNY
One St. Andrew's Plaza
New York, NY 10007
(212) 637-2444
Fax: (212) 637-2443
Email: Emil.Bove@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Michael Dennis Lockard**
United States Attorney Office,
SDNY
One Saint Andrew's Plaza
New York, NY 10007
(212) 637-2193
Fax: (212) 637-2527
Email:
michael.lockard@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Rachel Peter Kovner**
United States Attorney Office,
SDNY
One Saint Andrew's Plaza
New York, NY 10007
(212)-637-2470
Fax: (212)-637-2937
Email: rachel.kovner@usdoj.gov
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Rebekah Allen Donaleski**
United States Attorney's Office,
SDNY
One Saint Andrew's Plaza
New York, NY 10007
212-637-2423
Fax: 212-637-2443
Email:
Rebekah.Donaleski@usdoj.gov

*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/22/2012 | 1 | SEALED DOCUMENT placed in vault. (mps) (Entered: 06/22/2012) |
| 08/03/2012 | 2 | SEALED DOCUMENT placed in vault. (nm) (Entered: 08/03/2012) |
| 09/26/2012 | 9 | SEALED S(1)INDICTMENT as to Sealed Defendant 1 (1) count(s) 1. (jm) (Entered: 03/16/2016) |
| 11/19/2012 | 3 | SEALED DOCUMENT placed in vault. (mps) (Entered: 11/19/2012) |
| 12/20/2012 | 4 | SEALED DOCUMENT placed in vault. (mps) (Entered: 12/20/2012) |
| 04/29/2013 | 5 | SEALED DOCUMENT placed in vault. (mps) (Entered: 04/29/2013) |
| 02/21/2014 | 6 | SEALED DOCUMENT placed in vault. (nm) (Entered: 02/21/2014) |
| 05/19/2014 | 7 | SEALED DOCUMENT placed in vault. (nm) (Entered: 05/19/2014) |
| 08/27/2014 | 8 | SEALED DOCUMENT placed in vault. (rz) (Entered: 08/27/2014) |
| 12/15/2014 | | Order to Unseal Indictment as to Sealed Defendant 1. (Signed by Judge Robert P. Patterson on 12/15/15)(jm) (Entered: 03/16/2016) |
| 12/15/2014 | | S(1)INDICTMENT UNSEALED as to Paul Calder Leroux. (jm) (Entered: 03/16/2016) |
| 12/15/2014 | 11 | ORDER as to Paul Calder Leroux. Follows oral order of 9/27/12., ENDORSED LETTER as to Paul Calder Leroux addressed to Magistrate Judge Gabriel W. Gorenstein from AUSA Lockard dated 9/27/12 re: Unsealing and judicial assignment of S(1) Superseding Indictment. ENDORSEMENT: GRANTED. (Originally filed under seal on 9/27/12) (Signed by Magistrate Judge Gabriel W. Gorenstein on 9/27/12)(jm) (Entered: 03/17/2016) |
| 12/15/2014 | | Minute Entry for proceedings held before Judge Robert P. Patterson:Arraignment as to Paul Calder Leroux (1) Count 1 held on 12/15/2014. Deft. Leroux produced by US Marshals, present with attorney Marvinny; AUSAs Lockard and Kovner are also present. Conference is held, next conference scheduled for 5/22/13 at 1:00 PM. All time is excluded in the interests of justice through 5/22/13. The Gov't moves for delayed docketing of this proceeding, |

A                                    5

| | | |
|---|---|---|
| | | application is GRANTED. Deft. continued remanded. (Originally held under seal on 3/22/12) (jm) (Entered: 03/17/2016) |
| 12/15/2014 | | Minute Entry for proceedings held before Judge Robert P. Patterson:Attorney Appointment Hearing as to Paul Calder Leroux held on 12/15/2014. Deft. present with atty Marvinny; AUSA Lockard and Court Reporter Alena Lynch also present. Deft. sworn. The Court approved defendant's financial affidavit and appoints Jonathan Marvinny to represent deft. The next PTC is scheduled for 3/22/13 at 11:00 before USDJ Patterson. Speedy Trial Time is excluded from 9/27/12 through 3/22/13. (Originally held under seal on 9/27/12) (jm) (Entered: 03/17/2016) |
| 12/15/2014 | | Attorney update in case as to Paul Calder Leroux. Attorney Jonathan Andrew Marvinny for Paul Calder Leroux added. (Originally appointed 9/27/12) (jm) (Entered: 03/17/2016) |
| 12/15/2014 | | Minute Entry for proceedings held before Judge Robert P. Patterson:Arraignment as to Paul Calder Leroux (1) Count 1 Paul Calder Leroux (1) Count 1 held on 12/15/2014. Deft. produced by U S Marshal and is present with atty Marvinny; AUSA Kovner present. Plea entered by Paul Calder Leroux (1) Count 1 Paul Calder Leroux (1) Count 1 Not Guilty. The Court accepts the plea. Counsel advises that defendant will be pleading without discovery having to be turned over. Next conference is set for 1/3/13 at 10:00 AM. All time is excluded, in interests of justice, through 1/3/13 with the understanding that if defendant wants discovery in the interim the Gov't will so provide. The Gov't requests that this Court proceeding and transcript be sealed on a delayed docket entry procedure. Application is granted, transcript available to counsel. Remand continued. (Originally held under seal on 11/9/12) (jm) (Entered: 03/17/2016) |
| 12/15/2014 | 12 | NOTICE OF ATTORNEY APPEARANCE: Bernard Alan Seidler appearing for Paul Calder Leroux. (Originally filed under 8/8/13) (jm) (Entered: 03/17/2016) |
| 12/15/2014 | 13 | (S2) SUPERSEDING INFORMATION (Felony) filed as to Paul Calder Leroux (1) count(s) 1s, 2s, 3s, 4s. (jm)(THIS IS A REDACTED INFORMATION DOCKETED BY JUDICIAL ORDER THE ORIGINAL OF WHICH WAS FILED UNDER SEAL ON 2/19/14) (Entered: 03/17/2016) |
| 12/15/2014 | | Minute Entry for proceedings held before Judge Robert P. Patterson: Deft. presemnt with atty Seidler; AUSAs Hector, Lockard, Marks and Gorji also present. Arraignment as to Paul Calder Leroux |

| | | |
|---|---|---|
| | | (1) Count 1s,2s,3s,4s held on 12/15/2014. Plea entered by Paul Calder Leroux (1) Guilty as to Count 1s,2s,3s,4s. Allocution is conducted. The Court Accepts the plea. PSR is NOT ordered. Control date for conference is scheduled for 8/20/14 at 4 PM. Gov't submitted order is signed sealing the transcript of this proceeding along with the sealing of the proceeding itself. Remand continued. (Originally held under seal on 2/19/14) (jm) (Entered: 03/17/2016) |
| 02/25/2015 | | NOTICE OF CASE REASSIGNMENT as to Sealed Defendant 1, to Judge Loretta A. Preska. Judge Robert P. Patterson no longer assigned to the case. (pgu) (Entered: 02/25/2015) |
| 03/31/2016 | 14 | SEALED DOCUMENT placed in vault. (mps) (Entered: 03/31/2016) |
| 03/30/2017 | 15 | SEALED DOCUMENT placed in vault. (rz) (Entered: 03/30/2017) |
| 08/09/2017 | 16 | ORDER as to Paul Calder Leroux, Shai Reuven unsealing the underlying indictment. (Signed by Judge Loretta A. Preska on 8/9/17)(jm) (Entered: 08/10/2017) |
| 08/09/2017 | 17 | INDICTMENT FILED as to Paul Calder Leroux (1) count(s) 1ss, Shai Reuven (2) count(s) 1. (jm)(Filed under seal on 6/21/12) (Entered: 08/10/2017) |
| 10/18/2018 | 19 | ORDER OF CONFERENCE as to Paul Calder Leroux. It is hereby ORDERED that counsel are directed to appear in courtroom 12A, or such other courtroom as may be designated, United States Courthouse, 500 Pearl Street, New York, New York 10007 on October 23, 2018 at 11:30 a.m. for a conference in the above action. SO ORDERED. (Status Conference set for 10/23/2018 at 11:30 AM in Courtroom 12A, 500 Pearl Street, New York, NY 10007 before Judge Loretta A. Preska.) (Signed by Judge Loretta A. Preska on 10/18/2018)(ft) (Entered: 10/18/2018) |
| 10/23/2018 | | Minute Entry for proceedings held before Judge Loretta A. Preska: Status Conference as to Paul Calder Leroux held on 10/23/2018. Defendant present with his attorney Joseph DiBenedetto on the phone. AUSA Michael Lockard present. CJA on duty Xavier Donaldson present. Mr. Donaldson is appointed as second opinion counsel to Mr. Leroux. Next conference scheduled for November 6, 2018 at 11:00 a.m. (jbo) (Entered: 11/07/2018) |
| 11/05/2018 | 20 | NOTICE OF ATTORNEY APPEARANCE Emil Joseph Bove, III appearing for USA. (Bove, Emil) (Entered: 11/05/2018) |

| 11/05/2018 | 21 | LETTER by USA as to Paul Calder Leroux addressed to Judge Loretta A. Preska from Emil Bove dated November 5, 2018 re: Adjournment Request Document filed by USA. (Bove, Emil) (Entered: 11/05/2018) |
|---|---|---|
| 11/06/2018 | 22 | SEALED DOCUMENT placed in vault. (mhe) (Entered: 11/06/2018) |
| 11/06/2018 | 23 | SEALED DOCUMENT placed in vault. (rz) (Entered: 11/06/2018) |
| 11/06/2018 | 24 | SEALED DOCUMENT placed in vault. (rz) (Entered: 11/06/2018) |
| 11/06/2018 | 25 | SEALED DOCUMENT placed in vault. (rz) (Entered: 11/06/2018) |
| 11/06/2018 | 26 | SEALED DOCUMENT placed in vault. (rz) (Entered: 11/06/2018) |
| 11/06/2018 | 27 | MEMO ENDORSEMENT as to Paul Calder Leroux, Shai Reuven on re: 21 Letter filed by USA. ENDORSEMENT: The conference is adjourned to December 6, 2018 at 4:00 p.m. SO ORDERED. (Signed by Judge Loretta A. Preska on 11/6/2018)(ft) (Entered: 11/06/2018) |
| 11/06/2018 | | Set/Reset Deadlines/Hearings as to Paul Calder Leroux: Status Conference set for 12/6/2018 at 04:00 PM before Judge Loretta A. Preska. (ft) (Entered: 11/06/2018) |
| 11/16/2018 | 28 | TRANSCRIPT of Proceedings as to Paul Calder Leroux re: Conference held on 10/23/18 before Judge Loretta A. Preska. Court Reporter/Transcriber: Karen Gorlaski, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 12/7/2018. Redacted Transcript Deadline set for 12/17/2018. Release of Transcript Restriction set for 2/14/2019. (McGuirk, Kelly) (Entered: 11/16/2018) |
| 11/16/2018 | 29 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Paul Calder Leroux. Notice is hereby given that an official transcript of a Conference proceeding held on 10/23/18 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 11/16/2018) |

| 12/06/2018 | | Minute Entry for proceedings held before Judge Loretta A. Preska: Status Conference as to Paul Calder Leroux held on 12/6/2018. Defendant present with his attorney Joseph DiBenedetto. AUSA Michael Lockard present. CJA as second counsel opinion Xavier Donaldson present. Mr. Donaldson will stay on as second opinion counsel for now. The parties shall inform the court in two weeks by letter how the propose to proceed. (ft) (Entered: 12/14/2018) |
|---|---|---|
| 12/20/2018 | 30 | LETTER MOTION addressed to Judge Loretta A. Preska dated December 20, 2018 re: that the court order a presentence investigation report and allow the parties to update the Court upon completion of the presentence report . Document filed by Paul Calder Leroux. (DiBenedetto, Joseph) (Entered: 12/20/2018) |
| 12/21/2018 | 31 | MEMO ENDORSEMENT as to Paul Calder Leroux (1) granting 30 LETTER MOTION addressed to Judge Loretta A. Preska dated December 20, 2018 re: that the court order a presentence investigation report and allow the parties to update the Court upon completion of the presentence report. ENDORSEMENT: SO ORDERED. (Signed by Judge Loretta A. Preska on 12/21/2018) (ap) (Entered: 12/21/2018) |
| 12/21/2018 | 32 | Oral Order of Referral to Probation for Presentence Investigation and Report as to Paul Calder Leroux. (Signed by Judge Loretta A. Preska on 12/21/2018)(ap) (Entered: 12/21/2018) |
| 01/04/2019 | 33 | TRANSCRIPT of Proceedings as to Paul Calder Leroux re: Conference held on 12/6/18 before Judge Loretta A. Preska. Court Reporter/Transcriber: Vincent Bologna, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 1/25/2019. Redacted Transcript Deadline set for 2/4/2019. Release of Transcript Restriction set for 4/4/2019. (McGuirk, Kelly) (Entered: 01/04/2019) |
| 01/04/2019 | 34 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Paul Calder Leroux. Notice is hereby given that an official transcript of a Conference proceeding held on 12/6/18 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 01/04/2019) |

A                                                    9

| 03/14/2019 | 35 | SEALED DOCUMENT placed in vault. (rz) (Entered: 03/14/2019) |
|---|---|---|
| 03/14/2019 | 36 | SEALED DOCUMENT placed in vault. (rz) (Entered: 03/14/2019) |
| 04/01/2019 | 37 | ORDER as to Paul Calder Leroux: The CJA attorney on duty today, Jessica Ortiz, is appointed to represent the above-named defendant. Sentencing is scheduled for July 23, 2019 at 10:00 a.m. The Probation Department is ordered to prepare the presentence report. (Sentencing set for 7/23/2019 at 10:00 AM before Judge Loretta A. Preska) Added attorney Jessica Ortiz for Paul Calder Leroux. (Signed by Judge Loretta A. Preska on 4/1/2019) (Docketed in 12cr489 & 14cr075) (ap) (Entered: 04/01/2019) |
| 04/01/2019 | 38 | Oral Order of Referral to Probation for Presentence Investigation and Report as to Paul Calder Leroux. (Signed by Judge Loretta A. Preska on 4/1/2019) (ap) (Entered: 04/01/2019) |
| 04/22/2019 | 39 | SEALED DOCUMENT placed in vault. (rz) (Entered: 04/22/2019) |
| 05/23/2019 | 40 | NOTICE OF ATTORNEY APPEARANCE Rebekah Allen Donaleski appearing for USA. (Donaleski, Rebekah) (Entered: 05/23/2019) |
| 05/23/2019 | 41 | LETTER by USA as to Paul Calder Leroux addressed to Judge Loretta A. Preska from Rebekah Donaleski dated May 23, 2019 re: Related Case Document filed by USA. (Donaleski, Rebekah) (Entered: 05/23/2019) |
| 05/23/2019 | | Case as to (12-Cr-489-1) Paul Calder Leroux REASSIGNED to Judge Ronnie Abrams. Judge Loretta A. Preska no longer assigned to the case. (bw) (Entered: 05/23/2019) |
| 05/30/2019 | 42 | ORDER as to Paul Calder Leroux (Sentencing set for 8/14/2019 at 03:00 PM before Judge Ronnie Abrams.) These matters have been reassigned to me for all purposes. The Court will sentence Mr. LeRoux on August 14, 2019 at 3:00 p.m. The Government's submission shall be due two weeks prior to sentencing and defendant's submission shall be due one week prior to sentencing (Signed by Judge Ronnie Abrams on 5/30/2019)(jw) (Entered: 05/30/2019) |
| 07/15/2019 | 43 | NOTICE OF ATTORNEY APPEARANCE: James Matthew Branden appearing for Paul Calder Leroux. Appearance Type: Retained. (Branden, James) (Entered: 07/15/2019) |
| 07/17/2019 | 44 | FIRST LETTER MOTION addressed to Judge Ronnie Abrams from James M. Branden dated July 17, 2019 re: Adjournment of Pre- |

| | | |
|---|---|---|
| | | Sentence Report Objections and Sentencing . Document filed by Paul Calder Leroux. (Branden, James) (Entered: 07/17/2019) |
| 07/18/2019 | 45 | AMENDED LETTER MOTION addressed to Judge Ronnie Abrams from James M. Branden dated July 18, 2019 re: Adjournment of Pre-Sentence Report Objections and Sentencing . Document filed by Paul Calder Leroux. (Branden, James) (Entered: 07/18/2019) |
| 07/18/2019 | 46 | ENDORSED LETTER as to (12-Cr-489-1) Paul Calder Leroux addressed to Judge Ronnie Abrams from Attorney James M. Branden dated July 18, 2019 re: I am modifying my July 17 request and now request that the sentencings be adjourned until October 21, 2019 or later. ENDORSEMENT: Application granted. Mr. Branden may file objections to the PSR by August 12, 2019. The sentence is adjourned to October 25, 2019 at 2:30 p.m. SO ORDERED. (Signed by Judge Ronnie Abrams on 7/18/2019) [*** NOTE: Also docketed in Criminal Case 14-Cr-75(RA), Doc.#12. ***] (bw) (Entered: 07/18/2019) |
| 08/09/2019 | 47 | SECOND LETTER MOTION addressed to Judge Ronnie Abrams from James M. Branden dated August 9, 2019 re: Adjournment of Pre-Sentence Report Objections . Document filed by Paul Calder Leroux. (Branden, James) (Entered: 08/09/2019) |
| 08/09/2019 | 48 | MEMO ENDORSED granting 47 LETTER MOTION Adjournment of Pre-Sentence Report Objections as to Paul Calder Leroux (1)...ENDORSEMENT: Application granted. SO ORDERED. (Signed by Judge Ronnie Abrams on 8/9/19) (jbo) (Entered: 08/09/2019) |
| 10/10/2019 | 49 | LETTER by Paul Calder Leroux addressed to Judge Ronnie Abrams from James M. Branden dated October 10, 2019 re: Adjournment of Sentencing (Branden, James) (Entered: 10/10/2019) |
| 10/11/2019 | 50 | MEMO ENDORSEMENT as to Paul Calder Leroux on re: 49 Letter filed by Paul Calder Leroux. LETTER by Paul Calder Leroux addressed to Judge Ronnie Abrams from James M. Branden dated October 10, 2019 re: Adjournment of Sentencing. ENDORSEMENT: Application granted. The sentence is adjourned to December 11, 2019 at 1:00 p.m. (Sentencing set for 12/11/2019 at 01:00 PM before Judge Ronnie Abrams) (Signed by Judge Ronnie Abrams on 10/11/2019) (Docketed in 12cr489 and 14cr75) (ap) Modified on 10/11/2019 (ap). (Entered: 10/11/2019) |
| 11/19/2019 | 51 | LETTER by USA as to Paul Calder Leroux addressed to Judge Ronnie Abrams from Rebekah Donaleski dated November 19, 2019 re: |

| | | |
|---|---|---|
| | | Adjournment Document filed by USA. (Donaleski, Rebekah) (Entered: 11/19/2019) |
| 11/19/2019 | 52 | ENDORSED LETTER as to Paul Calder Leroux addressed to Judge Ronnie Abrams from Emil J. Bove III, Rebekah Donaleski and Michael D. Lockard dated 11/19/19 re: Reschedule Sentencing...ENDORSEMENT: Application granted. The sentence is adjourned to February 27, 2020 at 11:00am ( Sentencing set for 2/27/2020 at 11:00 AM before Judge Ronnie Abrams) Refer to 14 cr 75 (Signed by Judge Ronnie Abrams on 11/19/19)(jw) (Entered: 11/19/2019) |
| 03/09/2020 | 53 | LETTER by USA as to Paul Calder Leroux addressed to Judge Ronnie Abrams from United States dated 3/9/2020 re: Sentencing adjournment request Document filed by USA. (Lockard, Michael) (Entered: 03/09/2020) |
| 03/09/2020 | 54 | MEMO ENDORSEMENT as to Paul Calder Leroux on re: 53 LETTER by USA as to Paul Calder Leroux addressed to Judge Ronnie Abrams from United States dated 3/9/2020 re: Sentencing adjournment request. ENDORSEMENT: Application granted. (Sentencing set for 5/29/2020 at 04:00 PM before Judge Ronnie Abrams) (Signed by Judge Ronnie Abrams on 3/9/2020) (ap) (Entered: 03/09/2020) |
| 04/11/2020 | 55 | NOTICE OF ATTORNEY APPEARANCE: Jeffrey Chabrowe appearing for Paul Calder Leroux. Appearance Type: Retained. (Chabrowe, Jeffrey) (Entered: 04/11/2020) |
| 05/27/2020 | 56 | ORDER as to Paul Calder Leroux: The sentence has been adjourned to June 12, 2020 at 11:00 a.m. and will be held by video-conference. A separate Order will be posted to the docket with a call in number for public and press access. (Signed by Judge Ronnie Abrams on May 27, 2020)(arc) (Entered: 05/27/2020) |
| 06/08/2020 | 57 | ORDER as to Paul Calder Leroux: On May 28, 2020, the Government filed its sentencing submission under seal. On June 7, 2020, Mr. LeRoux filed his unredacted sentencing submission under seal, and filed a redacted sentencing submission on the docket. The press and the general public have a qualified First Amendment right to attend criminal trials so that the "constitutionally protected discussion of government affairs is an informed one." Globe Newspaper Co. v. Superior Court for Norfolk Cty., 457 U.S. 596, 604-05 (1982). Open criminal proceedings "enhance[] both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system" by "assur[ing] that established procedures are being followed and that deviations will |

become known." PressEnterprise Co. v. Superior Court of California, Riverside Cty., 464 U.S. 501, 508 (1984). The qualified First Amendment right of access to criminal trials encompasses a qualified right to attend sentencing proceedings. United States v. Alcantara, 396 F.3d 189, 199 (2d Cir. 2005). "Access to sentencing proceedings allows the public to understand the reasons behind a given sentence, a value reflected in 18 U.S.C. § 3553(c), which states that sentencing shall be held in open court, in part to 'enable the public to learn why defendant received a particular sentence.'" United States v. Armstrong, 185 F. Supp. 3d 332, 335 (E.D.N.Y. 2016) (quoting Alcantara, 396 F.3d at 206). The public also has a qualified First Amendment right to access judicial documents if they are "derived from or are a necessary corollary of the capacity to attend the relevant proceedings," or if "logic and experience" support such accessthat is, if access "plays a significant positive role in the functioning of the particular process in question" and the documents "have historically been open to the press or general public." Hartford Courant Co. v. Pellegrino, 380 F.3d 83, 9293 (2d Cir. 2004) (quotations omitted) (finding a qualified First Amendment right to access criminal docket sheets); see also United States v. Amodeo, 71 F.3d 1044, 1050 (2d Cir.1995) (discussing common law presumption of access to documents concerning cooperation and noting that, "[w]here filing with the court is unusual or is generally under seal," presumption of access is weaker). "The qualified First Amendment right of access should be abridged only where there is a higher value or compelling interest that will be significantly harmed by public access and the sealing is narrowly tailored to protect that interest." Armstrong, 185 F. Supp. 3d at 336 (citing Globe Newspaper, 457 U.S. at 60607; United States v. Aref, 533 F.3d 72, 82 (2d Cir.2008)). "The safety of a cooperating defendant can constitute a compelling interest that may be weighed against a First Amendment presumption of access." Id. (citation omitted). So too can the government's interest in the secrecy of its investigations and in securing cooperation in future cases. See id. (citing United States v. Smith, 985 F.Supp.2d 506, 531 (S.D.N.Y.2013); Amodeo, 71 F.3d at 1050). Where release of information is likely to cause persons in the particular or future cases to resist involvement where cooperation is desirable, that effect should be weighed against the presumption of access." Amodeo, 71 F.3d at 1050. Here, Mr. LeRoux has already testified publicly at the trials of Joseph Hunter, Adam Samia and Carl David Stillwell as a cooperating witness. United States v. Hunter et al., S10 13 Cr. 521 (RA), Dkts. 576, 578, 580, 581 (S.D.N.Y. Apr. 4-9, 2018). "Other judges, faced with similar facts, have found that, where information regarding a cooperator is already public in some form,

| | | |
|---|---|---|
| | | the government interest in protecting any materials containing that information disappears, and the public's right to access necessarily prevails." Armstrong, 185 F. Supp. 3d at 337-8 (citing United States v. Huntley, 943 F.Supp.2d 383, 387 (E.D.N.Y.2013); In re Application to Unseal, 891 F.Supp.2d 296, 300 (E.D.N.Y.2012); United States v. Key, 2010 WL 3724358, at *2-3 (E.D.N.Y. Sept. 15, 2010)). At least one court, however, has noted that "while alternate sources of information lessen the government interest in secrecy, they also diminish the urgency of the public's need for the sealed materials." Id. With these competing interests in mind, the Court holds that the public's qualified First Amendment right of access would be unduly abridged if either sentencing submission remains entirely under seal or in redacted form without sufficient justification. No later than June 9, 2020 at 5 PM, the parties shall meet and confer and either file their sentencing submissions in unredacted form on the docket, or file redacted versions thereof along with an explanation as to how those redactions are narrowly tailored to a compelling interest. To the extent either party believes it necessary to file its explanation of any redactions under seal, it may do so in the first instance. SO ORDERED. (Signed by Judge Ronnie Abrams on 6/8/2020) (lnl) (Entered: 06/08/2020) |
| 06/09/2020 | 58 | ORDER as to Paul Calder Leroux: In connection with the sentencing of Defendant Paul Calder Leroux, scheduled for Friday, June 12, 2020, the Government shall submit a letter no later than Thursday, June 11, at 12:00 p.m. informing the Court: (1) If it disagrees with any of the representations made in Mr. Leroux's submission; (2) At the time he began to cooperate with law enforcement, what Guideline range Mr. Leroux would have been facing; (3) If there are analogous cases in or out of this district that the Court should consider in terms of the egregiousness of the defendant's conduct, as well as the extent of his assistance to law enforcement; and (4) Its view as to whether Mr. Leroux continues to present a danger to any particular individuals or the community at large. If Mr. Leroux would like to respond prior to sentencing, he shall do so no later than Thursday, June 11, at 5:00 p.m. SO ORDERED. (Signed by Judge Ronnie Abrams on 6/9/2020) (lnl) (Entered: 06/09/2020) |
| 06/10/2020 | 59 | ORDER as to Paul Calder Leroux: The CourtCall video sentencing is scheduled for Friday June 12, 2020 at 11:00 a.m. Members of the public and the press can use the following dial-in information: Dial-In Number: 855-268-7844 Access Code: 67812309# PIN: 9921299# SO ORDERED. (Sentencing set for 6/12/2020 at 11:00 AM before Judge Ronnie Abrams) (Signed by Judge Ronnie Abrams on 6/10/2020) (lnl) (Entered: 06/10/2020) |

| 06/10/2020 | 60 | ORDER as to Paul Calder Leroux: In a June 8, 2020 Order, the Court held that the public's qualified First Amendment right of access would be unduly abridged if either party's sentencing submission remains entirely under seal or in redacted form without sufficient justification. The Court directed the parties to meet and confer and either file their sentencing submissions in unredacted form on the docket, or file redacted versions thereof along with an explanation as to how those redactions are narrowly tailored to a compelling interest. On June 9, 2020, the Government filed a proposed redacted sentencing submission under seal, along with a letter providing the justifications for its proposed redactions. The Court approves most of the Government's proposed redactions. On page 1, however, with the exception of the names of Mr. LeRoux's biological parents, there is no compelling justification for the proposed redactions because this biographical information about Mr. Leroux is already publicly available in the unredacted portions of the sentencing submission that Mr. LeRoux himself filed on the docket on June 7, 2020. Dkt. 17. All of the remaining proposed redactions, however, are narrowly tailored to the compelling interests of protecting the privacy of third parties, see United States v. Amodeo ("Amodeo II"), 71 F.3d 1044, 1050-51 (2d Cir. 1995) ("[t]he privacy interests of innocent third parties... should weigh heavily in a court's balancingequation.") (citation omitted), protecting Mr. LeRoux's safety, see United States v. Armstrong, 185 F. Supp. 3d 332, 336 (E.D.N.Y. 2016) (citations omitted), and protecting the secrecy of the Government's investigations, see United States v. Amodeo ("Amodeo I"), 44 F.3d 141, 147 (2d Cir. 1995); Amodeo II, 71 F.3d at 1050; United States v. Smith, 985 F.Supp.2d 506, 531 (S.D.N.Y.2013). Accordingly, the Government shall promptly file its sentencing submission on the docket with all of its proposed redactions, with the exception of the redactions on page 1 other than the names of Mr. LeRoux's biological parents. The Government shall also file the redacted version of its letter. Also on June 9, 2020, Mr. LeRoux filed a letter under seal stating, "After meeting and conferring with the government, we submit the redactions that both parties agree are unnecessary." (emphasis added). Mr. LeRoux has not, however, provided a justification for all the redactions that he believes are narrowly tailored to a compelling interest, as required by the Court's June 8, 2020 Order. No later than 5 PM on June 10, 2020, he shall do so, along with a revised version of his sentencing submission that redacts only those portions for which he provides a justification. (Signed by Judge Ronnie Abrams on 6/10/2020) (lnl) (Entered: 06/10/2020) |
| --- | --- | --- |

| 06/10/2020 | 61 | LETTER MOTION addressed to Judge Ronnie Abrams from United States dated June 9, 2020 re: Sealing and Redacted Filing *(Redacted)*. Document filed by USA as to Paul Calder Leroux. (Lockard, Michael) (Entered: 06/10/2020) |
|---|---|---|
| 06/10/2020 | 62 | SENTENCING SUBMISSION by USA as to Paul Calder Leroux. (Lockard, Michael) (Entered: 06/10/2020) |
| 06/10/2020 | 63 | LETTER by Paul Calder Leroux addressed to Judge Ronnie Abrams from Jeffrey Chabrowe, Esq. dated June 10, 2020 re: Request for Deadline Extension on Defendant's Redaction Request (Chabrowe, Jeffrey) (Entered: 06/10/2020) |
| 06/10/2020 | 64 | MEMO ENDORSEMENT as to Paul Calder Leroux on 63 LETTER by Paul Calder Leroux addressed to Judge Ronnie Abrams from Jeffrey Chabrowe, Esq. dated June 10, 2020 re: Request for Deadline Extension on Defendant's Redaction Request. ENDORSEMENT: Application granted. SO ORDERED. (Signed by Judge Ronnie Abrams on 6/10/2020)(lnl) (Entered: 06/11/2020) |
| 06/11/2020 | 65 | ORDER as to Paul Calder Leroux: In a June 8, 2020 Order, the Court held that the public's qualified First Amendment right of access would be unduly abridged if either partys sentencing submission remains entirely under seal or in redacted form without sufficient justification. The Court directed the parties to meet and confer and either file their sentencing submissions in unredacted form on the docket, or file redacted versions thereof along with an explanation as to how those redactions are narrowly tailored to a compelling interest. On June 10, 2020, the Court approved most of the Government's proposed redactions, and the Government filed its redacted sentencing submission on the docket. On June 11, 2020, Mr. LeRoux filed a proposed redacted sentencing submission under seal, along with a letter providing the justifications for his proposed redactions. The Court approves Mr. LeRoux's proposed redactions, as they are narrowly tailored to the compelling interests of protecting the privacy of third parties, see United States v. Amodeo ("Amodeo II"), 71 F.3d 1044, 1050-51 (2d Cir. 1995) ("[t]he privacy interests of innocent third parties... should weigh heavily in a courts balancing equation.") (citation omitted), protecting Mr. LeRoux's privacy and safety, see United States v. Armstrong, 185 F. Supp. 3d 332, 336 (E.D.N.Y. 2016) (citations omitted), and protecting the secrecy of the Governments investigations, see United States v. Amodeo ("Amodeo I"), 44 F.3d 141, 147 (2d Cir. 1995); Amodeo II, 71 F.3d at 1050; United States v. Smith, 985 F.Supp.2d 506, 531 (S.D.N.Y.2013). Accordingly, Mr. LeRoux shall promptly file his |

| | | |
|---|---|---|
| | | redacted sentencing submission on the docket, as well as a redacted version of his letter regarding his proposed redactions. SO ORDERED. (Signed by Judge Ronnie Abrams on 6/11/2020) (lnl) (Entered: 06/11/2020) |
| 06/11/2020 | 66 | SENTENCING SUBMISSION by Paul Calder Leroux. (Attachments: # 1 Exhibit Def. Ex. A, # 2 Exhibit Def. Ex. B, # 3 Exhibit Def. Ex. C, # 4 Exhibit Def. Ex. D, # 5 Exhibit Def. Ex. E, # 6 Exhibit Def. Ex. F, # 7 Exhibit Def. Ex. G, # 8 Exhibit Def. Ex. H, # 9 Exhibit Def. Ex. I, # 10 Exhibit Def. Ex. J, # 11 Exhibit Def. Ex. K, # 12 Exhibit Def. Ex. L, # 13 Exhibit Def. Ex. M, # 14 Exhibit Def. Ex. N, # 15 Exhibit Def. Ex. O, # 16 Exhibit Def. Ex. P, # 17 Exhibit Def. Ex. Q, # 18 Exhibit Def. Ex. R, # 19 Exhibit Def. Ex. S, # 20 Exhibit Def. Ex. T, # 21 Exhibit Def. Ex. U, # 22 Exhibit Def. Ex. V, # 23 Exhibit Def. Ex. W, # 24 Exhibit Def. Ex. X, # 25 Exhibit Def. Ex. Y, # 26 Exhibit Def. Ex. Z, # 27 Exhibit Def. Ex. AA, # 28 Exhibit Def. Ex. BB, # 29 Exhibit Def. Ex. CC, # 30 Exhibit Def. Ex. DD, # 31 Exhibit Def. Ex. EE, # 32 Exhibit Def. Ex. FF, # 33 Exhibit Def. Ex. GG, # 34 Exhibit Def. Ex. HH, # 35 Exhibit Def. Ex. II, # 36 Exhibit Def. Ex. JJ, # 37 Exhibit Def. Ex. KK, # 38 Exhibit Def. Ex. LL, # 39 Exhibit Def. Ex. MM, # 40 Exhibit Def. Ex. NN, # 41 Exhibit Def. Ex. OO, # 42 Exhibit Def. Ex. PP, # 43 Exhibit Def. Ex. QQ, # 44 Exhibit Def. Ex. RR, # 45 Exhibit Def. Ex. SS, # 46 Exhibit Def. Ex. TT, # 47 Exhibit Def. Ex. UU, # 48 Exhibit Def. Ex. VV, # 49 Exhibit Def. Ex. WW, # 50 Exhibit Def. Ex. XX, # 51 Exhibit Def. Ex. YY, # 52 Exhibit Def. Ex. ZZ, # 53 Exhibit Def. Ex. AAA, # 54 Exhibit Def. Ex. BBB, # 55 Exhibit Def. Ex. CCC, # 56 Exhibit Def. Ex. DDD, # 57 Exhibit Def. Ex. EEE, # 58 Exhibit Def. Ex. FFF, # 59 Exhibit Def. Ex. GGG, # 60 Exhibit Def. Ex. HHH, # 61 Exhibit Def. Ex. III, # 62 Exhibit Def. Ex. JJJ, # 63 Exhibit Def. Ex. KKK, # 64 Exhibit Def. Ex. LLL, # 65 Exhibit Def. Ex. MMM, # 66 Exhibit Def. Ex. NNN)(Chabrowe, Jeffrey) (Entered: 06/11/2020) |
| 06/11/2020 | 67 | LETTER by Paul Calder Leroux addressed to Judge Ronnie Abrams from Jeffrey Chabrowe, Esq. dated June 11, 2020 re: Letter to Judge Abrams from Defendant Paul Leroux (Chabrowe, Jeffrey) (Entered: 06/11/2020) |
| 06/12/2020 | | Minute Entry for proceedings held before Judge Ronnie Abrams:Sentencing held on 6/12/2020 for Paul Calder Leroux (1) Count 1s,2s,3s,4s. AUSA Michael Lockard present. Defendant Paul Calder Leroux present with attorneys Jeffrey Chabrowe and James Branden. Defendant waives his in person appearance and consents to proceed by video conference. Court reporter Paula Speer |

A                                        17

| | | |
|---|---|---|
| | | present. See Judgment for terms of sentence. Refer to 14 cr 75 (RA) (jw) (Entered: 06/12/2020) |
| 06/22/2020 | 68 | TRANSCRIPT of Proceedings as to Paul Calder Leroux re: Sentence held on 6/12/2020 before Judge Loretta A. Preska. Court Reporter/Transcriber: Paula Speer, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 7/13/2020. Redacted Transcript Deadline set for 7/23/2020. Release of Transcript Restriction set for 9/21/2020. (McGuirk, Kelly) (Entered: 06/22/2020) |
| 06/22/2020 | 69 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Paul Calder Leroux. Notice is hereby given that an official transcript of a Sentence proceeding held on 6/12/2020 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 06/22/2020) |
| 06/30/2020 | 71 | NOTICE OF APPEAL by Paul Calder Leroux from 70 Judgment. Filing fee $ 505.00, receipt number 465401261066. (nd) (Entered: 07/09/2020) |
| 06/30/2020 | 72 | TRANSCRIPT REQUEST FORM B Filed by Paul Calder Leroux. No transcript ordered. (nd) (Entered: 07/09/2020) |
| 07/08/2020 | | DISMISSAL OF COUNTS on Government Motion as to Paul Calder Leroux (1) Count 1,1ss. (jw) (Entered: 07/08/2020) |
| 07/08/2020 | 70 | JUDGMENT IN A CRIMINAL CASE as to Paul Calder Leroux (1). THE DEFENDANT: pleaded guilty to counts (1),(2),(3),(4). Any open counts are dismissed on the motion of the United States. IMPRISONMENT: 300 months. 300 months [to run concurrently] [300 Months on Count 1; 240 months on Count 2; 60 months on Count 3; 180 months on Count 4; for a total of 300 months] This sentence is to run concurrent to the sentence imposed in 14 Cr. 75. The defendant is remanded to the custody of the United States Marshal. SUPERVISED RELEASE: Life. Life on Count One of 12 Crim. 489, three years on each of Counts Two through Four of 12 Crim. 489 and Counts One through Three of 14 Crim. 75, to run concurrently, for a total of a life term of supervised release. See SPECIAL CONDITIONS OF SUPERVISION. ASSESSMENT: $400.00 |

| | | |
|---|---|---|
| | | due immediately. The defendant shall forfeit the defendant's interest in the following property to the United States: As a result of committing the offenses alleged in Counts One, Two and Three of the Information, the defendant shall forfeit to the United States any and all property constituting or derived from any proceeds the defendant obtained directly or indirectly as a result of the violations and any and all property used or intended to be used in any manner or part to commit and to facilitate the commission of these offenses. A separate Order of Forfeiture shall be issued. Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5)fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs. (Signed by Judge Ronnie Abrams on 7/8/2020) (ap) (Entered: 07/08/2020) |
| 07/09/2020 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet as to Paul Calder Leroux to US Court of Appeals re: 71 Notice of Appeal. (nd) (Entered: 07/09/2020) |
| 07/09/2020 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files as to Paul Calder Leroux re: 71 Notice of Appeal were transmitted to the U.S. Court of Appeals. (nd) (Entered: 07/09/2020) |
| 07/10/2020 | 73 | ORDER as to Paul Calder Leroux: On June 12, 2020, the Court sentenced Mr. LeRoux to 300 months imprisonment on a total of seven counts, namely Counts One through Four of 12-CR-489 and Counts One through Three of 14-CR-75. Upon reviewing the transcript of the sentencing proceeding, however, the Court has determined that the breakdown it provided for each of the underlying counts was partially in error. Accordingly, the Court will hold an additional sentencing proceeding on July 20, 2020 at 9 AM to clarify the breakdown of Mr. LeRoux's sentence on the record. In addition, no later than July 15, 2020, the parties shall submit their proposed forfeiture order to the Court. (Sentencing set for 7/20/2020 at 09:00 AM before Judge Ronnie Abrams) (Signed by Judge Ronnie Abrams on 7/10/2020) (Docketed in 12cr489 and 14cr75) (ap) (Entered: 07/10/2020) |
| 07/15/2020 | 74 | ORDER as to Paul Calder Leroux: The CourtCall video sentencing is rescheduled for Friday July 24, 2020 at 9:00 a.m. Members of the public and the press can use the following dial-in information: Dial-In Number: 855-268-7844, Access Code: 32091812#, PIN: 9921299#. (Sentencing set for 7/24/2020 at 09:00 AM before |

| | | |
|---|---|---|
| | | Judge Ronnie Abrams) (Signed by Judge Ronnie Abrams on 7/15/2020) (Docketed in 12cr489 and 14cr75) (ap) Modified on 7/16/2020 (ap). (Entered: 07/15/2020) |
| 07/15/2020 | 75 | Sentencing Letter by USA as to Paul Calder Leroux addressed to Hon. Ronnie Abrams from United States dated 7/15/2020 re: Proposed Order of Forfeiture. (Attachments: # 1Text of Proposed Order)(Lockard, Michael) (Entered: 07/15/2020) |
| 07/17/2020 | 76 | PRELIMINARY ORDER OF FORFEITURE as to Paul Calder Leroux. (Signed by Judge Ronnie Abrams on 7/17/2020) (See ORDER set forth) (Three certified copies forwarded to AUSA Alexander Wilson via inter office mail) (ap) (Entered: 07/17/2020) |
| 07/23/2020 | 77 | LETTER by Paul Calder Leroux addressed to Judge Ronnie Abrams from Jeffrey Chabrowe, Esq. dated July 23, 2020 re: Request to Adjourn Additional Sentencing Hearing (Chabrowe, Jeffrey) (Entered: 07/23/2020) |
| 07/23/2020 | 78 | MEMO ENDORSEMENT as to Paul Calder Leroux on 77 LETTER by Paul Calder Leroux addressed to Judge Ronnie Abrams from Jeffrey Chabrowe, Esq. dated July 23, 2020 re: Request to Adjourn Additional Sentencing Hearing. ENDORSEMENT: No later than July 27, 2020, the parties shall confer and file a joint letter proposing alternative dates for the hearing to clarify Mr. LeRoux's sentence. SO ORDERED. (Signed by Judge Ronnie Abrams on 7/23/2020)(lnl) (Entered: 07/23/2020) |
| 07/27/2020 | 79 | LETTER by Paul Calder Leroux addressed to Judge Ronnie Abrams from Jeffrey Chabrowe, Esq. dated July 27, 2020 re: Proposed Alternative Date (Chabrowe, Jeffrey) (Entered: 07/27/2020) |
| 07/28/2020 | 80 | MEMO ENDORSEMENT as to Paul Calder Leroux on re: 79 Letter filed by Paul Calder Leroux...ENDORSEMENT...Application granted. The sentence is scheduled for August 20, 2020 at 9:00am and will be held by video conference( Sentencing set for 8/20/2020 at 09:00 AM before Judge Ronnie Abrams.) (Signed by Judge Ronnie Abrams on 7/28/2020)(jw) (Entered: 07/28/2020) |
| 07/29/2020 | 81 | TRANSCRIPT of Proceedings as to Paul Calder Leroux re: Sentence held on 6/12/2020 before Judge Loretta A. Preska. Court Reporter/Transcriber: Paula Speer, (212) 805-0300, Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 8/19/2020. Redacted Transcript |

| | | |
|---|---|---|
| | | Deadline set for 8/31/2020. Release of Transcript Restriction set for 10/27/2020. (McGuirk, Kelly) (Entered: 07/29/2020) |
| 07/29/2020 | 82 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT as to Paul Calder Leroux. Notice is hereby given that an official transcript of a Sentence proceeding held on 6/12/2020 has been filed by the court reporter/transcriber in the above-captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days.... (McGuirk, Kelly) (Entered: 07/29/2020) |
| 08/18/2020 | 83 | ORDER as to Paul Calder Leroux. The CourtCall video sentencing is scheduled for Thursday August 20, 2020 at 9:00 a.m. Members of the public and the press can use the following dial-in information: Dial-In Number: 855-268-7844 Access Code: 32091812# PIN: 9921299# (Signed by Judge Ronnie Abrams on 8/18/2020)(jw) (Entered: 08/18/2020) |
| 08/18/2020 | 84 | LETTER by Paul Calder Leroux addressed to Judge Ronnie Abrams from Jeffrey Chabrowe, Esq. dated August 18, 2020 re: Request to Adjourn Additional Sentencing Hearing (Chabrowe, Jeffrey) (Entered: 08/18/2020) |
| 08/20/2020 | 85 | MEMO ENDORSEMENT as to Paul Calder Leroux...ENDORSEMENT...Application granted. The sentencing is hereby adjourned to September 10, 2020 at 9am and will be held via video conference. SO ORDERED( Sentencing set for 9/10/2020 at 09:00 AM before Judge Ronnie Abrams.). (Signed by Judge Ronnie Abrams on 8/19/20)(jw) (Entered: 08/20/2020) |
| 09/08/2020 | 86 | ORDER as to Paul Calder Leroux. The CourtCall video sentencing is scheduled for Thursday September 10, 2020 at 9:00 a.m. Members of the public and the press can use the following dial-in information: Dial-In Number: 855-268-7844 Access Code: 32091812# PIN: 9921299# SO ORDERED. (Signed by Judge Ronnie Abrams on 9/8/2020)(jbo) (Entered: 09/08/2020) |
| 09/10/2020 | | Minute Entry for proceedings held before Judge Ronnie Abrams: Sentencing held on 9/10/2020 for Paul Calder Leroux (1) Count 1s,2s,3s,4s. Sentence held. Defendant waives his in person appearance and consents to proceed by video conference. AUSA Michael Lockard present. Defendant Paul Calder Leroux present. Defense counsel Jeffrey Chabrowe present. Court reporter Pam |

| | | |
|---|---|---|
| | | Utter present. See Judgments for terms of sentence. (Court Reporter Pam Utter) (ap) (Entered: 09/10/2020) |
| 09/10/2020 | 87 | AMENDED JUDGMENT IN A CRIMINAL CASE as to Paul Calder Leroux (1). Date of Original Judgment: 7/8/2020. IMPRISONMENT: 300months (to run concurrently) (300 months on Count 1; 240 months on Count 2; 60 months on Count 3; 150 months on Count 4; for a total of 300 months) This sentence is to run concurrent to the sentence imposed in 14 Cr. 75. SUPERVISED RELEASE: Life on Count (1), three years on each of Counts (2), (3) and (4) to run concurrently, for a total of a life term of supervised release. This term of supervised release is to run concurrent to the term of supervision imposed in 14 Cr. 75. The defendant shall forfeit the defendant's interest in the following property to the United States: A separate Preliminary Order of Forfeiture was issued on July 17, 2020 and is incorporated into this Judgment. (Signed by Judge Ronnie Abrams on 9/10/2020)(ap) (Entered: 09/11/2020) |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - -x
                        :

UNITED STATES OF AMERICA
                        :       <u>SEALED INDICTMENT</u>

      - v. -
                        :

PAUL CALDER LEROUX,          S1 12 Cr. 489
  a/k/a "Bernard John Bowlins,"  :
  a/k/a "John Smith,"

        Defendant.     :

- - - - - - - - - - - - - - - - - -x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 9/26/12

<u>COUNT ONE</u>

The Grand Jury charges:

1.    From at least in or about April 2012 through the date of the filing of this Indictment, in Brazil, the Philippines, Liberia, and elsewhere, PAUL CALDER LEROUX, a/k/a "Bernard John Bowlins," a/k/a "John Smith," the defendant, who will be arrested and first brought to the Southern District of New York, and others known and unknown, intentionally and knowingly did combine, conspire, confederate and agree together and with each other to violate the narcotics laws of the United States.

2.    It was a part and an object of the conspiracy that PAUL CALDER LEROUX, a/k/a "Bernard John Bowlins," a/k/a "John Smith," the defendant, and others known and unknown, would and did import into the United States from a place outside thereof a controlled substance, to wit, five hundred grams and more of a mixture or substance containing a detectable amount of

A                23

methamphetamine, in violation of Sections 812, 952(a), and 960(b)(1)(H) of Title 21, United States Code.

3.    It was further a part and an object of the conspiracy that PAUL CALDER LEROUX, a/k/a "Bernard John Bowlins," a/k/a "John Smith," the defendant, and others known and unknown, would and did distribute a controlled substance, to wit, five hundred grams and more of a mixture or substance containing a detectable amount of methamphetamine, intending and knowing that such substance would be imported into the United States from a place outside thereof, in violation of Sections 959, 960(a)(3) and 960(b)(1)(H) of Title 21, United States Code.

<u>Overt Acts</u>

4.    In furtherance of the conspiracy, and to effect the illegal objects thereof, the following overt acts, among others, were committed:

a.    In or about April 2012, PAUL CALDER LEROUX, a/k/a "Bernard John Bowlins," a/k/a "John Smith," the defendant, communicated with a confidential source acting at the direction of law enforcement (the "CS").  During these communications, the CS represented to LEROUX, in substance and in part, that the CS was in contact with representatives of a South American drug trafficking organization (the "DTO") that was interested in establishing facilities in Liberia for the production of

2

methamphetamine and cocaine, for importation to the United States.

        b.    On or about May 11, 2012, LEROUX attended a meeting with the CS in Barra da Tijuaca, Brazil, to discuss, among other things, LEROUX's supplying the DTO with chemicals, a chemist, and facilities to manufacture methamphetamine for importation to the United States, and to discuss LEROUX's purchase of cocaine from the DTO for LEROUX's customers in Europe.

        c.    On or about May 18, 2012, LEROUX provided the CS with bank account information so that the DTO could pay LEROUX for a sample of methamphetamine and for a sterile laboratory-type facility -- which LEROUX referred to as a "clean room" -- that LEROUX would supply to the DTO in Liberia for the production of methamphetamine and cocaine.

        d.    On or about May 19, 2012, LEROUX emailed the CS a tracking number for a package containing a sample of methamphetamine LEROUX caused to be shipped to the DTO. A package associated with the tracking number provided by LEROUX was later received by law enforcement agents in Liberia from the commercial carrier. The contents of the package were tested and found to contain approximately 24.2 grams of nearly pure methamphetamine.

3

e.   On or about June 16, 2012, LEROUX sent the CS
an email proposing, among other things, to sell the DTO 100
kilograms of methamphetamine in exchange for 100 kilograms of
cocaine.

(Title 21, United States Code, Sections 952, 959, and 963,
        and Title 18, United States Code, Section 3238.)

### FORFEITURE ALLEGATION

4.   As a result of committing the controlled substance
offense alleged in Count One of this Indictment, PAUL CALDER
LEROUX, a/k/a "Bernard John Bowlins," a/k/a "John Smith," the
defendant, shall forfeit to the United States, pursuant to Title
21, United States Code, Sections 853 and 970, any and all
property constituting or derived from any proceeds the defendant
obtained directly or indirectly as a result of the said violation
and any and all property used or intended to be used in any
manner or part to commit and to facilitate the commission of the
violation alleged in Count One of this Indictment.

### Substitute Asset Provision

5.   If any of the property described above as being
subject to forfeiture, as a result of any act or omission of the
fpdefendant –

a.   cannot be located upon the exercise of due
        diligence;

b.   has been transferred or sold to, or deposited
        with, a third person;

4

A       26

      c.    has been placed beyond the jurisdiction of the Court;

      d.    has been substantially diminished in value; or

      e.    has been commingled with other property which cannot be subdivided without difficulty;

it is the intention of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the above forfeitable property.

(Title 21, United States Code, Sections 853 and 970.)

_____  9/24/2012
FOREPERSON

_____
PREET BHARARA
United States Attorney

5

Form No. USA-33s-274 (Ed. 9-25-58)

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

### UNITED STATES OF AMERICA

- v -

**PAUL CALDER LEROUX,**
a/k/a "Bernard John Bowlins,"
a/k/a "John Smith,"

Defendant.

### SEALED
### INDICTMENT

21 U.S.C. § 963

_____
PREET BHARARA
United States Attorney.

_Meme Pegli_

Foreperson

9/26/12  FILED SEALED INDICTMENT. WARRANT ISSUED.

COTT USM)



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

December 16, 2013

B. Alan Seidler, Esq.
580 Broadway
New York, NY 10012
(212)-334-3131
snedens66@aol.com

Re:    **United States v. Paul Calder LeRoux,**
       **S2 12 Cr. 489 (RPP) (SDNY)**
       **13 Cr. _____ (D. Minn.)**

Dear Mr. Seidler:

On the understandings specified below, the Office of the United States Attorney for the Southern District of New York ("this Office" or the "U.S. Attorney's Office") and the Consumer Protection Branch of the U.S. Department of Justice (the "Consumer Protection Branch") will accept a guilty plea from Paul Calder LeRoux ("LeRoux" or the "defendant") to Counts One through Four of the Information S2 12 Cr. 489 (RPP) (the "Information") (*see* Exhibit A hereto) and to Counts One through Three of an information to be filed in the United States District Court for the District of Minnesota and transferred to the Southern District of New York for plea and sentencing pursuant to Rule 20 of the Federal Rules of Criminal Procedure (the "Second Information") (*see* Exhibit B hereto).

Count One of the Information charges the defendant with a violation of Title 21, United States Code, Section 963, in connection with his participation in a conspiracy to distribute 500 grams and more a mixture and substance containing a detectable amount of methamphetamine, knowing and intending that it would be imported to the United States, and to import 500 grams and more of a mixture and substance containing a detectable amount of methamphetamine into the United States, from at least in or about April 2012 through in or about September 2012. Count One carries a maximum term of imprisonment of life; a mandatory minimum term of imprisonment of 10 years; a maximum term of supervised release of life; a mandatory minimum term of supervised release of five years; a maximum fine, pursuant to Title 21, United States Code, Section 960(b)(1) and Title 18, United States Code, Section 3571, of the greatest of $10,000,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense; and a $100 mandatory special assessment.

A                                                                          3507-28

Count Two of the Information charges the defendant with a violation of Title 50, United States Code, Section 1705 and Title 31, Code of Federal Regulations, Sections 560.203 and 560.204, in connection with his unlicensed exportation of goods and technology from the United States to a person in a third country with knowledge that goods and technology were intended for use in the production of or for incorporation into technology and services to be supplied to the Government of Iran, from in or about 2009 through September 2012. Count Two carries a maximum term of imprisonment of 20 years; a maximum term of supervised release of three years; a maximum fine, pursuant to Title 50, United States Code, Section 1705(c) and Title 18, United States Code, Section 3571, of the greatest of $1,000,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense; and a $100 mandatory special assessment.

Count Three of the Information charges the defendant with a violation of Title 18, United States Code, Sections 1030(a)(2) and (b) in connection with his participation in a conspiracy to commit computer hacking, from in or about 2008 through in or about 2011. Count Three carries a maximum term of imprisonment of five years; a maximum term of supervised release of three years; a maximum fine, pursuant to Title 18, United States Code, Section 3571, of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense; and a $100 mandatory special assessment.

Count Four of the Information charges the defendant with a violation of Title 18, United States Code, Section 3 for his assisting an offender, knowing that an offense against the United States had been committed, in order to hinder or prevent the offender's apprehension, trial or punishment, in or about 2008. Because the offender assisted by the defendant was charged with offenses including securities and commodities fraud in violation of Title 18, United States Code, Section 1348, Count Four carries a maximum term of imprisonment of twelve and a half years; a maximum term of supervised release of three years; a maximum fine, pursuant to Title 18, United States Code, Sections 1348 and 3571, of the greatest of $125,000, the gross pecuniary gain derived from the securities fraud offense, or the gross pecuniary loss to persons other than the defendant resulting from the securities fraud offense; and a $100 mandatory special assessment.

Count One of the Second Information charges the defendant with a violation of Title 18, United States Code, Section 371 in connection with his participation in a conspiracy to introduce misbranded drugs and to deliver for introduction into interstate commerce misbranded drugs with intent to defraud and mislead, from in or about 2004 through in or about September 2012. Count One of the Second Information carries a maximum term of imprisonment of five years; a maximum term of supervised release of three years; a maximum fine, pursuant to Title 18, United States Code, Section 3571, of the greatest of $250,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense; and a $100 mandatory special assessment.

Count Two of the Second Information charges the defendant with a violation of Title 18, United States Code, Section 1349 in connection with his participation in a conspiracy to commit mail and wire fraud, from in or about 2004 through in or about September 2012. Count Two of

the Second Information carries a maximum term of imprisonment of 20 years; a maximum term of supervised release of three years; a maximum fine, pursuant to Title 18, United States Code, Section 3571, of the greatest of $1,000,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense; and a $100 mandatory special assessment.

Count Three of the Second Information charges the defendant with a violation of Title 18, United States Code, Section 1956(h) in connection with his participation in a conspiracy to launder money, from in or about 2004 through in or about September 2012. Count Three of the Second Information carries a maximum term of imprisonment of 20 years; a maximum term of supervised release of three years; a maximum fine, pursuant to Title 18, United States Code, Sections 1956(a) and 3571, of the greatest of $500,000, twice the gross pecuniary gain derived from the offense, or twice the gross pecuniary loss to persons other than the defendant resulting from the offense; and a $100 mandatory special assessment.

Accordingly, the total maximum sentence of incarceration is life imprisonment, with a mandatory minimum sentence of ten years' imprisonment.

The defendant consents to the immediate transfer of the Second Information from the District of Minnesota to the Southern District of New York for purposes of plea and sentencing pursuant to Rule 20 of the Federal Rules of Criminal Procedure. The defendant further waives any objection to venue in the Southern District of New York with respect to the offenses charged in either the Information or the Second Information. The defendant also waives any applicable statute of limitations defenses with respect to the offenses charged in either the Information or the Second Information.

It is further understood that LeRoux shall make restitution in an amount to be specified by the Court in accordance with 18 U.S.C. §§ 3663, 3663A, and 3664. This amount shall be paid according to a plan established by the Court.

The defendant furthermore admits the forfeiture allegation with respect to Counts One, Two, and Three of the Information and Counts Two and Three of the Second Information, and agrees to forfeit to the United States (i) pursuant to Title 21, United States Code, Sections 853 and 970, any and all property constituting and derived from any proceeds that the defendant obtained directly and indirectly as a result of the offense charged in Count One of the Information and any and all property used and intended to be used in any manner or part to commit and to facilitate the commission of the offense charged in Count One of the Information; (ii) pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real or personal, constituting or derived from proceeds traceable to the offense charged in Counts Two and Three of the Information; (iii) pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real or personal, constituting or derived from proceeds traceable to the offense charged in Counts Two and Three of the Information; (iv) pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, all property, real or personal, constituting or derived from proceeds traceable to the offenses charged in Count Two of the Second Information; and (v) pursuant to Title 18, United States Code, Section 982(a)(1),

10/18/2013

A

3507-28

all property, real or personal, involved in the offense charged in Count Three of the Second Information and all property traceable to such property. It is further understood that any forfeiture of the defendant's assets shall not be treated as satisfaction of any fine, restitution, cost of imprisonment, or any other penalty the Court may impose upon him in addition to forfeiture.

It is understood that LeRoux (a) shall truthfully and completely disclose all information with respect to the activities of himself and others concerning all matters about which the U.S. Attorney's Office inquires of him, which information can be used for any purpose; (b) shall cooperate fully with the U.S. Attorney's Office, the Special Operations Division of the Drug Enforcement Administration, and any other law enforcement agency specifically designated by the U.S. Attorney's Office; (c) shall attend all meetings at which the U.S. Attorney's Office requests his presence; (d) shall provide to the U.S. Attorney's Office, upon request, any document, record, or other tangible evidence relating to matters about which this Office inquires of him; (e) shall truthfully testify before the grand jury and at any trial and other court proceeding with respect to any matters about which the U.S. Attorney's Office may request his testimony; (f) shall bring to the U.S. Attorney's Office's attention all crimes which he has committed, and all administrative, civil, or criminal proceedings, investigations, or prosecutions in which he has been or is a subject, target, party, or witness; and, (g) shall commit no further crimes whatsoever. Moreover, any assistance LeRoux may provide shall be pursuant to the specific instructions from and control of the U.S. Attorney's Office.

It is further understood that LeRoux will direct that certain assets that he (LeRoux) controls directly or indirectly be utilized or expended, pursuant to the guidance and supervision of the U.S. Attorney's Office and the Special Operations Division of the Drug Enforcement Administration, in connection with and in furtherance of those ongoing investigations in which LeRoux provides assistance as part of this Agreement.

It is understood that the U.S. Attorney's Office and the Consumer Protection Branch cannot, and do not, agree not to prosecute LeRoux for criminal tax violations. However, if LeRoux fully complies with the understandings specified in this Agreement, no testimony or other information given by him (or any other information directly or indirectly derived therefrom) will be used against him in any criminal tax prosecution. Moreover, if LeRoux fully complies with the understandings specified in this Agreement, he will not be further prosecuted criminally by the U.S. Attorney's Office or by the Consumer Protection Branch for any crimes, except for criminal tax violations, related to (1) his participation in a methamphetamine conspiracy, from approximately April 2012 through September 2012, as charged in Count One of the Information; (2) his exportation of goods and technology from the United States for use in the production of, or for incorporation into, technology and services to be supplied to the Government of Iran, from approximately 2009 through September 2012, as charged in Count Two of the Information; (3) his participation in a conspiracy to commit hacking, from approximately 2008 through 2011, as charged in Count Three of the Information; (4) his assisting an offender in order to hinder or prevent his apprehension, trial or punishment, in or about 2008, as charged in Count Four of the Information; (5) his participation in a conspiracy to distribute misbranded drugs (including but not limited to Fioricet, Soma, and Ultram) from approximately May 2004 through September 2012, as charged in Count One of the Second Information; (6) his participation in a conspiracy to commit mail and wire fraud, from

approximately May 2004 through September 2012, as charged in Count Two of the Second Information; (7) his participation in a conspiracy to launder money, from approximately May 2004 through September 2012, as charged in Count Three of the Second Information; (8) his discussions in or about 2012 about possessing with intent to distribute carisoprodol, a controlled substance; (9) his participation in a conspiracy to possess with intent to distribute cocaine and methamphetamine in the Philippines, Hong Kong, Thailand, Peru, and Ecuador from in or about 2010 through 2012, for which there is no federal jurisdiction; (10) his participation in the murders-for-hire of Bruce Jones, Herbert Chu, David Smith, FNU LNU a/k/a "Chito," Naomi Edillor, Katherine Lee, and Joe Frank Zuñiga in the Philippines from in or about 2010 through in or about 2012, for which there is no federal jurisdiction; (11) his participation in a conspiracy to commit assault and arson against Moran Oz in the Philippines, Steven Hahn and Andrew Hahn in Zimbabwe and the Philippines, Gary Smith and Matthew Smith in South Africa, and FNU LNU a/k/a "Joseph" in the Philippines from in or about 2008 through in or about 2011, for which there is no federal jurisdiction; (12) his participation in the bribery of foreign government officials in the Philippines, China, Laos, Africa, and Brazil from in or about 2005 through 2012, for which there is no federal jurisdiction; (13) his discussions in or about 2012 about acquiring surface-to-air missiles in or about 2012; and (14) his conspiring to distribute prescription medications controlled by State law without a valid prescription from in or about 2004 through 2012, for which there is no federal jurisdiction. This provision concerning further prosecution applies to participation in the conduct above to the extent that LeRoux has disclosed such participation to this Office as of the date of this Agreement. This Agreement does not provide any protection against prosecution for any crimes except as set forth above, including any other acts of violence.

It is understood that all of the conduct set forth in in the preceding paragraph shall constitute either relevant conduct, pursuant to United States Sentencing Guidelines ("U.S.S.G.") Section 1B1.3, or other conduct of the defendant, pursuant to U.S.S.G. § 1B1.4, that the Court may consider at the time of sentencing.

It is understood that LeRoux's truthful cooperation with this Office is likely to reveal activities of individuals who might use violence, force, and intimidation against LeRoux, his family, and loved ones. Should LeRoux's cooperation present a significant risk of physical harm, this Office, upon the written request of LeRoux, will take steps that it determines to be reasonable and necessary to attempt to ensure his safety and that of his family and loved ones. These steps may include application to the Witness Security Program of the United States Marshals Service, whereby LeRoux, his family, and loved ones, if approved, could be relocated under new identities. If this Office concludes that the entry into the Witness Security Program is appropriate based upon a significant risk of physical harm, if requested by the defendant, the Office will convey that information to the United States Marshals Service. It is understood, however, that the Witness Security Program is under the direction and control of the United States Marshals Service and of the Office of Enforcement Operations of the United States Department of Justice, Criminal Division ("OEO"), not of this Office.

If the defendant is eligible and applies to transfer his sentence pursuant to the international prisoner transfer program, the U.S. Attorney's Office and the Consumer Protection Branch agree that they will assess any application for a prisoner transfer under the Department of

10/18/2013

3507-28

A

Justice's Guidelines for Evaluation of Transfer Applications of Federal Prisoners. LeRoux acknowledges and understands, however, that the transfer decision rests in the sole discretion of OEO and that the position of the U.S. Attorney's Office or the Consumer Protection Branch is neither binding nor determinative of the positions of other federal agencies or on the final transfer decision of OEO. The defendant further understands that, in addition to OEO, federal law and the underlying transfer treaties require that the foreign government must also approve the transfer.

It is understood that this Agreement does not bind any prosecuting authority other than this Office and the Consumer Protection Branch. This Office will, however, bring the cooperation of LeRoux to the attention of other prosecuting offices, if requested by him. Nor does this Agreement bind the Bureau of Immigration and Customs Enforcement ("ICE"), although this Office will bring the cooperation of LeRoux to the attention of ICE, if requested by him.

It is understood that the sentence to be imposed upon LeRoux is within the sole discretion of the Court. This Office cannot, and does not, make any promise or representation as to what sentence LeRoux will receive, and will not recommend any specific sentence to the Court. However, this Office will inform the Probation Department and the Court of (a) this Agreement; (b) the nature and extent of LeRoux's activities with respect to this case and all other activities of LeRoux which this Office deems relevant to sentencing; and (c) the nature and extent of LeRoux's cooperation with this Office. In so doing, this Office may use any information it deems relevant, including information provided by LeRoux both prior to and subsequent to the signing of this Agreement. In addition, if this Office determines that LeRoux has provided substantial assistance in an investigation or prosecution, and if he has fully complied with the understandings specified in this Agreement, this Office will file a motion, pursuant to Section 5K1.1 of the Sentencing Guidelines and 18 U.S.C. § 3553(e), requesting the Court to sentence LeRoux in light of the factors set forth in Section 5K1.1(a)(1)-(5). It is understood that, even if such a motion is filed, the sentence to be imposed on LeRoux remains within the sole discretion of the Court. Moreover, nothing in this Agreement limits this Office's right to present any facts and make any arguments relevant to sentencing to the Probation Department and the Court, or to take any position on post-sentencing motions. LeRoux hereby consents to such adjournments of his sentence as may be requested by this Office.

It is understood that, should this Office determine either that LeRoux has not provided substantial assistance in an investigation or prosecution, or that LeRoux has violated any provision of this Agreement, such a determination will release this Office from any obligation to file a motion pursuant to Section 5K1.1 of the Sentencing Guidelines and 18 U.S.C. § 3553(e), but will not entitle LeRoux to withdraw his guilty plea once it has been entered.

It is understood that, should this Office determine, subsequent to the filing of a motion pursuant to Section 5K1.1 of the Sentencing Guidelines and/or 18 U.S.C. § 3553(e), that LeRoux has violated any provision of this Agreement, this Office shall have the right to withdraw such motion.

10/18/2013

A

3507-28

It is understood that, should LeRoux commit any further crimes or should it be determined that he has given false, incomplete, or misleading testimony or information, or should he otherwise violate any provision of this Agreement, LeRoux shall thereafter be subject to prosecution for any federal criminal violation of which this Office has knowledge, including perjury and obstruction of justice. Any such prosecution that is not time-barred by the applicable statute of limitations on the date of the signing of this Agreement may be commenced against LeRoux, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement of such prosecution. It is the intent of this Agreement to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date that this Agreement is signed.

It is understood that in the event that it is determined that LeRoux has committed any further crimes, given false, incomplete, or misleading testimony or information, or otherwise violated any provision of this Agreement, (a) all statements made by LeRoux to this Office, the Consumer Protection Branch, or any other designated law enforcement agents, and any testimony given by LeRoux before a grand jury or other tribunal, whether prior to or subsequent to the signing of this Agreement, and any leads from such statements or testimony shall be admissible in evidence in any criminal proceeding brought against LeRoux; and (b) LeRoux shall assert no claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, or any other federal rule that such statements or any leads therefrom should be suppressed. It is the intent of this Agreement to waive all rights in the foregoing respects.

The defendant hereby acknowledges that he has accepted this Agreement and decided to plead guilty because he is in fact guilty. By entering this plea of guilty, the defendant waives any and all right to withdraw his plea or to attack his conviction, either on direct appeal or collaterally, on the ground that the Government has failed to produce any discovery material, *Jencks* Act material, exculpatory material pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), other than information establishing the factual innocence of the defendant, and impeachment material pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), that has not already been produced as of the date of the signing of this Agreement.

The defendant recognizes that, if he is not a citizen of the United States, his guilty plea and conviction make it very likely that his deportation from the United States is presumptively mandatory and that, at a minimum, he is at risk of being deported or suffering other adverse immigration consequences. The defendant acknowledges that he has discussed the possible immigration consequences (including deportation) of his guilty plea and conviction with defense counsel. The defendant affirms that he wants to plead guilty regardless of any immigration consequences that may result from the guilty plea and conviction, even if those consequences include deportation from the United States. It is agreed that the defendant will have no right to withdraw his guilty plea based on any actual or perceived adverse immigration consequences (including deportation) resulting from the guilty plea and conviction. It is further agreed that the defendant will not challenge his conviction or sentence on direct appeal, or through litigation under Title 28, United States Code, Section 2255 and/or Section 2241, on the basis of any actual or perceived adverse immigration consequences (including deportation) resulting from his guilty plea and conviction.

10/18/2013

3507-28

A

This Agreement supersedes any prior understandings, promises, or conditions between this Office or the Consumer Protection Branch and LeRoux. No additional understandings, promises, or conditions have been entered into other than those set forth in this Agreement, and none will be entered into unless in writing and signed by all parties.

Very truly yours,

PREET BHARARA
United States Attorney

By: _____
Michael D. Lockard/Aimee Hector/Anna M. Skotko
Assistant United States Attorneys
(212) 637-2193/2203/1591

APPROVED:

_Lorin L. Reisner_
LORIN L. REISNER
Chief, Criminal Division

AGREED AND CONSENTED TO:

_____
Linda I. Marks, Senior Litigation Counsel
Perham Gorji, Trial Attorney
Consumer Protection Branch
United States Department of Justice

AGREED AND CONSENTED TO:

_____     12 - 30 - 13
Paul Calder LeRoux                  DATE

APPROVED:

_____     12 - 30 - 13
B. Alan Seidler, Esq.               DATE
Attorney for the Defendant

10/18/2013

A

3507-28

CASE 0:14-cr-00016-JRT *SEALED* Document 1 Filed 01/13/14 Page 1 of 11

A true printed copy of _____ ii____ sheet(s)
of the electronic record filed on 1-13-14
in the United States District Court
or the District of Minnesota
CERTIFIED _____ 2- 3 _____, 20__
BY: _____
Deputy Clerk

## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA | ) Cr. No. 14-__16 JRT__ |
| | ) |
| Plaintiff, | ) **INFORMATION (FILED UNDER SEAL)** |
| | ) |
| v. | ) 18 U.S.C. § 1341 |
| | ) 18 U.S.C. § 1343 |
| | ) 18 U.S.C. § 1349 |
| PAUL CALDER LE ROUX, | ) 18 U.S.C. § 1956(h) |
| a/k/a "Johan Smit," | ) 18 U.S.C. § 1956(a)(1)(A)(i) |
| | ) 21 U.S.C. §§ 331(a), 333(a)(2), 352(a) |
| | ) 18 U.S.C. § 982(a)(1) & (b) |
| Defendant | ) 21 U.S.C. § 853 |

**FILED UNDER SEAL**

THE UNITED STATES CHARGES THAT:

### COUNT ONE
### (Conspiracy to Violate the Federal Food, Drug, and Cosmetic Act)

1.     Beginning in or before May 2004, the exact date being unknown to the United

States, and continuing until on or about September 2012, in the District of Minnesota and

elsewhere, defendant

### PAUL CALDER LE ROUX,
### a/k/a "Johan Smit" ("LE ROUX"),

conspired and agreed, together and with others known and unknown to the United States, to

commit an offense against the United States, that is, introduce and cause the introduction and

delivery for introduction into interstate commerce from various locations in the United States,

outside the District of Minnesota, to various locations in the United States, including the District

of Minnesota, with the intent to defraud and mislead, prescription drugs, including the

prescription drugs Fioricet (butalbital/acetaminophen/caffeine, and also known as Isocet), Soma

(carisoprodol), and Ultram (tramadol), which were misbranded within the meaning of Title 21,

United States Code, Section 353(b)(1), in that they were dispensed without the prescription of a

SCANNED

JAN 1 7 2014

U.S. DISTRICT COURT MPLS

A

practitioner licensed by law to administer such drug, in violation of Title 21, United States Code, Sections 331(a) and 333(a)(2).

2.  The object of the conspiracy was for LE ROUX and his co-conspirators to obtain substantial revenues and profits by illegally offering for sale and selling – without valid prescriptions – prescription drugs, including Fioricet, Soma, and Ultram, via Internet websites and telephone call centers, and causing them to be shipped to consumers in the United States and elsewhere.

3.  It was part of the conspiracy that LE ROUX and his co-conspirators, owned, operated, were affiliated with, and used Internet websites to market prescription drugs offered for sale through various businesses collectively known as RX Limited. RX Limited's marketing websites were linked via the Internet to RX Limited's Internet infrastructure and operating systems, and enabled customers to place drug orders over the Internet, or by various toll-free numbers listed on RX Limited's marketing websites, without a physical examination or doctor-patient relationship. LE ROUX was the founder and manager of RX Limited, and directed co-conspirators who handled the day-to-day management of the Internet pharmacy operation.

4.  It was part of the conspiracy that customers chose the type, quantity, and dosage of prescription drugs the customer wished to purchase, and paid for drug orders with credit cards. RX Limited did not verify the information customers provided, including their identities, ages, and qualifying medical conditions, and RX Limited's customers did not provide medical records or any prior prescription to RX Limited.

5.  It was further part of the conspiracy that LE ROUX and his co-conspirators recruited and paid physicians and pharmacies ("RX Limited physicians" and "RX Limited pharmacies") to authorize sham prescriptions and fraudulently dispense prescription drugs. In

-2-

A                                    38

virtually all instances, RX Limited physicians had no contact with such customers, whether face-to-face, on the telephone, or by electronic mail, and retained no records of their purported "consultations."

      6.     LE ROUX and his co-conspirators also arranged and paid for the drugs to be shipped to customers through various shipping accounts with commercial carriers and the United States Postal Service. In doing so, LE ROUX and his co-conspirators unlawfully dispensed, caused to be dispensed, and aided and abetted the dispensing of prescription drugs to customers who lived throughout the United States, without (a) verifying the customer's medical complaint, (b) having an adequate patient history, (c) performing a mental or physical exam, (d) using appropriate diagnostic or laboratory testing, and (e) providing a means to monitor the customer's response to the medication.

      7.     It was further part of the conspiracy that through RX Limited's marketing websites, LE ROUX and his co-conspirators made various misrepresentations to customers, including that the websites provided a "valid means for patients to receive treatment" and obtain prescription medication by completing an online questionnaire without a physical examination, knowing this to be a false representation and knowing that the RX Limited scheme constituted an illegal method of dispensing, distributing, and obtaining prescription drugs in the United States. LE ROUX and his co-conspirators also used numerous aliases when interacting with RX Limited physicians and pharmacies, and with various other entities, including shipping services, banks, and telephone companies, in order to mask the true ownership and operation of RX Limited.

      8.     In furtherance of the conspiracy and to effect the objects thereof, LE ROUX and his co-conspirators committed the following overt acts, among others, in the State and District of Minnesota and elsewhere, as described in the chart below, in that they unlawfully caused to be

-3-

A               39

dispensed, and aided the distribution of, the prescription drugs listed below, from an RX Limited pharmacy located outside Minnesota, to an undercover law enforcement investigator in Minnesota who, on or about the dates listed below, posed as an RX Limited customer and completed RX Limited's customer questionnaire by accessing the websites and customer-service telephone number listed below, without having a valid doctor-patient relationship with an RX Limited physician:

| DATE | PRESCRIPTION DRUG DISPENSED | WEBSITE OR TELEPHONE NUMBER | PHYSICIAN | DISPENSING PHARMACY LOCATION |
|------|------------------------------|------------------------------|-----------|-------------------------------|
| 07/18/2008 | 90 Isocet tablets | www.all-the-best-rx.com | L.R. | McMinnville, Tennessee |
| 08/27/2008 | 95 Fioricet tablets | www.cheaprxmeds.net | P.T. | Monroe, Wisconsin |
| 08/28/2008 | 24 generic Fioricet tablets | www.allpharmmeds.com | K.B. | Oshkosh, Wisconsin |
| 12/02/2008 | 90 Fioricet tablets | www.allpharmmeds.com | E.K. | Oshkosh, Wisconsin |
| 03/18/2010 | 90 generic Fioricet tablets | www.buymedscheap.com | E.K. | Oshkosh, Wisconsin |
| 03/18/2010 | 90 generic Fioricet tablets | www.my-online-drugstore.com | L.R. | Chicora, Pennsylvania |
| 07/15/2010 | 90 generic Fioricet tablets | www.preapprovedrx.com | O.A. | Oshkosh, Wisconsin |
| 09/02/2010 | 89 Tramadol tablets | www.matrixmeds.com | A.K. | Mobile, Alabama |
| 09/09/2010 | 90 generic Fioricet | www.your-pills.com | A.K. | Dallas, Texas |
| 11/22/2011 | 30 generic Fioricet | www.speedyrxdrugs.com | K.B. | Hellertown, Pennsylvania |
| 01/06/2012 | 30 Fioricet tablets | www.123onlinepharmacy.com | D.O. | Easton, Pennsylvania |
| 01/19/2012 | 90 generic Fioricet tablets | www.epropecia.com | E.K. | Elmhurst, New York |
| 02/24/2012 | 91 generic Fioricet tablets | 801-742-8160 | E.K. | Kissimmee, Florida |
| 03/15/2012 | 91 generic Fioricet tablets | 801-742-8160 | E.L. | Chapmanville, West Virginia |
| 03/15/2012 | 180 Tramadol tablets | 801-742-8160 | E.K. | Jacksonville, Florida |
| 05/25/2012 | 90 generic Fioricet tablets | www.fioricetdosage.com | E.K. | Elmhurst, New York |
| 09/14/2012 | 90 generic Fioricet tablets | www.your-pills.com | E.K. | Elmhurst, New York |

All in violation of Title 18, United States Code, Section 371.

-4-

## COUNT 2
### (Conspiracy to Commit Mail Fraud and Wire Fraud)

1.     The factual allegations in paragraphs 1 through 8 of Count One are incorporated by reference and realleged as though fully set forth herein.

2.     Beginning in or around May 2004, the exact date being unknown, through in or around September 2012, in the District of Minnesota, and elsewhere, defendant

**PAUL CALDER LE ROUX,**
**a/k/a "Johan Smit" ("LE ROUX"),**

did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly, combine, conspire, confederate and agree with others, known and unknown to the United States, to commit certain offenses, that is:

(a) to knowingly and with intent to defraud, devise and intend to devise, a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that they were false and fraudulent when made, and for the purpose of executing the scheme and artifice, did deposit and cause to be deposited matter to be sent and delivered by U.S. mail and private and commercial interstate carrier, and did knowingly cause to be delivered certain matter by U.S. mail and private and commercial interstate carriers, for the purpose of executing the scheme and artifice, in violation of Title 18, United States Code, Section 1341; and

(b) to knowingly and with intent to defraud, devise and intend to devise, a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, knowing that they were false and fraudulent when made, and transmit and cause to be transmitted certain wire communications in interstate

-5-

A                      41

commerce, for the purpose of executing the scheme, in violation of Title 18, United States Code, Section 1343.

    3.    It was the purpose of the conspiracy for LE ROUX and his co-conspirators to obtain substantial revenues and profits by illegally offering for sale and selling prescription drugs to consumers in the United States by means that were outside of the usual course of professional medical practice and without a legitimate medical purpose.

    4.    The manner and means, among others, of this conspiracy are set forth in paragraphs 1 through 7 of Count One, and are incorporated by reference and realleged as if fully set forth herein.

    5.    On or about the following dates listed in the chart below, in the District of Minnesota and elsewhere, LE ROUX and his co-conspirators, for the purpose of executing the scheme and artifice described above, and attempting to do so, knowingly caused to be delivered to Minneapolis, within the State and District of Minnesota, by the United States Postal Service and commercial interstate carrier, according to the directions thereon, the following items:

| DATE | PRESCRIPTION DRUG MAILED |
|---|---|
| 07/18/2008 | 90 Isocet tablets from a pharmacy in Tennessee |
| 08/27/2008 | 95 Fioricet tablets from a pharmacy in Wisconsin |
| 08/28/2008 | 24 generic Fioricet tablets from a pharmacy in Wisconsin |
| 12/02/2008 | 90 Fioricet tablets from a pharmacy in Wisconsin |
| 03/18/2010 | 90 generic Fioricet tablets from a pharmacy in Wisconsin |
| 03/18/2010 | 90 generic Fioricet tablets from a pharmacy in Pennsylvania |
| 07/15/2010 | 90 generic Fioricet tablets from a pharmacy in Wisconsin |
| 09/02/2010 | 89 Tramadol tablets from a pharmacy in Alabama |
| 09/09/2010 | 90 generic Fioricet tablets from a pharmacy in Texas |
| 11/22/2011 | 30 generic Fioricet tablets from a pharmacy in Pennsylvania |
| 01/06/2012 | 30 Fioricet tablets from a pharmacy in Pennsylvania |
| 01/19/2012 | 90 generic Fioricet tablets from a pharmacy in New York |
| 02/24/2012 | 91 generic Fioricet tablets from a pharmacy in Florida |
| 03/15/2012 | 91 generic Fioricet tablets from a pharmacy in West Virginia |
| 03/15/2012 | 180 Tramadol tablets from a pharmacy in Florida |
| 05/25/2012 | 90 generic Fioricet tablets from a pharmacy in New York |
| 09/14/2012 | 90 generic Fioricet tablets from a pharmacy in New York |

-6-

A         42

6.    On or about the following dates listed in the chart below, in the District of

Minnesota and elsewhere, LE ROUX and his co-conspirators, for the purpose of executing the

scheme described above, and attempting to do so, did knowingly cause to be transmitted, from

websites hosted and telephone call centers located outside the State and District of Minnesota, to

Minneapolis, within the State and District of Minnesota, by means of wire communications in

interstate commerce, certain writings, signs, signals, and sounds identified below:

| DATE | ORIGIN | DESCRIPTION |
|---|---|---|
| 07/18/2008 | www.all-the-best-rx.com | Marketing website viewed by S.J. in Minnesota stated that the website provided a valid method of obtaining prescription drugs |
| 03/18/2010 | www.buymedscheap.com | Marketing website viewed by S.J. in Minnesota stated that the website provided a valid method of obtaining prescription drugs |
| 03/18/2010 | www.my-online-drugstore.com | Marketing website viewed by S.J. in Minnesota stated that the website provided a valid method of obtaining prescription drugs |
| 07/15/2010 | www.preapprovedrx.com | Marketing website viewed by S.J. in Minnesota stated that the website provided a valid method of obtaining prescription drugs |
| 09/09/2010 | www.your-pills.com | Marketing website viewed by S.J. in Minnesota stated that the website provided a valid method of obtaining prescription drugs |
| 11/22/2011 | www.speedyrxdrugs.com | Marketing website viewed by S.J. in Minnesota stated that the website provided a valid method of obtaining prescription drugs |
| 01/06/2012 | www.123onlinepharmacy.com | Marketing website viewed by S.J. in Minnesota stated that the website provided a valid method of obtaining prescription drugs |
| 01/19/2012 | www.epropecia.com | Marketing website viewed by S.J. in Minnesota stated that the website provided a valid method of obtaining prescription drugs |
| 02/24/2012 | RX Limited customer service telephone number 801-742-8160 | Telephone call between S.J. in Minnesota and RX Limited customer service representative |
| 03/15/2012 | RX Limited customer service telephone number 801-742-8160 | Telephone call between S.J. in Minnesota and RX Limited customer service representative |

All in violation of Title 18, United States Code, Section 1349.

A                                    43

## FORFEITURE NOTICE

1.      The factual allegations in Count Two of this Information are hereby realleged and incorporated by reference, as if fully set forth herein, for the purpose of alleging forfeiture to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c).

2.      Pursuant to Federal Rule of Criminal Procedure 32.2, defendant LE ROUX is hereby notified that if convicted of the offense alleged in Count Two, the defendant shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), his interest in any property, real or personal, that constitutes or is derived, directly or indirectly, from proceeds obtained, directly or indirectly, as a result of such violation and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of the violation.

3.      If any of the property subject to forfeiture, as a result of any act or omission of the defendant (a) cannot be located upon the exercise of due diligence, (b) has been transferred or sold to, or deposited with, a third party, (c) has been placed beyond the jurisdiction of the Court, (d) has been substantially diminished in value, or (e) has been commingled with other property which cannot be divided without difficulty, it is the intent of the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendant up to the value of the property subject to forfeiture, in the form of a money judgment.

All in accordance with Title 18, United States Code, Section 981(a)(1)(C); Title 28, United States Code, Section 2461(c); Rule 32.2(a), Federal Rules of Criminal Procedure.

-8-

A                                                  44

## COUNT 3
### (Conspiracy to Launder Money)

1.       The factual allegations in paragraphs 1 through 8 of Count One, and paragraphs

1 through 6 of Count Two, are incorporated by reference and realleged as though fully set forth

herein.

2.       Beginning in or before May 2004, the exact date being unknown, and continuing

until at least September 2012, in the District of Minnesota and elsewhere,

### PAUL CALDER LE ROUX,
#### a/k/a "Johan Smit" ("LE ROUX"),

conspired and agreed, together and with others known and unknown to the United States, to

transport, transmit, and transfer funds, from a place outside the United States, that is, Hong

Kong, to places in the United States, including the District of Minnesota, with the intent of

promoting the carrying on of specified unlawful activities, that is, mail fraud and wire fraud, in

violation of Title 21, United States Code, Sections 1341 and 1343.

3.       It was the purpose of the conspiracy for LE ROUX and his co-conspirators to

transport, transmit, and transfer funds, to a place in the United States from and through a place

outside the United States, with the intent of promoting the carrying on of specified unlawful

activities, in violation of Title 21, United States Code, Sections 1956(a)(2)(A), in order to obtain

large quantities of funds, thereby enriching themselves, in exchange for fraudulently distributing

and dispensing prescription drugs.

4.       It was a part of the conspiracy that LE ROUX and his co-conspirators caused

wire transfers to be made from financial institutions outside of the United States to United States

bank accounts belonging to and associated with RX Limited physicians and pharmacists, in

payment for the physicians' approval of RX Limited's customers' prescription drug orders, and

-9-

in payment for the wholesale cost of drugs and dispensing fees for RX Limited fulfillment pharmacies.

5. It was also part of the conspiracy that LE ROUX and his co-conspirators caused wire transfers to be made from financial institutions outside of the United States to the bank accounts of the owners and operators of RX Limited's marketing websites ("marketing affiliates"), at financial institutions in the United States, in payment for the marketing affiliates posting websites on the Internet.

All in violation of Title 18, United States Code, Section 1956(h).

## FORFEITURE NOTICE

1. The allegations of Count 3 of this Indictment are realleged and incorporated by reference as though set forth fully herein for the purpose of alleging forfeiture to the United States pursuant to the provisions of Title 18, United States Code, Section 982.

2. Pursuant to Fed. R. Crim. P. Rule 32.2(a), the defendant LE ROUX is hereby notified that, if convicted of the offense alleged above, the defendant shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a)(1), the following property:

(a) All right, title, and interest in any and all property involved in the conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956, and all property traceable to such property, including the following: (i) all money or other property that was the subject of each transaction, transportation, transmission or transfer in violation of Section 1956; (ii) all commissions, fees and other property constituting proceeds obtained as a result of those violations; and (iii) all property used in any manner or part to commit or to facilitate the commission of those violations.

(b) A sum of money equal to the total amount of money involved in the conspiracy to

-10-

A                    46

commit money laundering.

3.     Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), the defendant shall forfeit substitute property, if, by any act or omission of the defendant, the property, or any portion thereof, cannot be located upon the exercise of due diligence; has been transferred, sold to or deposited with a third party; has been placed beyond the jurisdiction of the court; has been substantially diminished in value; or has been commingled with other property which cannot be divided without difficulty.

All in accordance with Title 18, United States Code, Section 982(a)(1) and (b), and Rule 32.2(a), Federal Rules of Criminal Procedure.

DATED: January 13, 2014

                                        JOHN MARTI
                                        ACTING UNITED STATES ATTORNEY



                                        LINDA I. MARKS
                                        SENIOR LITIGATION COUNSEL
                                        PERHAM GORJI
                                        TRIAL ATTORNEY
                                        CONSUMER PROTECTION BRANCH
                                        U.S. DEPARTMENT OF JUSTICE

-11-

A                              47

1

Xe2j1ler1                    SEALED DO NOT DOCKET

1   UNITED STATES DISTRICT COURT
2   SOUTHERN DISTRICT OF NEW YORK
    -------------------------------x
3   UNITED STATES OF AMERICA,

4              v.                        12-CR-489 (RPP)
                                         14-CR-75  (RPP)
5   PAUL CALDER LEROUX,

6              Defendant.

7   -------------------------------x

8                                        New York, N.Y.
                                         February 19, 2014
9                                        5:10 p.m.

10

11  Before:

12            HON. ROBERT P. PATTERSON, JR.,

                                         District Judge
13

14                       APPEARANCES

15  PREET BHARARA
         United States Attorney for the
16       Southern District of New York
    BY:  AIMEE HECTOR, ESQ.
17       MICHAEL D. LOCKARD, ESQ.
         Assistant United States Attorneys
18
    U.S. DEPARTMENT OF JUSTICE CONSUMER PROTECTION BRANCH
19  BY:  LINDA I. MARKS, ESQ., Senior Litigation Counsel
         PERHAM GORJI, ESQ.
20
    B. ALAN SEIDLER, ESQ.
21       Attorney for Defendant

22

23

24

25

*make copy on A.*

2

Xe2j1ler1                    SEALED DO NOT DOCKET

1            THE COURT:  Have the attorneys surveyed the courtroom?

2    Is there anyone here who isn't authorized by the government and

3    the defense?

4            MS. HECTOR:  No, your Honor.

5            MR. SEIDLER:  No, your Honor.

6            THE COURT:  All right.  I prefer not to order the

7    sealing of the courtroom under the circumstances because it

8    sometimes complicates matters unduly by issuing such an order,

9    so otherwise I'll sign the sealing order --

10           MR. SEIDLER:  Thank you.

11           MS. HECTOR:  Okay.  Thank you.

12           THE COURT:  -- that the parties have sent up.

13           All right.  Mr. Seidler, do you want to say something?

14           MR. SEIDLER:  Well, just that there's a plea agreement

15   between the parties, your Honor, and Mr. Leroux is here to

16   enter a guilty plea to the four counts of the Southern District

17   information and the three counts of the Minnesota information,

18   which has been Rule 20'd to the Southern District.

19           THE COURT:  And is the information here in the

20   Southern District a superseding information, Superseder 2?

21           MR. SEIDLER:  Yes, sir.

22           THE COURT:  Which do the parties want to conclude

23   first?

24           MR. SEIDLER:  It doesn't matter, your Honor.  It

25   doesn't matter.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

3

Xe2j1ler1            SEALED DO NOT DOCKET

1          THE COURT: All right. Well, let's deal with the one

2   that's the superseder in this case. That is the information in

3   12 Crim. 489 and it's Superseding Information 2.

4          Before I do that, I need to have a waiver of

5   indictment, and I've been handed a waiver of indictment

6   apparently signed by Mr. Leroux, Mr. Monteagudo, my court

7   clerk, and by Mr. Seidler, dated February 19, 2014.

8          Mr. Leroux, did you sign this waiver of indictment?

9          THE DEFENDANT: Yes, your Honor.

10          THE COURT: Did you know at the time that you signed

11   it or before you signed it that you were entitled to have the

12   charges contained in the information presented to a grand jury?

13          THE DEFENDANT: I did, your Honor.

14          THE COURT: And do you understand the grand jury would

15   be comprised of 23 citizens of the United States who are not

16   connected with the prosecution?

17          THE DEFENDANT: Yes, I understood that, your Honor.

18          THE COURT: They're an independent body?

19          THE DEFENDANT: Yes.

20          THE COURT: Do you understand that that grand jury

21   would have to find that there was sufficient cause to have you

22   indicted in this matter, or on these charges?

23          THE DEFENDANT: Yes, sir, I understood.

24          THE COURT: And that they'd have to find that there

25   were adequate grounds to charge you with these crimes?

4

Xe2j1ler1                    SEALED DO NOT DOCKET

1           THE DEFENDANT:  Yes, your Honor.

2           THE COURT:  Did you sign it voluntarily, of your own

3    free will?

4           THE DEFENDANT:  I did, your Honor.

5           THE COURT:  No one forced you in any way to sign the

6    waiver of indictment?

7           THE DEFENDANT:  I was not forced, your Honor.

8           THE COURT:  And no one made any promises to you in an

9    effort to get you to sign the waiver of indictment?

10          THE DEFENDANT:  No promises were made, your Honor.

11          THE COURT:  All right.  I'll allow the waiver of

12   indictment to be filed.

13          And I'll ask Mr. Monteagudo to administer the oath to

14   the defendant.

15          THE DEPUTY CLERK:  Please stand and raise your right

16   hand.

17          (Defendant sworn)

18          THE DEPUTY CLERK:  Please state your name.

19          THE DEFENDANT:  Paul Leroux.

20          THE DEPUTY CLERK:  Judge, may he be seated?

21          THE COURT:  Yes, you may be seated.

22          I didn't arraign the defendant because he'd been

23   previously arraigned in this matter.  Should I have arraigned

24   him, counsel?

25          THE DEPUTY CLERK:  Judge, I don't believe he's been

5

1    arraigned on the second superseder.

2         MS. HECTOR:  He was not arraigned on the second

3    superseder.

4         THE COURT:  Oh, I should arraign him.  All right.

5    Well, then I'll arraign him on the second superseder.

6         Paul Calder Leroux, have you seen a copy of the

7    information charging you with conspiracy to import narcotics

8    into the United States from a place outside the United States,

9    and the amount of narcotics being over 500 grams and the dates

10   being between the dates of April 2012 through September 2012;

11   and then, on Count Two, charging you with exporting technology,

12   goods, technologies, and services specifically designed for the

13   use and the production of and incorporation into technologies

14   and services to be supplied to Iran and the government of Iran

15   without obtaining the required approval of the United States

16   Department of Treasury Office of Foreign Assets Control and

17   thereafter engaging in transactions for the purpose of evading

18   and avoiding that prohibition, thereby violating the

19   regulations of the United States Treasury Department, between

20   the dates of 2009 and up to September 2012; and a third count

21   charging you with wilfully and knowingly conspiring and

22   confederating and agreeing with other people, known and

23   unknown, to commit criminal and tortious acts, in violation of

24   the Constitution and laws of the United States by accessing a

25   computer without authorization and would thereby attempt and

6

1    obtain information from a protected computer, the value of

2    which exceeded $5,000, in violation of 18 United States Code

3    Section 1030(a)(2) and (c)(2)(B); and in furtherance of this

4    same conspiracy, you and others knowingly did, with intent to

5    defraud, obtain access to a protected computer without

6    authorization and by means of such conduct further the intent

7    to fraud in obtaining something of value in excess of $5,000 in

8    a one-year period, in violation of Title 18 United States Code

9    Section 1030(a)(4) and (c)(3)(A); and the fourth count charging

10   you with securities and commodities fraud, in violation of

11   Title 18 United States Code Section 1348 and Section 3, in that

12   you received and comforted and assisted an offender in order to

13   prevent the offender's apprehension, trial, and punishment, to

14   wit, you arranged for the transport and payment of money

15   intended to bribe foreign officials in order to impede the

16   offender's extradition to face criminal charges in the United

17   States.

18            Have you seen a copy of the superseding information

19   charging you with those crimes?

20            THE DEFENDANT:  I have, your Honor.

21            THE COURT:  And have you discussed this with your

22   attorney?

23            THE DEFENDANT:  I have.

24            THE COURT:  And Mr. Seidler, have you seen a copy of

25   the superseding information charging Mr. Leroux with those

A                         53

Xe2j1ler1                    SEALED DO NOT DOCKET

1   crimes?

2           MR. SEIDLER:  I have, and I have discussed it with

3   Mr. Leroux thoroughly, your Honor.

4           THE COURT:  And does he waive a reading of the

5   indictment?

6           MR. SEIDLER:  He does.

7           THE COURT:  Mr. Leroux, do you waive a reading of the

8   indictment?

9           THE DEFENDANT:  I do, your Honor.

10          THE COURT:  And do you wish a plea of not guilty

11  entered on your behalf at this time or not?

12          MR. SEIDLER:  No, your Honor.  He pled guilty to all

13  the charges, your Honor.

14          THE DEFENDANT:  We have a plea agreement, your Honor,

15  and I would like to plead guilty.

16          THE COURT:  All right.  Then I'll ask Mr. Monteagudo

17  to place the defendant under oath.

18          THE DEPUTY CLERK:  I swore him in a couple minutes ago

19  before you started the waiver.  Do you want him to do it again?

20          THE COURT:  All right.  You were already sworn.

21          MR. SEIDLER:  He was already sworn.  And he's going to

22  enter a guilty plea likewise to the superseding Minnesota

23  information as well.

24          THE COURT:  All right.  Thank you.

25          Mr. Leroux, do you understand that you're now under

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A                              54

8

Xe2j1ler1          SEALED DO NOT DOCKET

1   oath and that if you answer any of my questions falsely, your

2   answers may later be used against you in another prosecution

3   for perjury or making a false statement?

4           THE DEFENDANT:  I understand, your Honor.

5           THE COURT:  And has your attorney advised you that

6   it's important in terms of your sentence that you tell the

7   whole truth about your involvement in the crimes to which you

8   plan to plead guilty and you not try to hide or minimize the

9   extent to which you took part?

10          THE DEFENDANT:  He has explained everything, your

11  Honor.

12          THE COURT:  And please tell us your full name.

13          THE DEFENDANT:  Paul Calder Leroux.

14          THE COURT:  And how old are you?

15          THE DEFENDANT:  I was born in 1972, so I'm 41.

16          THE COURT:  And what education have you received?

17          THE DEFENDANT:  High school diploma, your Honor.

18          THE COURT:  In what country?

19          THE DEFENDANT:  South Africa.

20          THE COURT:  Do you have difficulty in understanding

21  English?

22          THE DEFENDANT:  No, your Honor.

23          THE COURT:  Have you ever been treated for mental

24  illness or addiction to alcohol or narcotic drugs?

25          THE DEFENDANT:  No, your Honor.

Xe2j1ler1                    SEALED DO NOT DOCKET

1           THE COURT:  Have you used any drug or any medication

2     or any alcoholic beverage or any prescription of any kind

3     within the last two days?

4           THE DEFENDANT:  No, your Honor.

5           THE COURT:  Have you received a copy of the

6     superseding information in this case?

7           THE DEFENDANT:  I have, your Honor.

8           THE COURT:  And that is Superseding Information 2.

9     Have you seen that one?

10          THE DEFENDANT:  Yes, I have, your Honor.

11          THE COURT:  And have you read it?

12          THE DEFENDANT:  I have, your Honor, extensively.

13          THE COURT:  And have you discussed the charges in the

14    superseding information fully with your lawyer, Mr. Seidler?

15          THE DEFENDANT:  I have, your Honor.

16          THE COURT:  Has Mr. Seidler explained those charges to

17    you?

18          THE DEFENDANT:  He has.

19          THE COURT:  Are you fully satisfied with Mr. Seidler

20    as your lawyer and with the representation and legal advice he

21    has given you in this case?

22          THE DEFENDANT:  Yes, I am, your Honor.

23          THE COURT:  Have you a plea agreement in this case?

24          THE DEFENDANT:  We've reached a plea agreement, your

25    Honor.

Xe2j1ler1                    SEALED DO NOT DOCKET

1          THE COURT:  Has it been handed up to the Court?  I
2   didn't see it.
3          MS. HECTOR:  We did hand it up, your Honor.
4          THE COURT:  I haven't seen that.
5          MS. HECTOR:  I have another copy, if it's easier.
6          THE COURT:  Here it is.  Thank you.
7          MS. HECTOR:  Okay.
8          THE COURT:  Is that a letter addressed to Mr. Seidler
9   dated December 16, 2013 and signed by Michael -- well, I'm not
10  sure of these signatures.  It looks as if it might be Michael
11  Lockard and Lorin Reisner, Chief of the Criminal Division, and
12  Linda Marks and Perham Gorji, Consumer Protection Branch of the
13  United States Department of Justice, and also signed by you,
14  Mr. Leroux, and signed by Mr. Seidler on December 30, 2013?  Is
15  that the plea agreement between the parties?
16         THE DEFENDANT:  Yes, sir.
17         THE COURT:  Have you read this letter from the
18  government to Mr. Seidler, this plea agreement dated
19  December 16th but signed by you on December 30, 2013?
20         THE DEFENDANT:  Yes, your Honor, I read the document
21  before signing it.
22         THE COURT:  Does the letter contain the terms of your
23  plea agreement with the government of the United States as you
24  understand them?
25         THE DEFENDANT:  It does, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A                              57

11

Xe2j1ler1                    SEALED DO NOT DOCKET

1              THE COURT:  And after you read the letter you

2      discussed it with Mr. Seidler?

3              THE DEFENDANT:  Yes, your Honor.

4              THE COURT:  And you did that before you signed it?

5              THE DEFENDANT:  Yes, your Honor.

6              THE COURT:  Has anyone made any other or different

7      promise or assurance to you in an effort to induce you to enter

8      a plea of guilty in this case?

9              THE DEFENDANT:  No, your Honor.

10             THE COURT:  Has anyone attempted in any way to force

11     you to plead guilty in this case?

12             THE DEFENDANT:  No, your Honor.

13             THE COURT:  Do you understand that the offenses to

14     which you're planning to plead guilty are felony offenses and

15     that if your pleas are accepted, you'll be adjudged guilty of

16     each of those offenses and that such adjudication may deprive

17     you of valuable civil rights such as the right to vote, the

18     right to hold public office, the right to serve on a jury, and

19     the right to possess any kind of firearm?

20             THE DEFENDANT:  I understand, your Honor.

21             THE COURT:  Can the defendant be deported if he's

22     convicted of these charges?

23             MS. HECTOR:  Yes, your Honor.

24             THE COURT:  Do you understand that you can be deported

25     if you're convicted of these charges, Mr. Leroux?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Xe2j1ler1                    SEALED DO NOT DOCKET

1          THE DEFENDANT:  I understand, your Honor.

2          THE COURT:  What is the government's position,

3    Ms. Hector, as to the maximum possible penalties which could be

4    imposed on this plea?

5          MS. HECTOR:  Your Honor, with respect to Count One of

6    the S2 information, the maximum allowable penalty, it carries a

7    maximum term of imprisonment of life, a mandatory term of

8    imprisonment of ten years, a maximum term of supervised release

9    of life, a mandatory minimum term of supervised release of five

10   years, a maximum fine of the greatest of $10 million or twice

11   the gross pecuniary gain derived from the offense or twice the

12   gross pecuniary loss to persons other than the defendant

13   resulting from the offense, and a hundred dollar mandatory

14   special assessment.

15         THE COURT:  Mr. Leroux, do you understand that those

16   are the possible consequences if you plead guilty to the charge

17   in Count One?

18         THE DEFENDANT:  I do, your Honor.

19         THE COURT:  All right.  Would you go to Count Two,

20   Ms. Hector.

21         MS. HECTOR:  Certainly, your Honor.  With respect to

22   Count Two, Count Two carries a maximum term of imprisonment of

23   20 years, a maximum term of supervised release of three years,

24   a maximum fine of the greatest of $1 million or twice the gross

25   pecuniary gain derived from the offense, or twice the gross

13

Xe2j1ler1          SEALED DO NOT DOCKET

1   pecuniary loss to persons other than the defendant resulting

2   from the offense, and a $100 special assessment.

3        THE COURT: Mr. Leroux, do you understand that those

4   are the possible consequences if you plead guilty to Count Two

5   of the information, Superseding Information 2?

6        THE DEFENDANT: I do, your Honor.

7        THE COURT: All right. Ms. Hector?

8        MS. HECTOR: Your Honor, with respect to Count Three,

9   Count Three carries a maximum term of imprisonment of five

10   years, a maximum term of supervised release of three years, a

11   maximum fine of the greatest of $250,000, twice the gross

12   pecuniary gain derived from the offense, or twice the gross

13   pecuniary loss to persons other than the defendant resulting

14   from the offense, and a $100 mandatory special assessment.

15        THE COURT: Mr. Leroux, do you understand that those

16   are the possible consequences if you plead guilty to Count

17   Three of the Superseding Information 2?

18        THE DEFENDANT: I do, your Honor.

19        THE COURT: All right.

20        MS. HECTOR: And with respect to Count Four, your

21   Honor, Count Four carries a maximum term of imprisonment of 12½

22   years, a maximum term of supervised release of three years, a

23   maximum fine of the greatest of $125,000 or the gross pecuniary

24   gain derived from the securities fraud offense or the gross

25   pecuniary loss to persons other than the defendant resulting

14

Xe2j1ler1                    SEALED DO NOT DOCKET

1   from the securities fraud offense, and a $100 mandatory special

2   assessment.

3            THE COURT:  Mr. Leroux, do you understand that those

4   are the possible consequences if you plead guilty to Count Four

5   of the superseding 2 information?

6            THE DEFENDANT:  I do, your Honor.

7            THE COURT:  Ms. Hector, are any forfeitures required?

8            MS. HECTOR:  Yes, your Honor.  There is a forfeiture

9   provision in the indictment.  And as part of the plea

10  agreement, he admits the forfeiture allegation.

11           THE COURT:  Is that correct, Mr. Leroux?

12           THE DEFENDANT:  It is, your Honor.

13           THE COURT:  All right.  And Ms. Hector mentioned

14  supervised release during her account of the possible

15  consequences of your pleading to Superseding Information 2 as

16  among them supervised release.  Do you understand that the

17  Court is required to impose a term of supervised release on

18  each of these counts which would take place after any term of

19  imprisonment?

20           THE DEFENDANT:  I understand, your Honor.

21           THE COURT:  And do you understand that that would mean

22  you'd be released on conditions such as you cannot commit

23  another crime, federal, state, or local; you cannot possess

24  illegal drugs or guns or weapons, explosive weapons or

25  ammunition; and that you must report to a probation officer,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A                              61

Xe2j1ler1                     SEALED DO NOT DOCKET

1   and if the government had evidence that you'd not complied with

2   any of those conditions, they could have you brought back here

3   to court, and if I found that you'd broken any of those

4   conditions, I could send you back to prison for the entire term

5   of supervised release imposed at the time of your sentence?

6           THE DEFENDANT:  I understand, your Honor.

7           THE COURT:  Are you aware that the United States

8   Sentencing Commission has issued guidelines for judges to

9   follow in determining a sentence in a criminal case?

10          THE DEFENDANT:  I'm aware of it, your Honor.

11          THE COURT:  And did Mr. Seidler advise you as to how

12  the guidelines might apply in your case?

13          THE DEFENDANT:  He did, your Honor.

14          THE COURT:  Do you understand that in determining your

15  sentence, the Court has an obligation to calculate the actual

16  Sentencing Guideline range and to consider that range as a

17  possible sentence and then to consider possible departures

18  under the Sentencing Guidelines to arrive at a potential

19  sentence; and finally, the Court must also consider other

20  sentencing factors under 18 United States Code Section 3553(a)

21  in order to arrive at a sentence that is sufficient but not

22  greater than necessary to achieve the sentencing purposes set

23  forth in 3553(a)?

24          THE DEFENDANT:  I understand, your Honor.

25          THE COURT:  And has Mr. Seidler advised you as to what

XE2JKCAL2          SEALED -- DO NOT DOCKET

1   those other sentencing factors under Section 3553(a) are?

2          THE DEFENDANT:  He has, your Honor.

3          THE COURT:  Do you understand that in order to qualify

4   for a sentence less than the mandatory minimum sentence, which

5   seems to apply in one or more of these counts of the

6   superseding information, the government will have to decide

7   whether you faithfully provided it with all the information you

8   have concerning the charges there?

9          THE DEFENDANT:  I understand, your Honor.

10          THE COURT:  And do you also understand that the

11   government makes the sole decision as to whether you will

12   receive a 5K1 letter from the Court?

13          THE DEFENDANT:  I understand, your Honor.

14          (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

17

XE2JKCAL2          SEALED -- DO NOT DOCKET

1              THE COURT:  I should say to the Court.

2              Do you understand that the Court will not be able to

3     determine the sentence for your case or compute the guideline

4     for your sentence until after the presentence report has been

5     completed and you and Mr. Seidler as well as the government

6     have had an opportunity to challenge the facts recorded by the

7     probation office?

8              THE DEFENDANT:  I understand, your Honor.

9              THE COURT:  And you also understand that even after

10    it's been determined what sentencing guideline applies to your

11    case, the judge has authority in some circumstances to impose a

12    sentence that's more severe or less severe than the guideline

13    sentence?

14             THE DEFENDANT:  I understand, your Honor.

15             THE COURT:  Do you also understand that you or the

16    government may have the right to appeal any sentence that I

17    impose?

18             THE DEFENDANT:  I understand, your Honor.

19             THE COURT:  Let me look at the plea agreement here.

20             MS. HECTOR:  Your Honor, if I may, would you like for

21    me to address the extent to which his appeal is limited by this

22    agreement?

23             THE COURT:  That would be fine.

24             MS. HECTOR:  Yes, your Honor.  On page 7 there are

25    some limitations on his appeal rights.  By entering this plea,

XE2JKCAL2          SEALED -- DO NOT DOCKET

1   the defendant is waiving any right to withdraw his plea or to

2   attack his conviction on direct appeal or collaterally on the

3   grounds that the government has failed to produce any discovery

4   material, Jencks Act material, exculpatory material pursuant to

5   Brady --

6          THE COURT:  Other than information establishing his

7   factual innocence?

8          MS. HECTOR:  Yes.  And he also has --

9          THE COURT:  And impeachment material?

10         MS. HECTOR:  Yes, your Honor.

11         And he's also agreed that he will not challenge his

12  conviction or his sentence on the basis of any actual or

13  perceived immigration consequences resulting from his guilty

14  plea today.  Those are the appellate related issues addressed

15  in the --

16         THE COURT:  There's another seminal one that I often

17  see that isn't --

18         MS. HECTOR:  Yes, your Honor.

19         THE COURT:  I was trying to make sure.

20         And also, Mr. Calder, do you understand that you are

21  waiving your right to withdraw your plea, either on direct

22  appeal or collaterally, on the ground that the government has

23  failed to produce any discovery material, Jencks Act material,

24  exculpatory material pursuant to Brady versus Maryland, other

25  than information establishing your factual innocence and

XE2JKCAL2          SEALED -- DO NOT DOCKET

1   impeachment material pursuant to Giglio versus United States

2   that has not already been provided to you as of the date of the

3   signing of this agreement?

4           THE DEFENDANT:  I understand, your Honor.

5           THE COURT:  Do you understand that parole has been

6   abolished and that if you are sentenced to prison, you will not

7   be released on parole?

8           THE DEFENDANT:  I understand, your Honor.

9           THE COURT:  And you understand if the sentence is more

10  severe than you expect, that you will still be bound by your

11  plea of guilty and will have no right to withdraw your plea of

12  guilty?

13          THE DEFENDANT:  I understand, your Honor.

14          THE COURT:  Do you understand that you have a right to

15  plead not guilty to any offense charged against you and to

16  continue with that plea of not guilty?

17          THE DEFENDANT:  Yes, I understand, your Honor.

18          THE COURT:  Do you understand that you would then have

19  first a right to trial by jury, at which trial the jury would

20  be instructed that you are to be presumed innocent until such

21  time, if any, as it reaches the unanimous verdict of guilty

22  beyond a reasonable doubt?

23          THE DEFENDANT:  I understand, your Honor.

24          THE COURT:  You understand that that jury would be

25  composed of 12 citizens who are not connected with the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A                        66

XE2JKCAL2                    SEALED -- DO NOT DOCKET

1    prosecution?

2           THE DEFENDANT:  I understand, your Honor.

3           THE COURT:  And you understand that that jury would

4    determine the amount of narcotics that you are charged with

5    importing into the United States?

6           THE DEFENDANT:  I understand, your Honor.

7           THE COURT:  Do you understand you would have the right

8    to the assistance of counsel for your defense at the trial and

9    at every other stage of the proceeding, including appeal, and,

10   if you could not afford counsel, to have court-appointed

11   counsel free of charge?

12          THE DEFENDANT:  I understand, your Honor.

13          THE COURT:  You understand you would have a right to

14   see and hear the witnesses against you and have them

15   cross-examined in your defense?

16          THE DEFENDANT:  I understand, your Honor.

17          THE COURT:  And you understand you'd have a right, on

18   your own part, to testify or to stand silent at that trial and

19   be protected from testifying unless you had elected to testify?

20          THE DEFENDANT:  I understand, your Honor.

21          THE COURT:  And do you also understand you'd have a

22   right to the issuance of subpoenas and compulsory process to

23   compel the attendance of witnesses to testify in your defense

24   and to compel the production of evidence to use in your

25   defense?

21

XE2JKCAL2            SEALED -- DO NOT DOCKET

1        THE DEFENDANT:  I understand, your Honor.

2        THE COURT:  Do you further understand that by entering

3    a plea of guilty, if that plea is accepted by the Court, there

4    will be no trial and you will have waived, or given up, your

5    right to a trial as well as the other rights I have just

6    described to you?

7        THE DEFENDANT:  I understand, your Honor.

8        THE COURT:  I'll now summarize the charge in Count One

9    to the defendant, which counsel has indicated he may be

10   entering a plea of guilty.

11       Count One of the information charges that from

12   April 2012 to September 2012, you, Mr. Le Roux, and others,

13   known and unknown, intentionally and knowingly did combine,

14   conspire, confederate and agree together to violate the

15   narcotic laws of the United States.  The indictment charges the

16   object of the conspiracy was for you and the other defendants

17   to import into the United States, from a place outside thereof,

18   a controlled substance, namely, 500 grams and more of mixtures

19   and substances containing a detectable amount of

20   methamphetamine, in violation of Title 21, United States Code,

21   and, further, that it was an object that you and the others

22   would and did distribute a controlled substance, to wit,

23   500 grams and more of mixtures or substances containing a

24   detectable amount of methamphetamine intending and knowing that

25   such substance would be imported into the United States from a

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A                          68

22

XE2JKCAL2          SEALED -- DO NOT DOCKET

1   place outside it.

2          In order to prove you guilty of the charge in Count

3   One, the government has to prove the following essential

4   elements to the unanimous satisfaction of a jury of citizens of

5   the United States of 12 citizens of the United States who are

6   independent from the prosecution:  First, that a conspiracy to

7   import narcotics into the United States existed during the

8   period April 2012 to September 2012; second, they must prove

9   that the object of the conspiracy was to import into the United

10  States, from a place outside the United States, at least

11  500 grams and more of mixtures and substances containing

12  methamphetamine; third, they must prove that yourself and the

13  other conspirators would and did distribute the controlled

14  substance, to wit, 500 grams and more of a mixture containing

15  methamphetamine, knowing that that substance would be imported

16  into the United States from a place outside thereof; lastly,

17  they must prove that you knew what you were doing was against

18  the law.

19          How do you plead to this charge, guilty or not guilty?

20          THE DEFENDANT:  Guilty, your Honor.

21          THE COURT:  Have you got a prepared statement to make

22  or do you want me to inquire, Mr. Seidler?

23          MR. SEIDLER:  He does have a prepared statement to

24  make, sir.

25          THE COURT:  Did you write the statement yourself,

A                          69

23

XE2JKCAL2            SEALED -- DO NOT DOCKET

1   Mr. Le Roux, or did Mr. Seidler help you?

2            THE DEFENDANT:  I was assisted, your Honor.

3            THE COURT:  I see.

4            And after you read it, finished the statement, did you

5   read it carefully?

6            THE DEFENDANT:  I did, your Honor.

7            THE COURT:  Is everything true in it, to your own

8   knowledge?

9            THE DEFENDANT:  It's true and correct, your Honor.

10           THE COURT:  And known by you to be true and correct?

11           THE DEFENDANT:  Yes, your Honor.

12           THE COURT:  All right.

13           Will you read the statement then.

14           THE DEFENDANT:  Count One, between May 2004 and

15   September 2012, I agreed with others to import 500 grams and

16   more of methamphetamine into the United States so we could

17   distribute the drug.

18           THE COURT:  Did you do that from a place outside the

19   United States?

20           THE DEFENDANT:  Yes, your Honor.

21           THE COURT:  Were the drugs coming from outside the

22   United States?

23           THE DEFENDANT:  Yes, your Honor.

24           THE COURT:  Was the amount of drugs 500 grams and more

25   of methamphetamine?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A

XE2JKCAL2            SEALED -- DO NOT DOCKET

1           THE DEFENDANT:  It was, your Honor.

2           THE COURT:  Did you know that the drugs would be

3      imported into the United States?

4           THE DEFENDANT:  I did, your Honor.

5           THE COURT:  From a place outside thereof?

6           THE DEFENDANT:  I did, your Honor.

7           THE COURT:  Did you know what you were doing was

8      against the law?

9           THE DEFENDANT:  Yes, your Honor.

10           THE COURT:  All right.

11           Is there any further allocution that the government or

12      defense feels is required here?

13           MR. LOCKHARD:  Just one moment, your Honor?

14           THE COURT:  I'll ask another question.

15           Did you do it knowingly and intentionally?  Mr. Le

16      Roux, did you know it knowingly and intentionally?

17           Mr. Le Roux, did you do it knowingly and

18      intentionally?

19           THE DEFENDANT:  Sorry, could you repeat the question,

20      your Honor?

21           THE COURT:  Did you act knowingly and intentionally

22      when you did these acts concerning the methamphetamine?

23           THE DEFENDANT:  Yes, your Honor.

24           THE COURT:  Anything further from the government or

25      defense?

XE2JKCAL2          SEALED -- DO NOT DOCKET

1              MR. SEIDLER:  Not from the defense, your Honor.

2              THE COURT:  Government?

3              MS. HECTOR:  Not from the government, your Honor.

4              I would just offer, your Honor, with respect to the

5    counts that are to come, if it would be helpful to your Honor,

6    we did write out the elements of all of these offenses, and

7    some of these offenses are not your typical offenses that you

8    see every day, so if your Honor would like us to hand that up,

9    I'm happy to do so.

10             THE COURT:  That might be helpful.  I've been working

11   all day and I've only reviewed them for the length of time that

12   you have been before me.

13             MS. HECTOR:  Thank you.

14             THE COURT:  Maybe you don't break them down as much as

15   I do.

16             MS. HECTOR:  We may not, your Honor, and I apologize

17   for that.

18             THE COURT:  Let's finish with Count One.

19             It is the finding of the Court, in the case of United

20   States versus Paul Calder Le Roux, that the defendant is fully

21   competent and capable of entering an informed plea and that his

22   plea of guilty to Count One is a knowing and voluntary plea

23   supported by an independent basis in fact containing each of

24   the essential elements of the offense.  His plea is therefore

25   accepted and he is adjudged guilty of that offense.

26

XE2JKCAL2          SEALED -- DO NOT DOCKET

1              With respect to Count Two, Mr. Le Roux, this charge is

2     a charge that you exported, sold, supplied, directly or

3     indirectly, goods, technology and services from the United

4     States knowing that the goods and technology and services were

5     being exported and supplied for the benefit of Iran or the

6     Government of Iran, and that you did so intentionally and

7     knowingly and in violation of the Treasury regulations, which

8     you were aware of, and that the goods, technology and services

9     provided involved conduct committed inside the United States,

10    and that you did so during the period September 12th -- excuse

11    me, 2009 up to and including September 12th, 2012 -- excuse me,

12    September 2012, and that you did certain acts as a part of

13    committing the offense, which are listed in paragraph 5.

14             Now, in order to prove you guilty of this crime, the

15    government must prove that during the period 2009 up to and

16    including September 2012, you reexported, sold or supplied,

17    directly or indirectly, goods, technology or services from the

18    United States;

19             Second, it must prove that you knew that the goods,

20    technologies and services were being reexported, sold or

21    supplied to or for the benefit of Iran or the Government of

22    Iran, including by such goods being used in the production of

23    for commingling with or for incorporation into goods,

24    technology or services to be directly or indirectly supplied

25    transshipped or reexported exclusively or predominantly to Iran

27

XE2JKCAL2          SEALED -- DO NOT DOCKET

1   or the Government of Iran;

2            Third, they must prove that you acted willfully, that

3   is, intentionally, and that you acted with knowledge that your

4   conduct was unlawful in that it violated legal restrictions of

5   the United States Government;

6            Fourth, the government must prove beyond a reasonable

7   doubt that the goods, technologies and services provided

8   involved conduct committed inside the United States;

9            And, lastly, they must prove that the defendant caused

10  transactions in the United States, and that the transactions

11  had the purpose of evading or avoiding or attempting to violate

12  the prohibitions against such acts promulgated by the United

13  States Government.

14           Lastly, they must prove that you knew what you were

15  doing was against the law.

16           How do you plead, guilty or not guilty?

17           THE DEFENDANT:  Guilty, your Honor.

18           THE COURT:  Have you a prepared statement here?

19           THE DEFENDANT:  I have, your Honor.

20           THE COURT:  And have you read it carefully?

21           THE DEFENDANT:  I have, your Honor.

22           THE COURT:  And is everything true in it, to your own

23  knowledge?

24           THE DEFENDANT:  It is, your Honor.

25           THE COURT:  Would you read it in.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A                        74

XE2JKCAL2          SEALED -- DO NOT DOCKET

1        THE DEFENDANT:  Count Two:  Between 2009 and September

2    2012, I sold, supplied and exported from the United States

3    technology specifically intended to be used and incorporated

4    into technology to be supplied to Iran and its government,

5    without first obtaining the requisite approval from the United

6    States Government.  In furtherance of this crime I solicited

7    and participated in the killings of others outside the USA.

8        THE COURT:  You did do these acts with knowledge that

9    the regulations of the Treasury and the Office of Foreign

10   Assets Control prohibited your engaging in those transactions?

11       THE DEFENDANT:  Yes, your Honor.

12       THE COURT:  Did you cause the transactions to be done

13   for the purpose of avoiding those prohibitions?

14       THE DEFENDANT:  Yes, your Honor.

15       THE COURT:  Were those acts done by you in the United

16   States?

17       THE DEFENDANT:  Yes, your Honor.

18       THE COURT:  Anything further from the prosecution or

19   the defense?

20       MR. SEIDLER:  No, sir.

21       MR. LOCKHARD:  Just one moment, your Honor?

22       THE COURT:  Yes.

23       (Pause)

24       THE DEFENDANT:  I'd like to clarify, your Honor, that

25   at the time, I wasn't personally in the United States but I

29

XE2JKCAL2          SEALED -- DO NOT DOCKET

1    caused others in the United States to undertake the acts.

2              THE COURT:  And those acts were taken in the United

3    States by the other persons?

4              THE DEFENDANT:  Yes, your Honor.

5              THE COURT:  And you were aware of that, what you were

6    causing, at the time you caused them to act?

7              THE DEFENDANT:  Yes, I was aware, your Honor.

8              THE COURT:  All right.

9              Any further allocution?

10             MR. SEIDLER:  No, sir.

11             THE COURT:  All right.

12             It is the finding of the Court, in the case of Paul

13   Calder Le Roux, that the defendant is fully competent and

14   capable of entering an informed plea, and that his plea of

15   guilty to Count Two is a knowing and voluntary plea supported

16   by an independent basis in fact containing each of the

17   essential elements of that count.  His plea is therefore

18   accepted and he is adjudged guilty of Count Two.

19             I then move to Count Three.

20             Count Three charges you with unauthorized computer

21   access, the conspiracy to engage in unauthorized computer

22   access, in violation of Title 18, United States Code, Section

23   1030(a)(2) and (a)(4).

24             In order to prove this charge against you, the

25   government must prove to the unanimous satisfaction of a jury

XE2JKCAL2          SEALED -- DO NOT DOCKET

1   of 12 citizens independent from the prosecution that:

2            One, a conspiracy existed between two or more persons

3   to violate the law.  A conspiracy is an agreement between two

4   or more persons.  Here, the law that they conspired to violate

5   is the federal narcotics law relating to the implication and

6   distribution of controlled substances --

7            MS. HECTOR:  Your Honor, I'm sorry to interrupt.  That

8   is not actually the object of the conspiracy.  The objects of

9   the conspiracy are listed below --

10           THE COURT:  I'm sorry, you're trailing --

11           MS. HECTOR:  That is true.  We didn't envision that

12  we'd be handing up to your Honor, and I should have alerted

13  your Honor to that when I saw that.  That is just a holdover

14  from the elements conspiracy before.

15           THE COURT:  I think I went wrong.  It's all right,

16  I'll start over.

17           MS. HECTOR:  OK.

18           THE COURT:  Let me go back to my old way.

19           Count Three, Mr. Le Roux, charges that from in or

20  about 2008 up to and including about 2011, you and others

21  entered into a conspiracy, and the conspiracy was to violate

22  Title 18, United States Code, Sections 1030(a) and 1030(a)(2)

23  and (a)(4).  It charges that the purpose of the conspiracy was

24  was for purposes of commercial advantage and private gain and

25  in furtherance of criminal and tortious acts, in violation of

XE2JKCAL2          SEALED -- DO NOT DOCKET

1   the Constitution and the laws of the United States.  The

2   conspirators would and did access a computer without

3   authorization, a private computer without authorization, and

4   thereby would and did obtain and attempt to obtain information

5   from a protected computer, the value of which -- I think that's

6   the value of the information -- exceeded $5,000, in violation

7   of Title 18, United States Code, Section 1030(a).

8          The indictment goes on to charge that it was further,

9   in part, an object of the conspiracy that you and the others

10  knowingly and with intent to defraud would access and attempt

11  to access a protected computer without authorization and, by

12  such means and such conduct, furthered the intended fraud and

13  obtained something of value exceeding $5,000 in a one-year

14  period, in violation of Title United States Code, Section

15  1030(a)(4) and (a) and (c)(3)(A).

16         In order to prove you guilty of the crime charged in

17  Count Three, the government must prove each of the following

18  essential elements of the charge against you beyond a

19  reasonable doubt, to the unanimous satisfaction of a jury of 12

20  citizens independent from the prosecution:

21         First, that on or about -- during the period 2008 up

22  to 2011, you and the other conspirators knowingly combined

23  together to violate the laws against illegal computer access.

24  It charges that it was a part and object of the conspiracy that

25  you and the others would intentionally and knowingly and

A

32

1   unlawfully, and for purposes of commercial advantage and

2   private financial gain, and in furtherance of a criminal and

3   tortious act, in violation of the Constitution of the United

4   States, intentionally access a computer without authorization

5   and thereby would obtain and attempt to obtain information from

6   a protected computer, the value of which exceeded $5,000;

7             And further, that an object of the conspiracy was to

8   defraud and to access and attempt to access this protected

9   computer without authorization and by means of such conduct

10  further the intended fraud and obtain something of value

11  exceeding $5,000 in a one-year period, in violation of Title 18

12  United States Code, Section 1030(a)(4) and (c)(3)(iv) and also

13  1030(b); and that you did these acts unlawfully, willfully and

14  knowingly for the purpose of commercial advantage and private

15  financial gain.

16            How do you plead to the charge?

17            THE DEFENDANT:  Guilty, your Honor.

18            THE COURT:  Do you have a prepared statement in

19  connection with this charge?

20            THE DEFENDANT:  I have, your Honor.

21            THE COURT:  Have you read it carefully?

22            THE DEFENDANT:  I have, your Honor.

23            THE COURT:  Is everything true in it, to your personal

24  knowledge?

25            THE DEFENDANT:  It is, your Honor.

A

XE2JKCAL2          SEALED -- DO NOT DOCKET

1          THE COURT:  Then I'll let you read it.  Go ahead.

2          THE DEFENDANT:  Count Three:  Between 2008 and 2011, I

3   agreed with others to access information for material gain in

4   excess of $5,000 during a one-year period, from a protected

5   computer without authorization to do so.

6          THE COURT:  Why do you say this was a protected

7   computer?

8          THE DEFENDANT:  Your Honor, the computer was located

9   within the jurisdiction of the United States.

10          THE COURT:  Was it used in or affecting interstate or

11   foreign commerce or communication?

12          THE DEFENDANT:  Yes, your Honor.

13          THE COURT:  And you obtained information from it?

14          THE DEFENDANT:  Yes, your Honor.

15          THE COURT:  You did so intentionally and knowingly?

16          THE DEFENDANT:  Yes, your Honor.

17          THE COURT:  Did you know it was unlawful to do that?

18          THE DEFENDANT:  I did, your Honor.

19          THE COURT:  And you acted for the purpose of

20   commercial advantage or private financial gain?

21          THE DEFENDANT:  Yes, your Honor.

22          THE COURT:  Why do you think the information was at a

23   value greater than $5,000?

24          THE DEFENDANT:  Because the individuals that conspired

25   with me to take the information were paid several hundred

34

XE2JKCAL2          SEALED -- DO NOT DOCKET

1    thousand dollars a week, your Honor.

2            THE COURT:  And you knew what you were doing was

3    unlawful?

4            THE DEFENDANT:  Yes, your Honor?

5            THE COURT:  Any further allocution from the government

6    or defense?

7            MR. SEIDLER:  No, sir.

8            MS. HECTOR:  No, your Honor.

9            THE COURT:  All right.

10           It is the finding of the Court, in the case of Paul

11   Calder Le Roux, that the defendant is fully competent and

12   capable of entering an informed plea, and his plea of guilty is

13   a knowing and informed plea and voluntary plea supported by an

14   independent basis in fact containing each of the essential

15   elements of the charge in Count Three of the Superseding

16   Information 2.  His plea is therefore accepted and he is

17   adjudged guilty of that offense.

18           With respect to Count Four, Mr. Le Roux, the

19   indictment charges that in or about 2008 you, knowing that

20   offenses against the United States had been committed, namely,

21   securities fraud in violation of Title 18, United States Code,

22   received and comforted and assisted an offender in order to

23   prevent the offender's apprehension, trial and punishment;

24   to wit, you arranged for the transport and payment of money

25   intended to bribe foreign officials in order to impede the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A                          81

XE2JKCAL2          SEALED -- DO NOT DOCKET

1   offender's extradition to face criminal charges in the United

2   States.

3           In order to prove you guilty of this crime, the

4   government must prove beyond a reasonable doubt to a jury of 12

5   citizens independent of the prosecution:  First, that the crime

6   I just read to you was committed specifically by an offender --

7           MR. LOCKHARD:  Yes, your Honor, I realize it says

8   "specify offender" in the elements we provided.  The offender

9   is Jacob Alexander, who was charged in the Eastern District of

10  New York, in the case numbered 06 CR 628, a securities and

11  commodities fraud.

12          THE COURT:  So it's necessary for the government to

13  prove that you knew that Jacob Alexander -- is that right?

14          MR. LOCKHARD:  Yes, your Honor.

15          THE COURT:  -- Jacob Alexander had committed

16  securities fraud in the Eastern District of New York, in

17  violation of Title 18, United States Code, Section 1348, and

18  that, knowing that he had committed that fraud and in an effort

19  to prevent his apprehension, trial and punishment, you arranged

20  for the transport and payment of money intended to bribe

21  foreign officials in order to impede Mr. Alexander's

22  extradition to face charges in the United States in the Eastern

23  District of New York.

24          How do you plead to the charge?

25          THE DEFENDANT:  Guilty, your Honor.

XE2JKCAL2          SEALED -- DO NOT DOCKET

1          THE COURT:  And in 2008, did you know that

2   Mr. Alexander had committed securities fraud against the United

3   States?

4          THE DEFENDANT:  I did, your Honor.

5          THE COURT:  Did you know that he was wanted to face

6   those charges?

7          THE DEFENDANT:  I did, your Honor.

8          THE COURT:  What did you do in connection with --

9   after you knew that he was wanted in the United States?

10          THE DEFENDANT:  I provided $750,000 to an individual

11   to take to the country where Mr. Alexander was located, in

12   order to bribe an official.

13          THE COURT:  And what country was that?

14          THE DEFENDANT:  Namibia.

15          THE COURT:  What was the purpose of your sending the

16   $750,000 to Namibia?

17          THE DEFENDANT:  To assist Mr. Alexander in getting the

18   extradition request from the United States denied.

19          THE COURT:  Did you do this intentionally and

20   knowingly?

21          THE DEFENDANT:  Yes, your Honor.

22          THE COURT:  Did you know it was against the law?

23          THE DEFENDANT:  Yes, your Honor.

24          THE COURT:  And you did this in 2008?

25          THE DEFENDANT:  Yes, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

37

XE2JKCAL2          SEALED -- DO NOT DOCKET

1          THE COURT:  Is there any further allocution that the

2     government or defense feels is required here?

3          MR. SEIDLER:  No, sir.

4          MS. HECTOR:  No, your Honor.

5          THE COURT:  It is the finding of the Court, in the

6     case of United States versus Paul Calder Le Roux, that the

7     defendant is fully competent and capable of entering an

8     informed plea and that his plea of guilty is a knowing and

9     voluntary plea supported by an independent basis in fact

10    containing each of the essential elements of the offense of

11    Count Four.  His plea is therefore accepted and he is adjudged

12    guilty of Count Four of the Superseding Information 2 in this

13    case.

14          I think the forfeiture has been dealt with, so we are

15    complete on Superseding Information 2 in 12 CR 489?

16          MS. HECTOR:  Yes, your Honor.

17          THE COURT:  I'll move to the other charge presented,

18    which is the charge from the United States District Court,

19    District of Minnesota, containing two counts --

20          MR. SEIDLER:  Three counts, actually.

21          THE COURT:  The first count is a conspiracy to violate

22    the federal Food, Drug and Cosmetic Act, and charges that the

23    defendant caused the introduction and delivery for introduction

24    into interstate commerce, from various locations in the United

25    States outside of Minnesota, to various locations in the United

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A                          84

XE2JKCAL2        SEALED -- DO NOT DOCKET

1   States, including the District of Minnesota, with the intent to

2   defraud and mislead.  The goods that he is alleged to have

3   caused to be introduced are prescriptions drugs, including the

4   prescription drugs Fioricet -- I'm reading the names not

5   there -- maybe I should say, also known as Isocet, Soma, and

6   Ultram, which were misbranded within the meaning of Title 21,

7   United States Code, Section 353(b)(1) in that they were

8   dispensed without the prescription of a practitioner licensed

9   by law to administer such drug or to sell such drug -- I

10  shouldn't say sell -- dispense such drug.

11          The object of the conspiracy was for Mr. Le Roux and

12  his coconspirators to obtain substantial revenues and profits

13  by illegally offering for sale and selling, without

14  prescriptions, prescription drugs -- including Fioricet, Soma

15  and Ultram -- via Internet websites and telephone call centers,

16  and causing them to be shipped to consumers in the United

17  States and elsewhere.

18          It was a further part of the conspiracy that

19  Mr. Le Roux and his coconspirators owned, operated and were

20  affiliated with and used Internet websites to market

21  prescription drugs offered for sale through various businesses

22  collectively known as RX Limited.  RX Limited's marketing

23  websites were linked via the Internet to RX Limited's Internet

24  infrastructure and operating systems and enabled customers to

25  place drug orders over the Internet or by various toll-free

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A                              85

XE2JKCAL2          SEALED -- DO NOT DOCKET

1  numbers listed on RX Limited's marketing websites without a

2  physical examination or a doctor-patient relationship.  The

3  defendant, Le Roux, was the founder and manager of RX Limited

4  and directed coconspirators who handled the day-to-day

5  management of the Internet pharmacy operation.

6       It was part of the conspiracy that customers chose the

7  type, quantity and dosage of prescription drugs the customer

8  wished to purchase and paid for drug orders with credit cards.

9  RX Limited did not verify the information customers provided,

10  including their identities, ages and qualifying medical

11  conditions, and RX Limited's customers did not provide medical

12  records or any prior prescription to RX limited.

13       It was a further part of the conspiracy that Le Roux

14  and his coconspirators recruited and paid physicians and

15  pharmacies ("RX Limited physicians" and "RX Limited

16  pharmacies") to authorize sham prescriptions and fraudulently

17  dispense prescription drugs.  In virtually all instances,

18  RX Limited physicians had no contact with such customers,

19  whether face-to-face, on the telephone or by electronic mail,

20  and retained no records of their purported consultations.

21       Le Roux and his coconspirators also arranged and paid

22  for the drugs to be shipped to customers through various

23  shipping accounts with commercial carriers and the United

24  States Postal Service.  In so doing, Le Roux and his

25  coconspirators unlawfully dispensed, caused to be dispensed,

XE2JKCAL2          SEALED -- DO NOT DOCKET

1   and aided and abetted the dispensing of prescription drugs to

2   customers who lived throughout the United States without

3   verifying the customer's medical complaint, having an adequate

4   patient history, performing a mental or physical exam, or using

5   appropriate diagnostic or laboratory testing or providing a

6   means to monitor the customer's response to the medication.

7        It was a further part of the conspiracy that through

8   RX Limited's marketing websites, Le Roux and his coconspirators

9   made various representations to customers, including that the

10  websites provided a "valid means for patients to receive

11  treatment" and obtain the prescription medication by completing

12  an online questionnaire without a physical examination, knowing

13  this to be a false representation and knowing that the

14  RX Limited scheme constituted an illegal method of dispensing,

15  distributing and obtaining prescription drugs in the United

16  States.

17       Le Roux and his coconspirators also used numerous

18  aliases when interacting with RX Limited physicians and

19  pharmacies, and with various other entities, including shipping

20  services, banks, and telephone companies, in order to mask the

21  true ownership and operation of RX Limited.

22       In furtherance of the conspiracy and to effect the

23  objects thereof, Le Roux and his coconspirators committed the

24  following overt acts, among others, in the United States and

25  the District of Minnesota and elsewhere, as described in the

XE2JKCAL2          SEALED -- DO NOT DOCKET

1   chart below, in that they unlawfully caused to be dispensed and

2   aided the distribution of the prescription drugs listed below

3   from an RX Limited pharmacy located outside Minnesota to an

4   undercover law enforcement investigator in Minnesota, who, on

5   or about the dates listed below, posed as an RX Limited

6   customer and completed RX Limited's customer questionnaire by

7   accessing the websites and customer service telephone number

8   listed below without having a valid doctor-patient relationship

9   with an RX Limited physician.  And then there follow dates

10  between July 18th, 2008, to September 14th, 2012, and the

11  prescriptions listed are Isocet, which is earlier described in

12  the indictment as another name for Fioricet, and five or six

13  Fioricet prescriptions, till 2010 and then a prescription for

14  tramadol.  I don't see tramadol earlier in the indictment.

15         MR. GORJI:  Your Honor, if I may -- Perham Gorji, on

16  behalf of the United States -- tramadol is the active

17  ingredient listed on page 1 of the information of Count One for

18  Ultram.  Ultram is the name for the tramadol.

19         THE COURT:  For Ultram.  U-L-T-R-A-M, oh, yes, I see

20  "tramadol" in parenthesis next to it.

21         And then there follow more Fioricet prescriptions

22  until March 15th, 2012, also a tramadol prescription the same

23  date, and two more Fioricet prescriptions later in 2012.  The

24  schedule shows that the dispensing pharmacies were located in

25  McMinnville, Tennessee; Monroe, Wisconsin; Oshkosh, Wisconsin;

XE2JKCAL2          SEALED -- DO NOT DOCKET

1    Chicora, Pennsylvania; Mobile, Alabama; Dallas, Texas;

2    Hellertown, Pennsylvania; Easton, Pennsylvania; Elmhurst,

3    New York; Kissimmee, Florida, Chapmanville, West Virginia;

4    Jacksonville, Florida; Elmhurst, New York and Elmhurst,

5    New York.

6              In order to prove you guilty of the crime charged in

7    Count One of the indictment in United States District Court for

8    the District of Minnesota, Mr. Le Roux, the government must

9    prove the following essential elements of the crime:

10             First, that there was a conspiracy in existence

11   between the dates of May 2004 to September 12th, 2004;

12             Second, that you and other persons entered into a

13   conspiracy during that period to commit an offense against the

14   United States, namely, to cause the introduction and delivery

15   for introduction into interstate commerce, from various

16   locations in the United States outside the District of

17   Minnesota, to various locations in the United States, including

18   the District of Minnesota, without intent -- with intent to

19   defraud and mislead by introducing into those states

20   prescription drugs, including Fioricet, Soma and Ultram, which

21   were misbranded within the meaning of Title 18 -- excuse me,

22   Title 21 Section 353(b)(1), and that they were dispensed

23   without prescription of a practitioner licensed by law to

24   administer such drug, in violation of Title 21, United States

25   Code, Section 331(a) and 333(a)(2), and that the object of the

43

XE2JKCAL2          SEALED -- DO NOT DOCKET

1    conspiracy was to obtain money for you and the conspirators to

2    obtain money and revenues and profits by illegally offering

3    these drugs for sale and selling them without valid

4    prescriptions, and that these drugs were marketed by websites

5    which operated in interstate commerce, and that you were a

6    founder and manager of the company that directed these

7    activities, which was called RX Limited, and the other

8    coconspirators acted for RX Limited and handled the day-to-day

9    management of the interstate pharmacy operation.

10          I'm looking to see whether you provided me with

11   something that's a little shorter than what --

12          MS. MARKS:  Your Honor -- Linda Marks from the

13   Consumer Protection Branch -- we also have some elements of the

14   offenses we can tender to the Court which might assist the

15   Court.  We also wanted to remind the Court that Mr. Le Roux has

16   not been arraigned on the three counts on the information that

17   came from Minnesota.  So I don't know if your Honor can arraign

18   and take the plea at the same time, but that's something we

19   wanted to --

20          THE COURT:  I'm glad you called it to my attention.

21          MS. MARKS:  Certainly.

22          THE COURT:  I better get the arraignment done.

23          MR. SEIDLER:  Your Honor, for purposes of the

24   arraignment, we will waive a reading of the indictment we've

25   gone through this multiple, multiple times.  So we will waive

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A                    90

44

XE2JKCAL2          SEALED -- DO NOT DOCKET

1   reading of the indictment, and it's the intention of

2   Mr. Le Roux, as with the Southern District information, to

3   plead guilty to these charges.

4           THE COURT:  I still want to -- Mr. Le Roux, have you

5   seen a copy of "Paul Calder Le Roux" -- Mr. Seidler, have you

6   seen a copy of the indictment charging the defendant with

7   conspiracy to violate the Food, Drug and Cosmetic Act in Count

8   One and with conspiracy to commit mail fraud and wire fraud in

9   Count Two?  And have you discussed it with your client?

10          MR. SEIDLER:  Yes, sir.  There's also Count Three,

11  which is money laundering.

12          THE COURT:  I'm sorry, there's a Count Three?

13          MS. MARKS:  Conspiracy to commit money laundering,

14  your Honor.  It's just an information.

15          THE COURT:  It's an information?

16          MS. MARKS:  Yes, sir.

17          (Continued on next page)

18

19

20

21

22

23

24

25

45

Xe2j1ler3                    SEALED - DO NOT DOCKET

1          THE COURT:  I see it way up there now.  It's not on

2    the earlier list.  And also of a conspiracy to launder money in

3    Count Three.  Have you seen that information, Mr. Seidler?

4          MR. SEIDLER:  I have, your Honor, and I've reviewed it

5    on multiple occasions with Mr. Leroux.  And as I said, we're

6    prepared to waive a reading of the indictment and --

7          THE COURT:  Are you prepared to enter a plea?

8          MR. SEIDLER:  Yes, a plea of guilty to each of the

9    three counts.

10         THE COURT:  Mr. Calder, have you seen a copy of the

11   indictment I just described to Mr. Seidler?

12         THE DEFENDANT:  I have, your Honor.  It was negotiated

13   over some period of time so I've read it multiple times.

14         THE COURT:  And have you discussed it fully with your

15   lawyer, Mr. Seidler?

16         THE DEFENDANT:  I have, your Honor.

17         THE COURT:  Do you also waive a reading of the

18   information at this time?

19         THE DEFENDANT:  I do, your Honor.

20         THE COURT:  Do you wish to plead guilty at this time?

21         THE DEFENDANT:  I wish to plead guilty to all three

22   counts, your Honor.

23         THE COURT:  All right.  Now I didn't ask you any

24   questions about Count One.

25         MR. SEIDLER:  He hasn't given his allocution yet to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A                              92

Xe2j1ler3          SEALED - DO NOT DOCKET

1   Count One.

2          THE COURT:  The best thing to do is go back.  Do you

3   want to hand up what you feel are the essential elements of the

4   charge.  Maybe I could save some time.

5          MS. HECTOR:  Yes, your Honor.  I gave them to the

6   courtroom deputy.

7          THE COURT:  Oh, I've got a lot of stuff in front of

8   me.  This one is the one from the US Attorney's Office and it's

9   not complete.

10         MR. LOCKARD:  That's our error, your Honor.  I

11  apologize.

12         THE COURT:  I think --

13         MR. GORJI:  Your Honor, just so you know, it's a

14  four-page document entitled Elements of the Offense --

15         THE COURT:  Yes, I've got it.

16         With regard to Count One, Mr. Leroux, this charges

17  that between the dates of between May 2004 until on or about

18  September 2012, you conspired and agreed together with other

19  persons to commit an offense against the United States to

20  violate the Federal Food, Drug, and Cosmetic Act, in violation

21  of Title 18 United States Code Section 371, which is a general

22  conspiracy charge, and the violations of the Federal Food,

23  Drug, and Cosmetic Act that you are alleged to have violated

24  are that during the period May through September 2012 you

25  conspired and agreed with others to introduce and cause the

Xe2j1ler3          SEALED - DO NOT DOCKET

1    introduction for delivery into interstate commerce from various

2    locations in the United States, outside Minnesota, to various

3    locations in the United States, including the District of

4    Minnesota, with the intent to defraud and mislead.  Namely, you

5    caused the introduction into interstate commerce of

6    prescription drugs, including prescription drugs Fioricet,

7    Soma, Ultram, which were misbranded within the meaning of

8    Title 21 United States Code Section 353(b)(1) in that they had

9    been dispensed without the prescription practitioner licensed

10   by law to administer such drug, in violation of 21 United

11   States Code Section 331(a) and 333(a)(2).  The object of the

12   conspiracy was for you and the other conspirators to obtain

13   substantial revenues and profits by illegally offering for sale

14   and selling without valid prescriptions prescription drugs,

15   including Fioricet, Soma, Ultram, via internet websites and

16   telephone call centers and causing them to be shipped to

17   consumers in the United States and elsewhere.  And it was a

18   further part of the conspiracy that you owned and operated and

19   used internet websites to market prescription drugs offered

20   through various businesses, collectively known as Rx Ltd., and

21   that those Rx Ltd. operated internet infrastructure and

22   operating systems which enabled customers to place drug orders

23   over the internet and by various toll-free numbers listed on Rx

24   Ltd.'s marketing websites without a physical examination or

25   doctor/patient relationship and that as part of the conspiracy,

1    the consumers chose the type, quality, and dosage of

2    prescription drugs the consumer wished to purchase and paid for

3    drug orders with credit cards, which Rx did not verify the

4    information customers provided and also did not verify their

5    identities, ages, and qualifying medical conditions, and that

6    the customers didn't provide medical records or any prior

7    prescription to Rx Ltd.  It was a further part of the

8    conspiracy that you and your co-conspirators recruited and paid

9    physicians and pharmacies, namely hereafter Rx Ltd. Physicians

10   and Rx Ltd. Pharmacies, to authorize sham prescriptions and

11   fraudulently dispense prescription drugs.  In virtually all

12   instances Rx Ltd. Physicians had no contact with such

13   customers, whether face to face, on the telephone, or via

14   electronic mail, and retained no records of their

15   consultations; and that you arranged for the shipping of these

16   drugs in interstate commerce from places outside Minnesota to

17   places inside Minnesota and elsewhere in the country without

18   verifying the customers' complaint or having adequate patient

19   history or performing a mental or physical exam using

20   appropriate diagnostic or laboratory testing and providing the

21   means to monitor the customers' response to the medication; and

22   that you also represented to customers via the websites that

23   this was a valid means for patients to receive "treatment" and

24   to obtain prescription medication by completing an online

25   questionnaire without a physical examination, knowing that this

Xe2j1ler3          SEALED - DO NOT DOCKET

1   was a false representation and knowing that Rx Ltd.'s scheme

2   constituted an illegal method of dispensing, distributing, and

3   obtaining prescription drugs in the United States.

4          And there follow a series of overt acts, which

5   describes a series of transactions by an undercover

6   investigator in Minnesota who, on the dates listed below, posed

7   as an Rx Ltd. customer and completed Rx Ltd. customer's

8   questionnaire, obtained prescriptions on various dates between

9   2008 to 2012, which I described to you earlier.

10          Now in order to prove you guilty of this crime in

11   Count One, the government must prove beyond a reasonable doubt

12   the following: that two or more persons reached an agreement to

13   violate the Federal Food, Drug, and Cosmetic Act, here, that

14   is, to introduce and cause the introduction and delivery for

15   introduction into interstate commerce drugs which were

16   misbranded within the meaning of Title 21 United States Code

17   Section 353(b)(1) in that they were dispensed without

18   prescription of a practitioner licensed by law to administer

19   such drug, with the intent to defraud and mislead, in violation

20   of Title 21 United States Code Sections 331(a) and 333(a)(2);

21   second, that you voluntarily and intentionally joined in the

22   agreement; third, that at the time you joined the agreement you

23   knew the purpose of the agreement; and four, that while the

24   agreement was in effect, a person or persons who had joined in

25   the agreement knowingly did one or more acts for the purpose of

Xe2j1ler3               SEALED - DO NOT DOCKET

1    carrying out or carrying forward the agreement. And then so

2    those acts which you have to know about were acts which were

3    done for the purpose of carrying out this illegal agreement to

4    deliver drugs to customers without a prescription from a

5    practitioner licensed by law to administer the drug and to do

6    so in interstate commerce, which is transportation from one

7    state to another, including Minnesota. And as used in the

8    indictment, the term "drug" includes articles intended for the

9    diagnosis, cure, mitigation, treatment, or prevention of

10   disease in humans or to affect the structure of any function of

11   the human body. And some are prescription drugs.

12          So I will have to ask you whether you were aware of

13   those facts. How do you plead to the charge, guilty or not

14   guilty?

15          THE DEFENDANT: Guilty, your Honor.

16          THE COURT: And did you enter into a conspiracy to

17   violate the Federal Food, Drug, and Cosmetic Act?

18          THE DEFENDANT: Yes, your Honor.

19          THE COURT: And during what period of time was that,

20   between the dates of 2004 and September 2012?

21          THE DEFENDANT: Yes, between 2004 and 2012 I agreed

22   with others for monetary gain to ship in interstate commerce

23   within the United States to consumers, including consumers

24   within the District of Minnesota, prescription drugs such as

25   Fioricet, Soma, Ultram, purchased on the internet by those

51

Xe2j1ler3             SEALED - DO NOT DOCKET

1    consumers which were misbranded in that we were -- in that they

2    were not lawfully prescribed by a person licensed to administer

3    those drugs.  And we sold the prescription drugs.

4         THE COURT:  You're reading that.  Are all those facts

5    true to your own knowledge?

6         THE DEFENDANT:  Yes, they are, your Honor.

7         THE COURT:  And did you and others agree to do the

8    acts that you just mentioned?

9         THE DEFENDANT:  Yes, your Honor.

10        THE COURT:  Did you understand that these drugs that

11   you mentioned were intended for the use and cure and mitigation

12   or treatment or prevention of disease in humans?

13        THE DEFENDANT:  Yes, your Honor.

14        THE COURT:  And you acknowledge that Fioricet and Soma

15   and Ultram are prescription drugs within the meaning of the

16   Food and Drug Act?

17        THE DEFENDANT:  I do, your Honor.

18        THE COURT:  Did you know what you were doing was

19   against the law?

20        THE DEFENDANT:  Yes, your Honor.

21        THE COURT:  And did you do it intentionally and

22   knowingly?

23        THE DEFENDANT:  Yes, your Honor.

24        THE COURT:  Any further allocution that is required

25   here?

Xe2j1ler3          SEALED - DO NOT DOCKET

1          MR. GORJI:  No, your Honor, but I would like to just

2     bring to the Court's attention, I don't believe that the Court

3     has reviewed the charges in the plea agreement with respect to

4     the Minnesota information, and I believe we'll have to do that

5     before accepting the plea.

6          THE COURT:  I haven't been handed the plea agreement

7     with respect to this information.

8          MR. GORJI:  Your Honor, it's the same plea agreement

9     that you previously were looking at.  I believe previously you

10    ended with Count Four of the information, which is Superseding

11    Information 2.  This is Count One of the second information.

12    It's on page 2.  I don't believe you --

13         THE COURT:  Sorry.  Let me just see what you're

14    reading from.  I don't know what you're reading from.  I have

15    so many documents in front of me with these two things.

16         (Pause)

17         MR. LOCKARD:  Your Honor, all of the provisions the

18    Court reviewed relating to waivers of rights also applies to

19    the second information, and I don't think the Court needs to

20    re-review it, but just the statutory penalties that apply to

21    each of the three counts in the second information.

22         THE COURT:  Oh.

23         MR. GORJI:  That's right, your Honor.  I believe it's

24    just three paragraphs on page 2 through 3 of the plea

25    agreement.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A                          99

Xe2j1ler3                    SEALED - DO NOT DOCKET

1              THE COURT:  What page?

2              MR. GORJI:  Starting on page 2, the fourth paragraph

3      on page 2.

4              THE COURT:  Okay.

5              MR. GORJI:  Starts with Count One of the second

6      information, and that's the charge you're reviewing with the

7      defendant currently.

8              THE COURT:  I see.

9              Mr. Leroux, are you aware or were you aware when you

10     made your plea allocution to the information from Minnesota

11     that Count One of that charge, a violation of Title 18 Section

12     371, carries a maximum term of imprisonment of five years, a

13     maximum term of supervised release of three years, and a

14     maximum fine, pursuant to Title 18 United States Code

15     Section 3571, of the greatest of $250,000 or twice the gross

16     pecuniary gain derived from the offense or twice the gross

17     pecuniary loss to persons other than the defendant resulting

18     from the offense, and a $100 mandatory special assessment?

19     Were you aware of that --

20             THE DEFENDANT:  Yes, your Honor.

21             THE COURT:  -- at the time you allocuted to the crime

22     in Count One?

23             THE DEFENDANT:  Yes, your Honor.

24             THE COURT:  Were you aware that Count Two of the

25     information, which charges you with violation of Title 18

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A                         100

Xe2j1ler3          SEALED - DO NOT DOCKET

1  United States Code Section 1349 in connection with your

2  participation in a conspiracy to commit mail and wire fraud,

3  from in or about 2004 through in or about September 2012,

4  carries a maximum term of imprisonment of 20 years, and a

5  maximum term of supervised release of three years, and a

6  maximum term, pursuant to Title 18 United States Code

7  Section 3571, of the greatest of $1 million, twice the

8  pecuniary gain derived from the offense, or twice the pecuniary

9  loss to persons other than the defendant resulting from the

10  offense, and a $100 mandatory special assessment?  Are you

11  aware of that?

12          THE DEFENDANT:  Yes, your Honor.

13          THE COURT:  Are you aware that Count Three of the

14  second information charges you with a violation of Title 18

15  United States Code Section 1956(h), in connection with your

16  participation in a conspiracy to launder money from in or about

17  2004 through in or about September 2012?  Are you aware that

18  Count Three of the second information charges you with that

19  crime during that period?

20          THE DEFENDANT:  Yes, I was aware, your Honor.

21          THE COURT:  And do you also understand that Count

22  Three of the second information carries a maximum term of

23  imprisonment of 20 years and a maximum term of supervised

24  release of three years and a maximum fine, pursuant to Title 18

25  United States Code Section 1956(h) and 3571, of the greatest of

Xe2j1ler3                    SEALED - DO NOT DOCKET

1    $500,000 or twice the gross pecuniary derived from the offense

2    or twice the gross pecuniary loss to persons other than the

3    defendant resulting from the offense, and a $100 mandatory

4    special assessment?

5           THE DEFENDANT:  Yes, I'm aware, your Honor.

6           THE COURT:  Are you aware that the total maximum

7    sentence of incarceration is life imprisonment and a mandatory

8    minimum sentence of ten years of imprisonment under the

9    information filed in the District of Minnesota?

10          MS. MARKS:  I'm sorry, your Honor.  That sentence

11   refers to both informations together since this is a joint plea

12   agreement, so that maximum sentence of life and a mandatory

13   minimum of ten years, those are the maximums in Count One of

14   the Southern District of NY second superseding information.  I

15   just want to make that clear that that reflected all seven

16   counts of this joint plea agreement.

17          THE COURT:  Then I stand corrected.

18          Mr. Leroux, do you understand that what I just said

19   applies to both the New York superseding information and the

20   Minnesota information?

21          THE DEFENDANT:  Yes, your Honor, I'm aware.

22          THE COURT:  Now I have to go back, right?

23          MR. SEIDLER:  To Count Two.

24          THE COURT:  To Count Two?

25          MS. MARKS:  Count Two, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

56

Xe2j1ler3          SEALED - DO NOT DOCKET

1         MR. GORJI:  Well, your Honor, we left off with you

2    asking the government and defense counsel whether or not we

3    believed any additional allocution was necessary, and from the

4    government's position --

5         THE COURT:  Anything further?

6         MR. GORJI:  No, your Honor.

7         THE COURT:  Thank you.

8         MR. SEIDLER:  No, sir.

9         THE COURT:  All right.  Count Two, Mr. Leroux, charges

10   you with conspiracy to commit mail fraud and wire fraud, and it

11   incorporates the allegations in paragraphs 1 through 8 of Count

12   One by reference and realleged as though fully set forth

13   herein.  Those paragraphs are all the paragraphs, as I see it,

14   of Count One so that the charge of mail fraud and wire fraud

15   incorporates the charges of violation of the Food, Drug, and

16   Cosmetic Act of the United States and then sets forth that

17   beginning in May 2004 to around September 2012 that you

18   intentionally and with intent to further the objects of the

19   conspiracy did knowingly conspire and confederate with others

20   known and unknown to the United States to commit the following

21   offenses:  (A) that you knowingly and with intent to defraud

22   and with an intent to devise a scheme and artifice to defraud

23   and obtain money and property by means of materially false and

24   fraudulent representations and promises, knowing they were

25   false and fraudulent when made, and for the purpose of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A

1   executing the scheme and artifice, did deposit and cause to be

2   deposited mail matter by U.S. Mail and private commercial and

3   interstate carrier and knowingly did cause to be delivered

4   certain United States mail, so this charge in Count Two is a

5   charge of mail fraud by you based on the information contained

6   in Count One of the indictment.  And then it goes on to also

7   charge that knowingly and with intent to defraud, you devised a

8   scheme and artifice to defraud by communications in interstate

9   commerce using wire communications as opposed to mail

10  communications.  And then it charges that the purpose was to

11  obtain revenues and profits by illegally offering for sale and

12  selling prescription drugs to consumers in the United States by

13  means that were outside the usual course of professional

14  medical practices and without a legitimate medical purpose.

15  And then it charges again that certain tablets were sent by

16  interstate mail or wire to various people in the United States

17  from pharmacies located in various states of the United States

18  in that schedule in paragraph 5.  And it then charges in

19  paragraph 6 that for purposes of executing the scheme and

20  artifice to defraud you and your co-conspirators caused to be

21  transmitted from websites hosted and telephone call centers

22  located outside the state and District of Minnesota, to

23  Minneapolis within the state and District of Minnesota, by

24  means of wire communications, and it lists a number of wires

25  that contained marketing materials viewed in Minnesota and two

Xe2j1ler3                    SEALED - DO NOT DOCKET

1    telephone calls between Minnesota and a customer service

2    representative of Rx Ltd.

3              In connection with this charge the government must

4    prove beyond a reasonable doubt, to the unanimous satisfaction

5    of a jury of 12 persons independent from the prosecution, the

6    following elements, and must prove these beyond a reasonable

7    doubt: first, that an agreement existed between two or more

8    persons to commit mail or wire fraud; second, that the

9    defendant knew of the agreement to commit mail or wire fraud,

10   as described in the indictment, and intentionally joined the

11   agreement; and next, that an overt act in furtherance of the

12   agreement was committed by you or one of the other

13   conspirators.  As I said earlier, conspiracy is an agreement

14   between two or more persons to violate the federal law.

15             How do you plead to the charge, guilty or not guilty?

16             THE DEFENDANT:  Guilty, your Honor.

17             THE COURT:  Have you got a prepared allocution here?

18             THE DEFENDANT:  I have, your Honor.

19             THE COURT:  All right.  And you read it and you

20   believe it to be true of your own knowledge?

21             THE DEFENDANT:  I have, your Honor.  I know that it is

22   true, your Honor.

23             THE COURT:  All right.  Would you read it then.

24             THE DEFENDANT:  Okay.  Count Two.  Between 2004 to

25   2012, I had an agreement with others to send by United States

Xe2j1ler3                    SEALED - DO NOT DOCKET

1    mail prescription drugs which were sold illegally by means

2    outside the usual course of professional medical practice.  We

3    also transmitted wire communications from outside the state and

4    District of Minnesota to Minneapolis, Minnesota as part of our

5    plan to sell these illegal prescription drugs.

6              THE COURT:  Did you also cause those drugs to be

7    mailed in interstate commerce pursuant to this agreement?

8              THE DEFENDANT:  I did, your Honor.

9              THE COURT:  And did you know what you were doing was

10   against the law?

11             THE DEFENDANT:  Yes, your Honor.

12             THE COURT:  Did you do it knowingly and intentionally?

13             THE DEFENDANT:  Yes, your Honor.

14             THE COURT:  Is there any further allocution that is

15   required by the prosecution or defense?

16             MR. GORJI:  No, your Honor.

17             MR. SEIDLER:  No, sir.

18             THE COURT:  All right.  Then it's the finding of the

19   Court in the case of Count Two of the information from

20   Minnesota that the defendant is fully competent and capable of

21   entering an informed plea and that his plea of guilty to Count

22   Two of that information is a knowing plea and constituting the

23   offense charged in Count Two.

24             Now move to Count Three.

25             MR. GORJI:  Your Honor, before we move on to Count

Xe2j1ler3                    SEALED - DO NOT DOCKET

 1    Three -- and I apologize for this, but I believe that you did

 2    not make the same finding with respect to Count One when I had

 3    to interject with respect to the reading of the offense, so I

 4    don't believe that that finding was ever put on the record.

 5            THE COURT:  With respect to Count One, the allocution

 6    by the defendant was adequate.

 7            With respect to Count One of the Minnesota information

 8    against Mr. Paul Calder Leroux, the Court finds that the

 9    defendant is fully competent and capable of entering an

10    informed plea and his plea of guilty to that count of the

11    information is a knowing and voluntary plea, supported by an

12    independent basis in fact containing each of the essential

13    elements of the offense.  His plea is therefore accepted and he

14    is adjudged guilty of Count One of the information.

15            Let's go on to Count Three.

16            Count Three charges that beginning in May 2004 to

17    September 2012, in the District of Minnesota and elsewhere,

18    you, Mr. Leroux, conspired and agreed with others, known and

19    unknown, to transport, transmit, and transfer funds from a

20    place outside the United States, that is, Hong Kong, to places

21    in the United States, including the District of Minnesota, with

22    the intent of promoting and carrying on specified unlawful

23    activities -- namely, mail fraud and wire fraud -- in violation

24    of Title 21 United States Code Sections 1341 and 1343.  The

25    purpose of the conspiracy for Leroux and his conspirators was

1   to transport, transmit, and transfer funds to take place in the

2   United States through a place outside the United States with

3   the intent of promoting and carrying on the specified unlawful

4   activities, in violation of Title 18 United States Code

5   Section 3556(a)(2)(A) in order to obtain large quantities of

6   funds, thereby enriching themselves in exchange for

7   fraudulently distributing and dispensing prescription drugs.

8   It was part of the conspiracy that Leroux and his

9   co-conspirators caused wire transfers to be made from financial

10  institutions outside the United States to United States

11  accounts, bank accounts belonging to and associated with Rx

12  Ltd. physicians and pharmacists in payment for the physicians'

13  approval of Rx customers' prescription drug orders and in

14  payment for the wholesale cost of drugs and dispensing fees for

15  Rx Ltd. fulfillment pharmacies.  It was also part of the

16  conspiracy that Leroux and his co-conspirators caused the wire

17  transfers to be made from financial institutions outside the

18  United States to bank accounts of the owners and operators of

19  Rx Ltd.'s marketing websites, that is, marketing affiliates, at

20  financial institutions in the United States to pay for the

21  marketing affiliates' hosting websites on the internet, all in

22  violation of Title 18 United States Code Section 1956(h).

23          1956(h) reads as follows:  Any person who conspires to

24  commit any offense defined in this section or Section 1957

25  shall be subject to the same penalties as those described for

Xe2j1ler3                    SEALED - DO NOT DOCKET

1    the offense, the commission of which is the object of the

2    conspiracy.  That doesn't help much.

3            MR. GORJI:  Your Honor, Section 1341, mail fraud, and

4    1343, wire fraud, are specified unlawful activities for

5    purposes of 1956 --

6            THE COURT:  Let me just see.  Where are you?

7            MR. GORJI:  1956(c)(7).

8            THE COURT:  Okay.

9            MR. GORJI:  And your Honor, I'm looking at the

10   elements that we provided on pages 3 and 4, which provide the

11   elements of conspiracy to launder money.

12           THE COURT:  Where are we?  I'm trying to find 1956(c).

13   Isn't that what you referred me to?

14           MR. GORJI:  The mail fraud and wire fraud are

15   specified on unlawful activities pursuant to 1956(c)(7).

16           THE COURT:  I've got the 2013 edition.

17           MR. GORJI:  Your Honor, if you look at 961 --

18           THE COURT:  I see it.  The next page.  I don't see

19   where it is.

20           MR. GORJI:  Your Honor, it's incorporated by

21   definition in 1961, Section 1961. Title 18.

22           THE COURT:  I thought you said it was in 1956(c).

23           MR. GORJI:  Your Honor, I apologize.  I don't have a

24   copy of the statute book, but if --

25           THE COURT:  It doesn't seem to be in 1956(c).

63

Xe2j1ler3          SEALED - DO NOT DOCKET

1          MR. GORJI:  The definition of SUA is defined by

2     incorporation --

3          THE COURT:  I could miss it because there are an awful

4     lot of different crimes in 1956(c).

5          MR. LOCKARD:  Your Honor, I believe one of the first

6     parts of the definition that's specified unlawful activity

7     refers to the definition of racketeering activity, which is

8     found in Section 1961, so specified unlawful activity is

9     racketeering activity plus all the additional crimes that are

10    listed in --

11         THE COURT:  1961?

12         MR. LOCKARD:  Right.  So that if you refer back to

13    1961 --

14         THE COURT:  No wonder I'm having trouble finding it.

15         MR. LOCKARD:  It's a little bit of a maze.

16         THE COURT:  1956(c).  Now where's the part that refers

17    you to 1961?

18         MR. LOCKARD:  So subsection (c) should include a

19    reference to the offenses listed in Section 1961.

20         THE COURT:  Section 1341 and 1343 are in 1961.

21         All right.  I feel more comfortable going ahead.  I'm

22    sorry, Mr. Leroux.  You probably think it's all silly, but I

23    have to be careful.

24         THE DEFENDANT:  No problem, your Honor.

25         THE COURT:  That includes mail fraud and wire fraud.

A                        110

64

Xe2j1ler3                    SEALED - DO NOT DOCKET

1    So in order to prove you guilty of the crime of conspiracy to

2    commit money laundering, in violation of Title 18 United States

3    Code Section 1956(h), the government must prove the following

4    elements beyond a reasonable doubt: (1) that two or more

5    persons reached an agreement to violate Title 18 United States

6    Code Section 1956, including 1961, which is incorporated in

7    1956, to violate the money laundering statute; and second, that

8    you participated in the agreement to violate Title 18 United

9    States Code Section 1956 with the intent that it succeed, and

10   in other words, they must prove that you transported the funds

11   with the intention of using those funds to commit the crimes of

12   mail fraud and wire fraud and that you did so knowingly and

13   intentionally and that you knew what you were doing was

14   unlawful at the time you did it.

15            How do you plead to the charge, guilty or not guilty?

16            THE DEFENDANT:  Guilty, your Honor.

17            THE COURT:  And so have you got a prepared allocution

18   you wish to give?

19            THE DEFENDANT:  I do, your Honor.

20            THE COURT:  All right.  And it's true to your own

21   knowledge?

22            THE DEFENDANT:  Yes, your Honor.

23            THE COURT:  All of it?

24            THE DEFENDANT:  Yes, your Honor.

25            THE COURT:  All right.

SEALED - DO NOT DOCKET

1          THE DEFENDANT: Count Three. As part of the scheme to

2     sell the prescription drugs illegally between 2004 to 2012 in

3     the District of Minnesota and elsewhere, I agreed with others

4     to transfer illegal proceeds from Hong Kong to the District of

5     Minnesota to carry on and to finance the illegal prescription

6.    drug business of Rx Ltd. and its pharmacists and physicians and

7     its marketing websites. In each case I knew what I did was

8     wrong and illegal.

9          THE COURT: And you did it in order to finance the

10    wire and mail fraud operation?

11         THE DEFENDANT: Yes, your Honor.

12         THE COURT: And you did so intentionally and

13    knowingly? Your acts were intentional and knowing?

14         THE DEFENDANT: Yes, your Honor.

15         THE COURT: And you knew at the time that you

16    transported the monies that it would be used for the mail fraud

17    activity?

18         THE DEFENDANT: I did, your Honor.

19         THE COURT: Is there any further allocution that the

20    government or defense feels is required here?

21         MR. SEIDLER: No, sir.

22         MR. GORJI: No, your Honor.

23         THE COURT: All right. It is the finding of the Court

24    in the case of United States v. Paul Calder Leroux that the

25    defendant is fully competent and capable of entering an

A

66

1   informed plea, and his plea of guilty to Count Three is a

2   knowing and voluntary plea, supported by an independent basis

3   in fact containing each of the essential elements of the

4   offense.  His plea is accepted and he's adjudged guilty of that

5   offense.

6           And I gather there's an agreement on forfeiture or --

7           MR. GORJI:  There is, your Honor.

8           MR. SEIDLER:  It's part of the agreement.

9           MR. GORJI:  Yes, your Honor, there is.

10          MR. SEIDLER:  It's contained in the plea agreement.

11          THE COURT:  He understands that there's a forfeiture.

12          MR. GORJI:  Yes, your Honor.

13          MR. SEIDLER:  Yes, your Honor.

14          THE COURT:  All right.  Then a written presentence

15   report will be prepared by the probation office to assist the

16   judge in sentencing in both cases, the New York case and the

17   Minnesota case.  Do you want a control date?

18          MR. LOCKARD:  Yes, your Honor.  I think we're not

19   prepared to have the PSR prepared at this time, but we would

20   request a control date of approximately 90 to 120 days,

21   whatever time the Court is --

22          THE COURT:  August 20th?  It sounds to me from the

23   number of matters you have here that you're not going to be

24   ready much before that.

25          MR. LOCKARD:  August 20th is fine, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

XE2JKCAL4    SEALED - DO NOT DOCKET                          67

1    We'll let the Court know in advance if there's a request for

2    adjournment.

3              (Continued on next page)

XE2JKCAL4    SEALED - DO NOT DOCKET

1           THE COURT:  All right.

2           MR. SEIDLER:  What time, your Honor?

3           THE DEPUTY CLERK:  August 20th at 4:00.

4           THE COURT:  A control date for August 20th, 2014, at

5    4:00 p.m.

6           MR. SEIDLER:  And this is going to be sealed, your

7    Honor, this transcript and the docketing --

8           THE COURT:  The proceedings will be sealed.  Are there

9    special sealing requests that are being made besides those in

10   the sealing order?

11          MR. LOCKHARD:  Your Honor, the sealing order requests

12   that the transcript and the filing be sealed, the docketing be

13   made in a United States versus John Doe docket, and I don't

14   know if we closed the courtroom today but there's a request for

15   courtroom closure.  We can strike that if the courtroom is not

16   actually closed.

17          THE COURT:  The courtroom is not closed.

18          MR. LOCKHARD:  So I can strike that and hand up the

19   proposed orders to the Court.

20          THE COURT:  All right.

21          MR. SEIDLER:  Thank you, your Honor.

22          THE COURT:  Thank you.

23          MS. MARKS:  Thank you, your Honor.

24          THE COURT:  Sorry it took so long.

25          MR. GORJI:  Thank you, your Honor.  * * *

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 5/30/19
```

UNITED STATES OF AMERICA,

v.

PAUL CALDER LEROUX,

Defendant.

No. S2 12-CR-489 (RA)
14 CR. 75 (RA)

ORDER

RONNIE ABRAMS, United States District Judge:

These matters have been reassigned to me for all purposes. The Court will sentence Mr.

LeRoux on August 14, 2019 at 3:00 p.m. The Government's submission shall be due two weeks

prior to sentencing and defendant's submission shall be due one week prior to sentencing.

SO ORDERED.

Dated:    May 30, 2019
          New York, New York

Ronnie Abrams
United States District Judge

A                              116

SOUTHERN DISTRICT OF NEW YORK

20MC176

District Judge Colleen mcMahon

IN RE: CORONAVIRUS/COVID-19 PANDEMIC

M10-468

THIS MATTER RELATES TO: Video Teleconferencing and Telephone Conferencing for Criminal Proceedings

STANDING ORDER

On March 13, 2020, the President of the United States declared that the Coronavirus Disease 2019 ("COVID-19") outbreak constitutes a national emergency under the National Emergencies Act, 50 U.S.C. §§ 1601 *et seq.*

On March 27, 2020, the President signed into law the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), which provides that, subject to certain requirements, video teleconferencing and telephone conferencing may be used in enumerated criminal proceedings in certain circumstances during the national emergency related to the Coronavirus Disease 2019 ("COVID-19") and 30 days thereafter.  On March 29, 2020, the Judicial Conference of the United States found that emergency conditions due to the national emergency declared by the President with respect to COVID-19 materially have affected and will materially affect the functioning of the federal courts generally.

As of today's date, there have been over 30,000 confirmed cases of COVID-19 in New York City alone, and estimates suggest that the number of cases may be many times greater. The current public health crisis has caused, is causing, and is expected to continue to cause extraordinary disruption throughout this District, including, but not limited to the temporary closure of offices; the imposition of travel restrictions and discouragement of the use of mass transportation; the dislocation of many residents; and disruptions and delays in the use of the mails. Cases of COVID have been diagnosed among members of the staff of this Court and/or members of their immediate families, which has required the closure of certain operations and

A                        117

made it impossible for members of the court staff to appear for work. Moreover, diagnosed cases

of COVID-19 in the population of the Metropolitan Correction Center and the Metropolitan

Detention Center have caused, and are likely to cause, restrictions on the movement of

defendants to and from court. These and other considerations make it increasingly necessary for

judges in this District to conduct proceedings remotely, by videoconference or other means, with

defense counsel and defendants sometimes in separate locations.

For these reasons, IT IS ORDERED THAT, on motion of the undersigned, the use of

video teleconferencing, or telephone conferencing if video teleconferencing is not reasonably

available, is authorized for the following proceedings with the consent of the defendant, or

juvenile, after consultation with counsel:

- Detention hearings under section 3142 of title 18, United States Code;

- Initial appearances under Rule 5 of the Federal Rules of Criminal Procedure;

- Preliminary hearings under Rule 5.1 of the Federal Rules of Criminal Procedure;

- Waivers of indictment under Rule 7(b) of the Federal Rules of Criminal Procedure;

- Arraignments under Rule 10 of the Federal Rules of Criminal Procedure

- Probation and supervised release revocation proceedings under Rule 32.1 of the Federal Rules of Criminal Procedure;

- Pretrial release revocation proceedings under section 3148 of title 18, United States Code;

- Appearances under Rule 40 of the Federal Rules of Criminal Procedure;

- Misdemeanor pleas and sentencings as described in Rule 43(b)(2) of the Federal Rules of Criminal Procedure;

- Proceedings under chapter 403 of title 18, United States Code (commonly known as the "Federal Juvenile Delinquency Act"), except for contested transfer hearings and juvenile delinquency adjudication or trial proceedings.

IT IS FURTHER ORDERED THAT, on motion of the undersigned, the undersigned specifically finds that felony pleas under Rule 11 of the Federal Rules of Criminal Procedure; felony sentencings under Rule 32 of the Federal Rules of Criminal Procedure; and equivalent plea and sentencing, or disposition, proceedings under chapter 403 of title 18, United States Code (commonly known as the "Federal Juvenile Delinquency Act") cannot be conducted in person without seriously jeopardizing public health and safety, and thus video teleconferencing, or telephone conferencing if video conferencing is not reasonably available, may be used in such proceedings with the consent of the defendant, or juvenile, after consultation with counsel and a upon a finding by the presiding judge that the proceeding cannot be further delayed without serious harm to the interests of justice.

IT IS FURTHER ORDERED that, because the CARES Act does not require the consent of a defendant or juvenile to be in writing, such consent may be obtained in whatever form is most practicable under the circumstances, so long as the defendant's consent is clearly reflected in the record.

IT IS FURTHER ORDERED that any authorization to use video teleconferencing or telephone conferencing pursuant to this Order may be terminated by further Order of the Court or pursuant to Subsections (b)(3) and (b)(5) of the relevant provisions of the CARES Act.

SO ORDERED.

Dated:    March 30, 2020
          New York, New York

_____
COLLEEN McMAHON
Chief United States District Judge

3

A                                    119

1

The Law Office of James M. Branden
551 Fifth Avenue
New York, New York 10176
Tel. 212-286-0173
Fax 212-286-0495


June 5, 2020


Hon. Ronnie Abrams
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

Re:  United States v. Paul Calder Leroux
     Cr. Docket Nos. 12-489 (RA); 14-75 (RA)

Dear Judge Abrams:

     I represent Mr. Leroux who is to be sentenced in the above-
referenced matter on June 12, 2020.  For the reasons set forth
below, I request that Mr. Leroux be sentenced to time served,
the equivalent of 92 months.

**STATEMENT OF THE CASE**

     Background

     Mr. Leroux was born in 1972 in what is now Zimbabwe (PSR.
31, ¶166).  His unwed parents placed him for adoption
immediately and he was adopted by Paul and Judith Leroux (PSR.
31, ¶¶166-167).  Paul is a retired military engineer and illegal
diamond smuggler living in South Africa (PSR. 31, ¶167).  Judith
passed in 2013 at the age of 70 (PSR. 31, ¶167).

     Paul was an alcoholic and a drug addict (PSR. 31, ¶167).
He was also brutally abusive to both Judith and Mr. Leroux (PSR.
31, ¶¶167-168).  Paul and Judith divorced when Mr. Leroux was
fifteen years old and he lived with Judith, whom he adored,
until adulthood (PSR. 31, ¶168).  Mr. Leroux believes that the
domestic violence he witnessed during his parents' marriage has
negatively affected his own adult relationships (PSR. 31, ¶168).

     For the past 15 years or so, Mr. Leroux has been totally

A                              120

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 2

estranged from his father and his only sibling, Natalie, whom he believes to be a religious zealot (PSR. 31, ¶¶167, 169).

Mr. Leroux had a miserable and at times terrifying childhood in Zimbabwe, then in civil war. He described his neighborhood as a "war zone" where he witnessed the Mugabe regime torture and murder the citizenry. Food was rationed and scarce (PSR. 32, ¶171).

When he was ten years old, Mr. Leroux was sent away to boarding school where he experienced atrocities of another kind. From the start, he was sexually assaulted by the older male students. Some years later he would, in turn, force himself on some of the younger male students. He was also subjected regularly to corporal punishment by the teachers (PSR. 32, ¶170). He spent six years at the school, until his parents' divorce, whereupon he was schooled locally near his mother's new residence in South Africa (PSR. 32, 35, ¶¶170, 194). The harrowing abuses at the boarding school scarred him, leading to persistent physical and emotional problems (PSR. 32, ¶170).

Mr. Leroux graduated high school in South Africa in 1988 (PSR. 35, ¶194). He graduated from a technical school there in 1992. Thereafter he moved to London and worked as a programmer at Barret Edwards Int'l, creating document management systems principally for law firms (PSR. 35, ¶201). In 1994, he moved to Sydney, Australia, and continued his work in programming (PSR. 35, ¶201).

In 1995, Mr. Leroux met Michelle Mustchin, a psychologist, residing in the United Kingdom (PSR. 32, ¶174). They married in Australia the following year, but Mustchin returned to the United Kingdom to work (PSR. 32, ¶174). The couple rarely saw each other and the marriage "quickly dissolved" (PSR. 32, ¶174).

In 1998, Mr. Leroux moved to Hong Kong and worked as a programmer for New Era of Networks (PSR. 35, ¶200). In 1999, he met Lilian Chung Yen Pui (PSR. 33, ¶175). They courted and married a year later in the Bahamas (PSR. 33, ¶175).

In 2000, Mr. Leroux moved back to London and a new position at Barret Edwards Int'l. He then moved on to design encryption

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 3

programs for computer hardware at Crypto Solutions.  In 2003, he
moved to Rotterdam and worked for Secur Star, a company based in
Germany and owned by Wilfred Heffner[1] (PSR. 35, ¶199).

In 2004, Heffner asked Mr. Leroux to perform programming
and website design for an online pharmacy business, known as
Atlas Pharmacy, which sold prescription drugs in the United
States through its website.  The drugs were purchased through a
wholesaler in Brazil by paying bribes to the wholesaler's
employees.  Heffner was arrested in Brazil and instructed Mr.
Leroux to wire $40,000 to secure his release and resolve the
matter.  Heffner left the online pharmacy business but Mr.
Leroux was just getting started.

From 2004 to 2012, Mr. Leroux's principal source of revenue
was his operation of Rx Limited, an online pharmacy business
targeting U.S. customers and issuing prescriptions for Tramadol
(an opioid analgesic), Soma (a muscle-relaxant) and Fioricet (a
combination of acetaminophen and butalbital, a barbiturate).
The operation of this business underlies the charges in 14 Cr.
75 (RA).

During his marriage to Lilian, the couple had four
children, ranging in present age from 12 to 18 (PSR. 33, ¶175).
The marriage ended in 2013 and the children now reside with
their mother in the Netherlands (PSR. 31, ¶180).  Nonetheless,
Mr. Leroux continues to support them all financially (PSR. 33,
¶175).

Lilian is concerned that she is a target of those trying to
exact revenge on Mr. Leroux.  In this regard, while living in
the Philippines in 2013, she was surveilled by unknown men.
Fearing for her safety and that of her children, she moved the
family to the Netherlands.  Her name has appeared in the media
multiple times, as the prior wife of Mr. Leroux.  Starting in
2015, her residence there was surveilled by unknown men.  In
2018, she was followed by a motorcycle driver and an apparent
"group."  On October 17, 2018, she was run off the road by an
unidentified driver and suffered a contusion, brain trauma and

---

[1] The true spelling of his last name is "Hafner," but to
avoid confusion, I refer to him as Heffner throughout.

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 4

retrograde amnesia (Exhibit A: Affidavit of Lilian dated March 25, 2019; Exhibit B: Letter of Lilian dated December 9, 2016; Exhibit C: Letter from Fascinatio General Practitioner Clinic, dated October 22, 2019).

Also during the marriage, from 2007 to 2012, Mr. Leroux had a relationship with Cindy Cayanan (PSR. 33, ¶176). Together they have two children, presently 8 and 11 years old (PSR. 33, ¶176). Cindy, a public accountant, and the children live in the Phillipines (PSR. 33, ¶176). Like Lilian, Cindy fears retaliation from Mr. Leroux's criminal co-conspirators (PSR. 33, ¶176). She and the children have been "followed" by unknown men (Exhibit D: Letter of Cindy dated December 1, 2016) and last year she received death threats.

As set forth in the presentence report, over the years, Mr. Leroux had shorter-term relationships, as well. These relationships have resulted in four more children (PSR. 33, ¶¶177-180). Mr. Leroux provides financially for three of the mothers and their children and has no contact information for the fourth mother and child (PSR. 33, ¶¶177-180).

Mr. Leroux also has a daughter, Gwen, who is now 7, with Melanie Agunaldo Marquez (Exhibit E: Certificate of Live Birth). Mother and daughter reside in the Philippines. On January 29, 2020, Melanie was abducted by four masked men. At gun point, they asked her if she knew of the Leroux family and showed her a book about him. They demanded money and Melanie gave them Php 300,000. They warned her not to contact the police and released her. She waited a week before contacting the police (Exhibit F: Police report of alleged robbery (extortion) and supporting affidavit of Melanie A. Marquez).

Mr. Leroux suffers from physical and mental ill-health. As to the physical, at 320 pounds, he is morbidly obese (PSR. 34, ¶183). He has hyperlipidemia (excessive fat in his blood), for which he takes a statin daily (PSR. 34, ¶186). He has Cushing's Syndrome, a metabolic disorder caused by the overproduction of corticosteroid hormones, which contributes to his high blood pressure (PSR. 34, ¶185). He also has hepatic steatosis (fatty liver disease), which can lead to cirrhosis. Mr. Leroux suffers, too, from Exophoria (Exhibit G: Records from TJH

```
Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 5
```

Opthamology).  As part of his treatment, he must wear eyeglasses
and see an opthamologist every six weeks for eye exercises, and
surgery may be warranted.  Left unchecked Exophoria can lead to
blindness in the affected eye.

During his detention at GEO, Mr. Leroux has suffered acute
injuries.  In 2014, he was admitted to Jamaica Queens Hospital
with severe pain.  He had gallstones and as a result his gall
bladder was removed (cholecystectomy).  He suffered significant
side effects, including fecal incontinence, which he continues
to suffer from.  Further, the incontinence has aggravated an
anal tear he suffered from an assault at the boarding school as
a child.  The tear becomes infected and leaks pus.  In addition,
in 2019, Mr. Leroux suffered a penile ulcer, which also leaked
pus and caused disruption of his sleep.  The ulcer was slow to
heal due to his other chronic conditions, specifically
hyperglycemia and mistreatment by GEO medical professionals
(Exhibit H: Records of treatment from hospitals and GEO).

Further, Mr. Leroux recently contracted viral Covid-19
pneumonia and was quite ill, with fever and shortness of breath
(Exhibit I: report from Northwell Health).  Based on his other
ailments, noted above, and the cramped and squalid conditions at
GEO, he remains at risk for re-infection and at reduced stamina
may suffer more threatening symptoms and possible death.

As to mental ill-health, Mr. Leroux suffers from depression
and anxiety.  Prior to his arrest, he self-medicated with
prescription drugs designed to relieve seizures, insomnia and
pain (PSR. 34, ¶192).

The Offense Conduct

The offense conduct was detailed in the presentence report
(at 5-26, ¶¶15-114) and in the government's §5K1.1 motion (at
section II).  Mr. Leroux has no objection to the stated conduct
or the Guidelines calculation set forth in the report (at 26-30,
¶¶117-159).  He notes here only that his foray into the
prescription drug on-line business, which proved to be an engine
to all of his criminality, lacked corrupt intent.  He consulted
with a lawyer who only advised him that selling drugs using
prescriptions issued based on online questionnaires "could be

A                          124

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 6

illegal." He was advised that if he dared to open the business, he should at least be careful not to sell drugs listed on the Schedules of the Controlled Substances Act (CSA). While Mr. Leroux perhaps took a risk in opening the business, he sought to minimize the risk by selling only in States with vague doctor-patient laws that may have allowed online questionnaires instead of in-person visits to a doctor. Further, he heeded counsel's advice and regularly screened the CSA Schedules to make sure he did not sell drugs listed thereon. When, for example, Soma was added to the Schedules in 2012, Rx Limited immediately stopped selling it. And, as to Fioricet, Mr. Leroux was simply mistaken in his belief that the drug was un-Scheduled.

The money poured in. Over time most States explicitly prohibited prescriptions based on online questionnaires, but by then Mr. Leroux was earning too much to stop. Rather than shutter the business, and driven now by greed, he sold in States that would subject his manner of drug sales to civil or administrative penalties only and avoided those that could prosecute him criminally. Other depravity ensued (e.g., payments to attorneys for fraudulent opinion letters as to the legitimacy of Rx Limited's business to banks that process credit card payments to the pharmacies, fake online websites, frauds perpetrated on Visa, American Express, Diner and FedEx, smuggling of Tramadol into the United States). And, as noted above, money from Rx Limited, corruptly earned, fueled most of the remaining criminality leading to the most severe total offense level under the Guidelines.

<u>Mr. Leroux's Cooperation</u>

The government's §5K1.1 motion is comprehensive. Mr. Leroux seeks only to highlight here certain aspects of his assistance to the government.

- One, he cooperated early. Indeed, he started to speak with law enforcement on the flight from Liberia, even before he reached the Southern District of New York, where he was presented.

- Two, the level of cooperation was extraordinary. Though I was not his counsel at the time, I am informed that Mr.

<u>A</u> 125

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 7

     Leroux attended scores of proffer sessions and spent more time debriefing agents than any other defendant in SDNY history.

- Three, he was at all times forthright and the information provided was "voluminous" and "detailed" (motion at 41). Some of his early proffers suffered from minimization (as most do), but in time he made full admissions even as to the murders. And, as noted in the government's motion, but for count one (the importation and distribution of methamphetamine), evidence of the remaining charges in 12 Cr. 489 (RA) was insufficient at the time of arrest and depended principally on Mr. Leroux's proffers. So, too, the charges contained in 14 Cr. 75 (RA) were not brought prior to Mr. Leroux's arrest and "[i]n the course of his post-arrest admissions, Leroux provided significant additional information . . . as well as access to electronic records" (motion at 38). Last, even further uncharged but relevant conduct, including all of the violence, was too vague and amorphous for use at sentencing before meetings with Mr. Leroux (motion at 38).[2]

- Four, Mr. Leroux did not just provide historical information. He also "engaged in communications with various associates in furtherance of ongoing investigations" (motion at 43). These undercover investigations "led to the dismantling of Leroux's [Rx Limited] enterprise and the arrests of over a dozen of his criminal associates" (motion at 43), including his mercenary team of killers (Joseph Hunter, Timothy Vamvakias, Dennis Gogel, Slowamir Soborski and Michael Filter) and his narcotics partners (Ye Tiong Tan Lim, Kelly Pealta, Phillip Shackels, Scott Stammers and Adrian Valkovic) (motion at 43-46). Further, he personally financed many of these undercover investigations, including money for, *inter alia*, continued salaries of targets, fuel

---

     [2] In its 5K1.1 motion, the government indicated that it had some knowledge of the Lee murder (motion at 38). Mr. Leroux recalls, however, that he provided all the information about that murder and that the agents knew nothing about it previously. He recalls that he even had to spell her name.

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 8

> costs, pilot costs, payments to foreign governments. The total expended was in excess of $2 million. He also provided information about his exploits with the Government of Iran and embarked on a proactive investigation to trade weapons and technology, which through no fault of his own, failed to reach fruition (motion at 43).

- Five, Mr. Leroux alerted the government to assets located overseas and consented to their forfeiture (e.g., gold and bank accounts in Hong Kong with a combined value of approximately $14 million, numerous homes and boats, a plane).[3] He also alerted the government to assets in the United States, such as a stash of 2-3 million Tramadol pills, valued at more than $1 million. In all, Mr. Leroux forfeited roughly $20 million.

- Six, Mr. Leroux testified at the trial of Hunter, Samia and Stillwell and gave compelling testimony over the course of three days leading to a guilty verdict on all counts (motion at 48) and he testified truthfully at a suppression hearing in the case involving his Rx Limited business associates (motion at 48-49). Further, he was prepared to testify in the trial in Minnesota. His 3500 material was disclosed to defense counsel and he was transferred to Minnesota in 2017 where he spent a month in solitary confinement awaiting the trial, but was not called as a government witness.[4]

---

[3] To be specific as to the boats, there were: one used in connection with the Hunter investigation, valued at $250,000; one in connection with the Guinea Bissau investigation valued at $2 million; four others located in Ecuador, Panama and Thailand, worth in excess of $300,000 and a $150,000 sailboat (which contained 200 kg of cocaine).

[4] In its 5K1.1 motion, the government observed that, at the time of his arrest, Mr. Leroux had also been under investigation by the DEA's Minneapolis Division Office and the Consumer Protection Branch of the Department of Justice (motion at 36). Mr. Leroux believes that a Minneapolis grand jury refused to indict him on one or two occasions. Mr. Leroux later agreed to be indicted.

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 9

- Seven, his cooperation was enormously beneficial. Suffice it to note well more than 20 arrests were made based on Mr. Leroux's accounts and most of the arrests led to convictions, including those of the mercenary kill team and Mr. Leroux's narcotics partners.

Mr. Leroux's Good Behavior in Detention

In its §5K1 motion, the government noted that Mr. Leroux misbehaved on three instances while at GEO. The instances were relatively minor (providing money to another inmate for commissary, phone minutes and a computer; use of the attorney phone to contact that inmate once he was transferred; and providing money to kitchen staff for extra food) (motion at 50).[5] It merits noting, however, that he also worked hard to improve himself (Exhibit J: Certificates for 23 weeks of coursework completed in: parenting skills, relapse prevention, and anger management).

The Leaks

The matter of *United States v. Calder Leroux* was under seal until Judge Loretta A. Preska ordered the matter unsealed on March 5, 2016. Prior to this date, the case against Mr. Leroux, including the superseding indictment, which was not entered until March 16, 2016, should have been unavailable to the public if all parties involved followed proper procedure. We know now that this procedure was not followed. In fact, certain documents which should always stay confidential, regardless of unsealing, such as proffer session notes and DEA surveillance video were leaked to the press, and consequently to the public. The sensitive nature of this material was acknowledged by the government when it applied for a protective order in the matter of *United States v. Hunter* (Exhibit K: 13-cr-521 (RA), ECF No. 38). This application was granted, and a protective order issued by Judge Swain on December 2, 2013. *See id.* As detailed in the

---

[5] In its 5K1.1 motion, the government noted that while at GEO Mr. Leroux agreed to consensual recordings in the facility (motion at 50). It should be noted that his assistance involved wearing a recording device. The resulting recordings were of a fellow inmate, which put Mr. Leroux at risk in the facility.

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 10

protective order, the risk to informants and their families
created by proffer material and discovery necessitated that it
be disclosed to and meant for defendant and his counsel only.
Further establishing the comprehensive and at-risk nature of the
3500 material, Judge Abrams also ordered that all 3500 material,
along with any witness list, must be destroyed or returned to
the government at the conclusion of trial (Exhibit L: 13-cr-
521 (RA), ECF No. 530).

There was no shortage of 3500 material documenting Mr.
Leroux's cooperation. As discussed in the government's §5K1.1
letter, Mr. Leroux regularly met with the government several
times a week over the course of several months. In addition, he
participated in an elaborate undercover scheme to assist law
enforcement in the continued dismantling of his criminal empire
and apprehension of known associates. The amount of inculpatory
information Mr. Leroux provided in good faith cannot be
overstated. Mr. Leroux's cooperation was so vital-the wellbeing
of their star informant so important, that after his
arrest, the government created the appearance that he was not
detained for over a year, even though he was in federal custody.
While Mr. Leroux fulfilled his end of the cooperation
agreement, individuals on the government's end did not.
Failing to observe even the paramount tenet of confidentiality,
Mr. Leroux's 3500 and discovery material were leaked to both
authors and the media. As a result, the lives of Mr. Leroux and
his loved ones are now in grave danger. *See infra*.

A careful comparison between the trial transcript, 3500
material, Presentence Report ("PSR") and text of Hunting Leroux,
clearly reveals that Mr. Leroux provided the disclosed
information in confidential sessions, and not through trial
testimony. This information was disseminated by a person who
attended such meetings, or accessed recordings and notes of the
meetings, in confidence. The fact that Hunting Leroux even
includes actual dialogue between Mr. Leroux and agents in
attendance, such as Agent Stouch and Agent Cindric, is
preposterous.

During Mr. Leroux's September 27, 2012 proffer session, Mr.
Leroux stated that he started working with Wilfred Heffner in
2004 to create an illegal web-based prescription medicine

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 11

company (Exhibit M: 3507-2, Proffer of Paul Calder Leroux,
dated September 27, 2012, page 6). Although she spells his
name differently, Shannon accurately details the proffer
wherein Mr. Leroux discusses his relationship with Mr. Heffner
(Exhibit N: Hunting Leroux, pages 525-26). During this session,
Mr. Leroux also explained that he needed to import certain
materials that were barred from import by Philippine
authorities (Exhibit O: 3507-2, Proffer of Paul Calder Leroux,
dated September 27, 2012, page 16). He explained that he was
informed that a North Korean submarine could be had for
$5,000,000. Id. However he felt that this was too expensive
and promptly recruited a team to build his own 10m and 30m
submarines at his shipyard. Id. This account, down to Agent
Cindric's own enthused questioning and the submarine
measurements, was reflected in Hunting Leroux (Exhibit P:
Hunting Leroux, pages 355-56). During this session, Mr. Leroux
also explained his relationship with Iranian officials, who
contracted him to develop weapons and chemical formulae for
them. He detailed the various plans he worked on, including
"PETN", or pentaerythritol tetranite, a component of military
explosives utilizing coffee sweetener, as well as
payment in gold bars worth about $5,000,000 (Exhibit Q: 3507-
2, Proffer of Paul Calder Leroux, dated September 27, 2012, page
13). He explained how he delivered them to Iranian officials in
a manner they found acceptable. Id. Mr. Leroux set up a secure
online server by which Iranian scientists could access plans
that he uploaded, making the transaction difficult to trace.
Id. Shannon describes the intricate relationship and plans,
including specific weapons, chemicals, and payment, as well as
the thought process behind the ingenious delivery system
utilizing an "FTP" server (Exhibit R: Hunting Leroux, pages
348- 50). It is important to note that nowhere in his
proffer does Mr. Leroux refer to an FTP server. However the
government did detail the basics of a an FTP server to
pretrial for preparation of Mr. Leroux's presentence report
(PSR. 13, ¶44).

        During his October 8, 2012 proffer session, Mr. Leroux
stated that while in the United Kingdom, he worked for GCHQ, the
UK equivalent of NSA (Exhibit S: 3507-5, Proffer of Paul
Calder Leroux, dated October 8, 2012, page 16; see also Exhibit
M: 3507- 2, Proffer of Paul Calder Leroux, dated September 27,

12

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 12

2012, page 6). Shannon reported the same, with added
historical background, in <u>Hunting Leroux</u>. (Exhibit T: <u>Hunting</u>
<u>Leroux</u>, page 110)

    During his October 22, 2012 proffer session, Mr. Leroux
detailed how he established his relationship with a man he knew
only as "the Accountant" (Exhibit U: 3507-10, Proffer of Paul
Calder Leroux, dated October 22, 2012, page 6; see also Exhibit
V: 3507-17, Proffer of Paul Calder Leroux, dated November 27,
2012, page 2). Shannon reported the relationship and the
specific bombings almost down to the exact word (Exhibit W:
<u>Hunting Leroux</u>, pages 353-54) (PSR. 34, ¶¶113-114). During this
session, Mr. Leroux also detailed his relationship with an
official within the Philippine Department of Foreign Affairs he
dubbed "Dragnet Man" (Exhibits X and U: 3507-10, Proffer of
Paul Calder Leroux, dated October 22, 2012, pages 5-6). He was
able to acquire various documents on foreign diplomats for a
fee as insurance in case these diplomats decided to interfere
with his operations. *Id.* Shannon details this extremely
confidential relationship, and the official documents acquired,
in her novel (Exhibit Y: <u>Hunting Leroux</u>, pages 347-48).

    During his November 22, 2012 proffer session, Mr. Leroux
stated that Google was attempting to curb prescription drug
abuse by preventing online pharmacies from participating in the
Google AdWords program (Exhibit Z: 3507-16, Proffer of Paul
Calder Leroux, dated November 22, 2012, page 4; see also
Exhibit AA: 3507- 13, Proffer of Paul Calder Leroux, dated
November 13, 2012, pages 4-5). Mr. Leroux explained to
government agents how he sidestepped the Google safeguards by
rerouting Google probes to fake websites during their
verification process. *Id.* Shannon details this elaborate
scheme, step by step, in her own words (Exhibit BB: <u>Hunting</u>
<u>Leroux</u>, page 141). In <u>Hunting Leroux</u>, Elaine Shannon
erroneously notes that Chris Miller, a man Mr. Leroux
recruited to bribe a Namibian judge, died of heart disease
shortly after returning from his venture (Exhibit CC:
<u>Hunting Leroux</u>, page 369). This was the same mistake made
by the government when providing cause of death to pretrial
(PSR. 17, ¶68). Mr. Leroux provided the correct cause of death
during his November 22, 2012 proffer session. Mr. Miller had
actually died of a stroke (Exhibit DD: 3507-16, Proffer of Paul

<u>A</u>                          131

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 13

Calder Leroux, dated November 22, 2012, page 2). The fact
that government agents disseminated confidential details at
least up until the drafting of Mr. Leroux's presentence report
is extremely unsettling.

During his November 27, 2012 proffer session, Mr. Leroux
disclosed in great detail that he purchased a boatyard in the
Batangas Province of the Philippines and was told he needed to
pay the local NPA guerillas approximately the equivalent of
$1150 monthly for protection (Exhibit EE: 3507-17, Proffer of
Paul Calder Leroux, dated November 27, 2012, pages 2-3).
Shannon's account is an exact match down to the very last
detail, except for misstating that Mr. Leroux paid $1200
monthly instead of $1150 (Exhibit FF: Hunting Leroux, pages
353-54).

The government leaks were not limited to material provided
during Mr. Leroux's numerous proffers. It is concerning that
even highly privileged discovery material was detailed   in
Hunting Leroux. Shannon writes about a recorded call where Mr.
Leroux requests the presence of a master chemist at a meeting
with the Colombian Cartel and even includes a   transcript
(Exhibit GG: Hunting Leroux, page 285-86). Shannon discloses
another recorded call between Mr. Leroux and his codefendant as
they discuss a sample of meth (Exhibit HH: Hunting Leroux, page
322). It is no surprise that highly privileged material was
improperly disseminated. Shannon's source knew no bounds when
disclosing material on Mr. Leroux. Even intimate details of Mr.
Leroux and Ms. Cayanan's love life, taken from audio recorded
using a bug, were documented in Hunting Leroux (Exhibit II:
Hunting Leroux, page 314). This audio was also part of
discovery and handed over to Shannon.

The government will argue that the information made public
was all disclosed in the trial of Joseph Hunter. However, it is
important to note that missing details and inconsistencies
between Mr. Leroux's trial testimony and the subject novels cast
serious doubt upon the government's claim.

- When Mr. Leroux testified at trial on his weapons
  contract work with Iran, he discussed his work on an
  explosive called "ETN", but not "PETN", which is the

<u>A</u>                              132

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 14

explosive that Shannon so affectionately dubbed the
"coffee sweetener bomb". (Exhibit JJ: <u>U.S. v. Hunter</u>
Tr., page 359).

- Mr. Leroux testified at trial that "the Accountant" was
a rebel leader in the Philippines, but did not mention
the militant group, NPA (Exhibit KK: <u>U.S. v. Hunter</u> Tr.,
page 409). This information was provided during proffer.
Additionally, Mr. Leroux proffered that "the Accountant"
was only associated with NPA, and did not mention him as
a leader until he testified at Mr. Hunter's trial.
Shannon's account is clearly based off the 3500
material, and not Mr. Leroux's trial testimony.

- When Mr. Leroux recounted the bribery of the Namibian
judge at Mr. Hunter's trial, he did not mention Mr.
Miller or his cause of death (Exhibit LL: <u>U.S. v. Hunter</u>
Tr., page 523). In fact he did not go much further than
referring to Mr. Miller as "somebody". *Id.*

- When testifying on his relationship with an insider at the
Philippine Department of Foreign Affairs, he allowed his
contact to be called the "Dragnet Guy" (Exhibit MM: <u>U.S.
v. Hunter</u> Tr., page 743-44). He also denied knowledge of
specific documents he had acquired through Dragnet Guy.
*Id.* However, in his proffer, Mr. Leroux specifically
referred to his contact as the "Dragnet Man", and
recounted numerous documents the Dragnet Man retrieved
for him, their contents, and the detailed purposes for
their respective retrievals.

- When Mr. Leroux testified about building his own
submarine, instead of purchasing one from North Korea, he
did not mention that he planned to build two
submarines, one 10m long, and one 30m long (Exhibit NN:
<u>U.S. v. Hunter</u> Tr., page 534-35). He stated that he
recruited a team to build a "small, one-man submarine."
*Id.* When he revisited the topic during a later session of
trial, Mr. Leroux again reiterated that he was designing
"a" submarine (Exhibit OO: <u>U.S. v. Hunter</u> Tr., page 573).
During summation by Mr. Hunter's counsel, he reiterated
that Mr. Leroux was designing "a submarine" (Exhibit PP:
<u>U.S. v. Hunter</u> Tr., page 1865). Mr. Leroux's plan to build
a 10m and 30m submarine were clearly derived from his
proffer material. In fact, in both the proffer notes and
<u>Hunting Leroux</u>, Mr. Leroux clarifies that the design for

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 15

the 10m submarine was already complete when he was arrested.

Further refuting the government's claim, the trial of Joseph Manuel Hunter and his co-defendants did not commence until April 2018. Details of Mr. Leroux's arrest and cooperation were leaked to the press as early as December 2013 (Exhibit QQ: File 26, South African coordinates Rio scheme in 40 countries of drug and arms trafficking, dated December 26, 2013). The article reveals Mr. Leroux's cooperation even while his case was under seal, and the massive criminal investigations he helped spark, which were confidential, were also detailed. A New York Times article from 2014 is even more preposterous. In this article, the reporter, Alan Feuer, even states that two of his primary sources are federal agents, one current, and one retired (Exhibit RR: File 12, In Real Life, Rambo, dated December 20. 2014). The agents reveal a wealth of information about Mr. Leroux, obviously focusing on the details that would attract the general public. *Id.* This article, and the leaks upon which it was written, also preceded the unsealing of Mr. Leroux's case, and the trial of Joseph Hunter.

The subject leaks also included confidential discovery material. DEA surveillance footage, was leaked to a publisher in efforts to promote <u>Hunting Leroux</u> (YouTube Video, <u>Hunting Leroux</u> by Elaine Shannon, <<u>https://www.youtube.com /watch?v=EczYpgtc3IA</u>>), and to CNA for their production of a documentary on Mr. Leroux (YouTube Video, <u>The Making of a Criminal Mastermind</u>, <<u>https://www.youtube.com/watch?v=hQxPwA7yGjk</u>>). Regardless of when these videos were published on YouTube, the actual DEA surveillance footage of Mr. Leroux should never have left the hands of the specific parties mentioned in the protective orders. These leaks were certainly not a product of Mr. Leroux's trial testimony, as the government alleges.

In her Note to Readers, Shannon herself appreciatively details the incredibly "rare access to firsthand witnesses" she had (Exhibit SS: <u>Hunting Leroux</u>, Note to Readers). Over the course of six years she was able to interview individuals with direct knowledge for "thousands of hours." *Id.* Even

<u>A</u>                    134

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 16

assuming that Shannon worked on Hunting Leroux right up until
its publication in February 2019, which is highly unlikely,
this means that the improper leaks started as early as
February 2013, well before the matter was beginning to be
unsealed. Shannon also had access to "thousands of documents,
including government documents, personal notes, diaries,
emails, texts, timelines, photos, transcripts, undercover audio
and videotapes, and documents seized from people investigated
and prosecuted for crimes. *Id.* The amount of accurate dialogue
from both proffers and confidential surveillance footage in
Hunting Leroux surely backs up her claims. Additionally,
Shannon states that his 3500 material was contained in the
Proposed Cooperation Agreement, signed February 4, 2013
(Exhibit TT: Hunting Leroux, page 527). Furthermore she states
that the Agreement was "not made part of the public court
record but was obtained by the author. *Id.* In a video
interview of Michael Mann, Elaine Shannon, and Agents Milione
and Cindric, a guest asks the agents how much information
needed to be withheld from Shannon during the process
(YouTube Video, Michael Mann, Elaine Shannon, Lou Milione &
Tommy Cindric Speak On "Hunting Leroux,
<https://www.youtube.com/watch?v=MTeonvkHKDk> at 32:41). Agent
Cindric first attempts to deflect by stating that unless
privileged, which the leaked material certainly was, criminal
cases are publicly available on PACER. *Id.* Agent Milione then
clarifies that they were given clearance to speak with Shannon
that they normally wouldn't have with anybody. *Id.* This Court
need not look much further when trying to determine the
government agents who leaked the material. Accordingly, this
Court should find that not only were the leaks highly improper
and of an unprecedented scale, but that the two aforementioned
government agents were the source, and not Mr. Leroux's trial
testimony.

The Significance of the Leaks

Protective orders consider the danger of leaked material
not only to the informant, but also to his or her family.
Retribution and intimidation know no bounds. This rings truer
when those who might seek revenge include foreign government
officials, mercenaries, and drug cartels. With Mr. Leroux in
federal custody, individuals whom he incriminated can only seek

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 17

serious recourse through harming his loved ones. This is not to
say that Mr. Leroux does not face any threats in prison. In
Hunting Leroux, Mr. Leroux tells his handlers that he was
assaulted while in custody (Exhibit UU: Hunting Leroux, page
501).

Shannon's novel lays out Mr. Leroux's first proffer at the
Marriot Hotel with an alarming level of detail (Exhibit VV:
Hunting Leroux, pages 365-67). Every attorney in attendance,
both defense and prosecution, is named. Id. Agent Cindric leaves
little room for doubt as to his level of involvement when he
reflects that "[Mr. Leroux] was driving that train." Id. These
pages cement Mr. Leroux's involvement as an informant, and
ultimately damn him and his loved ones to a lifetime of looking
over their shoulder.

Government agents leaked confidential material with wanton
disregard for the safety of both Mr. Leroux and his family.
Shannon's government source identifies Mr. Leroux's mother of
two of his children, Cindy Cayanan, by name (Exhibit WW:
Hunting Leroux, page 99). The leaks included body cam footage
from a CI that clearly depict the face of one of Mr. Leroux's
children and the mother of the child (Exhibit XX: Hunting
Leroux, page 289). Later, Shannon reveals the exact number of
Mr. Leroux's baby mothers and children, allowing one seeking
revenge to begin constructing a comprehensive checklist (Exhibit
YY: Hunting Leroux, page 405). Shannon later reveals the
approximate weight and height of one of his child's mothers
(Exhibit ZZ: Hunting Leroux, page 505). A few pages later,
Shannon writes that Mr. Leroux has a younger sister (Exhibit
AAA: Hunting Leroux, page 508). The Mastermind, by Evan
Ratliff, another novel profiting off the government leaks, even
makes Mr. Leroux's family searchable in the index (Exhibit BBB:
The Mastermind, page 440). With such valuable information
revealed to potential retaliators, it is no wonder that Ms.
Cayanan fears for her life (PSR. 33, ¶176).

The above examples are only a small sample of the
enormous amount of confidential material that was improperly
leaked by the government. The level of detail and accuracy,
down to the dialogue, indicates that the media had access to
sources while their recollections were fresh, discovery

A

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 18

material and private government documents that recorded
them, or both. Elaine Shannon certainly asserts as much
(Exhibit SS: Hunting Leroux, Note to Readers). The leaks
were so pervasive that certain incidents that were not even
documented in 3500 material were revealed in Hunting Leroux
(Exhibit CCC: Hunting Leroux, page 379). The depth and accuracy
of the government leaks reveals just how actively the
government agents pitched material to the media, and we
respectfully submit that this reckless misconduct must be
addressed through the sentencing of Mr. Leroux

    Collateral Consequences

    If Mr. Leroux were sentenced to a term of additional
imprisonment, he may be physically harmed or extorted. Two
books have been written about his criminal exploits – "The
Mastermind," by Evan Ratliff, and "Hunting Leroux," by Elaine
Shannon – and he is now well-known as a government informant and
cooperator. Like James "Whitey" Bulger who was gruesomely
murdered at USP Hazelton in 2018, Mr. Leroux is at risk. In
order to protect himself, Mr. LeRoux may be constrained to seek
segregated housing or even solitary confinement, which is
psychologically destructive. In this regard, it merits noting
that Mr. Leroux was assaulted at the MDC when his cooperation
was not known but merely suspected. He was also the repeat
victim of an attempted extortion at the GEO facility (Exhibit
DDD: Report of Leroux dated 8/30/16).

    Upon completion of his term of imprisonment, Mr. Leroux
will be removed from the United States and extradited to the
Philippines, on an outstanding warrant for smuggling firearms
from the vessel M/V Ufuk (Exhibit EEE: Affidavit of Mr. Leroux's
Filipino attorney, Robert John P. Juco, with enclosures). If
convicted of the offense, which surely he will be, he faces a
range of imprisonment of eight to twelve years. Id.

    Mr. Leroux had retained a lawyer to resolve the charges in
the Philippines and in late 2018 he was prepared to plead guilty
pursuant to a cooperation agreement. Unfortunately, his
usefulness was nullified by the release of the Ratliff and
Shannon books, which contained specific information about Mr.
Leroux's criminal conduct in, *inter alia*, the Philippines,

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 19

gathered by DEA agents and inappropriately leaked to the authors.

Mr. Leroux also faces other criminal charges in the Philippines. An attorney he consulted opined that Mr. Leroux had no viable defense given his testimonial admissions in the United States as to the relevant underlying facts (Exhibit FFF: Affidavit of Bernardo v. Cabal).

Meanwhile, the Congress in the Philippines is presently contemplating the reinstatement of the Death Penalty for the crime of murder, with which Mr. Leroux may well be charged (Exhibit GGG: Legal opinions regarding the death penalty and "double jeopardy" in the Philippines, dated October 14, 2019).

Further, even at liberty, Mr. Leroux will face tremendous risk in the Philippines. First, much of the local law enforcement is corrupt (Exhibit HHH: press report re: PNP officials linked to illegal drugs network; Exhibit III: press report re: kidnapping and killing of South Korean businessman by Filipino police officers; Exhibit JJJ: press report re: dossier on alleged narco cops) and appears intent on harassment. In this regard, one of Mr. Leroux's employees, Raymone Recerote, memorialized four separate incidents in the past five years of police abuse relating to Mr. Leroux, his real estate or business acquisitions (Exhibit KKK: Recerote Affidavits). In addition, an associate of Mr. Leroux's was approached by police officers on two consecutive days in August 2015 and told that Mr. Leroux needs to pay money or else he would be charged with Brian Hill in a drug possession prosecution (Exhibit LLL: Affidavit of Napoleon Araneta; Exhibit MMM: Decision finding Hill guilty, dated June 14, 2017).[6]

Further, Mr. Leroux has received a death threat from Laurence Anthony Canavan, the public face of a powerful criminal organization in the Philippines, which operates the Regal Knights Security agency and many other such agencies, staffed by more than 400 mercenaries. The Regal Knights even protects the

---

[6] Brian Hill was arrested by Leonardo Suan, a Phillipines National Police officer involved in kidnapping and murder (Exhibit JJJ).

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 20

family of the prior President of the Philippines.  The threat
derives from Mr. Leroux's cooperation in the instant matters,
which may lead to an indictment of members of the Canavan
organization, including some government officials who are part
of it.[7]  In addition, Lachlan McConnell, who was the target of a
failed sting by the DEA and Mr. Leroux, has now rejoined the
Canavan organization and will likely sponsor retaliation.[8]

Mr. Leroux's family is also at risk.  The Ratliff and
Shannon tomes contain detailed descriptions about Mr. Leroux's
personal life, including physical descriptions of Lilian and
Cindy, and their children, and their whereabouts.  Lilian, Cindy
and Melanie have already been victimized and there is no reason
to believe they are out of harm's way.  Even colleagues and
their families could be at risk.  In this regard, the 11 year
old daughter of Mr. Leroux's closest colleague, who was
mentioned several times in Mr. Leroux's trial testimony, was
raped in the Philippines in 2018 (Exhibit NNN: Philippine
National Police Crime Laboratory Legal Medical Report, dated
December 21, 2018).

**ARGUMENT**

---

[7] By way of further detail, Canavan is one of the leaders of
Regal Knights, which is powerful and extensive and is involved
in racketeering activity including murder for hire, kidnap for
ransom, bribery, smuggling, arms trafficking, prostitution, and
extortion.  Regal Knights operates a protection racket and
carries out extra-judicial killings ordered by the Philippines
state.  The organization was established in the mid-1990s by two
brothers, one a general in the Philippines National Police and
one a general in the Armed Forces of the Philippines.

[8] McConnell was a target of a sting by the Minneapolis DEA
office in 2014 in which Mr. Leroux tried to lure him to Haiti.
The sting was unsuccessful but McConnell was eventually charged,
detained in the Philippines and extradited to the United States.
While the trial court ultimately entered an order of acquittal,
Mr. Leroux believes that McConnell blames him for the entire
prosecution and will target him.  Mr. Leroux further believes
that McConnell has rejoined Canavan's organization, and it has
been reported to Mr. Leroux that since 2018 McConnell has been
observed surveilling his properties and family.

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 21

### MR. LEROUX SHOULD BE SENTENCED TO TIME SERVED

Under 18 U.S.C. §3553(a)(2), the Court "shall impose a sentence sufficient, but not greater than necessary" to comply with generally recognized purposes of sentencing, including the need:

> A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> B) to afford adequate deterrence to criminal conduct;
>
> C) to protect the public from further crimes of the defendant; and
>
> D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

Sentencing courts are also advised to consider, among other things: the nature and circumstances of the offense, the history and characteristics of the defendant and the applicable sentencing range as established by the now-advisory sentencing guidelines. 18 U.S.C. §3553(a)(1) and (4).

As set forth in the presentence report, while Mr. Leroux has never previously been arrested and is therefore in criminal history category I, with a total offense level of 43, he still faces a Guidelines term of imprisonment of life. Said term is circumscribed by statutory maximum terms on all counts but for count one of 12 Cr. 489 (RA), which would permit a life term.

The government, however, has moved for a downward departure pursuant to §5K1.1 of the guidelines and removal of the mandatory minimum term of ten years' imprisonment under count one of 12 CR 489 (RA) pursuant to 18 U.S.C. §3553(e), based on Mr. Leroux's substantial assistance, which it deemed "significant – notably so."

A                    140

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 22

    The government's motion is lengthy and comprehensive and I
have highlighted certain aspects of Mr. Leroux's cooperation
above, which I incorporate here by reference.  At bottom, Mr.
Leroux's cooperation was extraordinary in every relevant way.
Its significance and usefulness cannot be overstated.  See USSG
§5K1.1(a)(1).  Except for count one of 12 Cr. 489 (RA), evidence
of the remaining charges was insufficient or inchoate without
Mr. Leroux's admissions during the proffer sessions.  Further,
while he provided historical information about himself and other
cohorts, he also engaged in and underwrote various undercover
investigations, resulting in the arrests and convictions of more
than a dozen of his criminal associates, including his kill team
and narcotics partners.  He provided complete and reliable
information and his testimony both at trial and the suppression
hearing was truthful and compelling, resulting, as noted, in
convictions.  See id. at (2).  The breadth of his assistance is
unmatched by any cooperator I have known of or heard of in over
30 years in practice.  I am informed by others that he spent
more time debriefing agents than any other defendant in SDNY
history.  See id. at (3).  He has also suffered injury as a
result of his cooperation.  He was assaulted at the MDC when his
cooperation was merely suspected and at GEO he has repeatedly
been subject to extortion attempts.  Further, as set forth in
the "Collateral Consequences" section above, he is likely to
suffer further criminal prosecution and extortion in the
Philippines and has been subjected to death threats by corrupt
members of security agencies there.  Finally, in this regard,
his family also appears at risk, as Lilian, Cindy and Melanie
depicted in their attached submissions.  See id. at (4).  Last,
his assistance was timely.  Indeed, he first proffered on the
plane from Liberia before he was even presented in the District.
See id. at (5).

    As a further basis for a guidelines departure (or a
variance), I remind the Court of Mr. Leroux's lengthy detention
at local detention centers, mostly at GEO, while in ill-health.
To recap his ailments, he has had gallstones leading to surgery
to remove his gall bladder, which led to fecal incontinence and
infections of an anal tear dating back to childhood.  He has a
penile ulcer.  He also recently contracted Covid-19, for which
he is especially susceptible.  In that regard, he is morbidly
obsese.  He has hyperlipidemia.  He has a fatty liver.  He has

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 23

prediabetes.  He has a metabolic disorder that contributes to
high blood pressure.  Plus, he has had difficulty with his
vision over his stay in detention due to Exophoria.  Many of
these conditions have been poorly treated in the sense that GEO
has not followed the hospitals' treatment recommendations
resulting in prolonged illness and complications.

The Covid-19 infection (which led to lockdowns, isolations
and deprivations as to food, exercise and hygiene) and its
continuing threat to him in imprisonment is, of course, right
now paramount.

As to the nature and circumstances of the offense, I note
only, as I did above, that while Mr. Leroux devolved into
depraved criminality, he did not begin his crime spree
corruptly.  Unfortunately, he was greedy and ambitious and once
he amassed significant moneys from Rx Limited, including moneys
he knew were illegally earned, he decided to expand his criminal
empire (i.e., narcotics and weapons) and employ various criminal
means to protect it (i.e., bribery, forgery and the staffing of
a mercenary team to commit assaults, shootings, firebombings and
murder).  As evidenced by his cooperation, however, it seems he
has turned the corner.  In this regard, I also emphasize the
reparations: voluntary forfeitures totaling $20 million and the
personal funds he invested in the government's undercover
investigations.

As to the Mr. Leroux's history, it helps to explain the
conduct at issue and is largely mitigating.  Abandoned by his
birth parents, Mr. Leroux was raised by adoptive parents, in
Zimbabwe, then mired in civil war.  He witnessed atrocities in
his own neighborhood on a regular basis, including torture and
murder.  The family suffered from deprivations, such as the
rationing of food.  He adored his mother, but his father, while
apparently bright and capable of holding down a job, was an
alcoholic, a drug addict, and a diamond smuggler.  He was also
physically abusive and beat both his wife and Mr. Leroux.  At
ten, Mr. Leroux was sent away to boarding school, where sadly he
was sexually molested by the older boys (an anal tear still
plaguing him all these years later) and corporeally punished by
the teaching staff.  He hated the school.  His parents finally
divorced when Mr. Leroux was 15 and he returned to his mother's

A                            142

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 24

custody and day school nearby.

Nonetheless, the lack of humanity and the terror experienced during formative years – the civil war, hunger, the "war zone" neighborhood, the beatings he watched of his adored mother, the beatings he experienced, the sexual assaults and abusive teachers – shaped him.

Mr. Leroux is smart. He graduated high school and technical school. He has an IT degree and is a talented computer programmer and website designer. And, like his father, he can hold down a job. He is an earner. His employment history is laudable.

But, his relationships less so. With women, they are characterized by limited commitment, and maybe even nonchalance. While married to Lilian, and having four children with her, he was also in a "common law" relationship with Cindy, and having two children with her. During the same time, he had four or five other relationships resulting in four or five other children. He loves Lilian and Cindy and their children and to his credit he provides for them and the other mothers and children. But, as Mr. Leroux will admit, his parents' discordant, violent relationship adversely affected his adult amorous relations, uniformly stunted.

His other meaningful relationships involve his criminal empire, men he negotiated with or men he employed. The "war zone" and the school abuses prepared him for this.

Under the Parsimony Clause, a sentence of time served would be "sufficient, but not greater than necessary." Mr. Leroux has already served 92 months' imprisonment and much of it under the risk of retribution for his cooperation and difficult medical circumstances, which should be deemed punishment enough. Given his extraordinary cooperation, a sentence of time served should be understood to provide adequate deterrence to the general public. Further based on his cooperation, reparations and likely extradition to the Philippines to face additional imprisonment, new charges, or new extra-legal punishments, a time-served sentence will certainly protect the United States public from further crimes by Mr. Leroux. It is true that Mr.

<u>A</u>                    <u>143</u>

Hon. Ronnie Abrams
United States District Judge
June 5, 2020
Page 25

Leroux will continue to need medical care, but our detention and
prison facilities, now, are more of a concern than a balm.

### CONCLUSION

For the foregoing reasons, Mr. Leroux should be sentenced
to time-served.

Respectfully submitted,

_____
/s
James M. Branden
*Attorney(s) for defendant  Paul
Calder Leroux*

Encs.



1



**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

---

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

June 11, 2020

<u>BY EMAIL</u>
AbramsNYSDChambers@nysd.uscourts.gov

Honorable Ronnie Abrams
United States District Judge
Southern District of New York
Thurgood S. Marshall United States Courthouse
40 Foley Square
New York, New York 10007

> Re: ***United States v. Paul Calder Leroux,***
> **S2 12 Cr. 489 (RA), 14 Cr. 75 (RA)**

Dear Judge Abrams:

The Government respectfully submits this letter pursuant to the Court's order dated June 9, 2020, directing a response to the defendant's sentencing letter and other issues identified in the order.

**(1) If the Government disagrees with any of the representations made in Mr. Leroux's submission**

The Government disagrees with the following representations in the defendant's sentencing submission ("Def. Sent. Ltr.").

<u>Background.</u>

The defendant asserts that he fell "quite ill" with the coronavirus infectious disease 2019 ("COVID-19"). (Def. Sent. Ltr. at 5). The Government was in frequent contact with the warden and staff at Queens Detention Facility during April 2020 in connection with the defendant's request for an order directing that he be hospitalized. Based on those discussions and medical records provided by the facility, the Government understands that Leroux contracted COVID-19 but remained largely asymptomatic. Leroux was sent to the hospital out of extreme caution because his blood oxygen levels measured low during one of the facility's regular COVID-19 screenings, but never reported any shortness of breath or discomfort and never ran a fever. The hospital administered a COVID-19 test, which was positive, and a chest x-ray and discharged Leroux the same day. Leroux never exhibited symptoms and recovered without the need for any medical treatment.

A                                      145

Leroux asserts that family members have been targeted for revenge or extortion. (Def. Sent. Ltr. at 3-4). The Government is unable to corroborate those assertions. At the request of Leroux's former defense counsel, counsel for the Government and DEA agents met with Leroux and his counsel in May 2019 to discuss potential safety concerns. Leroux described the events regarding Lilian Chung Yen Pui and Cindy Cayanan on pages 3 and 4 of the defense's sentencing letter. The Government offered to speak with Ms. Yen Pui and Ms. Cayanan about the incidents to investigate and to provide advice and assistance with security, but Leroux failed to provide requested contact information for the two women. DEA agents attempted to contact Ms. Cayanan at a number they previously used to communicate with her, but they were unable to contact her and she did not return their messages. The Government had additional discussions with Leroux's replacement counsel in late 2019 about a request from Leroux to relocate family members to the United States; the Government again advised that it needed to discuss the security threats with the affected family members directly in order to assess the request, but had not been provided contact information despite earlier requests. The Government and the DEA met with Leroux again in late February 2020 to follow up on his previously expressed safety concerns, the timeline for his sentencing, and forfeiture issues; at that meeting, Leroux advised that there were no problems.

Moreover, during the course of Leroux's cooperation, the Government and DEA agents had repeated discussions with Leroux and his counsel about family safety concerns, including discussions about Ms. Cayanan's ability to relocate within the Philippines or her ability to relocate to somewhere outside the Philippines in the case of any safety concerns. At one point, DEA agents in the Philippines arranged to meet with Ms. Cayanan to obtain identification documents and exchange contact information. Ms. Cayanan appeared to have no interest in relocating and did not describe any serious threats to the agents. Leroux and his counsel never advised the Government of the incident described on page 4 concerning Ms. Marquez. Leroux's family may face risks of retaliation or extortion from Leroux's former criminal associates or others, but the Government has been unable to confirm these concerns and Leroux has not facilitated efforts to confirm and address them.

<u>The Offense Conduct.</u>

The defendant asserts that "He notes here only that his foray into the prescription drug on-line business, which proved to be an engine to all of his criminality, lacked corrupt intent." (Def. Sent. Ltr. at 5-6). This is false. **As Leroux acknowledged during proffers and in pleading guilty to the offense charged in Count One of the Information filed in 14 Cr. 75, Leroux knew that Rx Limited's online pharmacy business was unlawful.[1] Leroux points to the fact that he consulted with an attorney in the early stages of the business (*id.*), but, as described in the Government's Sentencing Memorandum, Leroux intentionally failed to disclose to this attorney how his online**

---

[1] At his plea, Leroux affirmed that "between 2004 and 2012 I agreed with others for monetary gain to ship in interstate commerce within the United States to consumers . . . prescription drugs such as Fioricet, Soma, Ultram, purchased on the internet by those consumers which were misbranded in that we were -- in that they were not lawfully prescribed by a person licensed to administer those drugs. And we sold the prescription drugs." (Feb. 14, 2014 Tr. at 50-51). The defendant affirmed that he knew that this was against the law, and that he did it intentionally and knowingly. (*Id.* at 51).

pharmacy business would operate. (Govt. Sent. Mem. at 3). Leroux consulted with an attorney because, among other things, he needed opinion letters to open payment processing accounts. (*Id.* at 7). Leroux established and operated the business, from the very start, using straw owners, front companies, and misrepresentations to financial institutions in order to conceal his involvement in the business. (*See, e.g.*, Govt. Sent. Mem. at 6-9). Leroux established Rx Limited after his experience working with Atlas Pharmacy, where Leroux helped bribe the owner's way out of jail in Brazil for illegally buying pharmaceuticals for sale in the U.S. via an online pharmacy website. (*Id.* at 2-3).

Leroux's decision to avoid scheduled drugs and to focus on states with arguable legal ambiguity about the validity of online prescriptions was not based on a belief that this was legal, but rather based on a calculus about the risk of law enforcement detection and criminal prosecution. Leroux simply believed that violations of state law or of the Food, Drug, and Cosmetics Act were likely to be less vigorously investigated and prosecuted than violations of the Controlled Substances Act; were less likely to be extraditable; and that his sentencing exposure was less.

Mr. Leroux's Cooperation.

**The defendant testified at a suppression hearing held in the District of Minnesota in 2016 and at trial in this District in 2018**. The defendant also mistakenly describes being prepared to testify at trial in the District of Minnesota in 2017 as a witness for the government. (Def. Sent. Ltr. at 8). Leroux was identified as a potential defense witness in that trial; he was not expected to be called as a government witness. The Government advised Leroux that, if called as a defense witness, his obligation to testify truthfully was no different than if called by the Government, and the Government expects that Leroux would have testified truthfully if called. As noted in the Government's sentencing letter, the district court in Minnesota granted the defendants' motion pursuant to Rule 29 and Leroux was not called as a witness.

The defendant asserts that he "believes a Minneapolis grand jury refused to indict him on one or two occasions." (Def. Sent. Ltr. at 8, n.4). It is not clear what this belief is based on. **The charges in the information, 14 Cr. 75 (RA), were not presented to a grand jury.** The Government understands that, although these charges were not presented prior to Leroux's arrest in connection with the superseding indictment, S1 12 Cr. 489 (RA), the investigation had developed evidence sufficient to charge.

The Publication of *Hunting Leroux*.

Much of the defendant's sentencing submission focuses principally on information published in a book titled, *Hunting Leroux*. (Def. Sent. Mem. at 9-16). This discussion ignores the substantial public record regarding Mr. Leroux's personal circumstances and offenses that was developed based on independent media investigation, third parties' statements, and **Leroux's own public testimony at a suppression hearing in Minneapolis in March 2016 and at trial before this Court in April 2018.**

As the Court is aware, two now-retired DEA officials, with express approval from the DEA, spoke with a journalist who later published a book, *Hunting Leroux*, which contained information provided during those interviews and from other sources. The DEA made the decision

to participate in those discussions because the case is of public significance and public interest, and had received significant media coverage.[2] Moreover, contrary to Leroux's speculation that copies of proffer notes were turned over to the media, **it is the Government's understanding that no notes were handed over.**

To the extent the Information that was **included information concerning Leroux's family members that was unnecessary to the public's understanding of the case, the Government regrets those disclosures.** Any such disclosures, however, occurred in the context of already-intense public interest in Leroux and ongoing, independent journalistic investigations of him and his criminal activity. Those independent efforts already resulted in the publication of significant information about Leroux's personal background and family, including about his former romantic partners and children. Moreover, the book was published in 2019, after Leroux's cooperation was widely known, and after his testimony in Minnesota in 2016 and in this District in 2018.

By way of background, Leroux was arrested in September 2012. Prior to Leroux's arrest, he already had been discussed in a United Nations report on concerning conditions in Somalia and Eritrea: weapons trafficking and drug trafficking by Leroux and his company, Southern Ace, in Somalia were extensively discussed.[3] As discussed in the Government's sentencing memorandum, the fact of Leroux's 2012 arrest by the DEA was shielded from disclosure so that he could assist in ongoing, proactive investigations. (Govt. Sent. Mem. at 41). This led to, among other things, the coordinated international takedown in September 2013 of 10 defendants, arrested in three different continents, charged in *United States v. Hunter et al.*, 13 Cr. 521 (RA), and *United States v. Stammers et al.*, 13 Cr. 579 (ALC). Leroux was not discussed in the indictments, but many of these defendants—including Joseph Hunter, Timothy Vamvakias, Ye Tiong Tan Lim, Allan Kelly Reyes Peralta, Scott Stammers, and Philip Shackels—previously committed crimes in the employ of, or in partnership with, Leroux, and the investigation against them arose out of that conduct. (Govt. Sent. Mem. at 44-48).

In July 2015, two more defendants, Adam Samia and Carl David Stillwell, were indicted and arrested based on their participation in a murder-for-hire for Leroux in 2012. (Govt. Sent. Mem. 48). In the indictment, Leroux was referred to as "the Boss." Also in 2015, defendants in the *Hunter* and *Stammers* indictment began pleading guilty; sentencing submissions described their association with a "transnational criminal organization based in the Philippines." Joseph Hunter's sentencing submissions explicitly discussed Leroux, drawing additional media scrutiny. Alan Feuer, *U.S. Reveals Criminal Boss's Role in Capturing a Mercenary*, N.Y. Times (Feb. 1, 2015), *available at* https://www.nytimes.com/2015/02/02/nyregion/us-reveals-criminal-bosss-role-in-capturing-a-mercenary.html.

---

[2] The Government did not discuss the case with the book's author and did not review the information provided by the DEA.

[3] *See* Report of the Monitoring Group on Somalia and Eritrea pursuant to Security Council resolution 1916 (2010) (July 18, 2011), at 53, 255, 267-72, available at https://reliefweb.int/sites/reliefweb.int/files/resources/Full_Report_1869.pdf.

In March 2016, Leroux testified in open court in the District of Minneapolis, in connection with a suppression hearing.[4] A DEA agent also testified. At that hearing, Leroux's arrest in Liberia, his cooperation, and his potential connection with various murders were the subject of questioning. The questioning also addressed Leroux's aliases, his activities in Somalia, weapons trafficking, explosives precursors, trafficking in North Korean methamphetamine, and other crimes.

In early 2016, around the time that Leroux's cooperation was publicly disclosed through his court testimony, in-depth media coverage of him and his background was also being published. For example, in a series of articles published in the Atavist Magazine, a wealth of personal information about Leroux, his childhood, his family, and other detailed personal information was disclosed, based on interviews with family members and associates of Leroux, foreign law enforcement officials, witnesses, and others, as well as documents obtained from these and from publicly available sources. *See, e.g.*, Evan Ratliff, *An Arrogant Way of Killing*, The Atavist Magazine (Mar. 10, 2016), available at https://magazine.atavist.com/an-arrogant-way-of-killing; see also *He Always Had a Dark Side*, The Atavist Magazine (Mar. 24, 2016), *available at* https://magazine.atavist.com/he-always-had-a-dark-side; Evan Ratliff, *He Got Greedy*, The Atavist Magazine (Apr. 14, 2016), *available at* https://magazine.atavist.com/he-got-greedy. These and other articles identified Leroux's romantic partners and their nationalities, the existence of children, business names and locations, corruption, and other information not publicly available from the court proceedings. Some of the publicly reported information about Leroux's personal and criminal past based on interviews of associates included inaccurate speculation about law enforcement, such as a December 2014 article claiming that Leroux was arrested while in Liberia in connection with the M/V Jereve, and that Leroux was cooperating with the FBI. Richard Shears, *Revealed, the most successful criminal mastermind you've never heard of: The real-life Bond villain behind a cocaine and gun empire spanning four continents who's now turned super-snitch*, The Daily Mail (Dec. 30, 2014), *available at* https://www.dailymail.co.uk/news/article-2890164/Revealed-successful-criminal-mastermind-ve-never-heard-real-life-Bond-villain-cocaine-gun-empire-spanning-four-continents-s-turned-super-snitch.html.

Also in approximately March 2016, records in the two dockets in this case, 12 Cr. 489 (RA) and 14 Cr. 75 (RA), were unsealed. Additional press coverage followed these unsealings, including additional independent investigative reporting. *Id.*; *see also, e.g.*, Keegan Hamilton, *Meth, Murder, and the DEA's Mysterious Deal With the 'Most Dangerous Man in the World'*, VICE News (Apr. 18, 2016), *available at* https://www.vice.com/en_us/article/ney4az/paul-le-roux-joseph-hunter-rambo-the-dea-meth-and-cocaine.

As this Court knows, in April 2018, Leroux testified publicly again in the trial of Hunter, Samia, and Stillwell for the murder of Catherine Lee. During his extensive testimony, Leroux covered the breadth of his criminal conduct, including participation in murders, weapons trafficking, weapons design for Iran, methamphetamine and cocaine trafficking, and bribery of

---

[4] The suppression hearing concerned an argument by one of the defendants that Leroux did not voluntarily consent to the search of certain electronic devices or accounts, or to certain consensually recorded telephone calls.

government officials in the Philippines, China, Laos, Africa and Brazil. (*See generally* Trial Tr. 308-803).

In the context of this extensive public disclosure regarding Leroux's cooperation, his personal and family history, and his criminal conduct, any disclosure of additional details or the collection of details into a narrative structure in *Hunting Leroux* do not represent any material change in the safety of Leroux or his family. And, as discussed above, the DEA had a legitimate interest in sharing accurate information about a case of public importance and public interest. To reiterate, the Government views the extent of the information shared with the author of the book as unfortunate and regrettable, but Leroux has not demonstrated that he is entitled to sentencing leniency as a result.

<u>The Significance of the Disclosures.</u>

The defense submission contends that the disclosure of information by the DEA represents a significant threat to Leroux's and his family's safety. (Def. Sent. Ltr. at 17-18). As discussed above, the disclosures in *Hunting Leroux* followed extensive public disclosures of Leroux's cooperation, criminal activity, and personal details in his testimony, court filings, and media coverage based on interviews of others, and the Government believes that they do not materially change any risks that Leroux may already have faced. In addition, as described above, when Leroux raised concerns about family safety, the Government and the DEA attempted to address them but received little cooperation from Leroux and his family members in doing so, and did not even alert the Government to one of the episodes described in the defense submission.

**(2) At the time he began to cooperate with law enforcement, what Guideline range Mr. Leroux would have been facing**

At the time of the defendant's arrest in September 2012, he was charged with one count of conspiring to distribute 500 grams and more a mixture and substance containing a detectable amount of methamphetamine, knowing and intending that it would be imported to the United States, and to import 500 grams and more of a mixture and substance containing a detectable amount of methamphetamine into the United States, from at least in or about April 2012 through in or about September 2012, in violation of Title 21, United States Code, Section 963.

The Government estimates that the sentencing range for this offense under the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") would have been life imprisonment. The Guidelines calculation for this offense would have been as follows, assuming that the defendant entered a timely plea of guilty and was not charged with further crimes between his arrest and such guilty plea:

<u>A. Offense Level</u>

Pursuant to U.S.S.G. § 2D1.1(a)(5), because the object of the conspiracy was the importation of 100 kilograms of methamphetamine, the base offense level would be 38.

Pursuant to U.S.S.G. § 2D1.1(b)(1), because a firearm was possessed during the offense,[5] 2 offense levels would be added.

Pursuant to U.S.S.G. § 2D1.1(b)(5), because the offense involved the importation of methamphetamine[6] and the defendant is not subject to a mitigating role adjustment, 2 offense levels would be added.

Pursuant to U.S.S.G. § 2D1.1(b)(11), because the defendant attempted to bribe a law enforcement officer to facilitate the commission of the offense,[7] 2 offense levels would be added.

Pursuant to U.S.S.G. § 2D1.1(b)(16), because the defendant would receive an adjustment for aggravated role and the offense involved the factor that the offense was committed as part of a pattern of criminal conduct engaged in as a livelihood, 2 offense levels would be added.

Pursuant to U.S.S.G. § 3B1.1, because the defendant was an organizer or leader of criminal activity that involved five or more participants or was otherwise extensive, 4 levels would be added.

Pursuant to U.S.S.G. § 3E1.1, assuming the defendant clearly demonstrated acceptance of responsibility for his offense, the offense level would be decreased by 2 levels. If the defendant assisted authorities in the investigation or prosecution of his own misconduct by timely notifying authorities of his intention to enter a plea of guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, the offense level would be decreased by an additional 1 level.

---

[5] During the offense conduct for the methamphetamine importation conspiracy, Leroux owned an armory, was involved in weapons-trafficking, maintained an armed mercenary team that was headed by David Smith and that included Joseph Hunter, and was seeking suppliers of surface-to-air missiles for a Southeast Asian military group at the request of a DEA confidential source. Previously, Leroux had founded and operated an armed camp in a remote region of Somalia as a base of operations for weapons and drug trafficking and heroin production; the camp was disbanded when it became too expensive and too difficult to man and supply. Under these circumstances, Leroux's possession of weapons (through his armory) facilitated his ability to negotiate and partner with violent drug cartels, including the purported Mexican cartel that the CSes claimed to represent. At a minimum, it manifestly is not "clearly improbable that the weapon[s] [were] connected with the offense." U.S.S.G. § 2D1.1, cmt.,. n.11(a).

[6] During the offense conduct for the methamphetamine importation conspiracy, the CSes asked Leroux to provide a sample of methamphetamine that could be tested in New York. Leroux caused a co-conspirator to ship a sample of his North Korean-produced methamphetamine to Liberia, where he understood the CSes would further import it into the United States for testing. The methamphetamine was in fact delivered to the United States for testing by the DEA, and was approximately 99.6% pure.

[7] During his arrest in Liberia in September 2012, Leroux attempted to bribe Liberian law enforcement in order to escape apprehension.

Based on the foregoing, the total offense level would have been 47. Pursuant to U.S.S.G. Chapter 5, Part A, cmt. n.2, this would be treated as level 43 for determining the applicable Guidelines sentencing range.

### B. Criminal History Category

The defendant has no prior convictions. Accordingly, the defendant's Criminal History Category is I. (PSR ¶¶ 164-67).

### C. Sentencing Range

Based upon the foregoing, the defendant's Guidelines sentencing range would have been life imprisonment, with a mandatory minimum term of 120 months' imprisonment, had Leroux pleaded guilty to the charge that served as the basis for his arrest.

**(3) If there are analogous cases in or out of this district that the Court should consider in terms of the egregiousness of the defendant's conduct, as well as the extent of his assistance to law enforcement**

The Government has not been able to identify readily comparable cooperating defendants in terms of the offense conduct or assistance to law enforcement, who have been sentenced. Few criminal defendants, much less cooperators, can compare to the defendant in terms of the wide-ranging scope of his criminal conduct. In part due to the scope of Leroux's criminal conduct, the proactive investigation that the DEA's Special Operations Division designed based on his cooperation was similarly wide-ranging, and the corresponding investment of law enforcement and prosecutorial resources in proffers, consensually recorded conversations, consensually monitored electronic communications, and overseas evidence-gathering efforts reflects the scope of the defendant's criminal conduct.

**(4) The Government's view as to whether Mr. Leroux continues to present a danger to any particular individuals or the community at large**

The Government is not aware of a danger the defendant currently poses to any particular individual or individuals. The defendant does not appear to have a motive for retribution against any particular person, and in light of his arrest and the dismantling of his criminal organization, he currently lacks access to armed mercenaries or weapons in order to carry out violence.

As in any case, and particularly for defendants with a history of violence, the Government cannot rule out risks of recidivism and danger to the community when the defendant completes his sentence. These risks appear to be exacerbated to some extent, from the Government's perspective, because the defendant's decision to cooperate seems to have been a calculated decision on his part to mitigate his criminal sentence, and—more importantly—his sentencing advocacy to date reflects little, if any, remorse, rehabilitation, or acceptance of responsibility beyond that required by U.S.S.G. § 3E1.1. These risks are further exacerbated by Leroux's initial lack of candor regarding his history of violence, and his post-plea relationship with Mir Islam as described in the Government's sentencing submission. (Govt. Sent. Mem. at 50-51 & n.14). To be clear, the Government has no evidence that Leroux and Islam were planning to engage in

criminal business. But plans for a call center business between Leroux, the former operator of an illegal online pharmacy business, and Islam, a cybercriminal, to be operated from the Philippines where Leroux previously operated his criminal organization and where he still has criminal and corrupt contacts, presents a scenario rife with illicit opportunities.

The risk of the defendant's harm to the community resulting from a return to crime is mitigated, however, by several considerations.

- First, the defendant's arrest and prosecution in this case should have a substantial deterrent effect. The defendant is now aware of U.S. law enforcement's, and in particular the DEA's Special Operations Division's, considerable skill, ingenuity, and tenacity in pursuing and apprehending individuals who violate the United States criminal laws, even when those who believe they have created a safe haven for themselves overseas. The defendant is also aware that U.S. law enforcement will have a continued interest in detecting any criminal activity directed towards the United States that he may engage in upon his release, and that if he were arrested for new offenses, his sentence likely would be much harsher based on his criminal history and his status as a cooperator who squandered any sentencing leniency he received from his prior cooperation.

- Second, the defendant's arrest and cooperation have resulted in a degree of notoriety that should make it more difficult for him to engage in criminal activity without detection, both as a result of his profile with the public and with the law enforcement community. Potential co-conspirators' awareness of his cooperation may also discourage others from committing crime with him—although, as the Islam example indicates, not necessarily.

- Third, the defendant argues in his sentencing submission that he is unable to return to the Philippines because of pending or possible criminal charges against him, or that if he does return to the Philippines, he will be incarcerated. (Def. Sent. Mem. at .) If this were true, it would indicate that the defendant would not be able to re-establish his corrupt and criminal contacts in the Philippines in order to establish a safe haven for criminal activity. With respect to this last point, however, the Government finds it difficult to credit the defendant's arguments about Philippines criminal exposure. Over the course of the nearly eight years the defendant has been cooperating, the Government and the DEA have repeatedly advised the defendant and his counsel against returning to the Philippines and to explore other countries where he could lawfully reside. The defendant appears to have remained steadfast in his desire to return to the Philippines, however, as shown by his prior counsel's sustained efforts to negotiate a remote plea bargain with Philippines authorities and by the fact that his common-law wife and their children continue to reside in the Philippines despite purported threats to their safety. The defendant's history of exploiting corrupt contacts within the Philippines law enforcement and Justice Department also undermines confidence that his risk of criminal prosecution and incarceration is as serious as his sentencing submission claims.

In sum, while the Government is not aware of any danger the defendant currently poses to specific individuals, it is possible that he may once again pose a risk of danger to the community upon his release. That risk is at least somewhat mitigated by the forces of specific deterrence, the

defendant's notoriety, and any obstacles that may exist to the defendant's return to the Philippines, but it is impossible to say whether the risk is completely mitigated.

Respectfully submitted,

GEOFFREY S. BERMAN
United States Attorney


by: _____ /s/
_____ Emil J. Bove III / Rebekah
Donaleski /
   Michael D. Lockard
Assistant United States Attorneys
(212) 637-2444/2423/2345

cc: James Branden, Esq.
    Jeffrey Chabrowe, Esq.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                               :

UNITED STATES OF AMERICA      :

                               :

        - v. -               :    S2 12 Cr. 489 (RA)

                               :    14 Cr. 75 (RA)

PAUL CALDER LEROUX,       :
  a/k/a "Bernard John Bowlins,"  :
  a/k/a "John Smith,"         :
  a/k/a "Johan Smit,"         :

                               :

             Defendant.      :

                               :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## GOVERNMENT'S SENTENCING MEMORANDUM
## <u>AND MOTION PURSUANT TO U.S.S.G. § 5K1.1</u>

 

GEOFFREY S. BERMAN
United States Attorney for the
Southern District of New York

Emil J. Bove, III
Rebekah Donaleski
Michael D. Lockard
Assistant United States Attorney
   - *Of Counsel* -

<u>A</u>                   <u>155</u>

The Government respectfully submits the following to advise the Court of the pertinent facts concerning the assistance that the defendant Paul Calder Leroux (the "defendant" or "Leroux") has rendered to the Government. In light of these facts, and assuming that the defendant continues to comply with the terms of his cooperation agreement, commits no additional crimes before sentencing, and appears for his sentencing as scheduled, the Government intends to move at sentencing, pursuant to Section 5K1.1 of the Sentencing Guidelines and Section 3553(e) of Title 18, United States Code, that the Court sentence the defendant in light of the factors set forth in Section 5K1.1(a)(1)-(5) of the Guidelines.

## I.        The Defendant's Background

Leroux was born on December 24, 1972, in Bulawayo, Rhodesia (now Zimbabwe). His biological parents are Jill Hepple and John Hornbuckle. Shortly after birth, Leroux was adopted by Paul and Judith Leroux. He has a sister, Natalie Leroux, born in 1974. In 1984, the Lerouxs emigrated to South Africa to escape the Mugabe regime in Zimbabwe, moving to Krugerdorf approximately 45 minutes outside of Johannesburg. Leroux graduated from technical school in South Africa in 1992.

In 1992, Leroux began working as a programmer in London for Barret Edwards International ("BEI"), principally working on document management systems for BEI clients such as law firms. In approximately 1994, Leroux moved to Sydney, Australia, where he was employed in programming jobs at various banks. In approximately 1998, while Leroux was working for New Era of Networks ("NEON"), he moved to Hong Kong, where he continued working for NEON. In 2000, he returned to London, where he worked again for BEI. While with BEI, Leroux worked on a project in Seattle for approximately six months.

In 2001, Leroux returned to London and began working for Crypto Solutions, designing encryption programs for computer hardware. In 2003, Leroux moved to Rotterdam, where he

worked odd programming jobs until he began working with Secur Star, a company based in Germany owned by Wilfred Heffner.

## II.    The Defendant's Criminal Conduct

Agents and prosecutors have held numerous proffers with Leroux since he first began meeting with the Government. During these sessions, Leroux admitted to the full extent of his prior criminal history, as was required by his cooperation agreement with the Government. The description below is based on the Government's independent investigation and Leroux's proffer admissions.

### A.    Online Pharmacy Business, 2004-2012

From approximately 2004 until his arrest in 2012, Leroux's principal source of revenue was his operation of an online pharmacy business targeting U.S. customers. Tramadol, Soma, and Fioricet comprised the bulk of the online pharmaceutical sales, which were based on prescriptions written by doctors based on online questionnaires submitted by customers. Because these online questionnaire-based prescriptions -- which could be issued by Leroux's doctors without their even viewing the questionnaires -- are legally invalid, the drugs distributed were "misbranded" under the Food, Drug, and Cosmetics Act. (*See* PSR ¶ 16). As discussed in more detail below, Leroux also engaged in various other deceptive and fraudulent conduct in the course of operating the online pharmacy business.

#### 1.    Atlas Pharmacy

In approximately 2004, while Leroux was working for Secur Star, Heffner asked Leroux to do some programming and website design for an online pharmacy business, Atlas Pharmacy, which Hefner was operating separately from Secur Star. Hefner sold prescription drugs (including Xanax, Valium, clonazepam, and anabolic steroids) in the United States through the website. Heffner purchased these drugs from a wholesaler in Brazil by paying bribes to

wholesaler employees. In or about 2004, Heffner was arrested in Brazil and asked Leroux to send approximately $40,000 to Brazil so that Heffner could pay bribes to resolve the investigation. Leroux wired the money and Heffner was able to secure his release. (*See* PSR ¶ 17).

### 2. Rx Limited

Heffner exited the online pharmacy business after his arrest, and Leroux started his own online pharmacy operation, which ultimately became a family of entities generally operating under the name Rx Limited. Rather than supplying drugs directly to consumers, Rx Limited supplied customers with prescriptions for drugs, which would then be shipped to the customer by affiliate pharmacies located in the United States. Customers paid Rx Limited, which in turn paid the doctors writing or approving the prescriptions and the pharmacies filling the orders. (*See* PSR ¶ 18).

Leroux established the Rx Limited business in approximately 2004. Leroux consulted with Martin Dix, Esq., of Ackerman Senterfitt LLP, in Tallahassee, Florida to obtain opinion letters. Leroux described his plan to sell prescription drugs using prescriptions issued based on online questionnaires, but did not fully disclose how and where the business would operate. Dix advised Leroux that the DEA and some courts had taken the position that prescriptions issued based on online questionnaires were not valid, and that Leroux would face the risk that the business could be determined to be unlawful. Dix also discussed the example of Vineet Chhabra, a Floridian who pleaded guilty in the Eastern District of Virginia to a conspiracy to distribute controlled substances (including the Schedule III drug phendimetrazine) using prescriptions issued based on online questionnaires.[1] Dix further advised Leroux that if Leroux entered the

---

[1] *See United States v. Vineet Chhabra et al.*, 03 Cr. 530 (LMB) (E.D. Va.).

online prescription business, he should avoid drugs listed on the schedules to the Controlled Substances Act ("CSA"). Dix advised Leroux that issuing prescriptions for CSA-scheduled drugs would be a federal felony if the prescriptions were determined to be invalid. (*See* PSR ¶ 19). Dix did not advise Leroux on state law.

### 3. Rx Limited Doctors and Pharmacies

As discussed above, prescriptions for Rx Limited sales were issued by doctors recruited by Rx Limited employees (the "Rx Limited Doctors"). The prescriptions were based on an online questionnaire filled out by the customers, who were assigned to Rx Limited Doctors based on an algorithm intended to keep an approximately equal number of questionnaires in each doctor's queue. Neither customers nor doctors had any control over which doctor the questionnaires went to, and questionnaires from repeat customers were not necessarily routed to the doctors who had previously reviewed their questionnaires. The Rx Limited Doctors were paid for each prescription approved, but were not paid for questionnaires that they reviewed without authorizing a prescription. Rx Limited typically had approximately five to 10 doctors at any given time, and the Rx Limited Doctors typically could approve approximately 50 to 300 prescriptions per day. (*See* PSR ¶ 20). Some Rx Limited Doctors approved up to 1,000 prescriptions per day at times. Some Rx Limited Doctors acted while their licenses were suspended or expired; and at least one acted with a forged medical license.

The prescriptions were filled by affiliate pharmacies, also recruited by Rx Limited employees. . Rx Limited tracked pharmaceutical approvals by Rx Limited Doctors, assigned the orders to Rx Limited affiliate pharmacies for fulfillment, paid shipping costs to deliver the drugs to customers, and calculated and wired the funds due to the Rx Limited Doctors and the affiliate pharmacies. The pharmacies typically were small businesses facing financial difficulties, whose owners were eager for the per-prescription fees paid by Rx Limited. (*See* PSR ¶ 21).

### 4. Rx Limited Drugs and Markets

Rx Limited sold a number of types of prescription drugs through this system. The top sellers were Tramadol, an opioid analgesic;[2] Fioricet, a combination of acetaminophen and butalbital, a barbiturate; and Soma, a brand of the muscle-relaxant carisoprodol. Leroux focused the Rx Limited business on drugs that he believed were not controlled under the CSA. To determine whether a drug was controlled under the CSA, Leroux or one of his employees would compare the generic and brand name of the drug against the schedules on the DEA Diversion Group website. When carisoprodol (Soma) was added to the CSA schedules in January 2012, Rx Limited stopped selling it. (*See* PSR ¶ 22). Some of the drugs Rx Limited distributed were controlled under various states' laws and regulations.

One drug where this screening failed, however, was Fioricet. Soon after forming Rx Limited, Leroux and his employees (largely based in Philippines and Israel) reviewed the CSA schedules and concluded that Fioricet (which contains butalbital) was not itself a scheduled substance, but was controlled only when it also contained codeine or another independently controlled substance. Leroux did not seek a legal opinion, but instructed one of his employees to contact the DEA about the drug's status. The employee advised Leroux that the DEA had told the employee that Fioricet/butalbital was not scheduled unless it contained another scheduled drug, like codeine. Leroux also relied on Rx Limited's affiliate pharmacies to notify Rx Limited when a drug became scheduled at either the federal or state level, because pharmacies typically would not ship controlled substances and required them to be picked up in person. Leroux was never advised that a pharmacy reported that Fioricet was a scheduled drug or that a pharmacy

---

[2] Tramadol was classified as a Schedule IV drug under the CSA on August 18, 2014, *see* 79 Fed. Reg. 37623 (July 2, 2014), after Leroux's arrest, but was noncontrolled during the time of Leroux's offense conduct.

would not ship Fioricet. Despite Leroux's belief to the contrary, Fioricet contains a barbiturate and is, in fact, a controlled substance (*see* PSR ¶ 24; *see also* 21 U.S.C. § 812 Schedule III(b)(1)), though it is exempt from certain provisions of the Controlled Substances Act under 21 C.F.R. § 1308.32. *See United States v. Ricco*, 43 F. Supp. 3d 301, 304-07 (S.D.N.Y. 2014).

Leroux focused the Rx Limited business on states that did not explicitly define what constituted a doctor-patient relationship -- *i.e.*, states where it was at least arguable that a prescription issued based on an online questionnaire, rather than an in-person visit, was valid. As discussed below, as states became more restrictive (or at least, more explicit) in their definitions and the number of jurisdictions of arguable ambiguity fell, Rx Limited grew more willing to sell to states where it was clear that the online-prescription model was not lawful. By 2012, most states prohibited prescriptions based on online questionnaires either by statute or by administrative decision. Despite this, Rx Limited sought to avoid sales in only a handful of states -- Florida, Tennessee, Kentucky, and Nevada -- where Leroux believed internet prescriptions would subject Leroux and his company to state criminal liability. Leroux continued to target states where internet prescriptions carried civil or administrative penalties. (*See* PSR ¶ 25). Rx Limited's operations also violated state laws regarding dispensing prescription medication based on internet questionnaires.

In approximately 2008, Leroux hired two Canadian computer hackers to create spam to generate additional business for the online pharmacy. These individuals also hacked computer servers to obtain customer leads, including servers maintained by health service providers in the United States.

### 5.  Credit Card Processing

Rx Limited relied principally on third-party credit card processors to complete the online drug sales. As state regimes became more restrictive, credit card processing services became

more difficult to obtain. Visa increased its supervision of acquiring banks (banks that process credit card payments for merchants) processing online pharmacy transactions, including by creating transaction codes specifically relating to online pharmacy sales and periodically auditing acquiring banks processing such transactions and their payment processors, requiring that they maintain opinion letters concerning the legality of the merchants' business. (*See* PSR ¶ 26).

Leroux initially obtained supporting opinion letters from Martin Dix. By approximately 2006, however, Dix was no longer willing to provide opinion letters and Leroux turned to Rahulan Kathir, a California attorney. Kathir required Rx Limited to provide him with a letter describing its business. These letters contained what Leroux and Kathir knew to be false information. For example, the letters represented that Rx Limited did not sell Tramadol, because Visa began prohibiting its banks from processing payments for online Tramadol sales. The letters also represented that Rx Limited avoided business in certain states, which was also false. Kathir first charged approximately $10,000 per opinion letter, but increased his fee to as high as $35,000 per letter. Leroux understood that these opinion letters would be provided to Visa by the acquiring banks. Fraudulent opinion letters were provided principally to overseas banks, but also to Harris Bank, an FDIC-insured financial institution, in connection with a denied application to open credit card processing there. (*See* PSR ¶ 27).

In addition to the fraudulent opinion letters, Leroux and his employees created fake online pharmacy websites to show the banks. These sites omitted prohibited drugs like Tramadol; some also purported to require customers to fax in prescriptions from their physicians. Leroux similarly used fake websites for Google's review so that Rx Limited could purchase keywords for Google's AdWords program, which displays keyword-based advertisements for certain search string results. Google began restricting the availability of advertising for online

pharmacy businesses, and the fake websites were intended to allow Rx Limited to evade these restrictions. Leroux accomplished this by determining the IP addresses from which Google employees browsed the web and redirected internet traffic on the Rx Limited websites originating from Google IP addresses to the fake websites. (*See* PSR ¶ 28).

American Express and Discover similarly began requiring that merchants processing online pharmacy sales have valid pharmacy licenses. In order for Rx Limited to accept American Express and Discover payments, Babubhai (Bob) Patel -- the owner of a number of Detroit-area pharmacies and a seller of pharmaceuticals for Rx Limited -- opened merchant accounts with American Express and Discover for the use of Rx Limited. Thus, Patel's licensed pharmacies were nominally the merchant on the accounts, but they were in fact used by Rx Limited. (*See* PSR ¶ 29).

Leroux also bought a pharmacy called G & E Pharmacy and caused G & E to apply to the National Association of Boards of Pharmacy ("NABP") for accreditation as a Verified Internet Pharmacy Practice Site ("VIPPS"). In the application, G & E Pharmacy was identified as a mail-order pharmacy, which Leroux understood to mean a pharmacy where doctors or patients would send legitimate prescriptions by fax or mail to pharmacies in order to fill the order. The G & E Pharmacy VIPPS application was later abandoned. The purpose of the VIPPS application was so that Leroux could open a VIPPS shipping account with FedEx, where Rx Limited was among the largest accounts. In 2011, FedEx closed the account because it had been advised that Rx Limited was shipping controlled substances in violation of federal law. Rx Limited opened a new FedEx account under a different name and continued shipping pharmaceuticals, and also used UPS and another shipper. (*See* PSR ¶ 30).

In addition to the online pharmacy business, Leroux also explored establishing a wholesale drug distributor in the United States, but after taking initial steps abandoned the project because the process of applying for appropriate licenses was too burdensome and intrusive. (*See* PSR ¶ 31).

In approximately October 2011, Leroux caused approximately one-half kilogram of Tramadol powder to be smuggled into the United States aboard a Philippines Airlines flight, using a contact of Jeff Hedges (discussed in more detail below). The shipment was a test-run for possible future shipments; Leroux wanted to have the ability to make Tramadol pills in the United States, either for street sales or wholesale. Leroux also sent another 2-4 kilograms through Canada to New York. (*See* PSR ¶ 32).

In approximately 2011, Leroux caused approximately two to three million pills of Tramadol to be smuggled from Mexico to El Paso, Texas, where it was delivered to Tim Vamvakias, a mercenary employed by Leroux and an associate of Joseph Hunter (both discussed in more detail below). The pills remained in a storage site controlled by Vamvakias, available in case Leroux wanted to try to sell them on the street or wholesale at some date in the future.[3] (*See* PSR ¶ 33).

In approximately 2010 and 2011, Leroux bought large quantities of prescription drugs in the Philippines, including approximately 20 million Tramadol pills, 5,000 to 10,000 pills of Hydrocodone, Oxycontin, and Diazepam. Leroux was exploring the viability of smuggling the pills into the United States, but the Indian-manufactured generics that he bought were unsuitable for the U.S. market. (*See* PSR ¶ 34).

---

[3] The Tramadol stash was seized by law enforcement in 2013, with assistance from Leroux.

U.S. pharmacies and doctors who participated in the Rx Limited distribution business were paid by wire transfers originating outside the United States. The wires were designed to disguise the source, origin, ownership and control of the funds and to evade law enforcement detection. Approximately $250 million in funds were laundered through the U.S. financial system in furtherance of the operations of the online drug distribution business, including payments by customers and payments to pharmacies, doctors, marketing affiliates, and shippers. (*See* PSR ¶ 35).

**B.      Weapons Trafficking, 2008-2012**

In approximately 2008, Leroux formed Red White & Blue Arms ("RWB") as a weapons dealer in the Philippines. Through RWB, Leroux obtained a variety of handguns, rifles (including combat rifles), rocket-propelled grenade launchers, explosives (including composition 4), and other weapons. Leroux principally sold these weapons in the Philippines to elected and appointed government officials, law enforcement officials, and warlords. The weapons were consigned to the Philippines National Police ("PNP") Firearms and Explosives Division ("FED"), who handled the sales. Leroux also maintained a substantial arsenal of his own that he used to arm security personnel in his employ or that were subcontracted to him. The arsenal was managed by Michael Lontoc. (*See* PSR ¶ 36).

RWB bought some Sig Sauer pistols from the United States in approximately 2008 using an end-user certificate ("EUC") from the PNP. Leroux also explored alternative potential suppliers, including PT Pindad (an arms company in Indonesia) and the Defense Industries Organization ("DIO"), controlled by the Iranian Ministry of Defense for Armed Logistics ("MODAFL").[4] (*See* PSR ¶ 37).

---

[4] The U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC") designated the DIO as a Specially Designated National ("SDN") on March 30, 2007, pursuant to Executive

In late 2008 or early 2009, RWB bought a shipment of rifles and handguns from PT Pindad using an EUC from the FED and one from Mali. David Smith and Joseph Hunter (two mercenaries employed by Leroux, both of which are discussed in more detail below), procured the Mali EUC. Both EUCSs were purchased through bribes. The PT Pindad weapons were loaded on a cargo boat, the merchant vessel "Captain Ufuk," for shipment to the Philippines, where they were to be transferred to the FED for sale to a warlord in the Southern Philippines who was allied with the Arroyo government. While the Captain Ufuk was docked in Mariveles, Philippines, in approximately August 2009, a local reported the boat to authorities. The Philippines Coast Guard raided the Captain Ufuk and seized the weapons on board. Prior to the raid, some of the weapons were offloaded to one of Leroux's yachts, and ultimately moved to the house of a man named Henry Chu. Smith and Bruce Jones, the boat captain, were arrested and Leroux bribed their release from custody. (*See* PSR ¶ 38).

In approximately late 2008, Leroux instructed one of his employees, Nestor Del Rosario, to make contact with the Iranian DIO. Del Rosario, one of Del Rosario's assistants named Rogelio "Ogie" Palma, and others traveled to Tehran to meet the DIO and explore purchasing weapons. The team obtained a weapons catalogue and instructions from the DIO that they required an EUC from an African military general to lend the air of legitimacy to the EUC. During discussions with the DIO, and over the course of several trips to Tehran, the RWB team began discussing the DIO's needs for military components, including gyroscopes, missile

---

Order 13382, which targets proliferators of weapons of mass destruction. The DIO was also sanctioned pursuant to U.N. Security Council Resolution ("UNSCR") 1737 on December 23, 2006 as an entity linked to Iran's proliferation-sensitive nuclear activities or Iran's development of nuclear weapon delivery systems.

OFAC designated MODAFL as an SDN on October 25, 2007 under Executive Order 13382 based on its authority over Iran's ballistic missile research, development, and production activities. MODAFL similarly was sanctioned pursuant to UNSCR 1737.

guidance systems, supersonic wind tunnels, and other materials. (*See* PSR ¶ 39). Leroux's

involvement in weapons development for Iran will be discussed in more detail below.

In 2012, as part of an undercover investigation by the DEA, a confidential source (the

"CS") represented to Leroux that the Shan State -- a non-governmental semi-autonomous

military group in Burma -- wanted to buy surface-to-air missiles in order to combat U.N. and

DEA drug crop eradication efforts. Leroux spoke to Phil Shackles, an associate involved in drug

trafficking (discussed in more detail below) about procuring the missiles from a group of

Serbians. Leroux and Shackels at the time were arranging a cocaine deal with the Serbian group,

and Shackels advised Leroux that the Serbians would not discuss a weapons deal until the

cocaine deal was completed. Leroux considered trying to get the SAMs from Poly Technologies

("Polytech"), a Chinese weapons manufacturer, but Polytech would require an EUC and the CS

advised Leroux that the Shan State would not provide an EUC. Leroux's preliminary efforts to

identify a source of SAMs for sale to the Shan State do not amount to a conspiracy or attempt to

violate U.S. law. (*See* PSR ¶ 40).

### C. Weapons Development for Iran, 2009-2012

As discussed above, while exploring weapons procurement from the Iranian DIO, Leroux

began discussions with the DIO through his employees about commodities and technology that

Leroux could supply to the DIO. The DIO initially expressed interest in high-quality components

for designing and building missiles and missile guidance systems, such as ring laser gyros,

supersonic wind tunnels, and vibration platforms. Leroux recommended against seeking to

procure these kinds of technologies for two reasons. First, they typically were only available

from the U.S. and the DIO would never be able to procure sufficient quantities to supply the

Iranian military. Second, Iran lacked the engineering capacity to build the components

themselves, even if they were able to reverse-engineer U.S.-sourced samples. (*See* PSR ¶ 41).

Leroux proposed developing technologies for the Iranian military that were an improvement over their existing capabilities and which were of sufficiently simple design, or based on widely available components, such that they could readily be reproduced by Iranian engineers. The DIO expressed an interest in developing, among other things, (1) an explosives formula based on unmonitored materials; (2) enhanced missile guidance systems; (3) design specifications and performance measurements for the American-made AIM-54 Phoenix air-to-air missile.[5] The DIO also expressed interest in vibration platforms and supersonic wind tunnels. The DIO would pay Leroux to develop the technologies of interest by delivering gold to Leroux in a Muslim nation of Leroux's choosing. (*See* PSR ¶ 42).

In approximately 2010, based on the DIO's expressed interest, Leroux began assembling a team of engineers to work on the projects.[6] Leroux already had some computer programmers and engineers in his employ, who were used for various projects in the Philippines. For example, at the time a programmer and an electrical engineer were engaged in a project to design a private, mobile "listening station" that could intercept cellphone communications. Leroux intended to use the listening station to intercept Philippines law enforcement as a means of developing intelligence and protecting himself from extortion by law enforcement. These engineers, along with a team of engineers hired from Romania, were tasked with various research and development projects. Leroux camouflaged the true nature of the research and development by advising the engineering team that he was developing an unmanned aerial vehicle ("UAV"), or

---

[5] Iran later reportedly developed an air-to-air missile based on the Phoenix design that went into production in 2018.

[6] The DIO asked for the team to be based in Tehran, but Leroux demurred on the grounds that the engineers were largely European and would be too conspicuous traveling in and out of Iran. Leroux set the engineering team up in office space in Manila, Philippines. (*See* PSR ¶ 43 n.5).

drone, to conduct surveillance for exploring for mineral deposits in the southern Philippines. (*See* PSR ¶ 43).

In approximately late 2010, Leroux's team developed a recipe for explosives based on unmonitored precursors, principally on coffee sweetener and erythritol tetranitrate ("ETN"), a chemical relative of pentaerythritol tetranitrate ("PETN"), which is used to make plastic explosives. The engineers also developed designs related to the missile project. Leroux sent the designs to the DIO through his employees; after a few days, the DIO reported back that they were pleased with the explosives formula but not the missile-related designs. Leroux and the DIO made arrangements for the DIO to pay Leroux approximately 5 million dollars' worth of gold bars off the coast of Indonesia. Dave Smith received the gold on one of Leroux's yachts.[7] (*See* PSR ¶ 44).

In approximately 2011, Leroux gave the DIO file transfer protocol (FTP) access to a portion of the servers used to store records relating to the research and development projects so that the designs could be accessed remotely, rather than Leroux's employees having to physically travel to Iran in order to deliver the designs. Leroux caused the servers to be configured so that there was no record or log documenting when or by whom the servers were accessed. (*See* PSR ¶ 45).

At the time of his arrest, Leroux's team of engineers was continuing to work on a number of development projects for the Iranian deal, including performance testing of the Phoenix missile and the development of a long-range cruise missile with similar specifications to the Tomahawk missile. As part of the cruise missile project, the engineering team was working to

_____

[7] As discussed below, Leroux later came to learn that Smith stole most or all of the gold, which led to a number of contract murders as part of Leroux's quest to locate and recover the gold.

create GPS navigation components that would function outside limits set by the International Traffic in Arms Regulation ("ITAR"). GPS systems that, inter alia, produce navigation results when traveling at a velocity of 1000 knots or greater, or at an altitude above 60,000 feet, are subject to the United States Munitions List ("USML"), Category XV(c)(2). (*See* PSR ¶ 46).

In connection with the research and development projects for the DIO, Leroux procured numerous components from the U.S. Leroux placed orders through Jonathan Wall, a resident of Kentucky who was Leroux's principal procurement agent. Leroux believes that the components themselves were not subject to export controls, and he advised Wall to avoid export-restricted items in order to avoid drawing law enforcement scrutiny. The components were used or intended to be used, however, in the design, construction, and testing of technologies being developed for the DIO. Among the U.S.-sourced commodities and equipment were: Honeywell jet engines for testing purposes; X-Plane flight simulator software; GPS chips; a HEATCON carbon fiber oven; potassium perchlorate, nitric acid, and liquid mercury from United Nuclear; a fume hood; vacuum pumping equipment; a desiccator; nichrome wire; a VectorNav inertial measurement unit ("IMU"); a fiberoptic gyro; a piezoelectric vibration platform; numerous electronic and mechanical components, including engine valves, sensors, micro controllers, resistors, capacitors, and electric switches, etc. (*See* PSR ¶ 47).

### D. Narcotics and Controlled Substances Trafficking, 2009-2012

In approximately 2010, Leroux bought approximately 48 kilograms of methamphetamine through an individual known to him as "Kelly," Allan Kelly Reyes Peralta. Kelly had an associate that Leroux understood to be a representative or leader of the Asian Triad organized crime gang in the Philippines, whom Kelly referred to as "Joe," Ye Tiong Tan Lim. Kelly reported that the methamphetamine was supplied through the Triads by North Korea, and that North Korea had the production capacity to supply up to six tons of methamphetamine per

month. The price for the 48 kilograms was approximately $60,000 per kilogram, which Leroux thought was excessive but which he was willing to pay because he anticipated that his relationship with Kelly and the Triads would give him access to weapons and to a submarine. (*See* PSR ¶ 48).

In addition to supplying methamphetamine, Kelly purported to have connections to Polytech, a Chinese weapons maker. Leroux wanted to be able to buy surface-to-air missiles, to use for components and analysis in connection with his R&D projects for the DIO. Kelly provided Leroux with Polytech weapons catalogues, but Leroux never placed an order because Polytech required an EUC for the weapons and Leroux did not have a source for a SAMs EUC. (*See* PSR ¶ 49).

Kelly also reported that he could broker the procurement of a North Korean submarine, and sent Leroux a photograph of a North Korean-flagged submarine which was purportedly for sale. Leroux was interested in a submarine because many of the chemicals he was buying for the DIO R&D projects (such as rocket fuel components and igniters) were export- and import-controlled in Asia. In order to avoid customs, Leroux planned to import large quantities of these chemicals into the Philippines from China or elsewhere in Southeast Asia using a submarine. Leroux ultimately did not pursue the North Korean submarine because the asking price -- approximately $5 million -- was too high. Leroux instead began designing a 10-meter and a 30-meter submarine that his team could build in the Philippines, and began construction on a submarine dockyard on coastal land Leroux owns in a remote part of the Batangas province south of Manila. (*See* PSR ¶ 50).

Between approximately 2010 and early 2012, Leroux bought approximately 20 to 30 kilograms of cocaine from the Philippines Drug Enforcement Agency ("PDEA") through a

former employee of the Philippines National Bureau of Investigation ("NBI"). Leroux believed that the cocaine was recovered by the PDEA from a shipment of cocaine that was lost at sea and washed up in the Cimarron in Philippines. Leroux bought the cocaine in order to resell it to the Triads, but several kilograms were sham and the quality of the remaining kilograms was too poor. In 2011, Leroux shipped approximately 11 kilograms of the cocaine to Thailand and approximately 10 kilograms to Hong Kong aboard one of his yachts. (*See* PSR ¶ 51).

David Smith introduced Leroux to Scott Stammers, a/k/a "Shawn," a British national, who Leroux understood to traffic cocaine from Thailand to Australia. Leroux worked with Stammers and Shackels on various drug and weapons deals. For example, Shackels stored the methamphetamine Leroux bought from the Triads, storing approximately half in the Philippines and half in Thailand. Stammers was to sell the Thai methamphetamine, but could not get a price high enough to justify the sale. Shackels also stored the cocaine shipped to Hong Kong. (*See* PSR ¶ 52).

In approximately 2011, Stammers proposed partnering with a Cambodian general to produce methamphetamine in Cambodia for distribution in Southeast Asia. Stammers negotiated with the general for protection for the production operation, but the plan did not go forward because Shackels couldn't get the methamphetamine to crystalize using the chemicals that Leroux had available. (*See* PSR ¶ 53).

In early 2012, Leroux arranged two cocaine deals with suppliers in Peru and Ecuador. Shackels arranged Leroux's purchase of approximately 150 kilograms of cocaine sourced from Peru through a Serbian group. The cocaine, along with additional kilograms of the Serbians', was loaded onto the "Jereve," one of Leroux's sailboats. The Jereve set sail for the Philippines under the captaincy of Ivan Vaclavik. In November of 2012, the sailboat was found beached on

the Pacific island of Tonga, with the boat captain missing and a dead body aboard (not,

apparently, Vaclavik's). Australian police recovered approximately 200 kilograms of cocaine

from the shipwreck. (*See* PSR ¶ 54).

Through an Israeli associate, Benyamin Cohen, a/k/a "Big," Leroux negotiated a

purchase of approximately 50 kilograms of cocaine sourced from Ecuador. The cocaine was to

be loaded on another of Leroux's sailboats and shipped to the Philippines, but the mast broke and

the sailboat remained docked in Ecuador. (*See* PSR ¶ 55).

As part of the DEA's investigation of Leroux, in 2012 confidential sources represented to

Leroux that a South American drug trafficking organization wanted to buy methamphetamine

from Leroux for delivery to Liberia, from where it would be further distributed to Europe and the

United States. Leroux agreed to supply methamphetamine in exchange for cocaine, which

Leroux intended to supply to the Triads in order to get better prices for methamphetamine.

Leroux also offered to supply the organization with laboratory facilities, chemicals, and a

chemist to produce methamphetamine, and emailed the CSes designs for methamphetamine

production facilities. A co-conspirator, Shai Reuven, discussed with Leroux on an intercepted

telephone call the purported South American organization's distribution in the United States and

the potential use of these distribution channels for street sales of Soma, and Reuven agreed to

procure a methamphetamine cook for the organization. Leroux also offered to supply the CSes'

organization with chemicals needed to produce cocaine from unprocessed cocaine base. During

the negotiations concerning the drug transaction, Leroux caused an associate to send sample of

approximately 24 grams of methamphetamine from the Philippines to Liberia, for the purpose of

having the sample further transported to the United States for testing by the organization. Leroux

ultimately proposed to supply the CSes' organization with 100 kilograms of methamphetamine

for importation to the United States, in exchange for 100 kilograms of cocaine. In September

2012, Leroux travelled to Liberia to meet with the CSes to finalize the details of the drug

transaction. After his arrival in Liberia, Leroux was arrested by Liberian law enforcement

authorities and expelled to the custody of the DEA. (*See* PSR ¶ 56).

### E.      Public Corruption in the Philippines and Elsewhere

While in the Philippines and engaged in various ventures around the globe, Leroux made

and directed the payments of bribe money -- for protection, for information, to avoid customs or

other regulatory inspections or oversight, to obtain permits or other approvals, and to influence

judicial proceedings. (*See* PSR ¶ 57).

**The Philippines**. Leroux describes the Philippines as a highly corrupt nation, where

Leroux had contacts at high levels of the Department of Foreign Affairs, the National Bureau of

Investigation ("NBI"), the Department of Justice ("PDOJ"), and the Philippines National Police

("PNP"). Leroux's payments to public and law enforcement officials were both bribes to

influence the actions of government officials, and also the result of extortion to avoid retaliation

or unwanted governmental action against Leroux or his organization. (*See* PSR ¶ 58).

Among the corrupt connections Leroux had in the Philippines were an individual who

worked at the Department of Foreign Affairs that Leroux referred to as the "Dragnet Man," who

sold Leroux sensitive diplomatic and law enforcement information. The Dragnet Man obtained

information from embassies and showed Leroux redacted versions, with unredacted reports

available for a price. Leroux saw and purchased law enforcement reports from the United States

(including DEA and FBI reports and requests for legal assistance) and Australia. Leroux has also

seen from the Dragnet Man dossiers on particular diplomatic personnel, including law

enforcement liaisons and U.S. embassy personnel. (*See* PSR ¶ 59).

Leroux paid bribes to a PDOJ attorney named Niven LNU, principally through Niven's representative Jeff Hedges, a lawyer. Leroux calls Hedges "the Drunk" because he is an alcoholic. Niven originally assigned David Smith, who worked for Niven, as security for Leroux. Leroux paid Smith a salary and bonuses, understanding that Smith would pay Hedges and Niven. David Smith told Leroux that Niven was responsible for arranging non-judicial killings for the Philippines government. In approximately 2011, Leroux and Niven went into business together, with Leroux establishing Niven as the head of a Philippines company that imported pharmaceuticals and chemicals. Leroux bought chemicals from Niven's company. Niven arranged the sale to Leroux of TNT, C4, Claymore mines (believed to be from the Armed Forces of the Philippines). Niven and Hedges provided Leroux the contacts in Philippines Airlines who smuggled Tramadol powder into the United States. (*See* PSR ¶ 60).

In approximately 2010, Leroux met with Ruel Lasala, then the deputy director of the NBI. For Lasala's protection against interference with Leroux's arms business and pharmaceutical call centers, Leroux arranged to pay Lasala approximately 1 million Philippines pesos per month over the course of approximately a year, along with other miscellaneous payments. Leroux made the payments to Lasala through an NBI agent named "Nat." (*See* PSR ¶ 61).

Conrad Najera is a former NBI agent that Leroux used as a connection to the NBI and the PNP Firearms and Explosives Division. In the aftermath of the Captain Ufuk raid and seizure, Leroux paid Najera approximately 50 million Philippines pesos (approximately $1.2 million) to interfere with the resulting investigation and to obtain the release from custody of David Smith and Bruce Jones. (*See* PSR ¶ 62).

Leroux paid a PNP Criminal Investigation and Detection ("CIDG") Group officer named Chris for information and law enforcement reports. After Michael Lontoc, Leroux's manager of RWB, was murdered in 2011, Chris told Leroux that Lontoc was killed by two PNP generals because Lontoc was getting involved in illegal gambling in competition with the illegal gambling controlled by the two generals. (*See* PSR ¶ 63).

**Cambodia**. As discussed above (*supra* at 17), Leroux and Stammers explored establishing methamphetamine production in Cambodia under the protection of a Cambodian general. While Stammers negotiated terms with the general, the venture did not get off the ground. (*See* PSR ¶ 64).

**Africa and South America**. Leroux has engaged in numerous gold and timber ventures in Africa, in connection with which he has caused bribes to be paid in Benin, Mali, Ghana, the Congo, the Democratic Republic of Congo, Zimbabwe, and Zambia for permits, favorable customs treatment, and similar purposes. (*See* PSR ¶ 65).

Leroux has also paid individuals to obtain fraudulent government-issued passports in South Africa, Zimbabwe, Kenya, and Tanzania, understanding that bribes would be paid to obtain the passports. (*See* PSR ¶ 66).

As discussed above (*supra* at 10), Leroux obtained a fraudulent government-issued EUC for weapons from Mali through bribery. Leroux has also given money to an attorney in South Africa named Billy Mentjes for the purpose of obtaining a fraudulent government-issued EUC for pseudoephedrine. (*See* PSR ¶ 67).

Through an individual named Sam Blili (a resident of Zurich) and another named Chris Miller (a resident of South Africa), Leroux sought to arrange for diplomatic status in Swaziland so that Leroux could attempt to avoid prosecution or extradition in the event his arrest was

sought in the Philippines, the United States, or elsewhere. Leroux arranged for bribes to be paid to the King of Swaziland, although he did not ultimately get the diplomatic status he sought. (*See* PSR ¶ 68).

In approximately 2007 or 2008, Leroux received a message from one of his Israeli employees that a friend (possibly a business associate) of Jacob Kobi Alexander sought Leroux's assistance in helping Alexander avoid extradition to the United States from Namibia. Alexander, the former CEO of Comverse Technology, is indicted in the Eastern District of New York on securities fraud and other charges relating to his conduct at Comverse. Leroux agreed, knowing Alexander to be an extremely wealthy individual and expecting that Alexander would later compensate him. Leroux flew approximately $750,000 in cash to South Africa, where he gave the money to Chris Miller. Miller drove to Namibia and, on his return, informed Leroux that he had paid the money to the office of the President of Namibia. Leroux learned that the extradition proceedings were thereafter delayed, possibly because the judge overseeing the proceedings was replaced. Miller died shortly thereafter of heart disease, and Leroux did not have any further contact with Alexander or his associates and was not been paid back for the $750,000. (*See* PSR ¶ 69).

### F.     Murders and Violence

#### 1.     Leroux's Mercenary Team and Acts of Violence

In approximately 2008, Leroux hired a team of mercenaries, including Hunter, Samia, Timothy Vamvakias, and others, to complete acts of violence, including kidnapping and murder, across the world. All of these men accepted positions Leroux's team of mercenaries on the understanding that they may be required to engage in acts of violence, including murder, to protect or recover Leroux's assets. The mercenary team operated under the name of a front company, Echelon Associates. Hunter was recruited for this job because of his military

background and Samia for his tactical weapons training. Initially, Hunter's and Samia's work for

Leroux focused on providing so-called "security" for individuals seeking to purchase gold in

Africa on behalf of Leroux in connection with an asset-based money laundering scheme. (*See*

PSR ¶ 71).

Samia engaged in smuggling and agreed to commit acts of violence for Leroux as part of

the Echelon mercenary team. In 2008, under the auspices of Echelon, Samia traveled to the

Philippines, Hong Kong, Papua New Guinea, the Democratic Republic of the Congo, and the

Republic of the Congo. In a subsequent email to a fellow mercenary, John O'Donoghue, Samia

described his activities with Echelon as involving, among other things, "ground combat with

many threats (whether it be with Indigenous people of the area [or] individuals with interest in

our princip[al] and assets)." O'Donoghue told Vamvakias that in 2008 he and Samia surveilled a

target in Papua New Guinea from a boat using high-powered rifles outfitted with long-range

scopes, and that he and Samia were directed to murder a target, but that O'Donoghue declined

the assignment. (*See* PSR ¶ 72).

Hunter engaged in acts of violence for Leroux as part of the Echelon mercenary team. In

connection with gold-related disputes in approximately 2008 and 2009, Hunter shot a co-

conspirator named Steve Hope Hahn in the hand, and participated in attempted murders that

included the firebombing of a co-conspirator's home and throwing a grenade inside another co-

conspirator's residence. Hunter also engaged in weapons-trafficking activities in multiple

countries on behalf of Leroux, including by helping corruptly to obtain end-user certificates for

the weaponry transported on the Captain Ufuk. Hunter also investigated the possibility of

organizing a coup d'état against the government of the Seychelles. As depicted on a video of

Hunter surreptitiously recorded in Thailand (the "Thailand Video"), Hunter described these

activities—as well as the murder of Catherine Lee and a second Philippines victim named Noemi Edillor—as being "just like you're in war" and akin to a "James Bond movies."

### 2. Murder of Bruce Jones, Captain of the M/V Captain Ufuk

As discussed above (*supra* at 11), in approximately August 2009, Philippines law enforcement raided the vessel Captain Ufuk and seized weapons that Leroux had purchased from PT Pindad using EUCs obtained from Mali and from the Philippines FED. The captain of the Captain Ufuk, Bruce Jones, was arrested in connection with the raid and Leroux paid bribes for his release. Joe Frank Zuñiga, a Philippines attorney, was hired to represent Jones. Jones became unpredictable, for example, giving interviews on Philippines television about the weapons deal, implicating Leroux as well as Philippines governmental and law enforcement officials. (*See* PSR ¶ 73).

David Smith began talking about having Jones killed, and also talked about having Zuñiga killed for taking money without controlling Jones' unpredictable behavior. In approximately 2010, Leroux negotiated with Zuñiga a payment for Jones' silence. Smith told Leroux to deliver 7 million Philippines pesos to "Razz" -- a prostitute, an employee Philippines organized crime figure John Nash, and Smith's girlfriend. The purported purpose of the payment was for to Zuñiga use to buy Jones' silence, but Leroux believed that there was a strong probability that this payment was actually for a contract murder. Leroux later got a call from Smith advising him that Jones would not be a problem anymore, and Leroux learned from the press that Jones had been shot in Angeles, a city north of Manila where Nash operated. As discussed below, Nash later claimed to have arranged for the 2011 murder of Zuñiga, for which Leroux paid. (*See* PSR ¶ 74).

### 3. Murder of Herbert Chu

In 2010, Leroux had become suspicious of David Smith's unexplained wealth. An ex-girlfriend of Smith's told Leroux that Smith had stolen Leroux's gold and was planning to kidnap and kill Leroux in order to take more money from him. Leroux decided to try to learn the whereabouts of the gold from Herbert Chu, a friend of Smith's who had stored the weapons saved from the Captain Ufuk raid. Leroux believed that Chu would have stored the stolen gold for Smith or would know where Smith had stored it. Leroux hired Marius Malherbe, a/k/a "Marcus," a South African contract killer, to help him interrogate and kill Chu. Employing a ruse, Leroux told Chu that they needed to move him to a safe house on an island in order to protect Chu from attention in connection with the Captain Ufuk raid. Leroux, Marcus, and Chu boarded a boat to get to the island and, during the trip, Leroux tasered Chu and Marcus threw Chu into the water. Leroux interrogated Chu about the whereabouts of the stolen gold, and Chu told Leroux that Chito, another of Smith's and Chu's friends, was helping Smith with the gold. Marcus then handcuffed Chu and, using a Colt .45 that Leroux had supplied from the RWB armory, shot and killed Chu. Marcus then weighted the body with the boat's anchor and sunk it. (*See* PSR ¶ 75).

### 4. Murder of David Smith

With Marcus having heard from Chu about the stolen gold, Leroux offered Marcus a 10% finder's fee if Marcus helped Leroux track the gold down. Marcus agreed. David Smith was the next target. (*See* PSR ¶ 76).

Again employing a ruse, Leroux told Smith that he had agreed to bury $2 million in cash on Leroux's Batangas property for a friend of Leroux's who needed the money temporarily hidden. Marcus and Smith drove out to the property with a locked safe loaded with weights approximating the weight of $2 million in cash. Leroux followed Marcus and Smith in a separate

car. Upon Leroux's arrival at the property, Marcus shot Smith with a 9mm that Leroux had supplied to him from the RWB armory. The shot was not fatal and the 9mm jammed; both Leroux and Marcus worked to clear the jam and Marcus was able to clear it. Marcus shot Smith approximately 5 or 6 times in the head, killing him. Leroux then shot Smith's body approximately 3 times with an MP5 that Leroux had brought. (*See* PSR ¶ 77).

Marcus wrapped Smith's corpse in a tarp and loaded it onto a boat that was docked at the Batangas property. Marcus and Leroux drove the boat out from shore and sank the corpse using an outboard motor from a dinghy. Leroux later instructed his employees to report the motor stolen because, if Smith's body were discovered, the serial number of the motor used to anchor the body would be traceable to him. (*See* PSR ¶ 78).

Smith's disappearance is known in the Philippines, but his body has not been found.

### 5. Murder of Chito

After Smith's murder, Leroux and Marcus targeted Chito. Marcus and Leroux met Chito, put him in a car, and drove with him to Batangas. Chito, perceiving the danger to himself, became afraid and told Leroux and Marcus about the stolen gold. According to Chito, Smith sold the gold through a broker who thought that Smith was giving sale orders on Leroux's behalf. Leroux and Marcus put Chito on a boat that was docked at the Batangas property and drove the boat away from shore. Leroux displayed a stun stick, intending to stun Chito and have Marcus throw Chito into the water for further interrogation. Chito, however, seeing the stun stick, leapt into the water and clung to the boat's hull, pleading for his life. A passenger ferry approached Leroux's boat, and Marcus shot Chito so that he would not be seen or heard by the ferry passengers. Marcus used a Colt .45 with a silencer, supplied by Leroux. Marcus tied the boat's anchor to Chito's body and sank it. (*See* PSR ¶ 79).

Leroux paid Marcus approximately $25,000 each for the Smith, Chu, and Chito murders, plus expenses. Marcus was also paid an additional approximately $25,000 representing 10% of the assets recovered from the DIO gold. (*See* PSR ¶ 80).

### 6. Violence Against Joseph

After Chito's murder, Marcus returned to South Africa for a couple of weeks before returning to the Philippines to continue to assist in Leroux's search for the gold. Leroux and Marcus interviewed many of Smith's associates, including his wife and mistresses; repossessed a house of Smith's that Leroux had paid for; and seized cars, clothing, jewelry, weapons, and other personal possessions. During this investigation, a man from southern Philippines named Joseph returned two empty Pelican cases to Smith's former house; Leroux recognized the cases as those in which the DIO gold had been stored. (*See* PSR ¶ 81).

Leroux asked an individual that Leroux calls "the Accountant" to investigate Joseph and his role in the stolen gold. (The Accountant is discussed in more detail below.) The Accountant caused Joseph's truck to be firebombed, and Joseph disappeared. Joseph later returned. Leroux asked the Accountant to stop looking into Joseph, and asked John Nash to look into him instead. Nash proposed kidnapping Joseph, but Leroux ultimately decided that enough time, energy, and resources had been spent unsuccessfully searching for the remnants of the stolen gold and that it was no longer worthwhile to pursue Joseph. (*See* PSR ¶ 82).

### 7. Murders of Naomi Edillor and Catherine Lee

In early 2011, Leroux promoted Hunter to take Smith's place as the head of the mercenary teams. Hunter later explained on the Thailand Video that he was "promoted" to take Smith's position after Smith "got killed for stealing money." Hunter recruited Chris DeMeer, a former Leroux mercenary, and Timothy Vamvakias in early 2011. Hunter told DeMeer and

Vamvakias that Leroux had a "list" of people to kill, and that Hunter would be the new manager of the kill teams. (*See* PSR ¶ 83).

Between 2011 and 2012, Hunter managed the deployment of mercenary teams on Leroux's behalf, including to perform murders-for-hire. In February and March 2011, while Hunter was recruiting new members of the kill team and mercenary team, he traveled home to the United States. Hunter returned to the Philippines in March 2011. One of the people that Hunter had killed at Leroux's direction was Noemi Edillor. (*See* PSR ¶ 84).

After Leroux learned about Smith's theft of the DIO gold, Leroux was suspicious of everyone who worked for him and began looking for other occasions when people may have stolen from him. Leroux found another example in the case of Nestor del Rosario, Naomi Edillor, and Catherine Lee. (*See* PSR ¶ 85).

Del Rosario worked for Leroux for several years as one of the managers of RWB and of the online pharmacy business. For example, del Rosario was the leader of the teams that traveled to Tehran to meet with the DIO in connection with RWB's interest in buying DIO-supplied weapons and Leroux's interest in supplying the DIO with military technologies. In approximately 2010 or 2011, del Rosario's subordinate (and later his successor), Rogelio Palmer, a/k/a "Ogie," told Leroux that del Rosario's girlfriend, Janice, had information about del Rosario's thefts. Leroux and his girlfriend met with Janice, who described del Rosario having embezzling substantial amounts of money from Leroux by padding prices on company purchases, from real estate to office supplies. Naomi Edillor was a purchasing manager working with del Rosario, and Catherine Lee was a real estate broker involved in real estate transactions where inflated prices were alleged to be used to embezzle from Leroux. Leroux believes del Rosario stole between approximately $2 million and $4 million. (*See* PSR ¶ 86).

During a later phone call with del Rosario, Leroux told del Rosario in substance that if del Rosario had stolen from Leroux he was a dead man. After this conversation, Leroux lost contact with del Rosario. Edillor also left Leroux's company. (*See* PSR ¶ 87).

Leroux met with Hunter and told him to surveil Edillor and Lee, to get information from them about the money del Rosario stole, and then to kill them. Leroux believed Edillor and Lee also profited from del Rosario's embezzlement, at Leroux's expense. The Edillor murder was executed in June 2011 by Chris DeMeer and another man known as "Daddy Mac." Leroux met with "Daddy Mac" and DeMeer prior to the murder. (*See* PSR ¶ 88).

Hunter later advised Leroux that Edillor had been killed outside her home, but Hunter's men did not obtain any information about del Rosario or money stolen from Leroux. After Edillor was murdered, Hunter sent a news article about Edillor's murder to Leroux, and wrote: "There is your fucking proof. Have my guys money tomorrow!!!!" Leroux then paid Hunter, DeMeer, and Daddy Mac for Edillor's murder. In August 2011, however, Hunter informed Leroux via email that both DeMeer and Mac Daddy were "quitting." (*See* PSR ¶ 89).

In September 2011, Hunter recruited Samia and Carl David Stillwell to be the new kill team. On September 30, 2011, Hunter e-mailed Leroux to confirm that Samia would travel to Brazil to meet with Leroux. Hunter told Leroux that Samia had agreed to be a member of the new kill team at this time, and would travel to Brazil to meet with Leroux to discuss the upcoming murders. In early October 2011, Hunter also told Vamvakias that Samia had been assigned a "bonus job," meaning murder, with a partner. (*See* PSR ¶ 90).

Samia and Stillwell arrived in the Philippines on January 10, 2012, and January 11, 2012, respectively, and participated in efforts to murder four people during the trip: Catherine Lee, Dazl Silverio, Fitch Penalosa, and Manuel Jalos. Documents relating to the defendants' targeting

of each of these individuals were found on electronic devices later seized by the DEA from Samia's home and Stillwell's home in North Carolina. (*See* PSR ¶ 91).

The first target Leroux provided to Hunter, Samia, and Stillwell was Dazl Silvero. Just days after Samia and Stillwell arrived in the Philippines, Hunter wrote to Leroux: "Need another person. The one you gave me is going to take along time. She has four addresses, one of which is an island 200 miles from here ....... Need someone we can find now, and get it done right away." Leroux then provided a second target: Catherine Lee. (*See* PSR ¶ 92).

On January 17, 2012, Hunter asked Leroux for a "picture of this subject," meaning Catherine Lee. On February 6, 2012, Hunter again asked Leroux for a murder target:

> We are checking on the firsts [sic] subject you gave but they have
> not been seen and one of the addresses is empty now and for sale.
> We need a new subject with a photo, address and car plates. If the
> guys don't have a good photo, everything is put at risk because they
> have to inquire and find out about the subject and that makes people
> suspicious. All of these areas are gated, and as soon as the guys park
> to pull surveillance, within a few minutes the roving patrol comes
> by and asked them what they are doing. These guys already draw
> attention, and them sitting somewhere draws even more.

(*See* PSR ¶ 93).

Leroux later provided Hunter, Samia, and Stillwell with target packages for Penalosa and Jalos. In the meantime, Samia and Stillwell conducted surveillance to prepare to murder Catherine Lee. Lee worked in the area of Las Piñas in Manilla metropolitan area. A digital camera seized from the Samia's residence on the day of his arrest contained surveillance photographs of a business where Lee worked, which were taken in late-January 2012. (*See* PSR ¶ 94).

On January 23, 2012, Samia sent an email to Hunter requesting "OP funds" to facilitate preparations for the murder. In a separate email, Hunter requested weapons from Leroux, including a "Rifle Silenced with optics" and a ".22 or 380 Pistol" with a silencer. Hunter later

confirmed that he had received the weapons, requested a "bigger caliber rifle to go along with the small caliber one I received today," and indicated that "Sal" and "JT"—code names for Samia and Stillwell, respectively—would be owed $35,000 if they completed the murder ("Mission Success"). (*See* PSR ¶ 95).

On February 4, 2012, Hunter emailed Leroux to request funds to purchase and modify a computer bag in order to conceal a weapon, and to pay for travel to "this las pinas place" where Lee was located. At the same time, Samia and Stillwell used the cover of posing as potential real estate purchasers in order to establish contact with Lee. (*See* PSR ¶ 96).

On February 12, 2012, Lee met with Samia and Stillwell to show them several real estate properties. Later that day, as Stillwell drove the Toyota Innova van, Samia shot Lee twice in the face using a .22 caliber pistol with a silencer. The two men dumped her body on a pile of garbage. Lee's body was found the following morning, on February 13, 2012. An autopsy examination subsequently determined that Lee died as a result of the gunshot wounds to her face: one gunshot wound under each eye. (*See* PSR ¶ 97).

A cellphone seized from Stillwell on the day of his arrest contained photographs bearing a "Date Modified" of February 12, 2012—*i.e.*, the day that Lee was murdered—that appear to depict, among other things, the Toyota Innova van in which Lee was murdered, and Catherine Lee's head covered in blood. (*See* PSR ¶ 98).

The following day, Hunter informed Leroux that Samia and Stillwell "plan on doing one more"—meaning one more murder—before they returned home to the United States, and came back to the Philippines to commit more murders. On February 14, 2012, Samia sent Hunter an "expense report." Also on February 14, 2012, two days after murdering Lee, Samia wrote in a

Facebook message to another individual that it was "easier to put down a person than a dog." (*See* PSR ¶ 99).

Shortly after Lee's murder, Leroux gave Hunter $35,000 each for Samia and Stillwell in exchange for the murder of Catherine Lee, which Hunter provided to Samia and Stillwell. Between February and March 2012, Samia and Stillwell sent part of the proceeds of the crime back to the United States via structured funds transfers using Western Union to trusted friends and family. (*See* PSR ¶ 100).

### 8. Murder of Joe Frank Zuñiga

Prior to David Smith's murder, Smith told Leroux about a number of contracts he had put out on various individuals, which Leroux understood to be a reference to bounties that would be paid for those individuals' murders. At least some of these contracts had been placed with John Nash. After Smith's murder, Nash asked Leroux if any of the bounties were still open. Leroux told Nash that they were all closed except for one: Joe Frank Zuñiga, Bruce Jones' lawyer. Later, Nash advised Leroux that Zuñiga had been killed, and showed Leroux a picture on Nash's cell phone of an unidentifiable body covered in plastic. Nash advised that the body had been gotten rid of. Nash owed Leroux at that time, and Leroux agreed to deduct the amount of the bounty from Nash's debt. (*See* PSR ¶ 101).

Prior to Nash's claim of killing Zuñiga, Leroux hired a South African called "Pierre" for the Zuñiga murder. Pierre claimed to have shot Zuñiga and his maid, but Leroux did not believe him and Pierre eventually admitted that he hadn't carried out the job. Pierre was also hired to detonate Joseph's car, in order to scare Joseph to flee his hometown (which was near a law enforcement base). Pierre claimed to have done so, but again later admitted that he hadn't. (*See* PSR ¶ 102).

Zuñiga's disappearance is known in the Philippines, but his body has not been found.

33

### 9.     Other assaults, arsons, and violent acts

Leroux and his employees or associates have been involved in several other, non-fatal, acts of violence at Leroux's direction.

In approximately 2008, a real estate broker owed Leroux some money from a condominium transaction. Leroux asked Smith to collect that money, and Smith had surveillance conducted on the broker. Later, Smith told Leroux that he had thrown a grenade at the broker's house. Apparently no one was injured, and Leroux told Smith to stand down. (*See* PSR ¶ 105).

In approximately 2008 or 2009, Smith went to South Africa with Hunter and DeMeer to deal with Steve and Andrew Hahn, two brothers with whom Leroux had entered into a gold buying venture. Leroux had given money to the Hahns to buy gold in Africa, which Leroux intended to export and resell. The Hahns had been introduced to Leroux by his South African cousins, Matthew and Gary Smith, as individuals knowledgeable about the African gold markets. Leroux learned that the Hahn brothers had stolen a large portion of Leroux's money, and instructed David Smith to find out what was going on. Smith, Hunter, and DeMeer conducted surveillance on the Hahns, and Hunter shot Steve Hahn in the hand. (*See* PSR ¶ 106).

The Hahns came to the Philippines to meet with Leroux and try to avoid further retribution. They advised Leroux that they had given most of the stolen money to Leroux's cousins, the Smiths. Leroux and David Smith arranged for Andrew Hahn to be arrested by planting approximately 5 grams of cocaine in his bag. Steven Hahn showed Leroux evidence that Leroux's cousins had received most of the money, sufficient to satisfy Leroux that the Hahns did not have the money. Andrew Hahn was eventually released from prison and the charges dismissed, but it took approximately two to two-and-a-half years. (*See* PSR ¶ 107).

Leroux dispatched David Smith and Hunter back to South Africa to deal with his cousins. David Smith firebombed Matthew Smith's house, though apparently no one was injured. Leroux

considered putting out a contract to murder the Smiths or to have them beaten, and sought prices for hired killers from a Zimbabwean associate. Smith told Leroux that he could assemble a team of ex-U.S. Special Forces personnel to carry out murders. Ultimately Leroux concluded that it would be too expensive to have his cousins murdered or beaten and furthermore was reluctant to have family members murdered or beaten. (*See* PSR ¶ 108).

In approximately 2009, Leroux learned that an employee in the online pharmacy business named Moran Oz had stolen from his company. Leroux told David Smith to deal with the situation. Smith, along with Hunter and Demeer, took Oz out on one of Leroux's yachts. At sea, Smith threw Oz into the water and fired a gun into the water around Oz. Smith then pulled Oz back into the yacht and told him not to steal again. Leroux did not know in advance exactly how Smith planned to deal with Oz and, upon learning of the incident, believed that Smith's actions were excessive, but Leroux understood in advance that Smith was likely to employ some form of violence or intimidation. (*See* PSR ¶ 109).

In approximately 2011, Leroux retained Marcus to conduct surveillance on Menchu, a Filipino lawyer. When the Captain Ufuk was seized, a yacht and two rubber boats were also seized. Menchu was given 20 million pesos to recover the boats (likely through paying bribes). The yacht was released but the other two boats were not. David Smith argued that Menchu fell short because he had stolen most of the money, and claimed that he had put a bounty on Menchu. After Smith's murder, Leroux gave the Menchu job to Marcus, who conducted surveillance. Leroux cancelled the job, however, concluding that Smith probably had not given all 20 million pesos to Menchu and had stolen some of the money himself. Leroux also hired Marcus to kill Matthew and Gary Smith, but called the job off after Marcus conducted some surveillance. (*See* PSR ¶ 110).

35

**10.** **Delivery of Protection Money, Explosives, and Sensitive Information to Suspected NPA Member**

In approximately 2010, Leroux embarked on constructing a submarine dock in Batangas (as described above, *supra* at 16). Leroux asked the Dragnet Man to direct him to someone who could provide security and protection in Batangas. The Dragnet Man gave Leroux contact information for an individual that Leroux later came to call the Accountant. Leroux sent an employee to meet with the Accountant to discuss how the Accountant could help protect the submarine dock project and the cost. Leroux learned that the Accountant had several dozen men that appeared to be in his employ or under his command. Leroux arranged for 1.2 million pesos (approximately $290,000) to be delivered to the Accountant and, in exchange, the submarine project was, for a time, free from regulatory or other types of interference. (*See* PSR ¶ 111).

During this time, Leroux also sold the Accountant law enforcement files that Leroux had obtained from the Dragnet Man, including files on Australian AFP and U.S. law enforcement personnel and records from the Philippines National Intelligence Coordinating Agency ("NICA") about counter-terrorism activities in Mindanao. (*See* PSR ¶ 112).

The Accountant later asked if Leroux could supply him with explosives, blasting caps, igniters, and cell phone detonators. Leroux had Lontoc provide the Accountant with C4 from the RWB armory, but Lontoc could not provide cell phone detonators. Leroux built two or three detonators himself for the Accountant. Sometime later, a major bridge in the area was bombed, and the Accountant told Leroux that the bombing was a message to Leroux that he needed to pay more for protection. Leroux negotiated a payment of 50,000 pesos per month (approximately $1,150), which Leroux paid for approximately a year. (*See* PSR ¶ 113).

Leroux inferred that the Accountant had used the cell phone detonators for the bridge bombing and further inferred that the Accountant was likely a member of or associated with the

New People's Army, a communist separatist group in Batangas that is a designated Foreign Terrorist Organization ("FTO"). Leroux made the NPA association because the bridge bombing was consistent in both modus operandi and audacity with the NPA's activities. The NPA is also active in Batangas. Leroux later learned from one of his employees that one of the Accountant's employees said that the Accountant conducted contract bombings. The Accountant himself later told Leroux that the Accountant caused the bombing of a Philex Mining Corp. office building. Thus, Leroux lacked knowledge at the time he supplied the detonators that the recipient was a member of an FTO or an organization engaged in terrorism, though he understood the likelihood that the detonators could be used for acts of violence. (*See* PSR ¶ 114).

### III. The Information and Guilty Plea

On February 14, 2014, Leroux waived indictment and consented to the filing of an information, S2 12 Cr. 289 (RA) (the "Information"). Leroux also consented to the filing of an information filed in the District of Minnesota, which was transferred to this District pursuant to Rule 20, 14 Cr. 75 (RA) (the "Second Information").[8] Leroux pleaded guilty to the charges in both informations before the Honorable Robert P. Patterson, United States District Judge, pursuant to a cooperation plea agreement.

Count One of the Information charges Leroux with his participation in a conspiracy to distribute 500 grams and more a mixture and substance containing a detectable amount of methamphetamine, knowing and intending that it would be imported to the United States, and to

---

[8] As discussed above, Leroux was arrested in connection with an investigation conducted by the DEA's Special Operations Division and the U.S. Attorney's Office. Leroux and several of his associates were also the subject of an independent diversion investigation being conducted by the DEA's Minneapolis Division Office and the Consumer Protection Branch of the Department of Justice, relating to Rx Limited. At the time of his arrest, Leroux had not yet been charged in connection with this investigation.

import 500 grams and more of a mixture and substance containing a detectable amount of methamphetamine into the United States, from at least in or about April 2012 through in or about September 2012, in violation of Title 21, United States Code, Section 963. This Count is based on Leroux's participation in the narcotics conspiracy that was the subject of the DEA's proactive undercover investigation (*see supra* at 18-19; PSR ¶ 56), and corresponds to the offense charged in the underlying Indictment on which Leroux was arrested.

Count Two of the Information charges Leroux with the unlicensed exportation of goods and technology from the United States to a person in a third country with knowledge that goods and technology were intended for use in the production of or for incorporation into technology and services to be supplied to the Government of Iran, from in or about 2009 through September 2012, in violation of the International Emergency Economic Powers Act ("IEEPA"), Title 50, United States Code, Section 1705; and the Iran Transactions and Sanctions Regulations ("ITSR"), Title 31, Code of Federal Regulations, Sections 560.203 and 560.204. This Count is based on Leroux's development of technology for the Iranian military (*see supra* at 11-15; PSR ¶¶ 39 & 41-47), which Leroux accomplished in part by acquiring technological components from the United States for use in building and testing designs for Iran. Count Two further alleges that the murders of Smith (*supra* at 25-26; PSR ¶¶ 76-78); Chu (*supra* at 25; PSR ¶ 75); Chito (*supra* at 26-27; PSR ¶¶ 79-80); Edillor (*supra* at 28-29; PSR ¶¶ 88-89); and Lee (*supra* at 30-32; PSR ¶¶ 88 & 90-100)—all part of Leroux's efforts to obtain or regain proceeds paid by the Government of Iran for the military designs— as well as Leroux's involvement in the solicitation of the murders of Jones (*supra* at 24; PSR ¶¶ 73-74) and Zuñiga (*supra* at 32; PSR ¶¶ 101-03), were overt acts taken in furtherance of the IEEPA conspiracy.

At the time of Leroux's arrest, the investigation by the DEA's Special Operations Division had gathered evidence of Leroux's potential involvement in the murders of Jones, Smith, Edillor, and Lee (among other things) and that aspect of the investigation was ongoing; the evidence, however, was not yet sufficient to support bringing charges against Leroux relating to those crimes. Law enforcement also was aware of some of Leroux's procurement activity involving U.S. technological components, Leroux's involvement in supplying military technology to Iran and his involvement in the murders of Chu and Chito, and the solicitation of the murder of Zuñiga, was not known by law enforcement until Leroux's post-arrest admissions. Similarly, the relationship between the murders and the Iran business was not known to law enforcement until Leroux's post-arrest admissions.

Count Three of the Information charges Leroux with participation in a conspiracy to commit computer hacking, from in or about 2008 through in or about 2011, violation of Title 18, United States Code, Sections 1030(a)(2) and (b). This Count is based on Leroux's involvement in obtaining customer lists from U.S. servers by means of computer hacking. (*See supra* at 6). Leroux's involvement in this offense was not known to law enforcement until Leroux's post-arrest admissions.

Count Four of the Information charges Leroux with assisting an offender, knowing that an offense against the United States had been committed, in order to hinder or prevent the offender's apprehension, trial or punishment, in or about 2008, violation of Title 18, United States Code, Section 3. This Count is based on Leroux's delivery of money for the purpose of bribing a foreign government official to frustrate the extradition of Alexander to face charges filed in the Eastern District of New York. (*See supra* at 22). Leroux's involvement in this offense was not known to law enforcement until Leroux's post-arrest admissions.

Count One of the Second Information charges Leroux with participating in a conspiracy to introduce misbranded drugs and to deliver for introduction into interstate commerce misbranded drugs with intent to defraud and mislead, from in or about 2004 through in or about September 2012, in violation of Title 18, United States Code, Section 371. This Count is based on Leroux's operation of Rx Limited. (*See supra* at 3-10; PSR ¶¶ 16-34). At the time of Leroux's arrest, the investigations by the DEA Minneapolis Division Office and by the Special Operations Division had gathered evidence of Leroux's involvement in these illicit online pharmaceuticals distribution businesses, but charges against Leroux had not yet been filed. In the course of his post-arrest admissions, Leroux provided significant additional information regarding these offenses, as well as access to electronic records of the businesses.

Count Two of the Second Information charges Leroux with participating in a conspiracy to commit mail and wire fraud, from in or about 2004 through in or about September 2012, violation of Title 18, United States Code, Section 1349, based on numerous fraudulent representations made in the course of the operations of the Rx Limited business.

Count Three of the Second Information charges Leroux with participating in a conspiracy to launder money, from in or about 2004 through in or about September 2012, violation of Title 18, United States Code, Section 1956(h). This Count, too, is based on Leroux's conduct of the Atlas Pharmacy and Rx Limited businesses, which involved numerous international transfers of funds from outside the United States to inside the United States to promote the mail and wire fraud offenses charged as part of Count Two of the Second Information.

In addition to Leroux's pleas of guilty to the charges in the Information and the Second Information, pursuant to the plea agreement the parties agree that the other criminal conduct described in the PSR and in this memorandum—which cannot be charged because Leroux's

efforts did not develop to the point of a criminal offense or because federal criminal jurisdiction is lacking—is relevant conduct for purpose of sentencing, including his discussions in or about 2012 about possessing with intent to distribute carisoprodol, a controlled substance; his participation in a conspiracy to possess with intent to distribute cocaine and methamphetamine in the Philippines, Hong Kong, Thailand, Peru, and Ecuador from in or about 2010 through 2012; his participation, as independent substantive crimes, in the murders-for-hire of Jones, Chu, Smith, Chito, Edillor, Lee, and Zuñiga; his participation in a conspiracy to commit assault and arson against Oz, the Hahns, Gary and Matthew Smith, and "Joseph;" his participation in the bribery of foreign government officials in the Philippines, China, Laos, Africa, and Brazil; his discussions in or about 2012 about acquiring surface-to-air missiles; and his conspiring to distribute prescription medications controlled by State law without a valid prescription. Leroux described all of this conduct in his post-arrest admissions. At the time of his arrest, the investigations against him had developed evidence of some, but not all, of these offenses.

## IV.    The Defendant's Substantial Assistance

As described above, the defendant was arrested in connection with an investigation conducted by the DEA's Special Operations Division and the U.S. Attorney's Office of his international drug and weapons trafficking activity. Specifically, as part of a proactive investigation, DEA confidential sources posed as drug traffickers and negotiated with Leroux to sell Leroux cocaine and to buy from Leroux methamphetamine and methamphetamine laboratories and supplies, for importation into the United States; Leroux and the confidential sources also discussed potential weapons deals. As part of that investigation, Leroux travelled to Monrovia, Liberia in September 2012 expecting to meet with the confidential sources to finalize the details of their narcotics agreement. Leroux was arrested by Liberian law enforcement and expelled to the custody of the DEA. (*See supra* at 19; PSR ¶¶ 56, 115).

Leroux initially attempted to resist his arrest in Liberia, refused to comply with efforts to restrain and move him, and attempted to offer a bribe to Liberian law enforcement for his release. After those efforts proved unsuccessful and Leroux was placed on an airplane for transportation to this District, however, Leroux expressed an interest in cooperating with law enforcement, waived his *Miranda* rights, and gave a post-arrest interview. Upon his arrival in the District, Leroux was appointed counsel, waived presentment and arraignment, met with agents and prosecutors, and began engaging in recorded communications with his criminal associates under the supervision of law enforcement. The indictment and the fact of Leroux's arrest remained sealed in order to preserve the appearance that Leroux was at liberty and continuing to engage in criminal conduct.

For the next several months, Leroux met regularly with agents and prosecutors, often as much as three or four times a week for several hours a day. In the course of these meetings, Leroux participated in proffers regarding his criminal past, and also continued engaging in recorded communications with his associates under the supervision of the DEA. Counsel was present for all proffers regarding Leroux's prior conduct. For purposes of engaging in communications with associates, Leroux waived the presence of counsel. As discussed above, at the time of Leroux's arrest in connection with his participation in a conspiracy to import methamphetamine, law enforcement had gathered evidence of his involvement in additional offenses and was continuing to investigate those crimes; in the course of his proffers Leroux both disclosed additional crimes about which law enforcement was not yet aware, and provided significant additional information regarding offenses about which law enforcement was aware. Leroux also provided access to electronic records stored on foreign servers controlled by him,

which contained records relating to his operation of Rx Limited as well as email communications with Hunter and other associates.

In his proffers, Leroux initially withheld his participation in murders and violence. (*See, e.g.*, Tr. 521-22). By the end of October 2012, Leroux admitted his participation in the murders of Jones, Smith, Chu, Chito, Zuñiga, Edillor, and Lee, and provided detailed and corroborated information, as well as electronic records, related to those those offenses that assisted in the prosecution of other individuals. In approximately 2015, Leroux withheld information about his involvement in soliciting Lee's murder and made false statements about his purpose for directing Hunter to hire Samia and Stillwell for murders-for-hire, before providing truthful information regarding the full scope of the offense. The Government assesses that the information that Leroux ultimately provided was truthful and complete to the best of his recollection, heavily corroborated by information provide by other individuals and by records, and significantly assisted the Government in the investigation and prosecution of other individuals, as described below.

The information provided by Leroux was voluminous, detailed, and heavily corroborated, both by evidence that Leroux was aware of and by evidence that Leroux was not aware of or that was later obtained. For example, in approximately early 2012, LeRoux was in Brazil and, while there, his telephone communications were intercepted by Brazilian law enforcement pursuant to court order. During intercepted phone calls and text messages, Leroux communicated with Shai Reuven, Shackels, Vaclavik, and others; and discussed methamphetamine production for the DEA confidential sources, the North Korean-produced methamphetamine Leroux had previously procured, and the Peruvian and Ecuadoran cocaine transactions. As discussed above, shortly

after Leroux's arrest, a vessel carrying Leroux's Peruvian cocaine to the Philippines ran aground in on the Pacific island of Tonga.

As another example, in approximately 2011, Hong Kong authorities seized several hundred kilograms of gold belonging to companies established by Leroux[9] and arrested several of Leroux's associates. Among the evidence that Hong Kong authorities seized in connection with the arrests were notes of one employee who had recently visited South America looking for cocaine suppliers, and documents regarding chemicals and an airplane engine that LeRoux bought for his Iran missile development project. Leroux also provided FTP access to the server used to store materials related to military research projects for Iran, and law enforcement agents downloaded the files. In addition, following his arrest, Leroux instructed one of his employees to call the DIO with a view to arranging a meeting for the purpose of exploring the DIO's ability to supply weapons and their interest in buying technologies or commodities that Leroux might offer as part of a proactive investigation. After this employee called the DIO, Leroux's FTP server registered access from an IP address inside Iran.[10]

As another example, with Leroux's assistance, law enforcement was able to seize approximately 30 kilograms of methamphetamine in Thailand and the Philippines, amounts remaining from his 48-kilogram purchase in 2010. Leroux was also able to direct law enforcement to other physical evidence, including the van used by Samia and Stillwell in the murder of Lee in the Philippines.

---

[9] At the direction of the Government, Leroux withdrew his efforts to contest the seizure of this gold. According to Leroux, the value of the gold and bank accounts seized by Hong Kong authorities totaled approximately $14 million.

[10] Despite Leroux's efforts to engage in communications with the DIO, the investigation of individuals responsible for circumventing sanctions for military purposes was unable to progress. Leroux's prior point of contact in the DIO had been replaced with a new individual and the DIO did not respond to efforts to reestablish contact.

In addition to historical information and records, Leroux also engaged in communications with various associates in furtherance of ongoing investigations. This assistance ultimately led to the dismantling of Leroux's enterprise and the arrests of over a dozen of his criminal associates. Within a matter of a few weeks following his arrest, at the direction and under the supervision of law enforcement, Leroux arranged to shut down Rx Limited, reducing his employees from at least approximately 600 individuals in Israel and the Philippines to a handful of staff and ending the unlawful distribution of prescription medications. Also at the Government's direction, Leroux did not contest the freezing or seizure of business assets located overseas, including the gold seized in Hong Kong. Most significantly, Leroux arranged for the introduction of DEA confidential sources to his criminal associates.

### A. Joseph Hunter, Timothy Vamvakias, Dennis Gogel, Slowamir Soborski, and Michael Filter

Leroux arranged the introduction of DEA confidential sources to his head of security and kill team organizer, Joseph Hunter, in January 2013, describing the sources as South American drug-trafficking partners of Leroux's, involved in the importation of cocaine into the United States. Hunter had been a member of Leroux's mercenary team since approximately 2008, and since Smith's murder had been the head of Leroux's security operations and oversaw the teams that committed the murders of Edillor and Lee. Over the course of the following nine months, Hunter recruited a team of former military to act as mercenaries for the CSes' purported drug cartel—Vamvakias, a former U.S. Army officer; Gogel and Filer, former members of the German military; and Soborski, a former member of the Polish military and counterterrorism officer. Led by Hunter, the team engaged in various operations for the purported cartel, including the surveillance in March 2013 of one of Leroux's boats docked in Thailand, which was represented to be used for the transportation of narcotics; providing counter-surveillance and

security in April 2013 for meetings between the confidential sources and drug trafficking targets in Mauritius, Africa; the surveillance in June 2013 of an airplane departure from the Bahamas to the United States purportedly loaded with several hundred kilograms of the cartel's cocaine; and a conspiracy to commit the murders-for-hire of a purported DEA special agent and confidential source in Africa in September 2013. The defendants ultimately were charged with narcotics offenses and, with respect to Hunter, Vamvakias, and Gogel, participation in a conspiracy to murder a DEA agent and informant. *See generally United States v. Hunter et al.*, S7 13 Cr. 521 (RA), Dkt. Entry No. 23 (S.D.N.Y. Sep. 30, 2013) (seventh superseding indictment).[11]

In addition to introducing the DEA confidential sources to Hunter and his mercenary team, Leroux substantially assisted this undercover investigation in a number of other ways. First, Leroux maintained regular contact with Hunter by phone and electronic communication (recorded and preserved), under the supervision of the DEA. Second, Leroux gave consent for DEA agents to assume his identity in electronic communications, so that agents could communicate with Hunter and others posing as Leroux. Third, Leroux provided access to his properties and assets in the Philippines and Thailand for use in furtherance of the investigation. For example, Hunter, Gogel, Soborski, and Filter stayed at a property owned by Leroux (through a nominee) in Thailand in early 2013, and Leroux consented to the installation of recording equipment by Thai law enforcement. Leroux's boat, the "Captain Fog," was the subject of the defendant's surveillance in March 2013.[12] Leroux also used funds generated by his online

---

[11] The investigation also targeted other members of the mercenary crew, such as Chris DeMeer, and Leroux's hitman Malherbe. Those individuals, however, were unwilling or unable to accept work purportedly on Leroux's behalf.

[12] In connection with a separate investigation being conducted by the DEA Special Operations Division, defendants in South America and Africa were charged with narcotics trafficking and narcoterrorism offenses arising out of their agreement to assist in the distribution of cocaine purportedly owned by the *Fuerzas Armadas Revolucionarias de Colombia* (FARC) through

pharmacy business to pay salaries and expenses for the team, totaling approximately $500,000 over the course of the year-long undercover investigation.

The five defendants were arrested on September 27, 2013, as part of a coordinated takedown along with five additional defendants, as discussed below. Hunter was arrested in Thailand, Vamvakias and Gogel were arrested in Kenya, and Soborski and Filter were arrested in Estonia. Following their extraditions or expulsions to the United States for prosecution, each of the five defendants pleaded guilty to the offenses with which they were charged.

### B.     Ye Tiong Tan Lim, Kelly Peralta, Phillip Shackels, Stammers, and Adrian Valkovic

Leroux also introduced DEA confidential sources to his narcotics partners, in particular, Tan Lim, Kelly, and Stammers. Tan Lim, a Philippines-based representative of a Triad organized crime group operating in Hong Kong, brokered Leroux's purchase in 2010 of approximately 48 kilograms of virtually pure methamphetamine that Tan Lim's organization procured from North Korea. Kelly was Tan Lim's associate and also involved in the methamphetamine deal, and Stammers and Shackels were also involved in Leroux's drug efforts. By January 2013, the CSes were introduced to Tan Lim, Kelly, and Stammers, and Shackels; Valkovic was later recruited by the crew. The DEA sources purported that their South American cartel had already sold some of the 48 kilograms of North Korean methamphetamine in the United States, and wanted to buy significant additional quantities for the same market. The DEA confidential sources also described their cartel's interest in procuring weapons, which the defendants—in particular,

––––––––––––––––––––

Guinea Bissau, including providing military support and supplying weapons for the FARC. *See United States v. Mane et ano*, S7 12 Cr. 839 (JSR), Dkt. Entry No. 16 (S.D.N.Y. April 5, 2013) (superseding indictment). Leroux provided a vessel for use by law enforcement agents in connection with a ruse meeting with defendants in 2013, for arrest and prosecution in the United States. During the meeting, rough weather caused damage to the vessel, rendering it unsalvageable.

Stammers—worked to fulfill. Over the course of the following nine months, all five defendants assisted the CSes' efforts to obtain significant quantities of methamphetamine, resulting in the defendant's agreement to sell, transport, and provide security for 100 kilograms of methamphetamine for $60,000 per kilogram, or $6 million. The defendants participated in several meetings held in Thailand in January, March, May, and August 2013; delivered several samples of methamphetamine to the confidential sources for testing; and conducted a "dry run" shipment of innocuous goods (several thousand kilograms of tea) from the Philippines to Thailand to test their delivery network. The defendants ultimately were charged with conspiring to import methamphetamine to the United States. *See generally United States v. Stammers et al.*, S8 13 Cr. 579 (ALC), Dkt. Entry No. 17 (S.D.N.Y. Nov. 20, 2013) (eighth superseding indictment).[13]

As with the investigation of Hunter, Vamvakias, Gogel, Soborski, and Filter, Leroux provided additional substantial assistance in the investigation of Tan Lim, Kelly, Stammers, Shackels, and Valkovic beyond the introduction of the confidential sources. Leroux maintained regular contact with the defendants by phone and electronic communication (recorded and preserved), under the supervision of the DEA and gave consent for DEA agents to assume his identity in electronic communications, so that agents could communicate posing as Leroux. Leroux also used funds generated by his online pharmacy business to pay expenses for the defendants' efforts on his and the confidential sources' behalf, such as travel.

The five defendants were arrested in Thailand on September 27, 2013, as part of a coordinated takedown along with the arrests of Hunter, Vamvakias, Gogel, Soborski, and Filter.

---

[13] The investigation also targeted other individuals involved in international narcotics trafficking and weapons trafficking, as well as North Korean manufacturers of methamphetamine and military equipment; but with respect to whom the investigation did not result in charges.

The same-day arrests of ten defendants on three continents represented one of the most logistically complex takedowns the DEA has ever conducted, and Leroux's assistance facilitated the successful execution of the arrest plan. Following their extraditions, all five defendants pleaded guilty to the offenses with which they were charged.

### C.    Joseph Hunter, Adam Samia and Carl David Stillwell.

The charges against Hunter, Vamvakias, Gogel, Soborski, and Filter were based on their participation in s murder-for-hire sting conducted after Leroux's arrest. Leroux's assistance, however, also led to the arrests and prosecution of Hunter, Samia, and Stillwell for their participation in the murder of Catherine Lee in the Philippines in 2012. Leroux provided historical information about the murder and the involvement of the participants, electronic records and communications regarding the murder, and information that led to the discovery of physical evidence in the Philippines, including the location of the van used by the hitmen, Samia and Stillwell, to commit the murder. Information provided by Leroux was also used, along with other evidence, in applications in support of warrants to search email and social media accounts used by Samia and Stillwell and to conduct searches of their residences in Person County, North Carolina, along with electronic devices recovered in those searches. In the course of the 2013 undercover investigation, Hunter also made statements, captured on video recording, about Lee's murder and his involvement.

Samia and Stillwell were charged with conspiring to commit murder and to commit murder-for-hire, conspiring to launder money, and firearms offenses for their participation in Lee's murder in an indictment filed in July 2015. *United States v. Samia and Stillwell*, S8 13 Cr. 521 (RA), Dkt. Entry No. 166 (S.D.N.Y. Jul. 14, 2015) (eighth superseding indictment). Hunter was charged for his participation in the murder in October 2017. *United States v. Hunter et al.*,

S10 13 Cr. 521 (RA), Dkt. Entry No. 446 (S.D.N.Y. Oct. 16, 2017) (tenth superseding indictment).

Hunter, Samia, and Stillwell all proceeded to trial on the charges in the tenth superseding indictment. Trial began on April 2, 2018 and ended with the return of a verdict of guilty on all counts on April 18, 2018. During trial, Leroux testified over the course of three trial days, including approximately a full day on cross-examination by three separate defense attorneys. Leroux testified truthfully.

### D.     Lachlan McConnell, Alon Berkman, Moran Oz, Omer Bezalel

In early 2014, Leroux assisted DEA Minneapolis and the Consumer Protection Branch in attempting the lures of his former associates in the Rx Limited business, who were charged in the District of Minnesota, for arrest and extradition or expulsion. Lachlan McConnell, who had served on Leroux's mercenary team in approximately 2008 through 2010, assisted with recruiting pharmacies in the United States to work with Rx Limited, as well as pharmaceuticals shipping operations in the United States, including establishing corporations, bank accounts, credit cards, and shipping accounts. Alon Berkman and Moran Oz were senior managers of Rx Limited in Israel, involved in managing Rx Limited's infrastructure, shipping logistics, physician and pharmacy relations, and merchant processing and banking operations. Omer Bezalel supported Rx Limited's illegal pharmacy business by establishing corporations, bank accounts, credit cards, and shipping accounts for Rx Limited's use.

Under the supervision of the DEA, Leroux engaged in monitored communications with Berkman, Oz, and Bezalel, who resided in Israel, to arrange their travel to Romania. Berkman declined to travel, but Oz and Bezalel agreed to travel to Romania, with the understanding they were going to meet with Leroux. When they got to Romania, they were arrested pursuant to provisional arrest warrants, and subsequently extradited for prosecution in the District of

Minneapolis. Bezalel later fled Minneapolis prior to trial and remains at large. Also supervised by DEA, Leroux attempted to contact McConnell, who resided in the Philippines, and arrange his travel to Haiti, where he would be expelled or extradited to the United States for prosecution. Attempts to contact McConnell were unsuccessful. McConnell later surrendered voluntarily. A fifth defendant, Shai Reuven (also a co-defendant in docket number 12 Cr. 489), was contacted in the course of monitored communications, but did not travel to Haiti as planned. He remains at large.

Leroux testified at a pretrial suppression hearing on March 2, 2016. Leroux testified truthfully at the hearing. McConnell, Oz, and two co-defendants proceeded to trial, which commenced on February 6, 2017; Leroux did not testify at that trial. McConnell and Oz were acquitted pursuant to Rule 29 of the Federal Rules of Criminal Procedure.

## V.     The Defendant's Post-Plea Conduct

In approximately 2015, Leroux met another inmate, Mir Islam, at the Queens Detention Facility. Islam had pleaded guilty to, and was awaiting sentencing for, various charges of computer crimes and fraud: attempted access device fraud, in violation of 18 U.S.C. § 1029A; conspiracy to commit access device fraud, in violation of 18 U.S.C. § 1029B; aggravated identify theft, in violation of 18 U.S.C. § 1028A; and conspiracy to commit computer intrusion, in violation of 18 U.S.C. § 1030B. *See United States v. Mir Islam*, S1 12 Cr. 810 (KMW) (S.D.N.Y.). After his sentencing in March 2016, Islam was transferred to another facility to face charges pending against him in the District of Colombia, *United States v. Mir Islam*, 15 Cr. 67 (RDM) (RMM). During this time period, Leroux discussed with Islam the prospect of opening a call center business together in the Philippines after Islam's release from prison. Leroux claimed that the call center business he and Islam discussed was intended to be for legal e-commerce.

During this time, Leroux violated BOP regulations by providing money to Islam for commissary, phone minutes, and a computer.

Leroux also violated BOP regulations by arranging communications with Islam (after Islam's transfer) using three-way calling on the Queens Detention Facility's attorney phone, which was, unlike the regular inmate phones, unmonitored and unrecorded. Leroux communicated with other individuals who were not part of his defense team in this same manner, until the activity was detected by law enforcement and he was confronted about it. The Government has no information that Leroux and Islam consummated any of the discussed call center business.[14]

While at the Queens Detention Facility, Leroux also violated BOP regulations by giving money to kitchen staff for extra food items.

After being confronted about his use of the prison attorney phone to conduct unmonitored calls, Leroux assisted in an investigation being conducted by the Eastern District of New York and DEA in Long Island of a paralegal used by Leroux's former attorney. Leroux also agreed to make consensual recordings in the Queens Detention Facility. The investigation in which Leroux assisted did not result in additional prosecutions by the U.S. Attorney's Office in the Eastern District.

## **CONCLUSION**

The defendant's criminal conduct, in its range and its seriousness, is significant. The defendant trafficked in illegal pharmaceuticals and narcotics; smuggled gold, chemicals, and

---

[14] According to press reports, after Islam's release from prison he in fact moved to the Philippines, where he has since been arrested for allegedly participating in a murder. *See, e.g.*, Victoria Bekiempis, *Bitcoin Trader Troy Woody and Pal Mir Islam Charged in Philippines Murder*, DAILY BEAST (Dec. 29, 2018), available at https://www.thedailybeast.com/bitcoin-trader-troy-woody-and-pal-mir-islam-charged-in-philippines-murder.

weapons on several continents; ran a weapons R&D program from the Iranian government; funneled large volumes of corrupt payments to multiple government officials for intelligence, protection, and false documents; and operated a mercenary team that committed beatings, shootings, firebombings, and murder.

The defendant's cooperation, however, has also been significant—notably so. Leroux began cooperating immediately after his arrest, giving a post-arrest statement while still in the air on his way from Liberia to the United States, and through his cooperation provided voluminous, detailed information and extensive records and physical evidence. Law enforcement was aware of much of Leroux's criminal conduct prior to his arrest, including his illegal online pharmaceuticals business, involvement in cocaine trafficking and weapons trafficking, and his implication in several murders, but Leroux volunteered significant information about conduct and co-conspirators previously unknown to the Government, including his work for the Iranian government, additional unknown murders, and the involvement of U.S. citizens in an international mercenary network. Leroux participated in an extraordinarily complex and ambitious undercover operation that resulted in the simultaneous arrests of ten defendants involved in violence and significant international drug trafficking and helped to expose North Korean production of producing huge quantities of high-quality methamphetamine distributed by Hong Kong Triad crime groups. The defendant testified truthfully and credibly at a pretrial hearing in Minnesota and at the trial of Samia and Stillwell in this District. His participation in these undercover investigations required hours of meetings with law enforcement and prosecutors on a regular basis for nearly a year. Leroux assisted law enforcement in in shutting down his criminal organization and bringing a dozen of his former associates and mercenaries to justice.

For the reasons stated above, the Government currently intends to request at sentencing that the Court sentence the defendant, Paul Calder Leroux, in light of the factors set forth in Section 5K1.1(a) of the Sentencing Guidelines and Title 18, United States Code, Section 3553(e). We also request that the Court enter an order forfeiting the proceeds of the defendant's criminal offenses and the instrumentalities of the money laundering offenses. The defendant should receive credit against his forfeiture obligation for proceeds that have been confiscated by foreign governments or which the defendant expended in furtherance of law enforcement operations.

Dated: New York, New York
      May 28, 2020

                    Respectfully submitted,

                    GEOFFREY S. BERMAN
                    United States Attorney

                By:_____*/s/*_____
                    Emil J. Bove / Rebekah Donaleski /
                    Michael D. Lockard /
                    Assistant United States Attorneys
                    (212) 637-2444/-2423/-2193

cc:    James Branden, Esq. (by email)
          Jemmard Thomas, US Probation Officer (by email)

K6CALERSps

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    UNITED STATES OF AMERICA,

4              v.                         (S2) 12-cr-489 (RA)
                                              14-cr-075 (RA)
5    PAUL CALDER LEROUX,
       a/k/a "Bernard John Bowlins,"
6      a/k/a "John Smith,"
       a/k/a "Johan Smit,"
7
               Defendant.                 Sentence
8
     ------------------------------x
9
                                          New York, N.Y.
10                                        **(via telephone)**

11                                        June 12, 2020
                                          11:30 a.m.
12

13   Before:

14                     HON. RONNIE ABRAMS

15                                        District Judge

16
                         APPEARANCES
17
     GEOFFREY S. BERMAN
18        United States Attorney for the
          Southern District of New York
19   BY:  MICHAEL D. LOCKARD, ESQ.
          Assistant United States Attorney
20
     LAW OFFICE OF JAMES M. BRANDEN
21        Attorneys for Defendant
     BY:  JEFFREY CHABROWE, ESQ.
22        JAMES M. BRANDEN, ESQ.

23

24

25

K6CALERSps

1              (Via telephone)

2              THE COURT:  Good morning, everyone.

3              We're here for United States v. Paul Calder Leroux.

4     There are two docket numbers, docket no. 12 Crim. 489, and 14

5     Crim. 75.

6              There is a little bit of feedback on one person's

7     line.  When you're not talking, if you can mute your line, that

8     would be helpful.

9              All right.  So, first of all, this is a reminder that

10    this is a public proceeding.  You are able to access the

11    proceeding through the public call number.  All participants

12    are reminded that any recording or rebroadcasting of any

13    portion of this proceeding is strictly prohibited.

14             I'm still getting a lot of feedback.  Can you all hear

15    and see me?

16             A VOICE:  Yes, Judge.

17             MR. LOCKARD:  For the government, yes, your Honor.

18             THE COURT:  All right.

19             MR. CHABROWE:  Yes, your Honor.

20             THE COURT:  All right.  So we're of course in the

21    middle of the COVID-19 pandemic.  I am conducting this

22    proceeding remotely pursuant to the authority provided by

23    Section 15002 of the CARES Act and the standing orders issued

24    by our chief judge pursuant to the act.  I am proceeding by

25    video conference.  Counsel are appearing remotely also via

K6CALERSps

1   video conference, as is the defendant, Mr. Leroux, who is

2   accessing this video conference from the GEO facility.

3           Mr. Leroux, I'm going to confirm again, sir, that you

4   can see me and hear me.  Can you see me and hear me?

5           THE DEFENDANT:  I can see you and I can hear you, your

6   Honor.  I can see you.

7           THE COURT:  If at any point during this proceeding you

8   are unable to see or hear me or other participants, let me know

9   right away and we can address the problem.  OK?

10          THE DEFENDANT:  Yes.  All right, your Honor.  Thank

11  you.

12          THE COURT:  Thank you.  Also, you should know that if

13  you would like to speak privately with your attorney, you are

14  free to do so.  We will move you into a remote breakout room

15  where no one else can see you or hear you.  So you have that

16  right.  Do you understand that?

17          THE DEFENDANT:  I do, your Honor.

18          THE COURT:  So I understand from defense counsel,

19  Mr. Leroux, that you wish to waive your physical presence and

20  proceed by video conference today.  Is that correct?

21          THE DEFENDANT:  Yes, your Honor.

22          THE COURT:  And did your attorney explain to you that

23  you have a right to be present in court when you are sentenced

24  and that by --

25          THE DEFENDANT:  Yes, your Honor.

K6CALERSps

1          THE COURT:  -- consenting to proceed by video

2    conference you are waiving that right?  Do you understand that?

3          Yes?  Is that right, Mr. Leroux?

4          THE DEFENDANT:  Yes, your Honor.

5          THE COURT:  OK.  Thank you.

6          Can counsel please describe the process by which you

7    discussed with Mr. Leroux his right to be present and his

8    willing and voluntary waiver of that right.

9          MR. CHABROWE:  Your Honor, I discussed with Mr. Leroux

10   the option of doing the sentencing remotely or doing it live in

11   a courtroom and, you know, when that potentially could be or so

12   forth and so on, and how this would be potentially different.

13   And Mr. Leroux, after a lengthy discussion, said that he wanted

14   to go forward with this, doing it by video as we're doing it

15   today.

16          THE COURT:  All right.  Thank you.

17          It looks like we lost the government momentarily, so

18   I'm going to wait until Mr. Lockard is back on.

19          THE COURT REPORTER:  Your Honor, if it's all right for

20   me to interrupt during this pause, the speaker who just spoke

21   for the defense, was that Mr. Branden or Mr. Chabrowe?  Please

22   remember I do not have a video feed, only voice.

23          MR. CHABROWE:  I'm sorry.  That was me, Mr. Chabrowe.

24   And prior to speaking next time in going forward, I will always

25   identify myself as such.  I apologize.

K6CALERSps

1             THE COURT:  Thank you.

2             THE COURT REPORTER:  Thank you.

3             THE COURT:  All right.  We have lost the government on

4    the video feed.  So we're just going to pause momentarily.

5             (Pause)

6             MR. LOCKARD:  Your Honor, can you hear me?

7             THE COURT:  Yes.  We can hear you now.

8             MR. LOCKARD:  OK.

9             THE COURT:  All right.  Thank you.

10            I find that Mr. Leroux has knowingly and voluntarily

11   waived the right to be physically present for this sentencing.

12   I also find that today's proceeding cannot be further delayed

13   without serious harm to the interest of justice.

14            This matter is on for sentencing in United States v.

15   Paul Calder Leroux.  Mr. Leroux pled guilty before Judge

16   Patterson in December 2014 to conspiracy to import and

17   distribute methamphetamine, unlicensed exportation of goods and

18   technology from the United States to a third country,

19   conspiracy to commit computer hacking, and accessory after the

20   fact.

21            In March 2016, he pled guilty before Judge Patterson

22   to conspiracy to introduce into interstate commerce misbranded

23   drugs, conspiracy to commit mail and wire fraud, and conspiracy

24   to commit money laundering.

25            So those were two different indictment numbers.  The

1    first three counts were from indictment no. 12 Crim. 489, or

2    the first four counts.  And the last three counts were part of

3    indictment no. 14 Crim. 75.  Those actions were reassigned to

4    Judge Preska after the death of Judge Patterson and then

5    reassigned to me on May 23rd, 2019, in light of Mr. Leroux's

6    testimony before me pursuant to a cooperation agreement in the

7    trial of Joseph Hunter, Adam Samia, and Carl David Stillwell in

8    case no. 13 Crim. 521, which took place in April of 2018.

9         Mr. Leroux was arrested on September 26, 2012 in

10   Monrovia, Liberia.  On September 27, 2012, he made his initial

11   appearance before the Southern District of New York and was

12   remanded.

13        In connection with today's proceeding I've reviewed

14   the following submissions: the revised presentence

15   investigation report dated May 20, 2020, which includes a

16   recommendation and addendum; Mr. Leroux's sentencing memorandum

17   dated June 5, 2020, with accompanying exhibits; as well as a

18   subsequent letter that I received yesterday, June 11th; the

19   government's sentencing memorandum dated May 28, 2020, as well

20   as a subsequent letter that I received on June 12th.

21        I've also received various letters from the parties

22   with respect to redactions of the public filings.

23        Have the parties received each of these submissions?

24        MR. LOCKARD:  Yes, your Honor.

25        MR. BRANDEN:  Yes, Judge.  Jim Branden.  Yes.

K6CALERSps

1          MR. CHABROWE:  Jeff Chabrowe also.

2          THE COURT:  And the government?

3          MR. LOCKARD:  For the government, yes, your Honor.

4    We've received those submissions.

5          THE COURT:  All right.  And am I missing anything?  Is

6    there anything else that was submitted to the Court that I have

7    not mentioned?

8          MR. BRANDEN:  Jim Branden.  No, Judge.

9          MR. CHABROWE:  Your Honor, there was a letter -- Jeff

10   Chabrowe, excuse me -- there was a letter that we submitted

11   last night from Mr. Leroux on ECF to the Court?

12         THE COURT:  That I did not receive.  So let me get

13   that now.

14         MR. CHABROWE:  OK.

15         THE COURT:  Did you file that on the docket?

16         MR. CHABROWE:  Yes, your Honor.  And I did get a

17   bounce for it.  Let me see.

18         MR. LOCKARD:  Your Honor, this is the government.

19   It's docket no. 67 in the 12 Crim. 489 docket.

20         THE COURT:  OK.

21         All right.  I'm getting out the letter.  Since I'm on

22   the court call I couldn't do it at the same time, but I just

23   accessed it and I'm reading it now.

24         All right.  I have read the letter.  Thank you.

25         So let's begin by discussing the presentence report

K6CALERSps

1    which was prepared by the Probation Department].

2            Mr. Branden or Mr. Chabrowe, have you reviewed the

3    presentence report and discussed it with your client?

4            MR. BRANDEN:  Jim Branden.  Yes, I have, Judge.

5            THE COURT:  And do you have any objections to the

6    presentence report?

7            MR. BRANDEN:  No, we do not.

8            THE COURT:  All right.  Mr. Leroux, have you reviewed

9    the presentence report and have you had enough of an

10   opportunity to discuss it with your attorneys?

11           THE DEFENDANT:  Yes, I have, your Honor.  I have

12   reviewed the report extensively and I have discussed it with my

13   attorneys.

14           THE COURT:  Does the government have any objection to

15   the presentence report?

16           MR. LOCKARD:  This is the government.  No, your Honor,

17   we have no objections.

18           THE COURT:  The presentence report will be made a part

19   of the record in this matter and placed under seal.  I adopt

20   the factual findings in the report.  If an appeal is taken,

21   counsel on appeal may have access to the sealed report without

22   further application to the Court.

23           Mr. Leroux, when you pled guilty both in December 2014

24   and in March 2016, you discussed the federal sentencing

25   guidelines with Judge Patterson.  The guidelines are a set of

K6CALERSps

1    rules published by the United States Sentencing Commission in

2    order to guide judges when they impose sentence.  Although at

3    one time they were mandatory, meaning the judges were required

4    to follow them, they are no longer binding on judges, but

5    judges must consider them in determining an appropriate

6    sentence and must thus ensure that they have properly computed

7    the guidelines calculation.

8         I understand that the parties agree with the

9    guidelines calculated in the presentence report pursuant to

10   which Mr. Leroux is facing a guidelines range of life in

11   prison.  Is that correct?

12        MR. BRANDEN:  Yes, Judge.  Jim Branden.  Yes.

13        MR. LOCKARD:  For the government, no objections to the

14   PSR calculations.  But, your Honor, just one minor procedural

15   clarification?  Mr. Leroux pleaded guilty to the charges in

16   both informations in the same proceeding held in February of

17   2014 before Judge Patterson.

18        THE COURT:  Oh.  Thank you very much.

19        All right.  So based on the parties' agreement and my

20   independent evaluation of the sentencing guidelines, I accept

21   the guidelines calculation in the presentence report.  I find

22   that Mr. Leroux's offense level is 43, his criminal history

23   category is I, and his recommended guidelines sentence is life.

24   As I said a moment ago, that range is only advisory.  Courts

25   may impose a sentence outside of that range based on one of two

K6CALERSps

1  legal concepts: a departure or a variance.  A departure allows

2  for a sentence outside of the advisory range based on some

3  provision in the guidelines.  A variance, by contrast, is based

4  on factors set forth in a provision of the federal law.  It's

5  18 United States Code § 3553(a).

6      I'd like to hear now from the parties.  Would the

7  government like to be heard with respect to the sentencing?

8      MR. LOCKARD:  Yes, your Honor.  And as noted in our

9  sentencing submissions, at this time the government formally

10  moves that the defendant be sentenced pursuant to Title 18

11  United States Code § 3553(b) and Section 5K1.1 of the United

12  States Sentencing Guidelines.

13      THE COURT:  That motion is granted.  Is there anything

14  else you'd like to say today?

15      MR. LOCKARD:  Your Honor has, as the Court noted,

16  voluminous written materials that have been submitted in

17  connection with the sentencing, and has also had an opportunity

18  to directly observe defendant during his extensive testimony,

19  during the Hunter trial, and I think, in light of that volume,

20  perhaps the most effective way for the government to proceed

21  would be to perhaps answer any questions or address any issues

22  that the Court would like us to address.

23      THE COURT:  One question I'd like you to address:  In

24  Mr. Leroux's letter, he says that with respect to a charge in

25  the Philippines, he has agreed that he will not contest

A

K6CALERSps

1    extradition from the U.S., will not contest a weapons

2    trafficking charge, does not contest superseding charges for

3    murder on his arrival in the Philippines, and will pay

4    restitution in the Philippines to victims' families.

5            He says that he will face a mandatory minimum of eight

6    years in prison in the Philippines and a maximum of 12 years in

7    prison.

8            Is that accurate?  One of the things that I have to do

9    here is, I have to balance a whole host of factors, and I'm

10   going to talk about them a little bit later.  But I have to

11   think about the danger that Mr. Leroux can present in the

12   future to society at large.  And if he is indeed going to be

13   incarcerated in the Philippines, that may weigh into my

14   decision.

15           MR. LOCKARD:  The short answer, your Honor, is, I do

16   not know.  I know over the course of this matter, the

17   government has had discussions over time with Mr. Leroux's

18   prior U.S. criminal defense counsel about efforts to resolve

19   potential charges in the Philippines by way of a plea,

20   including potentially a plea in absentia.  But I have been

21   advised that that's never been finalized and don't have any

22   independent knowledge about the status of that process.

23           THE COURT:  What's your understanding as to where he

24   will be extradited upon his release from incarceration in the

25   United States?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A

K6CALERSps

1          MR. LOCKARD:  So I say this not speaking on behalf of

2    ICE, but it's my understanding that Mr. Leroux, if he were to

3    be deported or removed, would be removed either to South Africa

4    or Australia, where he is a passport holder.  I believe there

5    is an extradition treaty between the United States and the

6    Philippines, but I don't believe there is an extradition treaty

7    between South Africa and the Philippines, and I believe there

8    is an extradition treaty between Australia and the

9    Philippines -- all of which is to say, if the Philippines were

10   to submit an extradition request to the United States and he

11   did not contest it or consented to extradition, I imagine he

12   would be extradited to the Philippines.

13          THE COURT:  All right.  Thank you.

14          And can you confirm the open case against him there?

15          MR. LOCKARD:  I am aware from discussions between U.S.

16   law enforcement and Philippines law enforcement that Mr. Leroux

17   has been the subject of ongoing Philippines law enforcement

18   interests.  I don't have any information about charges filed

19   against him and haven't received this information from the

20   Philippines Department of Justice or any prosecutor's office.

21          MR. CHABROWE:  Judge, if I may, it's our understanding

22   that the Philippines renewed their extradition request for

23   Mr. Leroux as recently as January just now, based upon their

24   following the sentencing coming soon in this case, and that

25   that request for extradition was just renewed in January of

K6CALERSps

 1    2020.

 2              THE COURT:  All right.  Thank you.

 3              Mr. Lockard, would any victims like to be heard today?

 4              MR. LOCKARD:  Your Honor, not that I'm aware of.

 5    Notifications were made through law enforcement channels to law

 6    enforcement in the United Kingdom and in the Philippines, and

 7    we were staying in contact with any victims if they wished to

 8    be heard, and I have not been advised that any victims have so

 9    indicated.

10              THE COURT:  All right.  Thank you.

11              Would defense counsel like to be heard?

12              MR. CHABROWE:  Yes, your Honor.  I think -- I would

13    like to be heard briefly.  I was going to go first.  I'm sorry.

14    Jeff Chabrowe for Mr. Leroux.  I was going to speak first.  I

15    believed that Mr. Branden would be speaking after me.  I am

16    going to be discussing the leaks briefly.  I know that this is

17    something that we've submitted voluminous material to the Court

18    and we've discussed it quite a bit.

19              A couple of points that were not made in our

20    submissions, your Honor.  There are a number of podcasts

21    actually that exist online, most recently one from 2019, with

22    Elaine Shannon, who is the author of the book *Hunting Leroux*,

23    Tommy Cindric, one of the former DEA agents, and Lou Milione,

24    who was the agent and the head of the 960 unit, discussing the

25    book, also discussing a movie that will be forthcoming about

K6CALERSps

1    the book.  In this interview, your Honor, Lou Milione says

2    that, talking to Elaine Shannon, they gave her information

3    about the investigation in Mr. Leroux that they wouldn't have

4    given to anyone else because they trusted her.  He says

5    specifically, quote/unquote, we have the clearance to be able

6    to speak to her and it wouldn't have been with anybody else,

7    although it's our understanding that Ms. Shannon did certainly

8    share a lot of this information as well.

9         Our understanding, your Honor, is that there actually

10   is a movie being made about -- that's already in

11   preproduction -- about *Hunting Leroux*, being made, produced by

12   Michael Mann.  And Lou Milione from the DEA, who used to be an

13   actor prior to being an DEA agent, is actually going to be

14   playing himself in the movie.

15        Another issue, your Honor, is that a lot of the

16   discovery from this case was actually uploaded to YouTube,

17   including details about Mr. Leroux's family, descriptions of

18   the family.  There's a clip of him sitting at a computer -- it

19   says "DEA surveillance" on it -- to sort of use as somewhat of,

20   I guess, a teaser for the book.

21        A number of description from the book, your Honor --

22   and these are all thing that could not have been obtained by

23   Ms. Shannon unless she had been told this information, that

24   she'd gotten any sort of confidential information.  There's a

25   description of, specifically in the book, page 99, Mr. Leroux's

K6CALERSps

1    children, different women that he's been with, who are the

2    mothers of each children.  Page 289, there's a confidential

3    source recording in a hotel shortly before Mr. Leroux is

4    arrested, a description of a child of his as an infant who they

5    described as a beady-eyed baby.  There is a description from

6    when Mr. Leroux's hotel room was bugged, a recording of he and

7    his wife having sex and things that are said during that time.

8    In the book there is a description of DEA Agent Tommy Cindric's

9    personal discussion with Mr. Leroux.  This is just the two of

10   them talking about how many children he had and who were the

11   mothers of those children.  And then another conversation that

12   takes place about Mr. Leroux's abuse that he suffered from his

13   father, how that affected him.

14         These are all things that are very, very personal

15   about his family or just about him, about his children, about

16   his wives, that were all released by the DEA to Elaine Shannon

17   for writing the book.  There is a recorded conversation between

18   a confidential informant and an undercover about the sale of

19   methamphetamine.

20         And then I think most disturbing, your Honor, there is

21   a very, very detailed descriptive discussion in the book, on

22   page 365 of what I'm looking at, of one of the first proffers

23   with Mr. Leroux in Brooklyn, describes exactly who is at the

24   proffer, and Mr. Lockard.  And actually I think it's the first

25   proffer.  There are supervisors present.  Everybody is present.

1    It describes what a proffer is.  And towards -- I believe this

2    is where there is the first discussion of the signing of a

3    cooperation agreement.

4         And I'm reading from the notes actually right now of

5    Ms. Shannon's book.  It states, "Leroux's admissions for his

6    plea bargain are contained in the proposed cooperation

7    agreement for Paul Leroux, drafted by the attorneys in the

8    office of the U.S. Attorney for the Southern District of New

9    York," and then it names a number of U.S. Attorneys who signed

10   off on this.

11        And then this is what is most troubling:

12   quote/unquote -- this was not made part of the public court

13   record but was obtained by the author.  This is on page 527 of

14   the paperback.  It's very clear, your Honor, that this is then

15   the proposed plea agreement.  And we had submitted something to

16   the Court yesterday in camera to look at this.  It's very clear

17   that the proposed plea agreement, which contains 3500 material,

18   as well as, I think, notes from proffers, was given to

19   Ms. Shannon.  We would assume it was done so by the DEA.  This

20   was signed on February 4th of 2013.  Once again, she clearly

21   states it was not made part of the public record but was

22   obtained by the author.

23        There is a description in the book, page 379, of, I

24   believe it's Tommy Cindric, questioning Mr. Leroux.  "You're

25   not being totally honest.  You have to tell us about the

K6CALERSps

1    murders, tell us about the murders."  Not only is this not even

2    in a proffer; it's actually in a hallway outside, nothing

3    that -- this goes way beyond anything that would have been in a

4    proffer or in 3500 material.

5           There are descriptions in the book about Mr. Leroux

6    setting up an FTP server for Iranian officials to access

7    weapons plans that he uploaded without directly implicating

8    themselves of a designed explosive, which is called PETN, which

9    Ms. Shannon repeatedly calls "the coffee sweetener bomb."

10          These are things, your Honor, that were never in trial

11   testimony, not something Ms. Shannon could have known unless it

12   had been leaked to her.

13          Yesterday, in a submission in the afternoon, the

14   government finally admitted, after years really, that the DEA

15   agents here leaked info from the case, referring to the leaks

16   as regrettable and unfortunate.  However, what struck me, your

17   Honor, one of the most revealing things of this submission is a

18   footnote.  On page 4 -- this is from yesterday afternoon --

19   where the government states, "The government did not discuss

20   the case with the book's author and did not review the

21   information provided by the DEA."

22          So this is sort of buried in the government's

23   submission yesterday, where they're saying that they did not

24   know, they don't know what the DEA gave to the author.  It was

25   not reviewed by them.  And I think it's very clear that they

K6CALERSps

1    had no idea what was provided or how much.

2         The government's submission yesterday when they're

3    finally acknowledging the leaks is at times contradictory in

4    and of itself.  And they're repeatedly saying that there were

5    leaks but all of the information, a lot of the information came

6    based upon public interest in the case.

7         The government also seems to be justifying the leaks

8    and saying that there was a great, deep degree of public

9    interest.  They specifically say that Agents Cindric and

10   Milione spoke to Ms. Shannon with the express approval of the

11   DEA, and this was done based upon public interest and the

12   significance of the case -- seemingly saying that if the DEA

13   makes a determination that a case is of significant public

14   interest and significance, they can then make their own

15   determination, regardless, I guess, of the U.S. Attorney's

16   Office involved at that point, to speak to the press or anyone

17   else based upon that.

18         I think, your Honor, this doesn't make sense.  I think

19   that any case with that amount of public interest, where the

20   government or certainly the DEA should be acting with more

21   discretion, not less, perhaps there should be some situations,

22   especially when you're talking about things like 3500 material

23   and proffer notes, it's up to the government to make any sort

24   of disclosures to the press.  Leaving that in the hands of DEA

25   is not at all appropriate, especially when we're talking about

K6CALERSps

1   cooperation and confidential information.  Not only is

2   justifying this as public interest incorrect and putting

3   Mr. Leroux at risk, but I think that it also creates a very

4   dangerous precedent in that it's going to chill or deter people

5   from cooperating in the future, particularly in high-interest

6   cases, where you're saying that, if there's a lot of interest

7   in the case, it's OK for the DEA to be leaking things to the

8   press.  Not only could this cause, I think, a chill on

9   cooperation in the future, but it also creates a situation

10   where it's encouraging DEA agents to not only leak to the press

11   in cases they determine to be those of public interest, but

12   even more dangerously, perhaps even looking for cases that are

13   deemed to be of great public interest so they can then do what

14   Mr. Cindric and Mr. Milione did and sell their story to authors

15   or to movie producers.  And that's very clearly what happened

16   here.

17        The government states in their letter yesterday that

18   the DEA expressly approved them speaking to Ms. Shannon, but I

19   would imagine that the DEA did not expressly approve Agents

20   Cindric and Milione to then quit and sell their story.  And I'm

21   sure that they received money for this.  As I stated, there is

22   now being a movie made with Mr. Milione actually playing

23   himself in the movie.

24        The government also repeatedly states in their

25   submission yesterday that the amount of information that is out

K6CALERSps

1      there as to Mr. Leroux, including that about his family, is

2      because of the public interest in this case.  They have it

3      backwards.  The leaks are what started the public interest in

4      this case.  The leaks in this case go back until December 2013.

5      And that's what actually started, I think, really, started the

6      amount of interest in this case, from the leaks.  Essentially

7      it was marketing for a book that was going to be coming out.

8      In doing so, this was violating multiple protective orders that

9      have been issued by this court.  And I think there's a

10     reference actually to an article, the government makes

11     reference to an article called -- that referred to Mr. Leroux

12     as "the criminal mastermind you never heard of."  And I think

13     that that's absolutely true, because no one had ever heard of

14     Mr. Leroux.  He wasn't, you know, someone like Pablo Escobar or

15     something like that, that -- at the time of his arrest, no one

16     knew who he was, and it was the leaks that led to him being

17     known.  And that's what led to the public interest in him, as

18     opposed to public interest causing the information to be leaked

19     by the government.

20          There was a number of evidence, different examples I

21     gave, where it's very clear that there are leaks made to

22     Ms. Shannon.  Our sentencing memorandum repeatedly talks about

23     that this is not what was in trial testimony, as the government

24     stated, although it seems to be now retreating from that

25     position.  Not once has the government been able to point out a

1   single example of any of the leaks that we've said where they

2   said no, this is the source of that.  Instead, they just sort

3   of vaguely refer to, oh, well, there's a lot of public

4   interest, there's a lot of press attention.  Every single

5   example that we gave is something that Ms. Shannon could not

6   have known about unless she got it -- they've never been able

7   to point out another source of this information.

8           I believe --

9           THE COURT:  Let me just ask you a question,

10  Mr. Chabrowe.  Even if everything you say is true, we're here

11  for a sentencing of a very violent criminal.  Other than the

12  physical harm that these alleged leaks may have caused

13  Mr. Leroux or his -- or potential harm it may have caused

14  Mr. Leroux or his family, how should I factor this in at

15  sentencing today, in your view?

16          MR. CHABROWE:  Well, obviously, your Honor, you know,

17  5K1 states that the risk that Mr. Leroux faces or that his

18  family faces are very much factors that your Honor should

19  consider when fashioning a downward departure.

20          THE COURT:  And I was going to factor those in anyway

21  of course.

22          MR. CHABROWE:  OK.  And I apologize for being -- I was

23  just getting to that point.  But I think that the risk that he

24  and his family face are quite substantial.  Melanie, who is the

25  mother of one of Mr. Leroux's children, was abducted and held

K6CALERSps

1    for ransom in the Philippines.  There were other home invasions

2    in the Philippines.  There were police reports for all of these

3    things were submitted to the Court in our sentencing

4    memorandum.

5          I think that there is also a lot of information that

6    Mr. Leroux gave that's in the book that was not disclosed

7    otherwise, that was not at trial, where Mr. Leroux is talking

8    about corruption in the Philippines particularly.  And he is,

9    as your Honor mentioned earlier in the sentencing, Mr. Leroux

10    is now going to be going to the Philippines.  This is now when

11    he's going to be most at risk, going where I think that they

12    certainly have an ax to grind against them.  He's going to be

13    going there and held.  He's going to be charged with murder and

14    weapons trafficking.  And he's going to be very much at risk

15    not just being in the Philippines, your Honor, but being in a

16    jail system where it's much easier for them to get at him and

17    in a jail system that, you know, this is not like being here,

18    at GEO, certainly not anywhere here, where people are much more

19    at risk from corrupt prison officials or organized crime.

20          I think that one example, your Honor, and when we're

21    talking about what could happen to Mr. Leroux once he's there,

22    beyond the risk to him and his family, that his co-defendant on

23    the case, one of his co-defendants on the drug case that he had

24    in the Philippines, Brian Hill, was sentenced to life already

25    in the Philippines.  There is an arresting officer in that

K6CALERSps

1      case, Leonardo Swann, who was also the arresting officer in

2      another case of a South Korean businessman named Jee Ick-joo.

3      And this is something that happened recently in the Philippines

4      where this man was arrested, there were repeated, repeated

5      efforts to extort him for money, that he was tortured while in

6      custody.  And while I think his wife was actually present,

7      there were efforts made where there was some money turned over,

8      and while Philippine officials were trying to extort him for

9      more money and torturing him, they accidentally killed him.

10     This is a case that has gotten some press attention, as stated.

11     The arresting officer on the case for Mr. Hill, who is

12     Mr. Leroux's co-defendant, is one of the same officers who was

13     involved in this.  And this is unfortunately what Mr. Leroux is

14     going to be dealing with going forward.

15            So I think that, I think your Honor could certainly

16     integrate this by considering alternatively deterrence of

17     future conduct by law enforcement, encourage responsibility and

18     accountability going forward.

19            But I think that the risks that Mr. Leroux and his

20     family are facing are not only significant, but are perhaps,

21     just now the real risks to Mr. Leroux are just now starting

22     from the fact that he is certainly going to be extradited to

23     the Philippines.  And I think that -- I know that there are

24     many, I'm sure that there are many people in the Philippines

25     base upon what we have submitted -- I know there is some other

K6CALERSps

1      stuff Mr. Branden has talked about -- who, Mr. Leroux has a lot

2      of enemies there.  And I think that the release of the

3      information by Ms. Shannon has certainly exacerbated that

4      situation.

5              THE COURT:  All right.  Thank you.

6              Mr. Branden, is there anything you would like to add?

7              MR. BRANDEN:  Yes, Judge.  Thank you.

8              Like the government noted, we have written a great

9      deal about Mr. Leroux in these sentencing submission.  For a

10     cooperator I don't normally write at such length, but this is

11     an outside case on so many different levels.  The number of

12     crimes that are detailed in the presentence report require

13     attention.  But on the other hand, so does the extraordinary

14     cooperation that this defendant provided.  I think that in the

15     government's letter from yesterday, they admitted that there is

16     really no precedence for this amount of cooperation.  Part of

17     that of course is because of the degree of the criminality.

18     But he has probably proffered more than anybody else in the

19     Southern District ever.  He gives assistance to the

20     government --

21             THE COURT:  I don't know where that figure came from,

22     by the way.

23             MR. BRANDEN:  I don't know.  Somebody told me that and

24     I threw it down in the submissions expecting maybe there would

25     a challenge, and there wasn't.  So I'm not asking the Court to

K6CALERSps

1    take it as the gospel truth.  But I would have expected that

2    the government would say, no, that's not true, if they believed

3    it to be untrue.  At the very least, the cooperation and

4    proffering was extensive.

5           So I'm not going to go through all of the 5K1 factors.

6    But certainly the cooperation has been extraordinary.  As a

7    result of his extensive cooperation, he's also spent eight

8    years in detention.  Generally serving time in detention is far

9    worse than serving time in BOP custody.  And I think that's

10   true here.  But in addition he's also been the subject of an

11   assault.  He was the subject of extortionate press.  He's had

12   serious health issues while he's been in.  And I suggest that

13   this eight years was worth more than just eight years.

14          And as Mr. Chabrowe noted, I think that there will be

15   severe collateral consequences for him when he's returned to

16   the Philippines, not just legally, perhaps extrajudicially, but

17   also the security agencies and the mercenaries out there that

18   are looking to target him anew pose a very, very serious threat

19   to him.

20          And I just want to note finally that the government's

21   letter from yesterday answers your Honor's question about

22   whether this particular defendant is a threat to anybody at the

23   moment.  And while the government couldn't rule that out, under

24   no circumstances, I think that it's a fair assessment of what

25   they're saying to you is, no, he is not a threat to anyone at

K6CALERSps

1    this present time.

2            So without getting, you know, reviewing everything

3    I've already said in writing, he's served nearly eight years in

4    prison already, eight years in detention already.  Especially

5    given what he's facing in the Philippines, in which he will

6    almost surely face another decade of imprisonment, he should be

7    sentenced to a term of time served.

8            THE COURT:  Thank you.

9            Mr. Lockard, was your position in that letter that he

10    doesn't pose a danger to the community, or just that there are

11    no particular individuals at this point in time that you know

12    he presents a danger to?

13            MR. LOCKARD:  Your Honor, it was the latter.  We're

14    not aware that he poses a danger to any particular person or

15    persons upon his release.  And I think we walk the Court

16    through sort of our analysis of whether or not he poses a risk

17    of danger to the community, essentially through the risk of

18    recidivism.

19            THE COURT:  And that he does continue to pose such a

20    risk.

21            MR. LOCKARD:  I think you have to say -- well, since I

22    can't say no, he poses no risk, then I have to say yes, he

23    poses some degree of risk.  That risk is difficult to quantify.

24    But I think it certainly is -- his past gives a reason to

25    believe that there's a risk, the incident involving Mr. Islam,

K6CALERSps

1    we think reasonably there is a risk.  And, you know, frankly,

2    the letter that was filed yesterday outlining Mr. Leroux's

3    intention to go into the bitcoin mining business points to the

4    possibility of such a risk.  And that is not to say that there

5    is anything illegal about operating a bitcoin mining business.

6    Those kinds of businesses can be operated in a perfectly legal

7    manner.  But it's also true that, you know, cryptocurrency is a

8    hot topic among law enforcement in terms of things like money-

9    laundering risks, sanctions evasion, and counter-

10   terrorism-finance risk.  And, you know, it is, I would say it's

11   not a comfort to know that that's Mr. Leroux's plan.

12            THE COURT:  You also noted in your latest letter that

13   his sentencing advocacy to date reflects little if any remorse,

14   rehabilitation, or acceptance of responsibility beyond that

15   required by guideline provision 3E1.1.

16            MR. LOCKARD:  Yes, your Honor.

17            THE COURT:  All right.

18            Mr. Leroux, would you like to be heard at all?  I read

19   your letter, but I'm happy to hear anything you'd like to say

20   today.

21            THE DEFENDANT:  I would, your Honor.  I would.

22            I would just like to thank the Court for offering me

23   the opportunity to speak, your Honor.  And also I'd like to

24   apologize to the Court for my acts and conduct in this case.  I

25   really have no words to describe my conduct.  I'd like to

A

K6CALERSps

1    apologize to the victims' families.  All I can say, your Honor,

2    is, I have no excuses.  I have been diagnosed with mental

3    health issues.  I've been diagnosed at GEO.  I saw the

4    psychologist in 2013.  I started mental health treatment.  I

5    was diagnosed with anxiety, depression, post-traumatic stress

6    disorder, and a personality disorder.  And I saw the

7    psychologist and I tried to treat myself.  The PSR says I

8    didn't undertake any treatment.  That is not true.  I did

9    counseling with the psychologist.  I can't take medications

10   because I have liver damage.  But I did do counseling.

11          Also, your Honor, I'd like to say that it was the

12   tremendous hyperbole of the media and the hyperboles that I

13   have no feelings and I have no remorse.  But that's not true,

14   your Honor.  I stay awake at night.  I sleep one or two hours.

15   And I told the prosecutor that during prep for the trial, when

16   I testified in front of you.  I sleep one, two hours.  I think

17   about my terrible crimes all the time.  I just don't understand

18   what happened.

19          I would like to tell you something about my family,

20   too, your Honor.  I spoke last week to my eight-year-old son.

21   He told me, "Dad, I've never seen you in my whole life.  When

22   are you coming home?"  And I understand, it broke my heart, I

23   understand how the victims' families must feel.  I can only

24   apologize over and over again.  So many of these people will

25   not have any more chance to reunite with their family members.

K6CALERSps

1          What I have done, your Honor, is, I've cooperated in

2     the federal case.  I submitted to your Honor, to the Court, the

3     original arrest warrant for the weapons-trafficking conduct,

4     and that includes relevant conduct, at least one of the murders

5     that occurred in Philippines.  That was dated in 2000 and

6     actually predates the instant case.  That was updated by the

7     Filipino government in January of 2020.  And the reason for

8     that is, they have worked on and submitted an extradition, as I

9     understand it, although presumably things have slowed down

10    because of the COVID-19 pandemic that's no doubt slowed things

11    down as well as it has slowed things down here in the United

12    States.

13          So what I've been saying is, I haven't cooperated

14    there.  The USA will extradite me.  There are outstanding

15    arrest warrants in the Philippines.  And I have agreed I will

16    pay restitution, and that's the first thing I plan to do.  For

17    family members that I destroyed and for the families that have

18    suffered I'll pay restitution immediately.

19          My own family, as it happens, relies on me on a daily

20    basis for money.  Nobody else has helped them in the

21    Philippines.  Most of them are in hiding and afraid for their

22    lives.  The leaks have been absolutely devastating, not in

23    respect so much to myself but with respect to their safety.

24    They said they effectively have death sentences on their heads,

25    your Honor.  The Philippines is a dangerous country.  Criminal

K6CALERSps

1    groups and the police are involved in kidnapping and murder in

2    the Philippines on a wholesale basis.  I can't say enough about

3    the danger to my family, because I just can't put it into

4    words.

5        I refer you to the first promotional portion of the

6    campaign in the Philippines in 2013.  And I refer you to the

7    first home invasion in 2015.  The dangers in the Philippines

8    are immense.  My co-defendant, Mr. Brian Hill, in his trial

9    testimony he stated he was extorted by the police in prison and

10   he still received a life sentence.  Also there was the example

11   mentioned earlier by Mr. Chabrowe, I believe, about a South

12   Korean businessman arrested and killed by the police.  He was

13   arrested by the same arresting officer as arrested --

14   (unintelligible).

15       In the government sentencing submission, that said

16   that I met the government in February, on or about February

17   2020, and I said that my family was OK.  This is because I had

18   nothing more to add, your Honor.  I had already submitted a

19   witness protection request for some of my family members, which

20   was actually denied on that day.  And the problem with my

21   family is, your Honor, is, they're not even cooperating with

22   me, never mind the government.  They're not cooperating because

23   they believe any information they will provide will be leaked

24   immediately, rightly or wrongly.  And that is the situation.  I

25   can't get documentation from them.  They don't want to send

K6CALERSps

1   anything to me for sentencing.  I had to beg to get all the

2   documents from them relating to the kidnapping incident,

3   relating to the home invasions, and relating to the fact that

4   they have been followed, extorted, arrests.  There's been

5   vandalisms of my, my properties.

6        I expect that I should suffer, your Honor.  I should

7   be punished.  But my family have done nothing wrong.  They have

8   not done anything, not committed any crimes, and effectively

9   all the leaks in this case have put a very big mark on the back

10  of their, of their heads.  It's just a miracle, your Honor,

11  nobody has been killed yet in this case.

12       I hope and I pray that the Court will take into

13  account the fact that I was arrested on a nonviolent drug

14  offense.  Apart from the example in the case in Count One, the

15  drugs involved are all in -- (unintelligible).  I would have, I

16  would have to say, if I had just stayed quiet, it's likely that

17  my plea would have been 25 to 30 years.  It's up to the

18  government and up to the Court what my eventual sentence would

19  have been, but I understand that the government said that there

20  wasn't enough information to charge me with any single act of

21  violence.  All the information, almost all the information in

22  the PSR and almost all the information in the --

23  (unintelligible) -- against me came from me.  If I had just

24  stayed quiet, I likely would have been sentenced like a

25  one-time drug offender.  And that is the wrong thing to do.  In

K6CALERSps

1     this situation, I need to bring closure.  I don't want to run

2     from the crimes that I've committed.  I want to do my time in

3     the U.S.  Whatever your sentence is today, your Honor, I want

4     to do that time and I want to do the time and should --

5     (unintelligible) -- because I caused damage to victims' family

6     and they deserve closure.  The government has repeatedly said

7     that the government wants justice for Catherine Lee.  However,

8     your Honor, it's not possible for Catherine Lee to have a full

9     measure of justice here in the U.S. for the simple reason that

10    most of the co-conspirators are in the Philippines and are not

11    subject to U.S. jurisdiction in respect to them.  So the only

12    way for me to have a full measure of justice is for me to be

13    returned to the Philippines for the arrest warrants that exist

14    as well as the superseding indictment for multiple murders

15    which occurred in the Philippines, and for me to cooperate and

16    bring into the system all the co-conspirators in the

17    Philippines that I conspired with in that time.  I'm the most

18    culpable person and I'm the person in the best position to

19    bring those people in and make sure they face justice.  And I

20    would have no objection to the government removing me to the

21    Philippines, because none of them can very easily verify that

22    the charges in the Philippines exist and are valid.

23          Now, in respect to the bitcoin mining, bitcoin mining

24    relates to the fact, your Honor, that I have an electronics

25    background.  I need to follow the line of work that aligns with

K6CALERSps

1    my skill set.  I have a programming background.  I have an

2    electronics background.  I can't sit here and tell the Court

3    that I'm going to do something which does not align with my

4    background.  So the bitcoin mining, yes, if I understand, there

5    are criminals involved in that business, as there are criminals

6    involved in everything.  But I intend to follow the laws.  I

7    intend to follow the regulations.  I intend to approach that

8    business correctly.

9         And I really have no explanation what happened to this

10   case, no excuse for my actions.  And my actions are

11   unforgivable.  And, again, I would like to apologize to the

12   Court, to the victims' families.

13        And that's all I have to say, your Honor.  Thank you

14   for your time.

15        THE COURT:  Thank you, Mr. Leroux.

16        Mr. Lockard, is there anything you want to say with

17   respect to what information you had about these acts of

18   violence before Mr. Leroux began to assist the government?

19        MR. LOCKARD:  Sure, your Honor.  And I think this will

20   also address in part some of the arguments that Mr. Chabrowe

21   made.  One of the important pieces of information about

22   Mr. Leroux that was already publicly available prior to his

23   arrest is the fact that he was discussed in a U.N. report about

24   instability and drug trafficking in Somalia, as a result of his

25   attempts to establish, you know, essentially a paramilitary

K6CALERSps

1    base in that country for weapons and drug trafficking.  And

2    that is a publicly available document that the U.N. published

3    in 2011.

4            So I don't think that Mr. Leroux would have been

5    treated as a run-of-the-mill narcotics defendant had the case

6    been resolved solely on the basis of the initial indictment.

7    The murders of several of the individuals in the Philippines

8    was the subject of public reporting.  And U.S. law enforcement

9    certainly was aware of indications that Mr. Leroux was involved

10   in or had directed some of those murders.  The information

11   wasn't sufficient to charge.  And, you know, there is not --

12   there was not an apparent U.S. jurisdictional basis to those

13   murders at the time.  But I think it's a bit of a stretch to

14   say that that information could not have been developed for

15   sentencing purposes.

16           So I think Mr. Leroux faced serious charges.  I think

17   that that is, you know, why he made the decision to cooperate,

18   because he knew about the seriousness of the charges that he

19   faced.  And he did cooperate.  And he lived up to his

20   cooperation obligations.

21           But to directly answer the Court's question, no,

22   Mr. Leroux would not have been treated as an ordinary drug

23   defendant.

24           THE COURT:  Is there any reason that sentence cannot

25   be imposed at this time?  Does anyone else want to be heard

K6CALERSps

1    further?

2              MR. CHABROWE:  Jeff Chabrowe for Mr. Leroux.  No

3    reason, no, your Honor, no.

4              MR. BRANDEN:  Jim Branden.  No reason, your Honor.

5              THE COURT:  Thank you.

6              I am required to consider the advisory guidelines

7    range of life in prison as well as various other factors that

8    are set forth in a provision of the federal law.  It's 18

9    United States Code § 3553(a).  And I have done so.  Those

10   factors include but are not limited to the nature and

11   circumstances of the offense and the personal history and

12   characteristics of the defendant, because every defendant must

13   be considered individually as a person.  Judges are also

14   required to consider the need for the sentence imposed to

15   reflect the seriousness of the offense, promote respect for the

16   law, provide just punishment for the offense, afford adequate

17   deterrence to criminal conduct, protect the public from future

18   crimes of the defendant, and avoid unwarranted sentencing

19   disparities, among other things.

20             Let me put that -- and, Mr. Lockard, if you can turn

21   your computer on mute, please.  I think there's a little

22   feedback.

23             MR. LOCKARD:  I apologize, your Honor.

24             THE COURT:  Let me put that in nonlegal terms.  Most

25   judges agree that the hardest thing we do in our jobs is to

K6CALERSps

1    sentence people.  It is indescribably difficult for a human

2    being to judge another human being, decide if they should be

3    deprived of their freedom, and if so for how long.  Each

4    sentence is difficult -- although, in all candor, some

5    sentences are more difficult than others.  This sentencing is

6    especially difficult for an unusual reason.  And that is

7    because there is no question in my mind that Paul Calder Leroux

8    deserves to spend the rest of his life in prison.  And I don't

9    say that lightly.  Indeed, the only people I have sentenced to

10   prison for life in my time on the bench are three members of

11   Mr. Leroux's own mercenary crew: Joseph Hunter, Adam Samia, and

12   Carl David Stillwell, all of whom faced mandatory life

13   sentences after being convicted of the murder for hire at

14   trial, the murder of Catherine Lee, a murder ordered by

15   Mr. Leroux.

16        Most criminal defendants have prior kindnesses or

17   charitable deeds that they highlight to the Court.  They show

18   genuine remorse, efforts at rehabilitation, or they at least

19   try and persuade me that they are no longer a danger to

20   society.  Not so here, not really.  I mean, today was the first

21   day I have heard Mr. Leroux express any remorse.

22        While Mr. Leroux has only been charged and pled guilty

23   to nonviolent crimes, those crimes alone provide for a

24   guidelines sentence of life in prison.  But they don't tell

25   half the story, as jurisdiction was lacking, and evidence in

K6CALERSps

1    some respects, with respect to much of what he has done in his

2    life.  Indeed, the scope and severity of Mr. Leroux's criminal

3    conduct is nothing short of breathtaking.  He agreed in his

4    plea agreement that all of it can be considered relevant

5    conduct at sentencing.

6         I have before me a man who has engaged in conduct in

7    keeping with the villain in a James Bond movie.  He operated a

8    mercenary team that committed beatings, shootings, and

9    firebombs.  He participated in the murder for hire of at least

10   seven people.

11        And let's just pause there for a minute.  There are

12   seven people -- Herbert Chu, David Smith, Chito, Naomi Edillor,

13   Catherine Lee, Joe Frank Zuñiga, and Bruce Jones -- whose loved

14   ones will never see them, hold them, or speak to them again.

15   In the case of Catherine Lee, she was shot in the face and her

16   lifeless body was left on a pile of garbage.  Others were shot

17   and their bodies anchored to boats and sunk in the water.  The

18   bodies of others still have not yet been found.

19        Mr. Leroux trafficked in illegal pharmaceuticals:

20   methamphetamine and cocaine.  He smuggled gold, chemicals, and

21   weapons on several continents.  He ran a weapons research and

22   development program for the Iranian government.  He attempted

23   to acquire surface-to-air missiles.  He laundered funds from a

24   pharmaceutical company.  He planned a coup in the Seychelles.

25   And he bribed government officials in the Philippines, China,

K6CALERSps

1    Laos, Africa, and Brazil.  If Paul Calder Leroux had a

2    situation that he could bribe or kill his way out of, he did

3    so.

4          So why is this sentencing difficult?  Why shouldn't he

5    just get a life sentence like Hunter, Samia, and Stillwell did?

6    Because Mr. Leroux also cooperated with the government.  He did

7    so for years.  And he put himself and his family at serious

8    risk of harm.  Although he initially attempted to bribe

9    Liberian law enforcement in order to escape apprehension, once

10   that effort proved unsuccessful and he was placed on an

11   airplane to this district, he began the process of cooperating

12   with the government.  And while he failed to mention his

13   involvement in murders and violence at first, he ultimately did

14   and provided voluminous, detailed, and heavily corroborated

15   information.  He actively engaged in communications with

16   various associates in furtherance of ongoing investigations,

17   and introduced them to DEA confidential informants.  He

18   testified in a hearing in Minnesota and before me at the trial

19   of Hunter, Samia, and Stillwell.

20         Mr. Leroux's cooperation led to the dismantling of his

21   mercenary organization, the arrests and prosecution of over a

22   dozen of his criminal associates, the seizure of kilograms of

23   methamphetamine in the Philippines, and the use of critical

24   physical evidence, including the van used during Catherine

25   Lee's murder.

1           If judges don't give cooperating witnesses a

2     significant benefit at sentencing, the criminal justice system

3     will suffer, fewer people will cooperate, and the government

4     will be unable to make important cases like those involving the

5     murder of Catherine Lee.  Cooperation is integral to the

6     system.

7           The question then becomes, how much of a benefit

8     should Mr. Leroux get for his cooperation?  How do I balance

9     that interest with the other interests I mentioned earlier,

10    including public safety, deterrence, just punishment, and the

11    need to avoid unwarranted sentencing disparities?  To help

12    answer that question, I asked the parties to suggest cases they

13    believed were analogous.  The government was unable to provide

14    a readily comparable case due to the sheer scope of

15    Mr. Leroux's criminal conduct.  Mr. Leroux urged me to consider

16    the sentencing of Yi Tiong Tan Lim, who was a criminal kingpin

17    in the Hong Kong Triad organization.  He received a sentence of

18    138 months after he attempted to cooperate, but he was never

19    signed up as a cooperating witness.  But Lim does not appear to

20    have engaged if any acts of violence.  So that example is

21    inapposite.

22          Just yesterday, his counsel also cited to two other

23    cases purportedly involving heinous acts of violence.  But

24    since those materials were under seal, none of us were able to

25    review them.

K6CALERSps

1          In any event, every sentencing is different.  Every

2     defendant is unique.  This sentencing is especially so.  This

3     defendant testified before me about how he used 200 armed men

4     in the hopes of becoming a warlord in Somalia, using, quote,

5     whatever violence was necessary.  That says a lot about who he

6     is as a person.  He wasn't just a mercenary.  But he had his

7     own mercenary team, shooting some people, including a former

8     associate, himself, and ordering the murder of numerous others.

9     Some murders were ordered simply out of paranoia.  Not only did

10    he smuggle gold and bribe countless foreign officials, but he

11    sought to purchase not only a submarine but missile technology

12    from North Korea so as to reverse-engineer it and sell it to

13    Iran.

14         This is no ordinary defendant and no ordinary

15    cooperating witness, particularly given the lack of genuine

16    remorse, again, that I have felt up to this point in time.  I

17    heard remorse expressed today for the first time.  Or efforts

18    at rehabilitation other than his cooperation.  In my view and

19    in the view of the Probation Department, and in the view of the

20    government, he still presents a danger to society.  Indeed, I

21    believe he continues to present a grave danger to society.

22         Finally, I've considered all the other arguments

23    Mr. Leroux has made in addition to his assistance with the

24    government, including but not limited to the difficult aspects

25    of his childhood in war-torn Zimbabwe and other war-related

K6CALERSps

1    traumas.  I've considered his health issues.  I've considered

2    the case in the Philippines and the fact that he may face

3    additional time there.  I've considered the harm he and his

4    family have faced as a result of the alleged improper leaks to

5    the press, as well as his cooperation more generally.

6           So ultimately I have to balance all the information I

7    have before me, the breadth of Mr. Leroux's conduct, what that

8    conduct says about him as a person, which I think is a strong

9    indicator of what someone is likely to do in the future, the

10   grievous harm he caused, the extent of his cooperation, and

11   everything else in the record, and I have to come up with a

12   sentence that is sufficient but no greater than necessary.

13          In the Court's view, he must get a real, significant

14   benefit, less than the life sentence recommended by the

15   guidelines.  But the sentence must also be sufficiently serious

16   so as to deter him from returning to a life of senseless crime

17   and to protect the public.  I am ready to do so.

18          Mr. Leroux, it is the judgment of this Court that you

19   be committed to the custody of the Bureau of Prisons for a term

20   of 25 years.  I'm going to read the breakdown of that sentence.

21   You are to receive a sentence of 300 months on Count One of

22   indictment 12 Crim. 489, 240 months on each of Count Two of 12

23   Crim. 489 and Counts Two and Three of 14 Crim. 75, 180 months

24   on Count Four of 12 Crim. 489, and 60 months on each of Count

25   Three of 12 Crim. 489 and Counts Two and Three of 14 Crim. 75,

A

K6CALERSps

1   all to run concurrently.  So it's a total of 300 months'

2   imprisonment on all counts.

3          With respect to supervised release, you'll receive a

4   term of supervised release of life on Count One of 12 Crim.

5   489, three years on each of Counts Two through Four of 12 Crim.

6   489 and Counts One through Three of 14 Crim. 75, to run

7   concurrently, for a total of a life term of supervised release.

8          I recognize of course that you will be expect to be

9   deported prior to that.

10         I also note for the record that Mr. Leroux has already

11  served 92 months of that sentence.

12         I will also note that this is by far the longest

13  sentence that I have imposed on a cooperating witness, but for

14  the reasons I stated above, I firmly believe it to be necessary

15  for this very unique case.

16         With respect to supervised release, all the standard

17  conditions of supervised release shall apply.  Counsel, would

18  you like me to read those conditions out loud, or is that not

19  necessary?

20         MR. CHABROWE:  That's not.  Jeff Chabrowe for

21  Mr. Leroux.  I don't believe that that's necessary, your Honor.

22         THE COURT:  I am going to read the mandatory terms of

23  supervised release:

24         You may not commit another federal, state, or local

25  crime.  You must not unlawfully possess a controlled substance.

K6CALERSps

1    You must refrain from any unlawful use of a controlled

2    substance.  You must submit to one drug test within 15 days of

3    release from imprisonment and at least two periodic drug tests

4    thereafter as determined by the Court.

5          I'm actually going to, at the recommendation of the

6    Probation Department, I'm going to suspend the drug testing

7    condition.

8          You must cooperate in the collection of DNA.  And you

9    must comply with the standard conditions that have been

10   imposed.

11         I'm also going to impose the recommended special

12   conditions that were recommended by the Probation Department.

13   You must obey the immigration law and comply with the

14   directives of immigration authority.  You must participate in

15   an outpatient mental health treatment program approved by the

16   Probation Office.  Must continue to take any prescribed

17   medications unless otherwise instructed by the healthcare

18   provider.  You must contribute to the cost of services rendered

19   based on your ability to pay and the availability of third-

20   party payments.

21         The Court authorizes the release of available

22   psychological and psychiatric evaluations and reports,

23   including the presentence investigation report, to the

24   healthcare provider.

25         You shall submit your person and any property,

K6CALERSps

1     residence, vehicle, papers, computer, and other electronic

2     communication, data storage devices, cloud storage, or media

3     and effects to a search by the United States Probation Office

4     and, if needed, with the assistance of any law enforcement.

5     The search is to be conducted at a reasonable time and in a

6     reasonable manner, when there is reasonable suspicion

7     concerning violation of a condition of your supervision or

8     unlawful conduct by the person being supervised.  Failure to

9     submit to a search may be grounds for revocation of release.

10    You shall warn any occupants at the premises that they also may

11    be subject to searches pursuant to this condition.  Any search

12    shall be conducted at a reasonable time and in a reasonable

13    manner.

14         You must provide the probation officer with any

15    requested financial information.  And you must not incur new

16    credit card charges or open lines of credit unless you're in

17    compliance with the payment schedule.

18         With respect to a fine, what's the government's

19    position?

20         MR. LOCKARD:  Your Honor, I'll address the fine in

21    just a moment.  We had also requested in our sentencing letter

22    that the Court issue an oral order for the forfeiture pursuant

23    to Title 18, Sections 981 and 982, and Title 21, Section 853,

24    of the forfeiture of the proceeds of Mr. Leroux's offenses, as

25    well as the instrumentalities of the money laundering and

K6CALERSps

1    narcotics offenses, with credit for assets that have been

2    confiscated by foreign governments or that the defendant

3    expended in furtherance of law enforcement operations.  And we

4    would propose to submit a written order to the Court following

5    the sentencing.

6               THE COURT:  Yes.  I intended to do that, in an order

7    to that effect.  I will order forfeiture to that effect.

8               With respect to restitution, are you intending to

9    submit a restitution order?

10              MR. LOCKARD:  We will also submit a restitution order

11   under Section 3663(a) of Title 18.

12              THE COURT:  So, again, forfeiture will be ordered as

13   requested by the government.  A restitution order will be

14   submitted within 90 days.

15              I am required to impose the mandatory special

16   assessment of $700, which is a hundred dollars per count, which

17   will be paid immediately.

18              And are you requesting a fine or are you not doing

19   that in light of the forfeiture and restitution orders?

20              MR. LOCKARD:  I think with respect to a fine, we would

21   agree with probation's recommendation.

22              THE COURT:  All right.  So no fine will be imposed.

23              Does either counsel know of any legal reason why this

24   sentence cannot be imposed?

25              MR. BRANDEN:  Jim Branden.  No, Judge.

K6CALERSps

```
 1              THE COURT:  Mr. Leroux, that is the sentence of this
 2    Court.  You have a right to appeal your conviction and sentence
 3    except to whatever extent you may have validly waived that
 4    right as part of your plea agreement.  If you do choose to
 5    appeal, the notice of appeal must be filed within 14 days of
 6    the judgment of conviction.  If you're not able to pay for the
 7    cost of an appeal, you may apply for leave to appeal in forma
 8    pauperis, which simply means the court costs and filing fees
 9    will be waived.  If you request, the Clerk of Court will
10    prepare and file a notice of appeal on your behalf.
11              Are there any open counts or underlying indictments
12    that need to be dismissed against Mr. Leroux?
13              MR. LOCKARD:  There are, your Honor.  At this time the
14    government moves to dismiss all open counts.
15              THE COURT:  All right.  They will be dismissed.
16              Are there any other applications at this time?
17              MR. CHABROWE:  No, your Honor.
18              THE COURT:  All right.  Thank you.  We're adjourned.
19              MR. CHABROWE:  Thank you.
20              (Adjourned)
21
22
23
24
25
```

Criminal Notice of Appeal - Form A

# NOTICE OF APPEAL

**United States District Court**

Southern _____ District of _____ New York

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6/30/2020

Caption:
United States
_____ v.

Leroux
_____

Docket No. 12-cr-489; 14-cr-75 (RA)
_____

Judge Ronnie Abrams
_____
(District Court Judge)

Notice is hereby given that ___defendant Paul Calder Leroux_____ appeals to the United States Court of

Appeals for the Second Circuit from the judgment [✔], other [ ]    _____
(specify)

entered in this action on _____
(date)

This appeal concerns: Conviction only [___]    Sentence only [✔]    Conviction & Sentence [___]    Other [___]

Defendant found guilty by plea [✔] | trial | | N/A [ .

Offense occurred after November 1, 1987?    Yes [✔] | No [ ]    N/A [

Date of sentence: ___June 12, 2020_____    N/A [ ]

Bail/Jail Disposition: Committed [✔]    Not committed | |    N/A |

Appellant is represented by counsel?   Yes [✔] | No | |    If yes, provide the following information:

Defendant's Counsel:    Jeffrey Chabrowe, Esq.

Counsel's Address:    261 Madison Ave. 12th Floor

New York, NY 10016

Counsel's Phone:    (917) 529-3921

Assistant U.S. Attorney:    Michael Dennis Lockard

AUSA's Address:    One Saint Andrews Plaza

New York, NY 10007

AUSA's Phone:    (212) 637-2527

_____
Signature

A                              255



256

A

Sheet 1

# UNITED STATES DISTRICTCOURT

Southern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE** |
| v. | |
| Paul Calder Leroux | Case Number: S2 12 Cr. 489-01 (RA) |
| | USM Number: 67464-054 |
| | James Branden/Jeffrey Chabrowe |
| | Defendant's Attorney |

## THE DEFENDANT:

☑ pleaded guilty to count(s)    (1), (2), (3), (4)

☐ pleaded nolo contendere to count(s)
   which was accepted by the court.

☐ was found guilty on count(s)
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 21USC952/959/983 | Conspiracy to Import and Distribute Methamphetamine | 9/26/2012 | (1) |
| 50USC1701-1707 | Unlicensed Exportation of Goods and Technology from US... | 9/26/2012 | (2) |
| 18USC1030(b) | Conspiracy to Commit Computer Hacking | 9/26/2012 | (3) |

The defendant is sentenced as provided in pages 2 through    8 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☑ Count(s)    Any open counts           ☐ is   ☑ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

6/12/2020

Date of Imposition of Judgment

Signature of Judge

Ronnie Abrams, U.S.D.J.

Name and Title of Judge

7/8/2020

Date

A

257

This page is always included when printing.

Sheet 1A

Judgment—Page ___2___ of ___8___

DEFENDANT:  Paul Calder Leroux
CASE NUMBER:  S2 12 Cr. 489-01 (RA)

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section [?] | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18USC3 | Accessory After the Fact | 9/26/2012 | (4) |

A

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page ___3___ of ___8___

DEFENDANT:   Paul Calder Leroux
CASE NUMBER:   S2 12 Cr. 489-01 (RA)

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

300 months [to run concurrently]
[300 Months on Count 1; 240 months on Count 2; 60 months on Count 3; 180 months on Count 4; for a total of 300 months]

This sentence is to run concurrent to the sentence imposed in 14 Cr. 75.

☐ The court makes the following recommendations to the Bureau of Prisons:

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

   ☐ at _____ ☐ a.m.   ☐ p.m.   on _____ .

   ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

   ☐ before 2 p.m. on _____ .

   ☐ as notified by the United States Marshal.

   ☐ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on_____to_____

at_____, with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

A

Sheet 3 — Supervised Release

Judgment—Page __4__ of ___8___

DEFENDANT:  Paul Calder Leroux
CASE NUMBER: S2 12 Cr. 489-01 (RA)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

Life on Count One of 12 Crim. 489, three years on each of Counts Two through Four of 12 Crim. 489 and Counts One through Three of 14 Crim. 75, to run concurrently, for a total of a life term of supervised release.

## MANDATORY CONDITIONS

1.  You must not commit another federal, state or local crime.
2.  You must not unlawfully possess a controlled substance.
3.  You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by thecourt.
    ☑ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.  ☑ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.  ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.  ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check ifapplicable)*
7.  ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

Sheet 3A — Supervised Release

Judgment—Page ___5___ of ___8___

DEFENDANT: Paul Calder Leroux
CASE NUMBER: S2 12 Cr. 489-01 (RA)

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____     Date _____



Sheet 3D — Supervised Release

| | Judgment—Page | 6 | of | 8 |
|---|---|---|---|---|

DEFENDANT: Paul Calder Leroux
CASE NUMBER: S2 12 Cr. 489-01 (RA)

## SPECIAL CONDITIONS OF SUPERVISION

The defendant must obey the immigration law and comply with the directives of immigration authorities.

The defendant must participate in an outpatient mental health treatment program approved by the Probation Office. Must continue to take any prescribed medications unless otherwise instructed by the healthcare provider. The defendant must contribute to the cost of services rendered based on his ability to pay and the availability of third-party payments. The Court authorizes the release of available psychological and psychiatric evaluations and reports, including the presentence investigation report, to the healthcare provider.

The defendant shall submit his person and any property, residence, vehicle, papers, computer, and other electronic communication, data storage devices, cloud storage, or media and effects to a search by the United States Probation Office and, if needed, with the assistance of any law enforcement. The search is to be conducted at a reasonable time and in a reasonable manner, when there is reasonable suspicion concerning violation of a condition of your supervision or unlawful conduct by the person being supervised. Failure to submit to a search may be grounds for revocation of release. The defendant shall warn any occupants at the premises that they also may be subject to searches pursuant to this condition. Any search shall be conducted at a reasonable time and in a reasonable manner.

The defendant must provide the probation officer with any requested financial information.

The defendant must not incur new credit card charges or open lines of credit unless he is in compliance with the payment schedule.

A

Include this page when printing?

Print this page now   Reset this page

Yes   No

Judgment — Page 7 of 8

DEFENDANT: Paul Calder Leroux
CASE NUMBER: S2 12 Cr. 489-01 (RA)

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 400.00 | $ | $ | $ | $ |

☑ The determination of restitution is deferred until ___9/14/2020___. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

    If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |

| **TOTALS** | $ 0.00 | $ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is orderedthat:

    ☐ the interest requirement is waived for the   ☐ fine   ☐ restitution.

    ☐ the interest requirement for the   ☐ fine   ☐ restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

Include this page when printing?
◉ Yes    ○ No

Sheet 6 — Schedule of Payments

Judgment — Page   8   of   8

DEFENDANT: Paul Calder Leroux
CASE NUMBER: S2 12 Cr. 489-01 (RA)

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A** ☑ Lump sum payment of $   400.00   due immediately, balance due

     ☐ not later than _____ , or
     ☐ in accordance with ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

**B** ☐ Payment to begin immediately (may be combined with ☐ C, ☐ D, or ☐ F below); or

**C** ☐ Payment in equal_____*(e.g., weekly, monthly, quarterly)* installments of $_____over a period of _____ *(e.g., months or years)*, to commence_____*(e.g., 30 or 60 days)* after the date of this judgment; or

**D** ☐ Payment in equal_____*(e.g., weekly, monthly, quarterly)* installments of $_____over a period of _____ *(e.g., months or years)*, to commence_____*(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within_____*(e.g., 30 or 60 days)* after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☐ Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

Case Number
Defendant and Co-Defendant Names             Total Amount          Joint and Several          Corresponding Payee,
*(including defendant number)*                                              Amount                        if appropriate

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s):

☑ The defendant shall forfeit the defendant's interest in the following property to the United States:
     As a result of committing the offenses alleged in Counts One, Two and Three of the Information, the defendant shall forfeit to the United States any and all property constituting or derived from any proceeds the defendant obtained directly or indirectly as a result of the violations and any and all property used or intended to be used in any manner or part to commit and to facilitate the commission of these offenses. A separate Order of Forfeiture shall be issued.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

Include this page when printing?
● Yes   ○ No

1

K9A5lerS                    telephonic proceeding

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                        12 Cr. 489/14 Cr. 75 (RA)

5   PAUL CALDER LEROUX,

6              Defendant.

7   ------------------------------x

8                                        September 10, 2020
                                         9:20 a.m.
9

10  Before:

11                 HON. RONNIE ABRAMS,

12                                       District Judge

13

14                      APPEARANCES

15  AUDREY STRAUSS
         Acting United States Attorney for the
16       Southern District of New York
    BY:  MICHAEL D. LOCKARD
17       Assistant United States Attorney

18  LAW OFFICES OF JEFFREY CHABROWE
         Attorneys for Defendant
19  BY:  JEFFREY CHABROWE

20

21

22

23

24

25

2

K9A5lerS                              telephonic proceeding

1           (Case called)

2           THE DEPUTY CLERK:  Counsel, will you please state your

3    name for the record?

4           MR. CHABROWE:  Jeffrey Chabrowe for Mr. Leroux.  Good

5    morning.

6           THE COURT:  Good morning.

7           MR. LOCKARD:  Good morning, your Honor.  This is

8    Michael Lockard for the government.

9           THE COURT:  Good morning.

10           As I noted in my July 10th order, I scheduled this

11   proceeding to clarify the breakdown of the 300-month sentence I

12   previously imposed but first I just want to remind everyone

13   that this is a public proceeding.  Members of the public and

14   press are able to access the proceeding through the public

15   call-in number.  All participants, however, are reminded that

16   any recording or rebroadcasting of any portion of this

17   proceeding is strictly prohibited.

18           I also want to confirm that Mr. Leroux again consents

19   to proceed by video today.  We are of course in the middle of

20   the COVID-19 pandemic.  I am conducting this proceeding

21   remotely pursuant to the authority provided by Section 15002 of

22   the CARES Act and standing orders issued by our Chief Judge

23   pursuant to that.  I am proceeding by video conference, I am

24   myself within the district.  Counsel are appearing by phone but

25   Mr. Leroux is appearing by video conference from the GEO

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

A

K9A5lerS                    telephonic proceeding

1   facility.

2          Mr. Leroux, can you see and hear me?

3          THE DEFENDANT:  I can, your Honor.

4          THE COURT:  And do you again consent to proceed by

5   video today?

6          THE DEFENDANT:  I do, your Honor.

7          THE COURT:  I find that a knowing and voluntary waiver

8   of the right to be physically present has been made.  I also

9   find that today's proceeding cannot be further delayed without

10  serious harm to the interests of justice because Mr. Leroux

11  initially sought a time-served sentence and now seeks to

12  promptly appeal the sentence.  It is also important that he be

13  designated to a facility.  So, let's just get to the heart of

14  this.

15         As you all know, on June 12th I sentenced Mr. Leroux

16  to 300 months' imprisonment on a total of seven counts,

17  specifically Counts One through Four of indictment 12 crim 489

18  and Counts One through Three of 14 crim 75.  Judgment was

19  entered in 12 crim 489 on July 8th.  Mr. Leroux appealed that

20  judgment on July 9th.  The Court will enter a revised judgment

21  in that case, in 12 crim 489, after this sentencing.  Judgment

22  has not yet been entered in 14 crim 75 because I discovered

23  errors regarding the breakdown of the sentence upon reviewing

24  the transcript of the sentencing proceeding prior to issuing

25  that judgment.

K9A5lerS                    telephonic proceeding

1          So, I want to be clear that I am incorporating

2    everything from the June 12th proceeding.  So, for the reasons

3    that I stated then I am imposing a sentence of 300 months in

4    prison.  That has not changed.  I am, though, amending the

5    breakdown of that sentence as there were errors in my

6    articulation of it.  So, the sentence is as follows:  300

7    months on Count One of 12 crim 489; 240 months on Count Two of

8    12 crim 489; 60 months on Count Three of 12 crim 489; 150

9    months on Count Four of 12 crim 489; 60 months on Count One of

10   14 crim 75; 240 months on Count Two of 14 crim 75; and 240

11   months on Count Three of 14 crim 75.  All of these sentences

12   are to run concurrently for a total of 300 months' imprisonment

13   on all counts which includes, of course, the amount of time

14   Mr. Leroux has already served which I believe is about 95

15   months at this point in time.

16          The terms of supervised release and the conditions of

17   supervised release will all remain the same, what I articulated

18   previously, as will the fine or lack thereof, and the $700

19   special assessment.  So that's all remaining the same.

20          I do, though, before we go, want to touch on

21   restitution and forfeiture.

22          Mr. Lockard, where are we on restitution?  On June 12

23   you requested 90 days which I believe is up today so where are

24   we on seeking restitution and submitting a proposed restitution

25   order?

K9A5lerS                    telephonic proceeding

1          MR. LOCKARD:  Yes, your Honor.

2          At this point we have not identified a victim

3   (inaudible) loss, and so at this time we are not in a position

4   to submit a proposed order of restitution.

5          THE COURT:  Okay.  Well, if that changes, I would

6   intend to impose restitution but, since it hasn't, I'm not

7   going to do so at this point in time.

8          Then, with respect to forfeiture, on July 17th I

9   signed the preliminary forfeiture order that the government

10  proposed.  Mr. Chabrowe, do you have any objection to the

11  preliminary forfeiture order?

12         MR. CHABROWE:  I do not, your Honor.

13         THE COURT:  Okay.  So I am incorporating the

14  forfeiture order into my sentence today.  I previously ordered

15  forfeiture but I am going to incorporate that forfeiture order

16  into my sentence today.

17         Does either counsel know of any legal reason why this

18  sentence should not be imposed, as stated?  All prior

19  objections are preserved for the record.

20         MR. CHABROWE:  I do not, your Honor.

21         THE COURT:  Mr. Lockard?

22         MR. LOCKARD:  I do not, your Honor.

23         THE COURT:  Okay.  So I want to clarify again that

24  Mr. Leroux has a right to appeal his conviction and sentence

25  except to whatever extent he may have validly waived that

6

K9A5lerS                          telephonic proceeding

1    right.  If he does choose to appeal, the notice of appeal must

2    be filed within 14 days of the judgment of conviction.  I am

3    going to issue these two judgments promptly.  If you cannot pay

4    for the cost of an appeal, you may apply for leave to appeal in

5    forma pauperis which simply means that Court costs such as

6    filing fees will be waived.  If you request, the Clerk of Court

7    will prepare and file a notice of appeal on your behalf.

8              Are there any other applications at this time?

9              All right.  Well, thank you all for coming back today

10   and allowing me to clarify that.  We are adjourned.  Thank you.

11                          o0o

12

13

14

15

16

17

18

19

20

21

22

23

24

25

A

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case          (form modified within District on Sept. 30, 2019)          (NOTE: Identify Changes with Asterisks (*))
                       Sheet 1

# UNITED STATES DISTRICT COURT

Southern District of New York

| UNITED STATES OF AMERICA | ) | **AMENDED JUDGMENT IN A CRIMINAL CASE** |
|---|---|---|
| **v.** | ) | |
| Paul Calder Leroux | ) | Case Number:  S2 12 Cr. 489-01 (RA) |
| | ) | USM Number:  67464-054 |
| **Date of Original Judgment:**  7/8/2020 | ) | Jeffrey Chabrowe (917) 529-3921 |
| *(Or Date of Last Amended Judgment)* | ) | Defendant's Attorney |

**THE DEFENDANT:**

☑ pleaded guilty to count(s)   (1), (2), (3), (4)

☐ pleaded nolo contendere to count(s)
   which was accepted by the court.

☐ was found guilty on count(s)
   after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 21USC952/959/983 | Conspiracy to Import and Distribute Methamphetamine | 9/26/2012 | (1) |
| 50USC1701-1707 | Unlicensed Exportation of Goods and Technology from US... | 9/26/2012 | (2) |
| 18USC1030(b) | Conspiracy to Commit Computer Hacking | 9/26/2012 | (3) |

The defendant is sentenced as provided in pages 2 through ___8___ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s)

☑ Count(s)   Any open counts          ☐ is   ☑ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

6/12/2020

Date of Imposition of Judgment

Signature of Judge

Ronnie Abrams, U.S.D.J.

Name and Title of Judge

9/10/2020

Date

A                                                271

AO 245C (Rev. 09/19)    Amended Judgment in a Criminal Case
                        Sheet 1A

(NOTE: Identify Changes with Asterisks (*))

Judgment — Page    2    of    8

DEFENDANT:  Paul Calder Leroux
CASE NUMBER:  S2 12 Cr. 489-01 (RA)

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18USC3 | Accessory After the Fact | 9/26/2012 | (4) |

AO 245C (Rev. 09/19)    Amended Judgment in a Criminal Case
                     Sheet 2 — Imprisonment                                                                    (NOTE: Identify Changes with Asterisks (*))

Judgment — Page   3   of   8  

DEFENDANT:   Paul Calder Leroux
CASE NUMBER:   S2 12 Cr. 489-01 (RA)

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a
total term of :
300 months [to run concurrently]
[300 Months on Count 1; 240 months on Count 2; 60 months on Count 3; 150 months on Count 4; for a total of 300 months]
This sentence is to run concurrent to the sentence imposed in 14 Cr. 75.

☐     The court makes the following recommendations to the Bureau of Prisons:

☑     The defendant is remanded to the custody of the United States Marshal.

☐     The defendant shall surrender to the United States Marshal for this district:

       ☐   at _____  ☐ a.m.  ☐ p.m.   on _____ .

       ☐   as notified by the United States Marshal.

☐     The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

       ☐   before 2 p.m. on _____ .

       ☐   as notified by the United States Marshal.

       ☐   as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on _____  to _____

at _____ with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

A                                  273

AO 245C (Rev. 09/19)    Amended Judgment in a Criminal Case
            Sheet 3 — Supervised Release
                                                                    (NOTE: Identify Changes with Asterisks (*))
                                                        Judgment—Page___4___ of ___8___

DEFENDANT:   Paul Calder Leroux
CASE NUMBER:   S2 12 Cr. 489-01 (RA)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of :

Life on Count (1), three years on each of Counts (2), (3) and (4) to run concurrently, for a total of a life term of supervised release.

This term of supervised release is to run concurrent to the term of supervision imposed in 14 Cr. 75.

## MANDATORY CONDITIONS

1.    You must not commit another federal, state or local crime.
2.    You must not unlawfully possess a controlled substance.
3.    You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
         ☑  The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4.    ☑  You must make restitution in accordance with 18 U.S.C. § 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5.    ☑  You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6.    ☐  You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7.    ☐  You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

A                                    274

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
                       Sheet 3A — Supervised Release

| | | Judgment—Page | 5 | of | 8 |
|---|---|---|---|---|---|

DEFENDANT:    Paul Calder Leroux
CASE NUMBER:   S2 12 Cr. 489-01 (RA)

# STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1.  You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2.  After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3.  You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4.  You must answer truthfully the questions asked by your probation officer.
5.  You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6.  You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7.  You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8.  You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9.  If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature _____     Date _____

A

AO 245C (Rev. 09/19)    Amended Judgment in a Criminal Case
                      Sheet 3D — Supervised Release
                                                                    (NOTE: Identify Changes with Asterisks (*))

Judgment—Page    6    of    8

DEFENDANT:  Paul Calder Leroux
CASE NUMBER:  S2 12 Cr. 489-01 (RA)

## SPECIAL CONDITIONS OF SUPERVISION

The defendant must obey the immigration law and comply with the directives of immigration authorities.

The defendant must participate in an outpatient mental health treatment program approved by the Probation Office. Must continue to take any prescribed medications unless otherwise instructed by the healthcare provider. The defendant must contribute to the cost of services rendered based on his ability to pay and the availability of third-party payments. The Court authorizes the release of available psychological and psychiatric evaluations and reports, including the presentence investigation report, to the healthcare provider.

The defendant shall submit his person and any property, residence, vehicle, papers, computer, and other electronic communication, data storage devices, cloud storage, or media and effects to a search by the United States Probation Office and, if needed, with the assistance of any law enforcement. The search is to be conducted at a reasonable time and in a reasonable manner, when there is reasonable suspicion concerning violation of a condition of your supervision or unlawful conduct by the person being supervised. Failure to submit to a search may be grounds for revocation of release. The defendant shall warn any occupants at the premises that they also may be subject to searches pursuant to this condition. Any search shall be conducted at a reasonable time and in a reasonable manner.

The defendant must provide the probation officer with any requested financial information.

The defendant must not incur new credit card charges or open lines of credit unless he is in compliance with the payment schedule.

A

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

(NOTE: Identify Changes with Asterisks (*))

Judgment — Page ___7___ of ___8___

DEFENDANT:   Paul Calder Leroux
CASE NUMBER:   S2 12 Cr. 489-01 (RA)

# CRIMINAL MONETARY PENALTIES

The defendant must pay the following total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Restitution | Fine | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $ 400.00 | $ | $ | $ | $ |

☐   The determination of restitution is deferred until _____ .  An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐   The defendant shall make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss*** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |

| | | | | |
|---|---|---|---|---|
| **TOTALS** | $ | 0.00 | $ | 0.00 |

☐   Restitution amount ordered pursuant to plea agreement  $ _____

☐   The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐   The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

☐   the interest requirement is waived for    ☐  fine    ☐  restitution.

☐   the interest requirement for the    ☐  fine    ☐  restitution is modified as follows:

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

A                                    277

AO 245C (Rev. 09/19)   Amended Judgment in a Criminal Case
               Sheet 6 — Schedule of Payments                                        (NOTE: Identify Changes with Asterisks (*))

Judgment — Page   __8__   of   __8__

DEFENDANT:  Paul Calder Leroux
CASE NUMBER:  S2 12 Cr. 489-01 (RA)

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

**A**  ☑  Lump sum payment of $ __400.00__ due immediately, balance due

        ☐  not later than _____ , or
        ☐  in accordance with  ☐  C,  ☐  D,  ☐  E, or  ☐  F below; or

**B**  ☐  Payment to begin immediately (may be combined with  ☐  C,  ☐  D, or  ☐  F below); or

**C**  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of  $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**D**  ☐  Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of  $ _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

**E**  ☐  Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**      Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

| Case Number Defendant and Co-Defendant Names *(including defendant number)* | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate. |
|---|---|---|---|
| | | | |

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☑  The defendant shall forfeit the defendant's interest in the following property to the United States:
    A separate Preliminary Order of Forfeiture was issued on July 17, 2020 and is incorporated into this Judgment.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

Thurgood Marshall U.S. Courthouse    40 Foley Square, New York, NY 10007 Telephone: 212-857-8500

MOTION INFORMATION STATEMENT

Docket Number(s): **20-2184/20-3410**

Motion for: **Consolidation of Appeals**

Caption [use short title]

**Leroux v. U.S.**

&

**Leroux v. U.S.**

Set forth below precise, complete statement of relief sought:

Petitioner seeks to consolidate his two 2nd Circuit
Court of Appeals matters, case nos. 20-2184 &
20-3410.

MOVING PARTY: **Paul Calder Leroux**    OPPOSING PARTY: **United States of America**

☐ Plaintiff    ☐ Defendant
☑ Appellant/Petitioner    ☐ Appellee/Respondent

MOVING ATTORNEY: **Paul Calder Leroux**    OPPOSING ATTORNEY: **United States of America**

[name of attorney, with firm, address, phone number and e-mail]

Jeffrey Chabrowe    261 Madison Ave. 12th Floor

The Law Office of Jeffrey Chabrowe    New York, New York 10016

jeff@chabrowe.com    (917) 529-3921

Court-Judge/Agency appealed from: **Southern District of New York - Hon. Ronnie Abrams**

Please check appropriate boxes:

Has movant notified opposing counsel (required by Local Rule 27.1):
☑ Yes ☐ No (explain):_____

Opposing counsel's position on motion:
☑ Unopposed ☐ Opposed ☐ Don't Know
Does opposing counsel intend to file a response:
☐ Yes ☐ No ☑ Don't Know

FOR EMERGENCY MOTIONS, MOTIONS FOR STAYS AND
INJUNCTIONS PENDING APPEAL:
Has request for relief been made below?    ☐ Yes ☐ No
Has this relief been previously sought in this Court?    ☐ Yes ☐ No
Requested return date and explanation of emergency:_____

Is oral argument on motion requested?    ☐ Yes ☑ No    (requests for oral argument will not necessarily be granted)

Has argument date of appeal been set?    ☐ Yes ☑ No    If yes, enter date:_____

Signature of Moving Attorney:

_____ Date: **12/22/2020**    Service by: ☑ CM/ECF    ☐ Other [Attach proof of service]

Form T-1080 (rev. 12-13)

Case 20-2184, Document 34, 12/22/2020, 2999045, Page2 of 5

**Nos. 20-2184 & 20-3410**

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

| | | |
|---|---|---|
| **PAUL CALDER LEROUX** | ) | On Appeal from the United States District Court for the Southern District of New York |
| Defendant-Appellant, | ) | |
| v. | ) | |
| | ) | No. 1:12-CR-489 |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | The Honorable Ronnie Abrams, United States District Judge |
| Appellee. | ) | |

| | | |
|---|---|---|
| **PAUL CALDER LEROUX** | ) | On Appeal from the United States District Court for the Southern District of New York |
| Defendant-Appellant, | ) | |
| v. | ) | |
| | ) | No. 1:14-CR-75 |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | The Honorable Ronnie Abrams, United States District Judge |
| Appellee. | ) | |

**APPELLANT'S MOTION TO CONSOLIDATE APPEALS**

A                                    280

Case 20-2184, Document 34, 12/22/2020, 2999045, Page3 of 5

Pursuant to Fed R. App. P. 3(b)(2), Defendant/Appellant Paul Calder Leroux, respectfully requests that the Court consolidate the following two cases for appeal: Paul Calder Leroux v. United States of America, No. 20-2184 ("the 2012 matter"), and Paul Calder Leroux v. United States of America, No. 20-3410 ("the 2014 matter"). Both appeals involve the same defendant/appellant, present the same legal questions, arise from the same district court proceeding, and the defendant in both cases is appealing from the same ruling. Consolidating the two matters for briefing and argument would spare the both the Court and the parties needless duplication of effort and procedure.

The 2012 matter was filed in the Southern District of New York on June 22, 2012. The 2014 matter was filed in the District of Minnesota, case no. 14 Cr. 16, on February 5, 2014. Although the indictment in the 2012 matter primarily charged Mr. Leroux with conspiracy to import a controlled substance, and the 2014 matter primarily charged Mr. Leroux with conspiracy to violate the federal food, drug, and cosmetic act, both indictments drew from the same overarching relevant conduct which occurred over many years and in many jurisdictions. Once Mr. Leroux informed the government that he intended to plea guilty in the 2014 matter, the case was transferred to the Southern District of New York on February 5, 2014 for allocution and sentencing. From this point on, defense counsel dealt with the same Assistant United States Attorneys and the same Judges in both matters.

Beginning in April of 2019, identical entries were made in both the 2012 and 2014 dockets. The Presentence Report released under seal in both referred to both Southern District of New York case numbers. Defendant's Sentencing Submission was filed in reference to both matters. Government documents filed in anticipation of sentencing in one matter were deemed filed in the other. Finally, the sentencing hearing on June 12, 2020 before the Honorable Ronnie

Abrams was conducted with reference to both the 2012 and 2014 matters. Both matters were essentially consolidated at the district court level, even though both dockets remained active.

Mr. Leroux filed his notice of appeal in both matters on October 9, 2020. The Acknowledgement and Notice of Appearance was then filed in both 2nd Circuit Court of Appeal matters on October 26, 2020. The question presented in both appeals is whether or not the sentence received, reflected in the judgment entered on September 10, 2020 on both Southern District of New York dockets, was harsh or excessive. That question relies on the same issues of law and fact in both cases. Because these underlying issues of fact and law are identical, Case Nos. 20-2184 and 20-3410 should be joined for briefing, argument, and decision.

For his briefing, defendant/appellant Paul Calder Leroux intends to file one appeal that would holistically address issues and facts from both underlying district court matters. Any anticipated oral argument would also be made in joint reference to both matters. Consolidation would therefore eliminate repeat arguments and minimize the burden on the Court. Consolidation would not result in any foreseeable delay. Both appeals have only been recently filed, and defense counsel in both matters intends to file an amended Form B to reset the briefing schedule.

The government consents to this motion to consolidate.

**CONCLUSION**

For the foregoing reasons, defendant/appellant Paul Calder Leroux respectfully requests that the Court consolidate his two 2nd Circuit Court of Appeals matters, case numbers 20-2184 and 20-3410 for briefing and oral argument.


Dated:  December 15, 2020
        New York, New York

**JEFFREY CHABROWE, ESQ.**
**Attorney(s) for Appellant/Defendant**
MANAGING PARTNER
THE LAW OFFICE OF
JEFFREY CHABROWE, P.C.
261 MADISON AVENUE
NEW YORK, NY 10016
(212) 736-3935

# UNITED STATES COURT OF APPEALS
## FOR THE
## SECOND CIRCUIT

At a Stated Term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 29th day of December, two thousand twenty.

Before:        Steven J. Menashi,
                    *Circuit Judge.*

_____

United States of America,

                    Appellee,

v.

Paul Calder Leroux,

                    Defendant - Appellant.

_____

**ORDER**

Docket Nos. 20-2184; 20-3410

Appellant Paul Calder Leroux moves for the consolidation of his appeals docketed under 20-2184 and 20-3410.

IT IS HEREBY ORDERED that the motion is GRANTED.


For the Court**:**
Catherine O'Hagan Wolfe,
Clerk of Court



A                                                284

Query     Reports     Utilities     Help     Log Out

CLOSED,APPEAL,ECF

# U.S. District Court
## Southern District of New York (Foley Square)
## CRIMINAL DOCKET FOR CASE #: 1:14-cr-00075-RA-1

Case title: USA v. Calder LeRoux

Date Filed: 02/05/2014

Date Terminated: 09/10/2020

Assigned to: Judge Ronnie Abrams

**Defendant (1)**

**Paul Calder Le Roux**
*TERMINATED: 09/10/2020*
*also known as*
Johan Smit
*TERMINATED: 09/10/2020*

represented by **Bernard Alan Seidler**
B. Alan Seidler
580 Broadway
Room 402
New York, NY 10012
212-334-3131
Fax: 212-334-2211
Email: snedens66@aol.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
Designation: Retained

**James Matthew Branden**
Law Office of James M. Branden
551 Fifth Avenue
Suite 422
New York, NY 10176
212-286-0173
Fax: 212-286-0495
Email: jamesmbranden@gmail.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
Designation: Retained

**Jessica Ortiz**
MoloLamken LLP (NYC)
430 Park Avenue
New York, NY 10022
212-607-8160
Fax: 212-607-8161
Email: jortiz@mololamken.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
Designation: CJA Appointment

A

| Pending Counts | Disposition |
|---|---|
| 18:371.F CONSPIRACY TO INTRODUCE MISBRANDED DRUGS INTO INTERSTATE COMMERCE (1) | IMPRISONMENT: 60 months on Count 1; 240 months on Count 2; 240 months on Count 3, all to run concurrent. This sentence is also to run concurrent to the sentence imposed in 12 Cr. 489, which will result in a total of 300 months. SUPERVISED RELEASE: Three years on Counts (1),(2) and (3), to run concurrently. |
| 18:1349.F ATTEMPT AND CONSPIRACY TO COMMIT MAIL AND WIRE FRAUD (2) | IMPRISONMENT: 60 months on Count 1; 240 months on Count 2; 240 months on Count 3, all to run concurrent. This sentence is also to run concurrent to the sentence imposed in 12 Cr. 489, which will result in a total of 300 months. SUPERVISED RELEASE: Three years on Counts (1),(2) and (3), to run concurrently. |
| 18:1956-4999.F MONEY LAUNDERING - FRAUD, OTHER (CONSPIRACY) (3) | IMPRISONMENT: 60 months on Count 1; 240 months on Count 2; 240 months on Count 3, all to run concurrent. This sentence is also to run concurrent to the sentence imposed in 12 Cr. 489, which will result in a total of 300 months. SUPERVISED RELEASE: Three years on Counts (1),(2) and (3), to run concurrently. |

**Highest Offense Level (Opening)**

Felony

**Terminated Counts**                                **Disposition**

None

**Highest Offense Level (Terminated)**

None

**Complaints**                                **Disposition**

None

---

**Plaintiff**

USA                          represented by   **Linda I. Marks**
                                              U.S. Department of Justice
                                              Consumer Protection Branch
                                              P.O. Box 386
                                              Washington, DC 20044
                                              202-307-0060
                                              Fax: 202-514-8742
                                              Email: linda.marks@usdoj.gov
                                              *LEAD ATTORNEY*

A                          287

*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

**Michael Dennis Lockard**
United States Attorney's Office, SDNY
One Saint Andrew's Plaza
New York, NY 10007
(212) 637-2193
Fax: (212) 637-2527
Email: michael.lockard@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*
*Designation: Assistant US Attorney*

| Date Filed | # | Docket Text |
|---|---|---|
| 02/05/2014 | 3 | CONSENT TO TRANSFER JURISDICTION (Rule 20) from the United States District Court - District of Minnesota; by Paul Calder Le Roux (1) count(s) 1, 2, 3. (jm) (Entered: 03/08/2016) |
| 02/11/2014 | 1 | SEALED DOCUMENT placed in vault. (mps) (Entered: 02/11/2014) |
| 04/16/2015 | | NOTICE OF CASE REASSIGNMENT as to Sealed Defendant 1, to Judge Loretta A. Preska. Judge Robert P. Patterson no longer assigned to the case. (pgu) (Entered: 04/16/2015) |
| 12/17/2015 | 2 | SEALED DOCUMENT placed in vault. (mps) (Entered: 12/17/2015) |
| 03/05/2016 | 4 | Order to Unseal Case as to Paul Calder Le Roux. (Signed by Judge Loretta A. Preska on 3/5/16)(jm) (Entered: 03/08/2016) |
| 03/05/2016 | | Case Designated ECF as to Paul Calder Le Roux. (jm) (Entered: 03/08/2016) |
| 03/05/2016 | | Case Designated ECF as to Paul Calder Le Roux. (jm) (Entered: 03/08/2016) |
| 03/05/2016 | | Attorney update in case as to Paul Calder Le Roux. Attorney Michael Dennis Lockard for USA added. (jm) (Entered: 03/08/2016) |
| 03/05/2016 | 5 | RULE 20 DOCUMENTS RECEIVED as to Paul Calder Le Roux transferred from the United States District Court - District of Minnesota, Case Number: 14cr16 JRT. The following documents were received: Certified copy of the indictment/information, certified copy of the docket sheet, and letter of acknowledgment. (jm) (Entered: 03/08/2016) |
| 03/05/2016 | | Minute Entry for proceedings held before Judge Robert P. Patterson: Deft. produced by US Marshal and is present with atty Seidler; AUSAs Hector, Lockard, Marks & Gorji are present. Allocution is conducted, Court accepts the plea. PSR is NOT ordered, control date set for conference is scheduled for 8/20/14 at 4 PM. Government submitted order is signed sealing the transcript of this proceeding along with sealing of the proceeding itself. Remand continued.Arraignment as to Paul Calder Le Roux (1) Count 1,2,3 held on 3/5/2016. Plea entered by Paul Calder Le Roux (1) Guilty as to Count 1,2,3. (Originally held under seal on 2/19/14) (jm) (Entered: 03/17/2016) |
| 03/05/2016 | | Attorney update in case as to Paul Calder Le Roux. Attorney Bernard Alan Seidler for Paul Calder Le Roux added. (jm) (Entered: 03/17/2016) |
| 03/22/2019 | 6 | NOTICE OF ATTORNEY APPEARANCE Linda I. Marks appearing for USA. (Marks, Linda) (Entered: 03/22/2019) |

| 04/01/2019 | 7 | ORDER as to Paul Calder Le Roux: The CJA attorney on duty today, Jessica Ortiz, is appointed to represent the above-named defendant. Sentencing is scheduled for July 23, 2019 at 10:00 a.m. The Probation Department is ordered to prepare the presentence report. Added attorney Jessica Ortiz for Paul Calder Le Roux. (Signed by Judge Loretta A. Preska on 4/1/2019)(Docketed in 12cr489 & 14cr075) (ap) Modified on 4/1/2019 (ap). (Entered: 04/01/2019) |
| 04/01/2019 | | Set/Reset Hearings as to Paul Calder Le Roux: Sentencing set for 7/23/2019 at 10:00 AM before Judge Loretta A. Preska. (ap) (Entered: 04/01/2019) |
| 04/01/2019 | | Oral Order of Referral to Probation for Presentence Investigation and Report as to Paul Calder Le Roux. (Signed by Judge Loretta A. Preska on 4/1/2019) (ap) (Entered: 04/01/2019) |
| 05/23/2019 | | Case as to (14-Cr-75-1) Paul Calder Le Roux REASSIGNED to Judge Ronnie Abrams. Judge Loretta A. Preska no longer assigned to the case. (bw) (Entered: 05/23/2019) |
| 05/30/2019 | 8 | ORDER as to Paul Calder Le Roux. These matters have been reassigned to me for all purposes. The Court will sentence Mr. LeRoux on August 14, 2019 at 3:00 p.m. The Government's submission shall be due two weeks prior to sentencing and defendant's submission shall be due one week prior to sentencing. Refer to 12 cr 489 (RA) (Signed by Judge Ronnie Abrams on 5/30/19)(jw) (Entered: 05/30/2019) |
| 05/30/2019 | | Set/Reset Deadlines/Hearings as to Paul Calder Le Roux: Sentencing set for 8/14/2019 at 03:00 PM before Judge Ronnie Abrams (jw) (Entered: 05/30/2019) |
| 07/15/2019 | 9 | NOTICE OF ATTORNEY APPEARANCE: James Matthew Branden appearing for Paul Calder Le Roux. Appearance Type: Retained. (Branden, James) (Entered: 07/15/2019) |
| 07/17/2019 | 10 | FIRST LETTER MOTION addressed to Judge Ronnie Abrams from James M. Branden dated July 17, 2019 re: Adjournment of Pre-Sentence Report Objections and Sentencing . Document filed by Paul Calder Le Roux. (Branden, James) (Entered: 07/17/2019) |
| 07/18/2019 | 11 | AMENDED LETTER MOTION addressed to Judge Ronnie Abrams from James M. Branden dated July 18, 2019 re: Adjournment of Pre-Sentence Report Objections and Sentencing . Document filed by Paul Calder Le Roux. (Branden, James) (Entered: 07/18/2019) |
| 07/18/2019 | 12 | ENDORSED LETTER as to Paul Calder Le Roux addressed to Judge Ronnie Abrams from Attorney James M. Branden dated July 18, 2019 re: I am modifying my July 17 request and now request that the sentencings be adjourned until October 21, 2019 or later. ENDORSEMENT: Application granted. Mr. Branden may file objections to the PSR by August 12, 2019. The sentence is adjourned to October 25, 2019 at 2:30 p.m. SO ORDERED. (Signed by Judge Ronnie Abrams on 7/18/2019) [*** NOTE: Also docketed in Criminal Case 12-Cr-489(RA), Doc.#46. ***] (bw) (Entered: 07/18/2019) |
| 08/09/2019 | 13 | SECOND LETTER MOTION addressed to Judge Ronnie Abrams from James M. Branden dated August 9, 2019 re: Adjournment of Pre-Sentence Report Objections . Document filed by Paul Calder Le Roux. (Branden, James) (Entered: 08/09/2019) |
| 08/09/2019 | 14 | MEMO ENDORSED granting 13 LETTER MOTION Adjournment of Pre-Sentence Report Objections as to Paul Calder Le Roux (1)...ENDORSEMENT: Application granted. SO ORDERED. (Signed by Judge Ronnie Abrams on 8/9/19) (jbo) (Entered: 08/09/2019) |
| 10/11/2019 | 15 | ENDORSED LETTER as to Paul Calder Le Roux addressed to Judge Ronnie Abrams, from James M. Branden dated 10/10/2019 re: Defense counsel writes to request adjournment of sentencing. ENDORSEMENT: Application granted. the sentence is adjourned to December 11, 2019 at 1:00 p.m. (Sentencing set for 12/11/2019 at 01:00 PM |

A

| | | before Judge Ronnie Abrams) (Signed by Judge Ronnie Abrams on 10/11/2019) (Docketed in 12cr489 and 14cr75) (ap) (Entered: 10/11/2019) |
|---|---|---|
| 05/27/2020 | | ORDER as to Paul Calder Le Roux: The sentence has been adjourned to June 12, 2020 at 11:00 a.m. and will be held by video-conference. A separate Order will be posted to the docket with a call in number for public and press access. (Signed by Judge Ronnie Abrams on May 27, 2020)(arc) (Entered: 05/27/2020) |
| 06/08/2020 | 18 | ORDER as to Paul Calder Le Roux: On May 28, 2020, the Government filed its sentencing submission under seal. On June 7, 2020, Mr. LeRoux filed his unredacted sentencing submission under seal, and filed a redacted sentencing submission on the docket. The press and the general public have a qualified First Amendment right to attend criminal trials so that the "constitutionally protected discussion of government affairs is an informed one." Globe Newspaper Co. v. Superior Court for Norfolk Cty., 457 U.S. 596, 604-05 (1982). Open criminal proceedings "enhance[] both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system" by "assur[ing] that established procedures are being followed and that deviations will become known." PressEnterprise Co. v. Superior Court of California, Riverside Cty., 464 U.S. 501, 508 (1984). The qualified First Amendment right of access to criminal trials encompasses a qualified right to attend sentencing proceedings. United States v. Alcantara, 396 F.3d 189, 199 (2d Cir. 2005). "Access to sentencing proceedings allows the public to understand the reasons behind a given sentence, a value reflected in 18 U.S.C. § 3553(c), which states that sentencing shall be held in open court, in part to 'enable the public to learn why defendant received a particular sentence.'" United States v. Armstrong, 185 F. Supp. 3d 332, 335 (E.D.N.Y. 2016) (quoting Alcantara, 396 F.3d at 206). The public also has a qualified First Amendment right to access judicial documents if they are "derived from or are a necessary corollary of the capacity to attend the relevant proceedings," or if "logic and experience" support such accessthat is, if access "plays a significant positive role in the functioning of the particular process in question" and the documents "have historically been open to the press or general public." Hartford Courant Co. v. Pellegrino, 380 F.3d 83, 9293 (2d Cir. 2004) (quotations omitted) (finding a qualified First Amendment right to access criminal docket sheets); see also United States v. Amodeo, 71 F.3d 1044, 1050 (2d Cir.1995) (discussing common law presumption of access to documents concerning cooperation and noting that, "[w]here filing with the court is unusual or is generally under seal," presumption of access is weaker). "The qualified First Amendment right of access should be abridged only where there is a higher value or compelling interest that will be significantly harmed by public access and the sealing is narrowly tailored to protect that interest." Armstrong, 185 F. Supp. 3d at 336 (citing Globe Newspaper, 457 U.S. at 60607; United States v. Aref, 533 F.3d 72, 82 (2d Cir.2008)). "The safety of a cooperating defendant can constitute a compelling interest that may be weighed against a First Amendment presumption of access." Id. (citation omitted). So too can the government's interest in the secrecy of its investigations and in securing cooperation in future cases. See id. (citing United States v. Smith, 985 F.Supp.2d 506, 531 (S.D.N.Y.2013); Amodeo, 71 F.3d at 1050). Where release of information is likely to cause persons in the particular or future cases to resist involvement where cooperation is desirable, that effect should be weighed against the presumption of access." Amodeo, 71 F.3d at 1050. Here, Mr. LeRoux has already testified publicly at the trials of Joseph Hunter, Adam Samia and Carl David Stillwell as a cooperating witness. United States v. Hunter et al., S10 13 Cr. 521 (RA), Dkts. 576, 578, 580, 581 (S.D.N.Y. Apr. 4-9, 2018). "Other judges, faced with similar facts, have found that, where information regarding a cooperator is already public in some form, the government interest in protecting any materials containing that information disappears, and the public's right to access necessarily prevails." Armstrong, 185 F. Supp. 3d at 337-8 (citing United States v. Huntley, 943 F.Supp.2d 383, 387 (E.D.N.Y.2013); In re Application to Unseal, 891 F.Supp.2d 296, 300 (E.D.N.Y.2012); United States v. Key, 2010 WL 3724358, at *2-3 (E.D.N.Y. Sept. 15, |

A

2010)). At least one court, however, has noted that "while alternate sources of information lessen the government interest in secrecy, they also diminish the urgency of the public's need for the sealed materials." Id. With these competing interests in mind, the Court holds that the public's qualified First Amendment right of access would be unduly abridged if either sentencing submission remains entirely under seal or in redacted form without sufficient justification. No later than June 9, 2020 at 5 PM, the parties shall meet and confer and either file their sentencing submissions in unredacted form on the docket, or file redacted versions thereof along with an explanation as to how those redactions are narrowly tailored to a compelling interest. To the extent either party believes it necessary to file its explanation of any redactions under seal, it may do so in the first instance. SO ORDERED. (Signed by Judge Ronnie Abrams on 6/8/2020) (lnl) (Entered: 06/08/2020)

| 06/09/2020 | 19 | ORDER as to Paul Calder Le Roux: In connection with the sentencing of Defendant Paul Calder Leroux, scheduled for Friday, June 12, 2020, the Government shall submit a letter no later than Thursday, June 11, at 12:00 p.m. informing the Court: (1) If it disagrees with any of the representations made in Mr. Leroux's submission; (2) At the time he began to cooperate with law enforcement, what Guideline range Mr. Leroux would have been facing; (3) If there are analogous cases in or out of this district that the Court should consider in terms of the egregiousness of the defendant's conduct, as well as the extent of his assistance to law enforcement; and (4) Its view as to whether Mr. Leroux continues to present a danger to any particular individuals or the community at large. If Mr. Leroux would like to respond prior to sentencing, he shall do so no later than Thursday, June 11, at 5:00 p.m. SO ORDERED. (Signed by Judge Ronnie Abrams on 6/9/2020) (lnl) (Entered: 06/09/2020) |
|---|---|---|
| 06/10/2020 | 20 | ORDER as to Paul Calder Le Roux: The CourtCall video sentencing is scheduled for Friday June 12, 2020 at 11:00 a.m. Members of the public and the press can use the following dial-in information: Dial-In Number: 855-268-7844 Access Code: 67812309# PIN: 9921299# SO ORDERED. (Sentencing set for 6/12/2020 at 11:00 AM before Judge Ronnie Abrams) (Signed by Judge Ronnie Abrams on 6/10/2020) (lnl) (Entered: 06/10/2020) |
| 06/10/2020 | 21 | ORDER as to Paul Calder Le Roux: In a June 8, 2020 Order, the Court held that the public's qualified First Amendment right of access would be unduly abridged if either party's sentencing submission remains entirely under seal or in redacted form without sufficient justification. The Court directed the parties to meet and confer and either file their sentencing submissions in unredacted form on the docket, or file redacted versions thereof along with an explanation as to how those redactions are narrowly tailored to a compelling interest. On June 9, 2020, the Government filed a proposed redacted sentencing submission under seal, along with a letter providing the justifications for its proposed redactions. The Court approves most of the Government's proposed redactions. On page 1, however, with the exception of the names of Mr. LeRoux's biological parents, there is no compelling justification for the proposed redactions because this biographical information about Mr. Leroux is already publicly available in the unredacted portions of the sentencing submission that Mr. LeRoux himself filed on the docket on June 7, 2020. Dkt. 17. All of the remaining proposed redactions, however, are narrowly tailored to the compelling interests of protecting the privacy of third parties, see United States v. Amodeo ("Amodeo II"), 71 F.3d 1044, 1050-51 (2d Cir. 1995) ("[t]he privacy interests of innocent third parties... should weigh heavily in a court's balancing equation.") (citation omitted), protecting Mr. LeRoux's safety, see United States v. Armstrong, 185 F. Supp. 3d 332, 336 (E.D.N.Y. 2016) (citations omitted), and protecting the secrecy of the Government's investigations, see United States v. Amodeo ("Amodeo I"), 44 F.3d 141, 147 (2d Cir. 1995); Amodeo II, 71 F.3d at 1050; United States v. Smith, 985 F.Supp.2d 506, 531 (S.D.N.Y.2013). Accordingly, the Government shall promptly file its sentencing submission on the docket with all of its proposed redactions, with the exception of the |

| | | |
|---|---|---|
| | | redactions on page 1 other than the names of Mr. LeRoux's biological parents. The Government shall also file the redacted version of its letter. Also on June 9, 2020, Mr. LeRoux filed a letter under seal stating, "After meeting and conferring with the government, we submit the redactions that both parties agree are unnecessary." (emphasis added). Mr. LeRoux has not, however, provided a justification for all the redactions that he believes are narrowly tailored to a compelling interest, as required by the Court's June 8, 2020 Order. No later than 5 PM on June 10, 2020, he shall do so, along with a revised version of his sentencing submission that redacts only those porti ons for which he provides a justification. (Signed by Judge Ronnie Abrams on 6/10/2020) (lnl) (Entered: 06/10/2020) |
| 06/10/2020 | 22 | LETTER MOTION addressed to Judge Ronnie Abrams from United States dated June 9, 2020 re: Sealing and Redacted Filing *(Redacted)*. Document filed by USA as to Paul Calder Le Roux. (Lockard, Michael) (Entered: 06/10/2020) |
| 06/10/2020 | 23 | SENTENCING SUBMISSION by USA as to Paul Calder Le Roux. (Lockard, Michael) (Entered: 06/10/2020) |
| 06/10/2020 | 24 | MEMO ENDORSEMENT as to Paul Calder Le Roux on (DE# 63 in Case No. 12-cr-489) LETTER by Paul Calder Leroux addressed to Judge Ronnie Abrams from Jeffrey Chabrowe, Esq. dated June 10, 2020 re: Request for Deadline Extension on Defendant's Redaction Request. ENDORSEMENT: Application granted. SO ORDERED. (Signed by Judge Ronnie Abrams on 6/10/2020) (lnl) (Entered: 06/11/2020) |
| 06/11/2020 | 25 | ORDER as to Paul Calder Le Roux: In a June 8, 2020 Order, the Court held that the public's qualified First Amendment right of access would be unduly abridged if either partys sentencing submission remains entirely under seal or in redacted form without sufficient justification. The Court directed the parties to meet and confer and either file their sentencing submissions in unredacted form on the docket, or file redacted versions thereof along with an explanation as to how those redactions are narrowly tailored to a compelling interest. On June 10, 2020, the Court approved most of the Government's proposed redactions, and the Government filed its redacted sentencing submission on the docket. On June 11, 2020, Mr. LeRoux filed a proposed redacted sentencing submission under seal, along with a letter providing the justifications for his proposed redactions. The Court approves Mr. LeRoux's proposed redactions, as they are narrowly tailored to the compelling interests of protecting the privacy of third parties, see United States v. Amodeo ("Amodeo II"), 71 F.3d 1044, 1050-51 (2d Cir. 1995) ("[t]he privacy interests of innocent third parties... should weigh heavily in a courts balancing equation.") (citation omitted), protecting Mr. LeRoux's privacy and safety, see United States v. Armstrong, 185 F. Supp. 3d 332, 336 (E.D.N.Y. 2016) (citations omitted), and protecting the secrecy of the Governments investigations, see United States v. Amodeo ("Amodeo I"), 44 F.3d 141, 147 (2d Cir. 1995); Amodeo II, 71 F.3d at 1050; United States v. Smith, 985 F.Supp.2d 506, 531 (S.D.N.Y.2013). Accordingly, Mr. LeRoux shall promptly file his redacted sentencing submission on the docket, as well as a redacted version of his letter regarding his proposed redactions. SO ORDERED. (Signed by Judge Ronnie Abrams on 6/11/2020) (lnl) (Entered: 06/11/2020) |
| 06/12/2020 | | Minute Entry for proceedings held before Judge Ronnie Abrams:Sentencing held on 6/12/2020 for Paul Calder Le Roux (1) Count 1,2,3. AUSA Michael Lockard present. Defendant Paul Calder Leroux present with attorneys Jeffrey Chabrowe and James Branden. Defendant waives his in person appearance and consents to proceed by video conference. Court reporter Paula Speer present. See Judgment for terms of sentence. (jw) (Entered: 06/12/2020) |
| 06/30/2020 | 32 | **PREMATURE** - TRANSCRIPT REQUEST *(FORM B)* by Paul Calder Le Roux. No transcript ordered. (tp) (Entered: 08/03/2020) |

| | | |
|---|---|---|
| 06/30/2020 | 33 | **PREMATURE -** NOTICE OF APPEAL by Paul Calder Le Roux. (tp) (Entered: 08/03/2020) |
| 07/10/2020 | 26 | ORDER as to Paul Calder Le Roux: On June 12, 2020, the Court sentenced Mr. LeRoux to 300 months imprisonment on a total of seven counts, namely Counts One through Four of 12-CR-489 and Counts One through Three of 14-CR-75. Upon reviewing the transcript of the sentencing proceeding, however, the Court has determined that the breakdown it provided for each of the underlying counts was partially in error. Accordingly, the Court will hold an additional sentencing proceeding on July 20, 2020 at 9 AM to clarify the breakdown of Mr. LeRoux's sentence on the record. In addition, no later than July 15, 2020, the parties shall submit their proposed forfeiture order to the Court. (Sentencing set for 7/20/2020 at 09:00 AM before Judge Ronnie Abrams) (Signed by Judge Ronnie Abrams on 7/10/2020) (ap) (Entered: 07/10/2020) |
| 07/15/2020 | 27 | ORDER as to Paul Calder Le Roux: The CourtCall video sentencing is rescheduled for Friday July 24, 2020 at 9:00 a.m. Members of the public and the press can use the following dial-in information: Dial-In Number: 855-268-7844, Access Code: 32091812#, PIN: 9921299#. (Sentencing set for 7/24/2020 at 09:00 AM before Judge Ronnie Abrams) (Signed by Judge Ronnie Abrams on 7/15/2020) (Docketed in 12cr489 and 14cr75) (ap) (Entered: 07/15/2020) |
| 07/15/2020 | 28 | Sentencing Letter by USA as to Paul Calder Le Roux addressed to Hon. Ronnie Abrams from United States dated 7/15/2020 re: Proposed Order of Forfeiture. (Attachments: # 1 Text of Proposed Order)(Lockard, Michael) (Entered: 07/15/2020) |
| 07/17/2020 | 29 | PRELIMINARY ORDER OFFORFEITURE as to Paul Calder Le Roux. (Signed by Judge Ronnie Abrams on 7/17/2020) (See ORDER set forth, Three certified copies forwarded to AUSA Alexander Wilson) (ap) (Entered: 07/17/2020) |
| 07/23/2020 | 30 | MEMO ENDORSEMENT as to Paul Calder Le Roux on (DE# 77 in Case No. 1:12-cr-00489-RA) LETTER by Paul Calder Leroux addressed to Judge Ronnie Abrams from Jeffrey Chabrowe, Esq. dated July 23, 2020 re: Request to Adjourn Additional Sentencing Hearing. ENDORSEMENT: No later than July 27, 2020, the parties shall confer and file a joint letter proposing alternative dates for the hearing to clarify Mr. LeRoux's sentence. SO ORDERED. (Signed by Judge Ronnie Abrams on 7/23/2020) (lnl) (Entered: 07/23/2020) |
| 07/28/2020 | 31 | ENDORSED LETTER as to Paul Calder Le Roux addressed to Judge Ronnie Abrams from Jeff Chabrowe dated 7/27/2020 re: Reschedule Sentencing....ENDORSEMENT: Application granted. The sentence is scheduled for August 20, 2020 at 9:00 a.m. and will be held by video conference ( Sentencing set for 8/20/2020 at 09:00 AM before Judge Ronnie Abrams.) (Signed by Judge Ronnie Abrams on 7/28/2020)(jw) (Entered: 07/28/2020) |
| 08/18/2020 | 34 | ORDER as to Paul Calder Le Roux. The CourtCall video sentencing is scheduled for Thursday August 20, 2020 at 9:00 a.m. Members of the public and the press can use the following dial-in information: Dial-In Number: 855-268-7844 Access Code: 32091812# PIN: 9921299# Refer to Docket #12 cr 489 (Signed by Judge Ronnie Abrams on 8/18/20) (jw) (Entered: 08/18/2020) |
| 08/19/2020 | 35 | ENDORSED LETTER as to Paul Calder Le Roux addressed to Judge Ronnie Abrams from Jeffrey Chabrowe dated 8/18/20 re: Reschedule Sentencing.ENDORSEMENT: Application granted. The sentencing is hereby adjourned to September 10, 2020 at 9am and will be held via video conference(Sentencing set for 9/10/2020 at 09:00 AM before Judge Ronnie Abrams.) (Signed by Judge Ronnie Abrams on 8/19/2020)(jw) (Entered: 08/20/2020) |
| 09/08/2020 | 36 | ORDER as to Paul Calder Le Roux. The CourtCall video sentencing is scheduled for Thursday September 10, 2020 at 9:00 a.m. Members of the public and the press can use |

| | | the following dial-in information: Dial-In Number: 855-268-7844 Access Code: 32091812# PIN: 9921299# SO ORDERED. (Signed by Judge Ronnie Abrams on 9/8/2020) (jbo) (Entered: 09/08/2020) |
|---|---|---|
| 09/10/2020 | | Minute Entry for proceedings held before Judge Ronnie Abrams: Sentencing held on 9/10/2020 for Paul Calder Le Roux (1) Count 1,2,3. Sentence held. Defendant waives his in person appearance and consents to proceed by video conference. AUSA Michael Lockard present. Defendant Paul Calder Leroux present. Defense counsel Jeffrey Chabrowe present. Court reporter Pam Utter present. See Judgments for terms of sentence. (Court Reporter Pam Utter) (ap) (Entered: 09/10/2020) |
| 09/10/2020 | 37 | JUDGMENT IN A CRIMINAL CASE as to Paul Calder Le Roux (1). THE DEFENDANT: pleaded guilty to counts (1),(2),(3). Any open counts are dismissed on the motion of the United States. IMPRISONMENT: 60 months on Count 1; 240 months on Count 2; 240 months on Count 3, all to run concurrent. This sentence is also to run concurrent to the sentence imposed in 12 Cr. 489, which will result in a total of 300 months. The defendant is remanded to the custody of the United States Marshal. SUPERVISED RELEASE: Three years on Counts (1),(2) and (3), to run concurrently. This term of supervised release is to run concurrent to the term of supervision imposed in 12 Cr. 489. See SPECIAL CONDITIONS OF SUPERVISION. ASSESSMENT: $300.00 due immediately. The defendant shall forfeit the defendant's interest in the following property to the United States: A separate Order of Forfeiture was issued on July 17, 2020 and is incorporated into this Judgment. (Signed by Judge Ronnie Abrams on 9/10/2020) (ap) (Entered: 09/10/2020) |
| 10/02/2020 | 38 | TRANSCRIPT REQUEST *(FORM B)* by Paul Calder Le Roux. No transcript ordered. (tp) (Entered: 10/02/2020) |
| 10/02/2020 | 39 | NOTICE OF APPEAL by Paul Calder Le Roux from 37 Judgment. (tp) (Entered: 10/02/2020) |
| 10/02/2020 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet as to Paul Calder Le Roux to US Court of Appeals re: 39 Notice of Appeal - Final Judgment. (tp) (Entered: 10/02/2020) |
| 10/02/2020 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files as to Paul Calder Le Roux re: 39 Notice of Appeal - Final Judgment were transmitted to the U.S. Court of Appeals. (tp) (Entered: 10/02/2020) |
| 10/05/2020 | 40 | SENTENCING SUBMISSION by Paul Calder Le Roux. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit, # 6 Exhibit, # 7 Exhibit, # 8 Exhibit, # 9 Exhibit, # 10 Exhibit, # 11 Exhibit, # 12 Exhibit, # 13 Exhibit, # 14 Exhibit, # 15 Exhibit, # 16 Exhibit, # 17 Exhibit, # 18 Exhibit, # 19 Exhibit, # 20 Exhibit, # 21 Exhibit, # 22 Exhibit, # 23 Exhibit, # 24 Exhibit, # 25 Exhibit, # 26 Exhibit, # 27 Exhibit, # 28 Exhibit, # 29 Exhibit, # 30 Exhibit, # 31 Exhibit, # 32 Exhibit, # 33 Exhibit, # 34 Exhibit, # 35 Exhibit, # 36 Exhibit, # 37 Exhibit, # 38 Exhibit, # 39 Exhibit, # 40 Exhibit, # 41 Exhibit, # 42 Exhibit, # 43 Exhibit, # 44 Exhibit, # 45 Exhibit, # 46 Exhibit, # 47 Exhibit, # 48 Exhibit, # 49 Exhibit, # 50 Exhibit, # 51 Exhibit, # 52 Exhibit, # 53 Exhibit, # 54 Exhibit, # 55 Exhibit, # 56 Exhibit, # 57 Exhibit, # 58 Exhibit, # 59 Exhibit, # 60 Exhibit, # 61 Exhibit, # 62 Exhibit, # 63 Exhibit, # 64 Exhibit, # 65 Exhibit, # 66 Exhibit)(Chabrowe, Jeffrey) (Entered: 10/05/2020) |
| 10/09/2020 | | USCA Appeal Fees received $ 505.00, receipt number 465401268023 as to Paul Calder Le Roux on 10/9/2020 re: 39 Notice of Appeal - Final Judgment filed by Paul Calder Le Roux. (tp) (Entered: 10/09/2020) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 04/07/2021 11:45:05 | | | |
| PACER Login: | bgr22697 | Client Code: | |
| Description: | Docket Report | Search Criteria: | 1:14-cr-00075-RA |
| Billable Pages: | 11 | Cost: | 1.10 |

A

Criminal Notice of Appeal - Form A

# NOTICE OF APPEAL

### United States District Court

Southern _____ District of _____ New York

RECEIVED
JUN 30 2020
S.D.N.Y. - APPEALS

Caption:

United States
_____ v.

Leroux
_____

Docket No.: 12-cr-489; 14-cr-75 (RA).

Judge Ronnie Abrams
_____
(District Court Judge)

Notice is hereby given that __defendant Paul Calder Leroux_____ appeals to the United States Court of

Appeals for the Second Circuit from the judgment |✔|, other | _____

entered in this action on _____.    (specify)
                          (date)

This appeal concerns: Conviction only |____   Sentence only |✔|   Conviction & Sentence |____   Other |____

Defendant found guilty by plea |✔| trial |   | N/A [    .

Offense occurred after November 1, 1987? Yes |✔, No [     N/A [

Date of sentence: __June 12, 2020_____ N/A |___|

Bail/Jail Disposition: Committed |✔'   Not committed |   , |  N/A |

Appellant is represented by counsel? Yes ✔ | No |      If yes, provide the following information:

| | |
|---|---|
| Defendant's Counsel: | Jeffrey Chabrowe, Esq. |
| Counsel's Address: | 261 Madison Ave. 12th Floor |
| | New York, NY 10016 |
| Counsel's Phone: | (917) 529-3921 |
| Assistant U.S. Attorney: | Michael Dennis Lockard |
| AUSA's Address: | One Saint Andrews Plaza |
| | New York, NY 10007 |
| AUSA's Phone: | (212) 637-2527 |

Signature

A                              296

AO 245B (Rev. 09/19) Judgment in a Criminal Case
Sheet 1

(form modified within District on Sept. 30, 2019)

# UNITED STATES DISTRICT COURT

Southern District of New York

| | |
|---|---|
| UNITED STATES OF AMERICA | } |
| v. | } **JUDGMENT IN A CRIMINAL CASE** |
| Paul Calder Leroux | } |
| | } Case Number: 14 Cr. 75 (RA) |
| | } USM Number: 67464-054 |
| | } Jeffrey Chabrowe (917) 529-3921 |
| | Defendant's Attorney |

## THE DEFENDANT:

☑ pleaded guilty to count(s)  (1), (2), (3)

☐ pleaded nolo contendere to count(s) _____
which was accepted by the court.

☐ was found guilty on count(s) _____
after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18USC371 | Conspiring to Introduce into Interstate Commerce Misbranded | 9/26/2012 | (1) |
| 18USC1349 | Conspiracy to Commit Mail and Wire Fraud | 9/26/2012 | (2) |
| 18USC1956(h) | Conspiracy to Commit Money Laundering | 9/26/2012 | (3) |

The defendant is sentenced as provided in pages 2 through _____7_____ of this judgment. The sentence is imposed pursuant to
the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s) _____

☑ Count(s)  Any open counts  ☐ is  ☑ are  dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence,
or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution,
the defendant must notify the court and United States attorney of material changes in economic circumstances.

6/12/2020
Date of Imposition of Judgment

_____
Signature of Judge

Ronnie Abrams, U.S.D.J.
Name and Title of Judge

9/10/2020
Date

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page ____2____ of ____7____

DEFENDANT: Paul Calder Leroux
CASE NUMBER: 14 Cr. 75 (RA)

# IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:

60 months on Count 1; 240 months on Count 2; 240 months on Count 3, all to run concurrent.

This sentence is also to run concurrent to the sentence imposed in 12 Cr. 489, which will result in a total of 300 months.

☐ The court makes the following recommendations to the Bureau of Prisons:

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ ☐ a.m. ☐ p.m. on _____ .

    ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on _____ .

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

Defendant delivered on_____to_____

at_____, with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

A

298

Print this page now | Reset this page

Include this page when printing?

Sheet 3 — Supervised Release

DEFENDANT:  Paul Calder Leroux
CASE NUMBER: 14 Cr. 75 (RA)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

Three years on Counts (1), (2) and (3), to run concurrently.

This term of supervised release is to run concurrent to the term of supervision imposed in 12 Cr. 489.

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   ☑ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☑ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq*.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

Include this page when printing?

Yes    No